# EXHIBIT A

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Aaron Greenspan (*Pro Se*)
956 Carolina Street
San Francisco, CA  94107-3337
Phone: +1 415 670 9350
Fax: +1 415 373 3959
E-Mail: aaron.greenspan@plainsite.org

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**06/12/2024**
**Clerk of the Court**
BY: JAMES FORONDA
Deputy Clerk

## SUPERIOR COURT OF CALIFORNIA
## COUNTY OF SAN FRANCISCO

AARON GREENSPAN, an individual,

        Plaintiff,

            v.

ELON MUSK, an individual, TESLA, INC., a
Delaware corporation, X CORP., a Nevada
corporation formerly known as TWITTER,
INC., EXCESSION, LLC, a Texas Limited
Liability Company, JARED BIRCHALL, an
individual, MORGAN STANLEY &
COMPANY, LLC, a Delaware Limited
Liability Company, OMAR QAZI, an
individual, SMICK ENTERPRISES, INC., a
Delaware corporation, SINGER CASHMAN,
LLP, a California partnership, ADAM S.
CASHMAN, an individual, ALLISON
HUEBERT, an individual, ADAM G. MEHES,
an individual, and ALEX SPIRO, an individual,
and DOES 1-10, inclusive,

        Defendants.

Case No.  **CGC-24-615352**

**COMPLAINT FOR:**

1.  Defamation Per Se
2.  Defamation
3.  Violation of Anti-Stalking Statute,
    Civil Code § 1708.7, *et seq.*
4.  Negligent Infliction of Emotional
    Distress
5.  Abuse of Process
6.  Malicious Prosecution
7.  Negligence
8.  Conspiracy
9.  Violation of California Business
    and Professions Code § 17200

DEMAND FOR JURY TRIAL

Plaintiff, Aaron Greenspan, alleges the following causes of action and requests for relief:

### INTRODUCTION

1.      Defendant Elon Musk is the centi-billionaire, self-declared "Technoking" of

Defendant Tesla, Inc. ("Tesla"), which manufactures electric vehicles and sells solar energy and

battery products.  He has attracted and cultivated a literal cult following, both among his

customer base and on Twitter, the social network Defendant Musk purchased in 2022 for $44 billion and renamed X (hereinafter "Twitter").

2.     Tesla has relied upon accounting tricks and grandiose promises, many of which are now the subject of multiple investigations by federal and state government agencies, to boost its stock price, cement inclusion in the S&P 500, and construct a false narrative of success.

3.     Such deceptive devices were necessary to distract investors from the fact that up through 2021 or later, Defendant Tesla was the largest Ponzi scheme in history—one that just happened to produce cars. New investors cashed out the old while executives, such as Defendant Musk, were rewarded ever more handsomely through stock-based compensation as the company lost ever more money and covered it up.

4.     Defendant Tesla's main product is its stock, which by 2018 made it of particular interest to Defendant Musk's collective arch-nemesis: short-sellers.

5.     On July 14, 2021, under oath, Defendant Musk's brother and Tesla Director Kimbal Musk summarized his family's approach to business, stating, "If you are the CEO of a company, you have relentless optimism or go find another job." The Musks' "relentless optimism" often veered into outright falsehood, however.

6.     In 2018, the United States Securities and Exchange Commission ("SEC") charged Defendant Musk with securities fraud. Defendants Musk and Tesla signed binding Consent Decrees and each paid a $20 million fine. The SEC has since commenced several additional investigations against Defendants Musk and Tesla for violations of securities laws.

7.     In 2023, the Delaware Court of Chancery invalidated Defendant Musk's 2018 executive compensation package worth $56 billion, finding that Defendants Musk and Tesla misled shareholders leading up to and during a defective voting process.

8.     While scapegoating short-sellers to distract from their fraudulent acts, Defendants conspired to spin and support a narrative centered around supposedly autonomous cars with "Full Self-Driving" ("FSD") features that led to a precipitous increase in Tesla's stock price throughout 2020 and 2021, making Defendant Musk the wealthiest person in the world with a net

worth of over $200 billion.

9.      It was therefore shocking when Defendant Musk admitted on the record in late 2020 that the short-sellers had been right all along: that Tesla had been on the verge of bankruptcy from "mid 2017 to mid 2019," rendering its investor disclosures, showing adequate cash, and lacking any "going concern" statements, totally fraudulent.  In sum, Defendant Musk fed investors non-stop lies to avoid a "self-fulfilling prophecy" that would cause Tesla's "death." Though he told hundreds of these lies himself, the conspiracy also involved Musk's proxies.

10.      Defendant Omar Qazi, individually and through his corporation, Defendant Smick Enterprises, Inc. ("Smick" and together, "Qazi"), was and remains a ferocious paid propagandist for Defendants Musk and Tesla, having authored and/or coordinated over 318,000 tweets praising Tesla and scapegoating its critics—plus essays, podcasts, and promotional videos touting Tesla's FSD features.  For the sake of comparison, Yevgeny Prigozhin ("Putin's Chef") employed a "troll-factory" that "generated one of the largest known online disinformation campaigns, churning out 71,000 tweets" according to Bellingcat in 2020.

11.      Defendant Musk is an officer, director and employee of Defendant Tesla.  Under *respondeat superior* doctrine, Defendant Tesla is liable for the actions of Defendant Musk performed in connection with its business.  Similarly, Defendant Smick is liable for Omar Qazi.

12.      Defendant Qazi, who has been criminally charged in at least two unrelated cases, is a Tesla shareholder, customer, and paid agent of Defendant Tesla.  Since Qazi is a paid agent of Defendant Tesla working at its direction, Defendant Tesla is also liable for Defendant Qazi's and Defendant Smick's actions.

13.      Defendant Qazi's antics, including but not limited to 1) recording Tesla FSD demonstration videos that secretly employed the use of at least one "cheat device" to make autonomous driving appear smoother, with fewer interruptions; 2) hiding problems with his own Tesla vehicle, including a persistent squeaking noise, from viewers, while he pleaded with Tesla service to fix the problems so that they did not impact his videos; 3) leading a mob that attempted to frame Plaintiff for possession of child pornography; and 4) constantly disparaging

Plaintiff during a years-long smear campaign, attracted a following of tens of thousands of Musk's supporters and numerous detractors before he was banned from and by Twitter for life.

14.    Today, Defendant Qazi has over 475,000 followers on Twitter.  One of those followers is Defendant Musk, who frequently uses Defendant Qazi's posts as springboards for official Tesla communications.

15.    Especially after Defendant Musk disbanded Defendant Tesla's formal Public Relations team in late 2019, Defendant Qazi filled in for its role, often working as a tag team with Defendant Musk to hurl accusations and falsehoods concerning Plaintiff, among other topics, in order to discredit Plaintiff's document-based research on Defendants Tesla and Musk.

16.    Internal Tesla documents provided to Plaintiff corroborate that Defendants made false and misleading statements in SEC filings—repeatedly misleading and lying to investors about Tesla's main metric of "deliveries," inflating cash balances, promising non-existent futuristic "robotaxis," and glossing over hundreds of millions of dollars worth of factory waste, among other issues—to manipulate Tesla's share price skyward.

17.    For his part, Defendant Musk has already generally admitted to market manipulation, having stated "I might pump but I don't dump" during a conference panel broadcast worldwide on July 21, 2021.

18.    The SEC recognizes social media as a potential manipulative "device" pursuant to the Securities and Exchange Acts.  Indeed, social media has been instrumental to Musk's unprecedented "pump" of Tesla's stock price, which culminated in a market capitalization of over $1.2 trillion at its peak: about twenty times the peak market capitalization of Enron, and more than the *combined* valuation of the rest of the automotive industry, e.g. Toyota, Volkswagen, Mercedes, General Motors, BMW, Honda, Fiat-Chrysler, Ford, Nissan and Suburu.

19.    After being banned from Twitter, Defendant Qazi returned under the guise of a new shared account, still acting as an agent of Defendants Musk and Tesla, until his further provocations triggered a backlash in the same community of zealots that had previously been so supportive of his at-times-criminal harassment.  So he appropriated a yet another new Twitter

account, which he shared with unknown Defendants Does 1-10 in order to evade liability.

20.    As Defendants Qazi and Smick assisted Defendant Musk with the suppression of legitimate criticism from Plaintiff and other short-sellers and journalists, Defendants Excession, LLC ("Excession"), Jared Birchall, and Morgan Stanley & Company, LLC ("Morgan Stanley") assisted Defendant Musk with the direct manipulation of Tesla's share price in response to that criticism.

21.    Defendant Birchall, who has a documented history of using aliases, including but not limited to "James Brickhouse," as well as hiring at least one convicted felon to drum up misinformation for Defendant Musk, is the head of Excession, Defendant Musk's family office, which manages Musk's wealth in conjunction with the Elon Musk Revocable Trust Dated July 22, 2003.  Defendant Birchall was formerly employed by Defendant Morgan Stanley, from which he was fired in 2016.  According to discovery documents originating in a different lawsuit, Defendant Birchall worked with Morgan Stanley employees Michael Grimes and Kate Claassen and former employee Kyle Corcoran to execute deliberately manipulative and secret stock trades on Defendant Musk's behalf while evading Morgan Stanley's compliance department and the advice of legal counsel.  Such activity is consistent with Musk's SEC disclosures.

22.    Through thousands of false and misleading statements and material omissions broadcast directly to millions, and indirectly to millions more through the media, Defendants successfully and unlawfully "pumped" the stock price of TSLA common shares from an average of $167.66 per share during the period of June 29, 2010 (the date of Defendant Tesla's Initial Public Offering) through September 23, 2018 (the day before Plaintiff first purchased put options) to $6,217.50 per share (split-adjusted) as of November 1, 2021, a 3,608% increase.

23.    After Defendants Musk and Tesla manipulated successive quarterly financial statements to make it appear as though Tesla had turned a profit, which then qualified Tesla for inclusion in the S&P 500 index on December 21, 2020, Tesla's stock peaked in November 2021 and then began to fall.  Today, it trades at less than 50% of its peak value.

24.    Despite its peak market capitalization of approximately $1.2 trillion, as of the date of filing, Defendant Tesla for years had no permanent General Counsel.  Three of its prior General Counsels and an Acting General Counsel resigned from November 2018 through mid-2021 (Todd Maron, Dane Butswinkas, Jonathan Chang, Al Prescott), as did two prior Chief Financial Officers (Jason Wheeler [who resigned in 2017], Deepak Ahuja) and two Chief Accounting Officers (Eric Branderiz, Dave Morton).  Tesla then burnt through two more General Counsels or equivalent officers (Bill Berry, Dinna Eskin) and another Chief Financial Officer (Zach Kirkhorn).

25.    Defendant Musk has primarily relied on an attorney unlicensed in California, Defendant Alex Spiro, to do his bidding in a state where it is unlawful for Defendant Spiro to practice law on a regular basis.

26.    Plaintiff sued Defendants Musk, Tesla, Qazi and Smick in federal court in the Northern District of California on May 20, 2020.  *See Greenspan v. Qazi et al*, Case No. 3:20-cv-03426-JD (N.D. Cal. *filed* May 20, 2020) (the "Federal Case").  Plaintiff's federal claims were dismissed with prejudice; the state claims were dismissed without prejudice and are re-filed herein.  The district court ruling's decision in this regard was upheld on appeal, with the United States Court of Appeals for the Ninth Circuit's mandate issued June 10, 2024.

27.    In the Federal Case, Defendants Musk and Tesla were initially represented by Cooley, LLP, which withdrew when Defendant Musk fired the entire firm because it hired an attorney who previously worked on a Musk investigation at the SEC.  Cooley, LLP was replaced by Quinn Emanuel Urquhart and Sullivan, LLP, for which Defendant Spiro works.

28.    Defendant Spiro never paid his *pro hac vice* fees in the Federal Case—part of a pattern evidenced by roughly a dozen other cases in which Defendant Spiro also failed to file required paperwork or pay fees.  At Defendant Musk's instruction, Defendant Spiro also provided legal advice to Defendant Qazi on Plaintiff's Federal Case then pending in California, despite not being licensed to do so.

29.    In 2022, Defendant Musk, who regularly abuses LSD, ketamine, tranquilizers,

and various other illegal narcotics according to *The Wall Street Journal*, publicly announced that he was "out for blood" and setting up a "hardcore litigation department." For its debut, he engaged Defendants Singer Cashman, LLP, Adam S. Cashman, Allison Huebert, and Adam G. Mehes (the "Hardcore Litigation Department") to file a frivolous lawsuit against Plaintiff (the "Alameda Case")—the first lawsuit Defendant Musk had ever filed in his individual capacity— in the Superior Court of California for Alameda County in retribution for Plaintiff's work on exposing Defendants' fraudulent acts. *See Musk v. Greenspan*, Case No. 23CV028370 (Alameda County *filed* February 24, 2023). The lawsuit's initial and only complaint (the "Alameda Complaint") was full of substantive and typographical errors and came to a close in July 2023 after it was voluntarily dismissed.

30. On June 13, 2023, X Corp. suspended Plaintiff's @AaronGreenspan and @PlainSite Twitter accounts, which had become vital resources for journalists covering Defendants Musk and Tesla. Both accounts were suspended simultaneously at approximately 1:15 P.M. for purported violations of the Twitter Terms of Service, but even after filing several so-called "appeals," Plaintiff was never told precisely what the purported violations were beyond "Violating our rules against posting private information." Nor was Plaintiff told how both accounts were found to be in violation at the same time, or what the "private information" was.

31. Throughout all of this, Defendant Qazi continuously libeled Plaintiff. Defendant Musk, on behalf of Defendant Tesla, explicitly approved of and encouraged it. Eventually, through Defendants X Corp. and Smick, Defendant Musk began paying Defendant Qazi for it.

32. Defendants' collective actions are part of an overt, disturbing, and at this point well-documented pattern in which Defendants have repeatedly incited on-line mobs against anyone who dares question or criticize them. Defendants smeared Plaintiff as mentally ill, a psychiatric patient, a rapist, a pedophile, a child molester, a likely school shooter, a stalker, a conspiracy theorist and more, all in service of one of the largest frauds in American history.

## **PARTIES**

33. Plaintiff Aaron Greenspan is an individual residing in San Francisco County in

the State of California.  Plaintiff is not a public figure.

34.    Defendant Musk is a public figure who controls Tesla, Inc., X Corp., and Excession, LLC, among other companies, who frequently works in California, and who lived in California during much of the relevant timeframe.

35.    Defendant Tesla, Inc. is a corporation based in Texas with operations in Alameda, Los Angeles, Santa Clara, San Francisco, San Joaquin, and San Mateo Counties in California. Its common stock trades on the NASDAQ Global Select Market under the ticker symbol "TSLA."

36.    Defendant X Corp., formerly Twitter, Inc., is a Nevada corporation with offices based in San Francisco County.

37.    Defendant Excession, LLC is a Texas Limited Liability Company.  It is Defendant Musk's family office, which manages his wealth.

38.    Defendant Jared Birchall is an individual who resides in Texas, but who lived in and worked in California during much of the relevant timeframe.  He works for Elon Musk.

39.    Defendant Morgan Stanley & Company, LLC is a Delaware Limited Liability Company with offices in California.  It provides investment banking services to Elon Musk.

40.    Defendant Omar Qazi is an individual residing at least part-time in San Francisco County who also does business in Los Angeles, Santa Clara and San Francisco Counties in California.

41.    Defendant Smick Enterprises, Inc. is a Delaware corporation unregistered with the California Secretary of State or Franchise Tax Board, which thus does not pay California taxes, but nevertheless operates in Santa Clara and San Francisco Counties.

42.    Defendant Singer Cashman, LLP is a California limited liability partnership that represented Elon Musk in the Alameda Case.

43.    Defendant Adam S. Cashman is an attorney licensed in California, State Bar No. 255063, who represented Elon Musk in the Alameda Case.  Mr. Cashman is a named partner at Singer Cashman, LLP.  He signed the Alameda Complaint on behalf of Elon Musk naming

Plaintiff as a defendant, which he had a legal obligation to review before filing.  He also signed the predecessor document to the Alameda Complaint.

44.    Defendant Allison Huebert is an attorney licensed in Texas, Bar Card No. 24124694, working for Tesla, Inc., but who represented Elon Musk in the Alameda Case.  Her name appears on the Alameda Complaint naming Plaintiff as a defendant, which she had a legal obligation to review before filing.

45.    Defendant Adam G. Mehes is an attorney licensed in Texas, Bar Card No. 24133603, working for X Corp. and/or Tesla, Inc. but who represented Elon Musk in the Alameda Case.  His name appears on the Alameda Complaint naming Plaintiff as a defendant, which he had a legal obligation to review before filing.  His name also appears on the predecessor document to the Alameda Complaint.

46.    Defendant Alex Spiro is an attorney licensed in New York who caters to celebrity clients working on behalf of Tesla, Inc. and Elon Musk.  His has been the subject of a motion for criminal sanctions brought by the State of Florida and routinely practices law in California without a license.  Defendant Spiro was also the subject of a sanctions motion in Texas.

## JURISDICTION AND VENUE

47.    The Court has personal jurisdiction over Defendants.  Defendant Qazi resides in San Francisco County.  Defendants Tesla, Inc., X Corp., Smick Enterprises, Inc., Morgan Stanley & Company, LLC, Singer Cashman, LLP and Adam S. Cashman maintain a place of business in San Francisco County.  All Defendants have taken advantage of the benefits and privileges of the laws of the State of California and have purposefully availed themselves of the California market.

48.    Venue is proper in this Court pursuant to Code of Civil Procedure § 393 because Defendants' violations of law occurred largely in the City and County of San Francisco.

## FACTUAL BACKGROUND

### *Tesla Stock Promoter Omar Qazi Inserts Himself Into A Dangerous Situation*

49.    Plaintiff is an investor who previously held put options in Tesla, Inc. common

stock.  Plaintiff invested in TSLA put options because he believed that Defendant Tesla's business was fundamentally overvalued by the market.  When Plaintiff began purchasing Tesla, Inc. securities he had no knowledge of any alleged fraud involving Defendant Tesla except for limited knowledge from news reports of Defendant Musk's August 2018 false "funding secured" tweet.

50.    Plaintiff is also a data journalist who runs a legal information service called PlainSite, which hosts tens of millions of court and agency dockets, government documents, and profiles.  PlainSite handles privacy requests on a case-by-case basis.  Consequently, a variety of individuals are occasionally upset that their information is in the public domain.

51.    One individual, Diego MasMarques, Jr., convicted of murder and attempted murder in Spain and charged with other crimes domestically, made death threats directed at Plaintiff over the fact that his convictions were public to the point where Plaintiff applied for and was granted a two-year restraining order against him.  *See Greenspan v. MasMarques*, Santa Clara County Superior Court Case No. 18CH008067 (the "Civil Harassment Case").  *See also Greenspan v. MasMarques et al*, Massachusetts District Court Case No. 1:23-cv-10134-DJC.

52.    On various websites, Mr. MasMarques, who has a documented history of mental illness, also posted thousands of libelous fabrications falsely alleging that Plaintiff and his family members had committed a wide variety of crimes ranging from setting up a "fraudulent" non-profit organization, to tax evasion, to extortion, to the hacking of his e-mail account.

53.    On January 13, 2019, Plaintiff posted on Twitter from the @PlainSite account warning Defendants Musk and Tesla that a customer had recorded a video of a Tesla Model 3 center console that was unresponsive while driving.  Defendants Musk and Tesla did not respond, but the next day, January 14, 2019, a Twitter account, "@tesla_truth" (posing as "Steve Jobs") did, falsely writing, "Aaron, the center touch screen has nothing to do with driving the car," and ending with, "Good luck in court on Tuesday for violating that restraining order," even though Plaintiff had not violated any order.

54.    Upon information and belief, on January 14, 2019, Mr. MasMarques and/or one

of his sympathizers began feeding Defendant Qazi false information concerning Plaintiff on Twitter, and the @tesla_truth account amplified that misinformation without bothering to verify its accuracy.  At approximately the same time as @tesla_truth first responded, a since-deleted Twitter account, @Tom34079930, replied to a @tesla_truth post falsely stating in part, "Aaron Greenspan went last year to a judge and lied to get a restraining order on Diego.  The judge was pissed when she found out he lied.  Now the restraining order is on Aaron and he violated it."  The @Tom34079930 account also falsely wrote to @tesla_truth, "Greenspan is a tax cheat."

55.     Plaintiff did not at any point solicit feedback from @tesla_truth.  Its owner attacked Plaintiff over a public safety concern, much as it had previously attacked journalists.

56.     The @tesla_truth account then began re-posting and linking to many more of the libelous and deranged posts that were the subject of the unrelated Civil Harassment Case, some of which featured Plaintiff's parents' home address, a photograph of their home, and the name of their synagogue, alongside serious and false accusations about Plaintiff and his family.

57.     The owner of the @tesla_truth account admitted, "I haven't researched many details about all the complaints against Aaron," displaying reckless disregard for the truth.

58.     An attempt via Direct Message ("DM") to discuss the seriousness of the matter and the associated safety concerns with @tesla_truth's owner was not fruitful.  The owner of the account refused to stop and continued making public antagonizing statements on Twitter, including, "Jail all shorts," echoing Defendant Musk's notorious scapegoating of short-sellers.

59.     Plaintiff sent a link via DM to the @tesla_truth account owner to a PDF file hosted on his personal website of Twitter posts concerning the Civil Harassment Case.  When the account owner clicked on the link, Plaintiff's server logs yielded the account owner's DNS hostname and IP address: c-73-71-59-42.hsd1.ca.comcast.net and 73.71.59.42, respectively.  Given the alarming safety concerns associated with the Civil Harassment Case, Plaintiff searched PlainSite's server logs for any associated usage history, and found that a user with the same IP address had searched for "smick enterprises," a company run by Defendant Qazi.

60.     Given the number of people the account owner had already harassed, Plaintiff

publicized a redacted form of this information to warn of the danger Defendant Qazi posed.

61. Defendant Qazi later admitted to using the @tesla_truth Twitter account.

62. The same day, still concerned about the danger posed to his family and others at synagogues mentioned in some of the posts, Plaintiff attempted to contact Defendant Qazi by phone at his employer's office as determined by his LinkedIn profile, but was unable to reach him. Plaintiff informed an unknown female supervisor that he had asked Defendant Qazi to stop and considered his conduct dangerous, harassing and libelous. At the time, Plaintiff did not know that Defendant Qazi's "employer" was actually Qazi's father's company. Plaintiff did not ask to speak with Defendant Qazi's father or any of his family members when he called. Plaintiff simply conveyed that Defendant Qazi's dangerous conduct should cease immediately.

### *Omar Qazi Steps Up His Campaign of Criminal Harassment*

63. The next day, on January 15, 2019 at 7:01 P.M. (all times herein are Pacific Time unless otherwise specified) Plaintiff received a harassing phone call from a blocked telephone number. The anonymous male caller impersonated a service technician who initially only said he was calling from "the phone company," and asked for Plaintiff's home address. Since the caller refused to identify "the phone company," and since AT&T does not customarily call from blocked numbers for service appointments, Plaintiff refused to divulge any information. Defendant Qazi later admitted to placing this harassing phone call both privately and publicly.

64. The @tesla_truth Twitter account, posing as "Steve Jobs," was eventually suspended by Twitter for violating its terms of service. It was permitted to continue operating only by renaming itself to "Steve Jobs *[sic]* Ghost" and by falsely identifying as a so-called "parody" account, even though the account's primary purpose was not to parody Steve Jobs, but to promote Defendants Musk and Tesla by abusing the imprimatur of Apple, Inc.'s co-founder.

65. In mid-July 2019, the @tesla_truth account once again began posting false and misleading information about Plaintiff and the Civil Harassment Case. Such posts continued through late October 2019 and inspired harassment from others.

66. On August 2, 2019 at 11:24 P.M., via the @PlainSite Twitter account, Plaintiff

reported on a public video posted by Defendant Qazi on the @tesla_truth account advertising

Tesla's so-called "Autopilot" functionality.  The video depicted a black Tesla Model 3 driving

through a red stoplight on Autopilot without the driver's hands on the steering wheel as required.

Although Defendant Qazi later claimed not to be the driver, he has not denied that the vehicle

was his, and he claimed to own the video's copyright.

*Omar Qazi Leads a Mob That Tries To Frame Plaintiff for Possession of Child Pornography*

67.     The next day, on August 3, 2019 starting at 7:49:32 A.M., an internet user with

the DNS hostname ip72-203-123-36.oc.oc.cox.net in or around Rancho Palos Verdes, California

accessed documents hosted on PlainSite from the Civil Harassment Case.

68.     Less than 20 minutes later, on August 3, 2019 at 8:07 A.M., the @tesla_truth

Twitter account posted an altered and false version of Form CH-100 from Plaintiff's Civil

Harassment Case, replacing the "Person From Whom Protection Is Sought" with the name

"Little Billy Watkins" and an age of "5" (referring to a fictional five-year-old child).  The altered

document also contained Plaintiff's phone and fax number alongside the text:

> "BREAKING: Aaron Greenspan of Plainsite has been arrested after trying to beat up a
> group of kids in the playground after a failed child abduction. The kids ended up doing a
> number on him and now he has filed a restraining order against them.  Should've known
> they would fight back."

69.     Fifteen minutes later, on August 3, 2019 at 8:22 A.M., at the same phone number

posted by Defendant Qazi as part of the altered Form CH-100, Plaintiff received several text

messages from an unknown telephone number, +1 408 767 6349, shown below:



These text messages falsely alleged that Plaintiff had "child pornography" and "[pornographic]

images of underage kids" on his computer and threatened to "call the police" accordingly.

70.     Seven minutes later, on August 3, 2019 at 8:29 A.M., Plaintiff received a fax on

the fax number posted by Defendant Qazi as part of the altered Form CH-100 from an unknown fax number, +1 415 969 2047, purporting to be from "Kids R Us" with a cover page message of, "Aaron, let me know if you need more.  Full price this time please."  The next page contained a monochrome pornographic image of a teenage young woman.  Plaintiff immediately reported the harassing text messages and pornographic fax to the Federal Bureau of Investigation ("FBI").

71.    Eight minutes later, on August 3, 2019 at 8:37 A.M., Defendant Qazi used the @tesla_truth Twitter account to post regarding Plaintiff, "he was just posting some stuff about me in his feed so I wanted to mess with him a little bit."

72.    A similar anonymous fax from the same fax number was reportedly sent to another critic of Tesla, Paul Huettner, in December 2018.  That fax, with the same cover page style, reportedly contained a thinly veiled death threat purporting to be from "Elon Musk."

73.    In light of these events, on August 7, 2019 at 3:27 P.M., Plaintiff e-mailed the Tesla Board of Directors, including Defendant Musk, with questions and concerns about Defendant Tesla's relationship with Defendant Qazi.  Plaintiff never received a response.

74.    On August 7, 2019 at 6:38 P.M., Defendant Qazi admitted to further harassment and to the destruction of evidence by posting from his @OmarQazi Twitter account:

"I did make the joke post about Aaron getting beat up by kids or whatever with his contact info I got from PlainSite.  Did it for fun because he posted tweeted *[sic]* about me.  Deleted it later that day.  Nothing personal against Aaron."

75.    In a DM conversation with a third party from September 27, 2019, Defendant Qazi admitted, "[I] take responsibility for what my followers do too and [I] take it seriously."

76.    On August 8, 2019 at 11:13 P.M., Defendant Musk responded to e-mailed, on-the-record questions from Plaintiff with a screenshot of false information stemming from libelous posts by Diego MasMarques, Jr., along with the words, "Your true colors …"

77.    Especially after Plaintiff was able to obtain previously confidential court documents from Delaware Court of Chancery Case No. 12711-VCS, *In Re Tesla Motors, Inc. Stockholder Litigation* (the "SolarCity Case"), including deposition transcripts of Defendant Musk, on a nearly daily basis, the @tesla_truth account posted dozens of false statements—

hundreds in aggregate—regarding Plaintiff, his family, and his non-profit organization.  These harassing statements were read by a wide audience of at least 10,000-35,000 followers.  Virtually all were published to promote Defendant Tesla's stock, its products, and Defendant Musk.

78.    On or around September 28, 2019, an internet user with the same last two cell phone digits as Defendant Qazi (37) created a Twitter account with the username @PlainShite (and a name of "Plain Shit") that made use of the PlainSite name and logo without permission.

79.    On the morning of October 9, 2019, *Bloomberg Businessweek* published an article by Zachary Mider referring to Defendant Musk, profiling Defendant Qazi, and stating:

> "The billionaire CEO, who declined to be interviewed for this story, replied to his fan [Defendant Qazi via e-mail] the same day [in August 2019]. 'Your Twitter is awesome!' he said, before adding a warning: 'Please be wary of journalists. They will sweet talk you and then wack *[sic]* you with a baseball bat.'  Musk cc'd me on the message.  Tesla also declined to comment."

The article contained a photograph of Defendant Qazi next to his black Tesla Model 3 and referred to the @tesla_truth account as a "bottomless font of Muskolatry."

80.    On October 9, 2019 at 2:53 P.M., Plaintiff published a copy of a Twitter DM conversation in which Defendant Qazi admitted that he had an "out of control revenge impulse" and that he had made the harassing telephone call to Plaintiff from a blocked number on January 15, 2019 "to fuck with him," though Defendant Qazi misrepresented the call's contents in several respects.  In this same conversation, Defendant Qazi also made reference to an unknown "Jim" who had contributed to or provided input for the @tesla_truth account in January 2019.

81.    To the extent that Defendant Qazi at any point denies having authored statements attributed to him on @tesla_truth or other social media accounts, they were authored by other employees and/or agents of Defendant Tesla with Defendant Qazi's supervision and approval.

82.    On October 9, 2019 at 3:09 P.M., regarding Plaintiff, the @tesla_truth Twitter account posted: "i'm going to drag his name through the mud until the day he does *[sic]*. I want everyone to know the true facts about who he really is..."

### *Elon Musk Personally Participates In The Harassment Campaign*

83.    On October 9, 2019 at 3:34 P.M., Plaintiff e-mailed a Notice of Intent to Sue and

Evidence Preservation Notice to Defendant Musk, attorneys at Defendant Tesla and SpaceX, Defendant Qazi, James Gleeson, and SEC Regional Director Erin Schneider.

84.    Also at 3:48 P.M., Defendant Musk replied by e-mail to all parties, including the SEC, with the message, "Does the psych ward know you have a cell phone? Just curious." (the "Musk Reply").  Defendant Musk then replied to all parties again, in reference to Defendant Qazi's response, with two laugh/crying emojis.  None of the responses had any substantive bearing on the Notice of Intent to Sue and Evidence Preservation Notice whatsoever and were accordingly not pre-litigation communications.  Nor did either of Defendant Musk's responses pertain to an active legal proceeding or a particular legal matter then under review.

85.    Also at 3:48 P.M., Defendant Qazi posted on the @tesla_truth Twitter account a screenshot of the e-mail containing Plaintiff's Notice of Intent to Sue and Evidence Preservation Notice to Elon Musk, without redacting any of Plaintiff's contact information.

86.    At 3:51 P.M., Defendant Qazi further posted a screenshot of Elon Musk's response, falsely suggesting that Plaintiff resided in a "psych ward."

87.    At 3:56 P.M., Defendant Qazi posted an image of the screenshot of the Notice of Intent to Sue and Evidence Preservation Notice zoomed in on Plaintiff's contact information alongside the text, "If you would like to contact Aaron for pranks you can email or call him using the info listed below. Remember that all pranks will be recorded, so give it your best shot."

88.    As a result of Defendants' actions, Plaintiff received unwanted telephone calls, e-mails and messages, and hundreds of additional libelous messages were posted publicly.

### *Omar Qazi Targets Plaintiff's Family for Further Harassment*

89.    The following day, on October 10, 2019 at approximately 11:00 A.M., Defendant Qazi created a fake Twitter account impersonating Plaintiff's father, Dr. Neil S. Greenspan.  The Twitter account's handle, deliberately intended to confuse others, was @greenspan_neil.  The account did not identify itself as a parody account and was not a parody account.

90.    Via Twitter, Defendant Qazi admitted that he used and/or uses the "catch all" feature on Google Apps (since renamed to G Suite and Google Workspace) to receive all e-mails

addressed to smick.com, including e-mails connected to numerous fake accounts on Twitter.

91. Defendant Smick uses and/or owns the domain name smick.com.

92. On Thursday, October 10, 2019, Plaintiff filed a Digital Millennium Copyright Act ("DMCA") takedown request with Twitter, Inc. regarding the copyrighted photograph Mr. Qazi used to impersonate Plaintiff's father. Consequently, Twitter removed the photograph. Defendant Qazi replaced it with a different copyrighted photograph of Plaintiff's disabled brother and changed the name on the account to Plaintiff's brother's name, Simon Greenspan. Plaintiff reported Defendants' harassment to the San Francisco Police Department ("SFPD"). The SFPD desk officer decided of his own volition to focus on the pornographic fax sent to Plaintiff and accordingly classified his police report as relating to child pornography.

93. On Friday, October 11, 2019, among other messages, Defendant Qazi wrote, "I hate my brother" from the fake @greenspan_neil account now posing as "Simon Greenspan." In a separate exchange on the same day with Twitter account @enL3X1, who asked, "Are you a parody or actually his brother?" Defendant Qazi wrote, "yeah I'm his little brother haha."

94. Plaintiff's brother is not active on Twitter and never has been.

95. On October 11, 2019, Defendant Qazi created websites using servers owned or leased by Defendant Smick Enterprises, Inc. (the "Smick Sites") containing copyrighted photographs of Plaintiff and his family members with the bold headline, "It's plain to see: This fraudulent charity is FULL OF SHIT." The text continued in part:

> "Have you been harassed, intimidated, threatened or targeted for extortion by Aaron Greenspan, his fraudulent 'Think Foundation' 'Charity', or board members Neil Greenspan or Judy Greenspan? You are not alone."

The website's source code contained the hidden HTML, "<!-- fuck you aaron -->".

96. The Smick Sites mainly echoed Mr. MasMarques's allegations: that Plaintiff's non-profit organization was a "fraudulent charity" and that Plaintiff and his family "harassed, intimidated, or targeted for extortion" individuals. Defendant Qazi claimed to have engaged "Lantham & Watkins" and wrote "56 people" had submitted "verified testimonies" to the site(s).

97. On October 15, 2019, the Smick Sites were updated to copy the appearance of the

PlainSite website and the misspelled reference to Latham & Watkins was removed.  Defendant Qazi updated the bold headline to: "Have you been a victim of harassment, intimidation, extortion, sexual assault, identity theft, or cyberstalking by Aaron Greenspan? You are not alone. The victims of Aaron Greenspan Foundation is gathering evidence of Aaron Greenspan's crimes to finally bring this criminal to justice."  The supposed "Victims of Aaron Greenspan Foundation" does not exist and never has.  Defendant Qazi changed the false number of people who had submitted "testimonies" to "956," corresponding to Plaintiff's home address.

98.  Later iterations of the Smick Sites increased the number of submitted "testimonies" to various numbers in the thousands, added HTML page titles such as "PlainSite :: Fake Charity Comitting *[sic]* Securities Fraud" and included other libelous hidden comments.

99.  On October 15, 2019 at approximately 10:52 P.M., Defendant Qazi contacted Plaintiff's disabled brother via Facebook Messenger.

100.  On October 16, 2019, Defendant Qazi removed the PlainSite source code from the Smick Sites, but left posted the bold headline accusing Plaintiff of several crimes and the copyrighted photographs of Plaintiff's family members, including Plaintiff's brother.

101.  On Friday, October 18, 2019 at 7:06 P.M., one of Defendant Qazi's harassing Twitter accounts, @PlainShite—intended to impersonate and disparage Plaintiff's company's trademarked brand, PlainSite—publicly accused Plaintiff of "attacking and slandering" others.

102.  On October 18, 2019 at 7:34 P.M., Plaintiff wrote to Defendant Qazi via e-mail stating, "If I've said anything objectively false I'd like to know what so that I can correct the record."  At 8:24 P.M., Defendant Qazi responded via e-mail, stating, "Thanks for writing. I will write back to you tomorrow, or Sunday if I don't get time tomorrow."  He never responded further, despite later falsely claiming in public that Plaintiff had failed to engage.

103.  Defendant Qazi solicited information about Plaintiff's supposed "crimes" from thousands of followers, but only two "testimonies" initially appeared on the Smick Sites: "M's TESTIMONY," and "P'S TESTIMONY," a haphazard PDF compilation of Mr. MasMarques's false allegations submitted by Defendant Qazi's friend, a conspiracy theorist and Elon Musk

obsessive named Amelia "Mia" Tracey of Sydney and Melbourne, Australia, but posted anonymously. Neither of these posts described any actual crime committed by Plaintiff or his family members, let alone any actual "victim" of Plaintiff, as none exist.

*Even With Omar Qazi Banned From Twitter, His Libel and Harassment Continues*

104. Defendant Qazi's harassment of Plaintiff led to the temporary suspension of Defendant Qazi's accounts. On or around October 22, 2019, Defendant Musk wrote an e-mail to Twitter, Inc. CEO Jack Dorsey in support of Defendant Qazi while disparaging Plaintiff.

105. On or about October 24, 2019, Twitter permanently banned Defendant Qazi, disabling @OmarQazi, @tesla_truth, @PlainShite, @greenspan_neil, and @SmickTrump.

106. On October 31, 2019, Defendant Qazi posted an essay on wholemars.org, a domain name and server controlled by Defendant Smick, entitled, "Steve Jobs is dead." In it, Defendant Qazi admitted that his @tesla_truth account was suspended repeatedly for various legal violations including impersonation, and that it was registered to teslatruth@smick.com.

107. In response, Defendant Qazi set up open-source software called Mastodon on a server belonging to Defendant Smick. On November 1, 2019, Defendant Qazi published an essay on wholemars.org thanking his supporters and inviting them to use Mastodon, where he posted false and libelous statements about Plaintiff without fear of Twitter intervening. (At various points in time, Smick's "wholemars" domain names have redirected to each other.)

108. On Saturday, November 2, 2019, Sascha Pallenberg, formerly of Daimler AG, wrote from his Twitter account, "Let me just be crystal clear about Omar Qazi. He harassed me, colleagues and dozens of people in the industry over various fake accounts!" Pallenberg is one of several automotive industry consultants and professional journalists who contacted Plaintiff to confirm that Defendant Qazi had harassed them as well. One journalist informed Plaintiff that Defendant Qazi had been banned from physically entering a building by corporate security.

109. Also on November 2, 2019, an unknown individual created a profile using Plaintiff's name and e-mail address without permission on the pornographic website Pornhub.

110. On November 6, 2019, an unknown individual using the Wikipedia username

"Cihwcihw" made their first edit to Wikipedia since signing up five years prior: the alteration of an article about Plaintiff, in order to supposedly "be more impartial and includ[e] additional details." In fact, this user only changed and added false content about Plaintiff, referencing Defendant Qazi's website while parroting his false claims about Plaintiff.

### *The Tesla Cult Fractures, with Omar Qazi Scapegoating Plaintiff*

111.   On April 29, 2020, Defendant Musk erupted into an angry tirade on Defendant Tesla's Q1 2020 earnings call, calling local public health officials "fascist." At one point, Defendant Musk was disconnected from his own earnings call, possibly by his own lawyers.

112.   On May 9, 2020, Defendant Musk ignited further controversy by threatening to sue, and days later suing, Alameda County over its implementation of the multi-county Shelter-In-Place Order concerning COVID-19, which curtailed Tesla's manufacturing in Fremont. Defendant Musk then instructed his employees to violate the Shelter-In-Place Order and return to work and risk death, or in the alternative, risk losing unemployment benefits. Soon after, Musk posted an image on Twitter falsely implying that he had defied the Shelter-In-Place Order.

113.   Many supporters of Defendants Musk and Tesla were, for once, appalled by Musk's erratic behavior and disregard for human life. On May 12, 2020, *Electrek* editor Frederic Lambert wrote an editorial critical of Musk and the "toxic" Twitter account @thirdrowtesla: a video podcast led by Defendant Musk's most ardent supporters, including Defendant Qazi.

114.   Signaling the vital importance of his work harassing Tesla's critics, Defendant Musk appeared with Defendant Qazi in a 3.5-hour Third Row Tesla video interview filmed at one of Defendant Musk's Los Angeles homes and published on February 9, 2020. The below photograph depicts Defendant Qazi (far right) with Defendant Musk (far left) and Tesla Director Kimbal Musk (second from right with cowboy hat) at the recording session:



115.    Also pictured is non-party Vivien "Viv" Hantusch, seated to the right of Defendant Musk, who secretly began working for Tesla full-time in the "Office of the CEO" starting in or around 2020, in a position with salary and lucrative stock options.



116.    Even as she worked for Tesla and Musk, Hantusch steadfastly refused to admit her formal association, posting thousands of messages promoting Tesla and other Musk businesses from her @flcnhvy Twitter account with over 100,000 followers by 2021.

117.    Due in part to the criticism from even friendly bloggers like Lambert, who had now labeled Third Row Tesla "toxic," Hantusch disapproved of Qazi's handling of the Third Row Tesla Twitter account, leading to a rift in the group.

118.    Defendant Qazi ultimately admitted authorship of Third Row Tesla's Twitter posts, thereby also admitting that he had deliberately contravened Twitter's lifetime ban.

119.    The fallout from the rift between *Electrek* and Third Row Tesla, both of which had served as cheerleaders for Defendant Tesla, led Defendant Qazi to author a 17,600-word screed on his website hosted by Defendant Smick, published on May 17, 2020 (the "Qazi Screed"). Entitled "Response to Frederic," it oddly invoked *Plaintiff*'s name at least 47 times.

120.    Virtually every statement concerning Plaintiff in the Qazi Screed was false or misleading. In some cases, Defendant Qazi cropped images to deliberately mislead his readers. Defendant Qazi also linked events that were chronologically impossible and omitted key facts.

121.    On May 20, 2020, Plaintiff filed the Federal Case against Defendants Qazi, Smick, Musk, and Tesla.

122.    On or around May 23, 2020, Defendant Qazi returned to Twitter once more via a proxy account, @WholeMarsLog, later renamed @WholeMarsBlog, set up for him by Tesla fan Scott Woods to assist with evasion of his lifetime ban. Defendant Qazi repeatedly made half-baked attempts to deflect blame onto Mr. Woods for his posts in the months that followed.

123.    On May 24, 2020, Third Row Tesla published "Episode 17" recorded on May 15, 2020, depicting Defendant Qazi wearing a shirt imprinted with a graph of TSLA's share price next to the text "Tesla $420.00," referring to Defendant Musk's false "funding secured" claim.



124.    On May 25, 2020, a federal holiday, Plaintiff's father received a phone call at 3:14 P.M. Eastern Daylight Time from a "Private Caller" on caller ID. The male caller identified himself only as working for the law firm Quinn Emanuel in connection with the Federal Case and calling on behalf of Defendants Musk and Tesla. The caller asked whether Plaintiff's father served on the Board of Directors of Plaintiff's non-profit organization and asked for his address.

125.    At 3:12 P.M. Eastern Daylight Time, two minutes prior to the call, Defendant

Qazi's @WholeMarsLog Twitter account had posted, "It's time for the board of Plainsite to face justice for their crimes," among other libelous statements.

126.    On June 8, 2020, Defendant Qazi boasted about his "Nikola shorts," indicating that despite his professed hatred of short-sellers, he had decided to become one himself because Nikola's purported hydrogen-powered truck competed with Tesla's purported electric truck.

127.    On July 16, 2020, Defendant Qazi referred to the mugshot (below right) associated with his arrest in Brevard County, Florida in connection with Case No. 05-2018-CF-010519-AXXX-XX for felony possession of a controlled substance (LSD) and misdemeanor possession of cannabis—as "my photo" from the @WholeMarsBlog account (below left), which established that Defendant Qazi controlled @WholeMarsBlog, and not Scott Woods.

 

128.    On or around July 25, 2020, Defendant Qazi posted a third document entitled "F'S TESTIMONY" and a link thereto on his Smick Sites purporting to be "testimony" from a "victim" of Plaintiff.  The document was yet another compilation of Diego MasMarques, Jr.'s posts authored once again by Amelia Tracey, who had also fabricated "P'S TESTIMONY."

129.    In or around August 2020, Defendant Qazi interviewed Nikola Corporation former CEO Trevor Milton and toured Nikola's headquarters in order to report insights back to Defendants Musk and Tesla on one of their potential competitors.

130.    On August 5, 2020, Defendant Qazi falsely and publicly accused Plaintiff of posting Defendant Qazi's phone number and e-mail address on the "Dark Web."

131.    On August 22, 2020, in order to cause Plaintiff worry and anxiety, Defendant Qazi began posting by name on his @WholeMarsBlog account about a female Harvard

University dean who Defendant Qazi erroneously believed was a college classmate of Plaintiff's.

132.    On August 25, 2020, Defendant Qazi made a photograph of Plaintiff's parents from a newspaper article the banner image for his @WholeMarsBlog account.

133.    After Plaintiff filed his Second Amended Complaint in the Federal Case on August 26, 2020, Defendant Qazi began a full-scale assault on Plaintiff's reputation to "drag his name through the mud" as promised, using at least twelve different websites: among them, Twitter, Hacker News, Mastadon, Quora, Reddit, Wikipedia, Amazon.com, SoundCloud, Anchor.fm, as well as sites owned by Defendants Qazi and/or Smick.

134.    On August 28, 2020, Defendant Qazi appeared on the "Inside Transportation" podcast.  As of July 31, 2021, the podcast had been listened to approximately 1,700 times.  The interview contained a litany of lies about Plaintiff and the admission at 13:30 that Defendant Musk was "very pissed" about Defendant Qazi being banned by Twitter in October 2019.

135.    On September 19, 2020, attempting to cause Plaintiff worry and anxiety, Defendant Qazi posted threats concerning law enforcement on his @WholeMarsBlog account, warning that Plaintiff's house was "completely bugged" due to a "warrant for a wiretap."

136.    On September 22, 2020, Defendant Qazi referred to Plaintiff as "twice as evil as Trevor [Milton]" on the @WholeMarsBlog account, twelve minutes after he had referred to Milton as someone who had "mollested [sic] his 15 year old cousin after a funeral."

137.    On September 24, 2020, Defendant Qazi posted links on his @WholeMarsBlog Twitter account to content authored by Diego MasMarques, Jr. and others on various gripe sites. Plaintiff had previously informed both Defendant Qazi and his counsel of the serious danger associated with the Civil Harassment Case, and again notified Qazi's counsel accordingly.

138.    On September 26, 2020, the @WholeMarsBlog Twitter account wrote "what aaron does to people is worse than murder IMHO", followed by a suggestion that Defendant Qazi was contemplating suicide.  Three days later, another cryptic suggestion appeared on @WholeMarsBlog falsely stating that Plaintiff would be responsible for Defendant Qazi's death.

139.    On October 1, 2020, a photograph of Plaintiff's mother appeared as the

background image on the @WholeMarsBlog Twitter account.

140.    On October 2, 2020, Plaintiff reported Defendant Qazi to SFPD a second time for internet harassment as the frequency of his harassing posts increased.

141.    On October 4, 2020, Defendant Qazi wrote that Plaintiff was "10x worse than [alleged child molester] Trevor Milton" and called him a "Truly sick person."  Defendant Qazi's Third Row Tesla colleague and confidant, Kristen Yamamoto, echoed Defendant Qazi's false allegations, writing, "—so you're *[sic]* daughter comes to you saying Trevor molested her & you tell her 'I have a bigger problem, Aaron Greenspan.' 🙁."  Defendant Qazi also posted a photograph of Plaintiff's disabled brother as the banner image of his @WholeMarsBlog account.

142.    On October 6, 2020, it was widely reported that at the direction of Defendant Musk, Defendant Tesla had shut down its entire Public Relations department months prior, leaving Defendant Musk and Qazi's Twitter accounts as the primary sources of information on social media about Defendant Tesla, nominally valued at hundreds of billions of dollars.

143.    On October 8, 2020, Ms. Yamamoto and Defendant Qazi recorded a podcast on the Anchor.fm platform in which Defendant Qazi referred to Plaintiff as "a giant piece of shit," "just insane," "crazy stalker guy," "delusional" and "loser."

144.    On October 9, 2020 at 11:43 P.M., from the @WholeMarsBlog Twitter account, Defendant Qazi wrote, "So it turns out nobody is really suspicious of a Tesla driving around Fremont / someone actually nodded and waved from security" as he photographed Defendant Tesla's factory, which is private property.  In contrast, on April 19, 2019, Randeep Hothi, a researcher of similar age and skin tone to Defendant Qazi, was subject to a Workplace Violence Civil Harassment Order filed by Defendant Tesla for observing the exact same factory by day.

145.    On October 17, 2020, Defendant Qazi retweeted a post by the @OfficialABQ Twitter account containing the text "Here's a message for Greenspam" above a cartoon image of one stick figure kicking another in the groin, causing it to collapse.  Twitter later removed this post for violating its rules prohibiting users from advocating violent conduct.

146.    On October 19, 2020, an unknown party created an unverified Anchor.fm account

in Plaintiff's name using Plaintiff's e-mail address, and then used the unverified account to send Defendant Qazi a recorded message *not* from Plaintiff, which Defendant Qazi then falsely and publicly cited as evidence of "harassment" by Plaintiff on his @WholeMarsBlog account.

147.    In late October 2020, Twitter, Inc. published a "Ban evasion policy" at https://help.twitter.com/en/rules-and-policies/ban-evasion, clarifying that Defendant Qazi was violating the Twitter Terms of Service by continuing to use the platform, directly or indirectly.

148.    On December 6, 2020, Defendant Qazi attempted to contact a friend of Plaintiff's via LinkedIn for an unknown reason.

149.    Upon information and belief, on December 8, 2020, Defendant Qazi used the Cihwcihw Wikipedia account to exclusively edit three pages involving Plaintiff.  The edits contained a misspelling that consistently appears in Defendant Qazi's writing.

150.    Also on or about December 8, 2020, Defendant Qazi created a new page on his personal website for "The Story," referring to his involvement with Plaintiff.  He promised readers that the saga would be told in installments, starting with an introduction that he published on December 15, 2020.  Between December 8th and 15th, Defendant Qazi published nine additional posts he referred to as "Apetizers" *[sic]* containing false and misleading statements about Plaintiff.  Each post, whether an "Apetizer" or formally part of "The Story," contained banner advertisements intended to produce financial gain for Defendant Qazi, as well as prominent links encouraging readers to donate to Defendant Qazi's legal defense funds via GoFundMe and PayPal.  The "Apetizers" alone were collectively 200 printed pages long.

151.    From December 9-11, 2020, the Cihwcihw Wikipedia account continued to smear Plaintiff on various Wikipedia articles by inserting false and misleading changes.

152.    On December 13, 2020, Defendant Qazi began publishing his series, "The Story," full of innumerable false and misleading statements and material omissions concerning Plaintiff. By January 11, 2021, the existing portions of "The Story" required 303 pages to print.

153.    Above and beyond those already enumerated, Defendant Qazi wrote over 100 pages of *additional* essays containing countless false statements about Plaintiff, including but not

limited to the grotesque falsehood that Plaintiff incited violence against Defendant Qazi.

154.    On January 7, 2021, with the price of TSLA common shares at or near all-time highs, Defendant Qazi celebrated his work, posting, "holy fucking shit we're all rich as fuck!!!"

### CLAIMS FOR RELIEF

### COUNT I
### Defamation Per Se
### Against Defendants Omar Qazi and Smick Enterprises, Inc.

155.    Plaintiff incorporates by reference the foregoing allegations.

156.    Starting on January 14, 2019 and even after the date of his ban by and from Twitter, Defendants Qazi and Smick made use of several Twitter accounts to publish constant, deliberate misinformation about Plaintiff and Plaintiff's family.

157.    From October 11, 2019 through present day, Defendants Qazi and Smick have employed a variety of domain names and websites, including but not limited to wholemars.com, wholemars.net, and wholemars.org to publish deliberate misinformation about Plaintiff and Plaintiff's family.

158.    Defendant Qazi made these false statements thousands of times with the hope that tarnishing Plaintiff's reputation and discrediting both Plaintiff's work and unrelated third-party court filings located by Plaintiff would increase or prevent any decrease in the value of TSLA shares.  Qazi was successful: TSLA shares increased in value, he was profiled in a major financial publication in connection with Defendant Musk, many of his followers began repeating his false claims about Plaintiff, and many refused to believe anything published by Plaintiff.

159.    Via Twitter and the Smick Sites, Defendants Qazi and Smick Enterprises, Inc. explicitly encouraged others to spread false statements and disinformation about Plaintiff.

160.    Defendant Qazi explicitly encouraged others to "harass" and "prank" Plaintiff.

161.    Defendant Qazi threatened, "any attempts to silence us will only make us louder."

162.    Defendants Qazi and Smick placed banner advertisements alongside their libelous statements about Plaintiff in order to derive further profits from their lies.

163.    Although Defendant Qazi published falsehoods, misleading barbs and reputation-

damaging accusations over a period of more than two years such that it is impossible to enumerate each and every one, select representative examples include:

| Statement No. / Date | Public Statement by Defendant Qazi | False / Misleading Aspects |
|---|---|---|
| 1<br><br>January 14, 2019 | "Strange how Aaron mentions that he think *[sic]* Diego wants to 'get in his pants'. Sounds like may be revealing some deeper desires there" | Plaintiff never said any such thing in any context or via any medium.  This statement falsely suggested a sexual attraction to Plaintiff's stalker.  That "Aaron mention[ed]" this statement on the particular website discussed in the post is provably false. |
| 2<br><br>September 28, 2019 | "Aaron Greenspan has child pornography at his house. I do not." | This statement explicitly and falsely accused Plaintiff of possessing child pornography, which would be a crime. The statement is provably false. |
| 3<br><br>September 30, 2019 | "To conclude, is anyone surprised Aaron Greenspan is a complete fraud? Every $tslaq I have looked into has committed serious crimes.<br><br>Aaron, know you have anger issues and like to 'do something' when you're mad but retaliating against me for reporting your fraud will make it worse" | This statement again explicitly mentioned Plaintiff and falsely accused him of fraud, and by referring to short-sellers including Plaintiff, "serious crimes."  This statement also falsely stated that Plaintiff suffers from a medical condition.  Plaintiff has never been diagnosed with "anger issues" or any similar medical condition. Defendant Qazi twisted a lone remark Plaintiff made at a memorial service for his deceased friend, Aaron Swartz. |
| 4<br><br>October 9, 2019 | "How will Aaron Greenspan, a criminal guilty of felony tax fraud with no lawyer, do in court against two guys with a lot more money than him?" | This post explicitly mentioned Plaintiff and stated that he is a "criminal guilty of felony tax fraud," which is false. Plaintiff has hired lawyers in various contexts over many years. |
| 5<br><br>October 15, 2019 | "Have you been a victim of harassment, intimidation, extortion, sexual assault, identity theft, or cyberstalking by Aaron Greenspan?<br><br>You are not alone.  The victims of Aaron Greenspan Foundation is gathering evidence of Aaron Greenspan's crimes to finally bring this criminal to justice" | This headline appeared on at least four of the known Smick Sites, directly and falsely implicating Plaintiff in numerous crimes.  The Smick Sites have *zero* actual accounts of Plaintiff committing any of the listed crimes because Plaintiff never committed them. |
| 6 | "he extorted $250,000 from | This statement is part of an essay on |

| November 1, 2019 | Mark Zuckerburg [*sic*]" | Defendant Qazi's website that explicitly names Plaintiff. Plaintiff did not extort Mark Zuckerberg or anyone else, making this statement provably false. |
|---|---|---|
| 7<br><br>May 25, 2020 | "Yes, Aaron Greenspan, Neil Greenspan, and Judith Greenspan.<br><br>As board members they presided over Plainsite's tax fraud, harassment of Tesla customers, and short and distort fraud." | Also posted on the @WholeMarsLog Twitter account, this statement falsely accused Plaintiff and his parents of various crimes. |
| 8<br><br>June 23, 2020 | "Aaron Greenspan abuses his charity to inure private benefit to himself.<br><br>His tax exempt status should and will be revoked, and he must pay back the taxes he illegally avoided." | From the @WholeMarsBlog Twitter account, where Defendant Qazi again falsely alleged that Plaintiff has committed tax crimes. The IRS did not identify any taxes that were "illegally avoided" in its recent audit of Think Computer Foundation, making the statement provably false. |
| 9<br><br>June 23, 2020 | "Aaron Greenspan is a cyberstalker who has been threatening and harassing Omar & others for years.<br><br>A common tactic used by cyber stalkers is false accusations and false victimization.<br><br>The harasser will try and make it look like they are the victim and use that to incite hate." | From the @WholeMarsBlog Twitter account, Defendant Qazi again falsely alleged that Plaintiff committed the crime of stalking while projecting his own actions onto Plaintiff. That Plaintiff has ever threatened Defendant Qazi with anything other than the instant litigation is provably false. |
| 10<br><br>July 10, 2020 | "I'm sad. Greenspan has stalked me and tried to hurt me so much, it can't even fit in a tweet. He rapes his victims, entering their mind and shattering their peace when they least expect it. You can't imagine it unless you've seen it first hand." | From the @WholeMarsBlog Twitter account, where Defendant Qazi falsely claimed that Plaintiff is a rapist. |
| 11<br><br>July 11, 2020 | "Aaron Greenspan had servers in New Jersey.<br><br>The same place the death threat | Here, Defendant Qazi falsely implied that Plaintiff had sent a Tesla super-fan a death threat across state lines, a criminal act, because Plaintiff's |

| | @JohnnaCrider0 got this week came from." | company once maintained a co-located server in New Jersey *in 2003*, which was provably de-commissioned and disconnected in March 2007. |
|---|---|---|
| 12<br><br>July 12, 2020 | "Even though Greenspan himself didn't publish the book, he didn't like people reading what he has to say because it establishes that he's been angry at the world and suffering from paranoid delusions since high school (or perhaps earlier)." | From Defendant Qazi's personal website in his "Aaron Greenspan Tries To Remove Book Review: How Evil People Abuse The DMCA To Silence Critics" post, in which he falsely describes Plaintiff as mentally ill. |
| 13<br><br>July 17, 2020 | "Aaron Greenspan is a serial rapist.<br><br>He enters his victims *[sic]* lives unannounced and unexpected, and rapes them while they're going about their lives, with their friends<br><br>You can't understand it unless you've been targeted by him. I will fight for all his victims — past and future." | From the @WholeMarsBlog Twitter account, where Defendant Qazi falsely claimed that Plaintiff is a serial rapist. |
| 14<br><br>July 17, 2020 | "saying that he harasses and threatens people just doesn't communicate the kind of person he is<br><br>he's a rapist<br><br>and the world will know the truth, no matter how hard he fights to keep it quiet" | From the @WholeMarsBlog Twitter account, Defendant Qazi again falsely claimed that Plaintiff is a rapist and insisted that it was the "truth." |
| 15<br><br>July 18, 2020 | "Aaron Greenspan stalks and harasses colleged *[sic]* aged girls! Creepy! Leave her alone!<br><br>@jack @Twitter Safety" | In this post, Defendant Qazi accused Plaintiff of harassment and stalking and flagged Twitter's safety team because Plaintiff wrote a single comment on the absurdity of a Third Row Tesla member publicly defending billionaire Jack Dorsey against outrage over Twitter (and @ElonMusk) being hacked. |
| 16<br><br>August 3, 2020 | "Scary. someone tried to hack into Omar's iCloud account, so it got locked and he had to reset | Defendant Qazi falsely accused Plaintiff of breaking into his iCloud account and of being a "criminal" as a result. |

| | | the password.<br><br>Added to the Greenspan criminal activity file…" | Plaintiff has never made any attempt of any kind to break into Defendant Qazi's accounts on any platform. This statement is provably false based upon server log evidence. |
|---|---|---|---|
| 17<br><br>August 21, 2020 | "Motives and profile of a Cyberstalker like Aaron Greenspan" [image of excerpt from "Motives and profile" section of Wikipedia article at https://en.wikipedia.org/wiki/Cyberstalking] | In this post, Defendant Qazi again falsely accused Plaintiff of the crime of "stalking" for a variety of completely inapplicable reasons. This is yet another example of Defendant Qazi projecting his own pathological obsession with and stalking of Plaintiff. |
| 18<br><br>August 21, 2020 | "Based on his cyberstalking and false police reports we have a good case to put him away for 5 and a half years" | In this post, Defendant Qazi again falsely accused Plaintiff of the crimes of "stalking" and filing a false police report, suggesting that Plaintiff would be incarcerated as a result. No criminal case against Plaintiff even exists. |
| 19<br><br>October 26, 2020 | "His rants are starting to sound like that of a Mass Shooter [sic]." | Defendant Qazi retweeted a post referring to Plaintiff by Twitter user @tesla_grl. |
| 20<br><br>November 30, 2020 | "Recently Martin Tripp has been working with Aaron Jacob Greenspan to threaten, harass and doxx Tesla customers." | This statement is baseless and false in several ways: Plaintiff has not ever "worked" with Martin Tripp, nor has Plaintiff ever taken any action against "Tesla customers." |
| 21<br><br>December 7, 2020 | "While researching the Aaron Greenspan story we've uncovered shocking evidence of massive fraud."<br><br>"we're talking about major organized criminal activity… this is some messed up stuff" | In two separate posts, both of which readers understood to refer to Plaintiff, Defendant Qazi falsely accused Plaintiff of unspecified "major organized criminal activity" and "massive fraud." |
| 22<br><br>December 8, 2020 | "Harvard Shut Down Aaron Greenspan's Website For Stealing Student Passwords" | Defendant Qazi falsely claimed that Plaintiff was stealing passwords, a possible violation of 18 U.S.C. § 1030, and that Harvard shut down Plaintiff's product. In reality, the product was secure and the university did not shut it down. Harvard administrators were misinformed by an overzealous student. |
| 23<br><br>December 8, 2020 | "I am trying to diagnose his various mental conditions, and believe he may have narcissistic personality disorder…" | From Defendant Qazi's personal website in his "Harvard Shut Down Aaron Greenspan's Website For Stealing Student Passwords" post, in |

|  |  | "What a psychopath."<br><br>"Aaron Greenspan clearly has serious mental health and anger issues that continue to this day." | which Defendant Qazi, who is neither a doctor nor qualified to offer a diagnosis in any way, again falsely portrays Plaintiff as mentally ill. |
|---|---|---|---|
| 24 | December 8, 2020 | "Given what we know about Aaron obsessively logging and storing all activity on his servers to try and use as blackmail, you can bet students were compromised the minute they signed up." | In this post, Defendant Qazi falsely accuses Plaintiff of having committed the crime of blackmail. |
| 25 | December 9, 2020 | "Greenspan has also admitted to anger issues that are completely out of control, driving him to seek revenge for even small or imagined slights." | In this post, Defendant Qazi again falsely portrays Plaintiff as mentally ill. This is textbook projection based on Defendant Qazi's self-described "out of control revenge impulse." There was no such admission by Plaintiff. |
| 26 | December 9, 2020 | "Well Aaron…FaceCash was shut down for violating financial regulations." | Here, Defendant Qazi falsely suggests that Plaintiff violated 18 U.S.C. § 1960. In fact, Plaintiff's company voluntarily shut down FaceCash *before* any violation could occur to ensure compliance with the law. |
| 27 | January 13, 2021 | "Aaron Greenspan has admitted that he is willing to resort to violence to silence us if his attempts at non-violent retaliation fail." | This assertion is completely false as no such admission or anything resembling such an admission was ever made. |
| 28 | April 6, 2021 | "Aaron Greenspan… He's like, you know, this very mentally ill guy…" | Defendant Qazi made this false verbal statement on a YouTube video podcast viewed approximately 1,700 times and hosted by a 13-year-old child. |
| 29 | June 13, 2021 | "Aaron Greenspan: 'Adolph [sic] Hitler was a great founder'" | Plaintiff is Jewish and does not believe that Adolf Hitler was "great" in any way. This quotation fabricated by Defendant Qazi falsely summarized a satirical post by Plaintiff highlighting the "just following orders" mentality pervasive in technology companies. |
| 30 | June 14, 2021 | "that's what a lot of people are concerned about" | This statement from the @WholeMarsBlog Twitter account affirming "He sounds like a future mass murderer" in response to the above post about Hitler falsely suggests Plaintiff's |

| | | intent to commit murder. |
|---|---|---|
| 31<br><br>July 18, 2021 | "Aaron Greenspan has gone to insane lengths to make sure nobody learns the truth about the Greenspan crime family and their fraudulent charity. They're ready to harass Omar for years if they have to. Telling people what's happening is the only thing keeping them from killing him" | This statement from the @WholeMarsBlog Twitter account falsely suggests Plaintiff's involvement in a conspiracy to commit murder. |
| 32<br><br>May 21, 2022 | "Aaron Greenspan has got to be sweating that they might find grounds to charge him criminally / Rumor has it Block was acting as the balance sheet (funding) for his short activism and harassment campaign." | There were and are no grounds for the United States Department of Justice, which Mr. Qazi was referring to, to charge Greenspan criminally. Complainant never has had any financial relationship directly or indirectly with short-seller Carson Block whatsoever, and Complainant has never run a "harassment campaign," let alone sought funding for one. |
| 33<br><br>July 3, 2022 | "Greenspan is probably going to appeal … Started stalking us a year or two before that. He's told us he's going to stalk us until the day he died or gets locked up." | Beginning with the word "started," Mr. Qazi's statement is a total fabrication. |
| 34<br><br>July 6, 2022 | "For the past two years since then Greenspan has been attempting to extort me into silence…"<br><br>"I could not in good conscience pay off such a deranged and evil criminal…" | These statements falsely accuse Plaintiff of the crime of extortion. |
| 35<br><br>December 3, 2022 | "he sued me and elon to hide the fact that he was committing fraud and harassing people" | This statement falsely alleges that Plaintiff committed the crime of fraud. |
| 36<br><br>January 13, 2023 | "Woah, this is crazy. My stalker Aaron Greenspan & his goons submitted thousands of fraudulent 50 cent donations on stolen credit cards to my donation page for legal defense against his SLAPP-suit against | This is false. The acts described, wire fraud, conversion, and identity theft—none of which Greenspan committed—are crimes. |

| | me and @elonmusk." | |
|---|---|---|
| 37<br><br>February 6, 2024 | "I was doxxed by Tesla short sellers on Twitter before Elon bought it. First Greenspan called my employer, but we own the company so I didn't get fired.<br><br>He harassed, stalked and tormented me for years, and still to this day. It's no joke." | These statements falsely allege that Plaintiff committed the crimes of harassment and stalking. |
| 38<br><br>May 4, 2024 | "Baby reindeer reminded me a lot of my experience with my TSLAQ stalker Aaron Greenspan" | Stalking is a crime. "Baby Reindeer" is a Netflix production concerning a female convict who physically harassed a male comedian and was sentenced to prison for it. |

164.    Defendant Qazi's statements via the @tesla_truth Twitter account, that he would "drag [Plaintiff's] name through the mud until the day he [dies]" and that "[a]fter he dies I'll keep telling people he sucked," as well as his repeated posting of Plaintiff's contact information, as well as his explicit encouragement that several thousand individuals "contact Aaron for pranks," all demonstrate considerable malice and reckless disregard for the truth.

165.    Defendant Qazi's persistent lies kicked off a chain of libel by his followers, who publicly referred to Plaintiff as a "psychopathic incel" and a likely "mass shooter."

166.    Defendant Qazi's written and verbal false statements were made with actual malice because Qazi knew the statements were false and made the statements with reckless disregard for whether the statements were false or not, *even after* the filing of the Federal Case.

167.    On October 19, 2019, Defendant Qazi stated, "I want everyone to know the true facts about who he really is," and on August 24, 2020, Defendant Qazi admitted that he frequently posts material on his Twitter accounts intended to be interpreted as fact, writing, "I trust you guys to be smart enough to figure out what's fact and speculation."

168.    Defendant Qazi's thousands of aspersions demonizing Plaintiff—none of which addressed a single one of Plaintiff's substantive concerns regarding Defendant Tesla's business practices—were interpreted by readers statements of fact. On October 9, 2020, one reader even

replied to a @WholeMarsBlog post with a video clip of man holding up a sign that simply reads "#FACTS." In addition to using a Twitter account containing the word "truth" to make statements concerning Plaintiff, Defendant Qazi also repeatedly exhorted his followers on Twitter and via the Smick Sites to complete IRS Form 13909 in order to file false reports echoing the conspiracy theories already submitted by Diego MasMarques, Jr.

169. Communications with the IRS are regulated by federal law and are required to be factual. Defendant Qazi also frequently tagged law enforcement Twitter accounts in posts.

170. On January 29, 2021, Defendant Qazi posted a heavily altered photograph of Plaintiff with a modified nose, mouth, eyes, and eyebrows that elicited replies from readers such as "ugly as shit" and "Stay safe out there!"

171. From Twitter and his Smick Sites, Defendant Qazi published links to libelous and/or pornographic material with the intent of poisoning search results concerning Plaintiff.

172. Defendant Qazi's false and misleading statements concerning Plaintiff, whether written or verbal, were not in service of and failed to further any public debate.

173. Defendant Qazi's false and misleading statements, written and verbal, have irreparably harmed Plaintiff's reputation by providing disinformation for others to re-post in an endless loop of defamation.

### COUNT II
### Defamation Per Se
### Against Defendants Elon Musk, Tesla, Inc., and X Corp.

174. Plaintiff incorporates by reference the foregoing allegations.

175. Since 2019, Defendants Musk, Tesla and X Corp. have treated Defendants Qazi and Smick in such a manner as to cause any reasonable observer to believe that Qazi is an actual or ostensible agent of Defendants Musk and/or Tesla, and more than just a casual friend, as exhibited by:

    a) Paying, through Defendant X Corp. on or about July 14, 2023 in the amount of $6,206.00, Defendant Qazi via Defendant Smick's Stripe account, as part of a select group of eligible users, for his Twitter posts (the first of several payments);

b)  Defendant Musk authorizing and endorsing Qazi's harassing conduct toward his critics, including but not limited to Plaintiff, by e-mailing Qazi, "Your Twitter is awesome!" alongside advice for handling journalists (as a Tesla Public Relations employee would) in an August 2019 e-mail to Qazi after the Tesla Board of Directors, including Defendant Musk, had been warned about Qazi's harassment;

c)  having reportedly shut down Tesla's Public Relations department, and out of his over 59 million followers, Defendant Musk consistently using Defendant Qazi's Twitter accounts as springboards to make material disclosures to investors;

d)  Defendant Qazi admitting from the @WholeMarsBlog Twitter account, "Many people don't know that Tesla actually reads everything we post on Twitter.  Even if Elon doesn't respond to you, they will get the feedback to the appropriate team. It's someone's job I think," prompting a former Tesla employee to write "Can confirm" and another observer to write, "They have this instead of a pr team.";

e)  permitting Defendant Qazi to attend exclusive, invite-only Tesla events where Defendant Musk presented new products;

f)  granting Defendant Qazi early access to Tesla FSD beta software—an honor bestowed upon only "25…non-employees" globally "based on…their safe driving record" according to Tesla attorney Eric C. Williams's December 14, 2020 letter to the California Department of Motor Vehicles—despite Defendant Qazi's history of criminal charges for violating the California Vehicle Code, including an alleged but later dismissed violation of § 23222(B): Possession of Marijuana While Driving, as well as Defendant Qazi publicly posting to Twitter images of substantial amounts of alcohol reportedly consumed before driving his Tesla vehicle;

g)  signing a written contract with Defendant Qazi that restricts his discussions with the media about Tesla beta software and gives Tesla editorial control over videos;

h)  allowing Defendant Qazi access to Tesla's private property in the same fashion

that has resulted in Tesla filing for restraining orders against others;

i) permitting Defendant Qazi to use the TESLA registered trademark in his @tesla_truth Twitter handle with no legal consequence;

j) granting Defendant Qazi over three hours of Defendant Musk's time to conduct an in-person interview promoting Defendant Tesla's products and narratives;

k) providing Defendant Qazi with access to material non-public information (MNPI) and other leaked news tips from inside Tesla;

l) Defendant Musk autographing the interior of Defendant Qazi's Model 3;

m) encouraging and/or allowing Tesla management, such as former Senior Global Director, Public Policy and Business Development Rohan Patel, to follow and "like" Defendant Qazi's Twitter posts regardless of the substantial controversy surrounding Qazi's misconduct;

n) Defendant Musk petitioning Twitter, Inc. CEO and fellow billionaire Jack Dorsey for special treatment for Defendant Qazi after Qazi was suspended from Twitter so that he could continue to promote Defendant Tesla's stock and products;

o) promoting Defendant Qazi's legal defense fund for the Federal Case;

p) allowing Defendant Qazi to correspond with Defendant Musk's preferred attorney, Defendant Spiro;

q) relying on Defendant Qazi for intelligence regarding competitors obtained at meetings and tours where official Tesla employees would not be permitted;

r) Defendant Musk regularly corresponding with Defendant Qazi about business matters via e-mail and Twitter DM through present day;

s) actively ignoring written concerns expressed to the Board of Directors about Defendant Qazi's conduct;

t) Defendant Qazi admitting on video that he performs work, compensated through stock ownership and referral bonuses, for Defendant Tesla, by exclaiming, ""I'll sell them all fuckin' Teslas.  I'll pull in those referrals!"

u)  Defendant Qazi appearing to work nearly 24 hours per day, every day, to exclusively promote the interests of Defendants Musk and Tesla on social media;

v)  Defendant Qazi admitting that he is a Tesla shareholder.

176.  Defendants Musk and Tesla are vicariously liable for all defamatory statements published by Defendant Qazi concerning Plaintiff from at least as early as 2019.

177.  Had Defendants Musk or Tesla instructed Defendant Qazi to stop defaming Plaintiff, Defendant Qazi would have obeyed and stopped because his defamatory statements were made in service of Defendants Musk and Tesla.  At no time did Defendants Musk or Tesla instruct Defendant Qazi to stop.

178.  In his December 9, 2018 CBS *60 Minutes* interview (the "60 Minutes Interview"), Defendant Musk admitted on air to journalist Lesley Stahl that he did at times "use [his] tweeting to kind of get back at critics" and that "I guess we might make some mistakes.  Who knows?"

179.  To the extent that Defendant Musk was unaware that his communications with Defendant Qazi would be quoted in *Bloomberg Businessweek*, he was given the opportunity to comment by journalist Zachary Mider.  As Mider's article states, "Tesla has legions of die-hard fans, many of them well-to-do, tech-obsessed, and male.  Qazi is pretty close to the archetype. His Twitter handle, @tesla_truth, is a bottomless font of Muskolatry.  Before we met in August, he'd emailed Musk to give him a heads-up and encourage him to speak with me."  Therefore, Defendant Musk was aware that a potential article would involve Defendant Qazi and at least one of Defendant Qazi's libel-spewing Twitter accounts, @tesla_truth.  Yet Defendant Musk made no effort to distance himself from Defendant Qazi's statements or to qualify them.

180.  The @ElonMusk Twitter account is disclosed as a source of factual "material information" in Defendant Tesla's SEC Form 8-K filed November 5, 2013.

181.  In addition to those statements for which Defendant Musk is vicariously liable, Defendant Musk himself published the following libelous statements about Plaintiff:

| Statement No. / Date / Medium | Written Statement by Defendant Musk | Pending Legal Review | Public Forum / Interest |
|---|---|---|---|
| 39 | "Does the psych ward know you have a cell phone? | No | Twitter |

| | Just curious." | | Only / No |
|---|---|---|---|
| October 9, 2019 / E-Mail and Twitter via Qazi | | | |
| 40<br><br>July 3, 2020 / Twitter | "Greenspan is crackers, bananas, barky & ten cards short of a full deck" | No | Yes / No |

182.    Defendant Musk's false and misleading statements, disseminated to his tens of millions of Twitter followers, have irreparably harmed Plaintiff's reputation.

183.    Plaintiff has never suffered from any psychiatric illness, nor has Plaintiff ever been diagnosed with any mental disorder.  Plaintiff provably does not live in and has never been admitted to a psychological unit for clinical evaluation, nor has Plaintiff ever visited with a mental health professional in a clinical setting except to assist with his brother's acute condition.

184.    *The Verge* has described Defendant Musk's followers as an "army of irregulars waiting to be marshaled," and Defendant Musk exploits this fact.  If he tweets about a crypto-currency or a stock, his followers buy it.  When he tweets about a person he dislikes, they attack.

185.    Defendant Musk authored and sent Statement 39 on behalf of himself and Defendant Tesla to numerous parties including government employees and Defendant Qazi, who Defendant Musk knew or should have known would republish his message publicly.

186.    On December 4, 2019, Defendant Musk testified under oath at trial that he expects his tweets to get widespread publicity both on and off of Twitter:

"Q.    So, you expected with both the 'pedo guy' tweet on Twitter, you knew at the time you made it then, and you expected at the time you made the apology that your tweets were going to get widespread publicity.  True?

A.    They're going to get some publicity, yeah.

Q.    Well, more publicity than they would get in terms of just the Twitter world, true?

A.    Yes.

Q.    You expected they would get publicity beyond the people on Twitter, true?

A.    Yes."

187.    In accordance with Defendant Musk's expectations, the tweets about Plaintiff were interpreted as factual by an enormous number of his and Defendant Qazi's followers, who have continued to harass Plaintiff and repeat false claims calling Plaintiff's mental health into question ever since.  Many individuals reading Defendant Musk's July 3, 2020 post interpreted it as a statement of fact meaning that Plaintiff is mentally ill.  Responses included "He needs medical help," references to Plaintiff as "psychotic," and multiple suggestions that Plaintiff should be used as "practice" for Defendant Musk's non-FDA approved, non-peer-reviewed Neuralink brain implant device.  In addition, Defendants Qazi and Musk's unending false statements and explicit calls for harassment exposed Plaintiff to unfounded threats, hatred and ridicule by countless individuals with whom Plaintiff had no prior relationship.  For example:

a) On October 9, 2019, @PandraKaka13 wrote, "Sadly Aaron's parents have let him have this sort of support for his revenge tactics. I'm concerned when they die that Aaron will have no one to support his psycho ways and may become even more volatile. Hope he doesn't own any guns. Mass shooter profile."

b) On October 9, 2019, @CleanRevelry wrote, "Yo @AaronGreenspan, see you on a dark night," using a song lyric authored by Defendant Musk's girlfriend as a warning.  Plaintiff interpreted this as a threat of violence, as did another user.

c) On May 17, 2020, @BarkMSmeagol wrote, "Yep. He belongs in an asylum."

d) After July 3, 2020, a search for Plaintiff's name on Twitter began yielding one auto-complete suggestion other than his name itself: "aaron greenspan crazy." This indicated that other Twitter users were searching for this phrase.

188.    Defendant Musk's Twitter account was and is "verified."  As a result, the account and its posts feature a small check mark in a seal wherever it appears.  Many Twitter users incorrectly interpret this icon to mean that an account's content is factually accurate.

189.    Defendant Musk's provably false and misleading statements concerning Plaintiff were not in service of and failed to further any public debate, or part of any debate at all.

190.    Defendant Musk's false statements were made with actual malice because Musk

knew the statements were false and/or made the statements with reckless disregard for the truth.

191.    On or around August 21, 2018, Defendant Musk e-mailed his former public relations consultant, Juleanna Glover—CCing his brother and co-Director Kimbal and former Global Communications Director Dave Arnold—"Will Tweet as I wish and suffer the consequences.  So it goes."  Defendant Musk thus affirmed his reckless disregard for the truth.

192.    None of Defendant Musk's statements concerning Plaintiff were ever deleted, retracted, or the subject of an apology.

## COUNT III
### Defamation
### Against Defendant X Corp.

193.    Plaintiff incorporates by reference the foregoing allegations.

194.    When Defendant X Corp. suspended Plaintiff's Twitter accounts on June 13, 2023, thousands of visitors to those accounts' former pages were informed that "Twitter suspends accounts that violate the Twitter Rules," falsely indicating that Plaintiff had, in some way, violated the Twitter Rules.

195.    In fact, Plaintiff did not violate the Twitter Rules.  Prior to Twitter, Inc. being owned by Defendant Musk, Plaintiff's accounts had been reported numerous times by various users who followed Defendants Qazi and/or Musk, but Twitter, Inc. examined those reports and found no violation.  In one instance, when Twitter, Inc. did purportedly find a violation reported in bad faith by Diego MasMarques, Jr., it quickly admitted an error and corrected that error.

196.    Today, X Corp. states, "X suspends accounts that violate the X Rules" when third parties attempt to visit Plaintiff's former profile pages.  However, Plaintiff never agreed to the X Rules and was never bound by them.  The implication that Plaintiff violated the X Rules, meriting suspension, is false.

## COUNT IV
### Violation of the California Civil Anti-Stalking Statute
### (California Civil Code § 1708.7, et seq.)
### Against Defendants Omar Qazi, Elon Musk and Tesla, Inc.

197.    Plaintiff incorporates by reference the foregoing allegations.

198.    Starting on January 14, 2019, Defendant Qazi began following, alarming, and harassing Plaintiff through a pattern of conduct involving his use of multiple Twitter accounts, prank telephone calls, false accusations regarding rape and possession of child pornography, and republication of deliberately altered court documents.  These actions also led to the transmission of additional false allegations regarding child pornography via text message and fax to Plaintiff.

199.    Defendant Qazi's amplification of posts by Diego MasMarques, Jr. made it more likely that his mob of followers would locate posts that identified Plaintiff's parents home by its address and photograph as well as posts that identified Plaintiff's parents' synagogue.

200.    As early as January 14, 2019, Plaintiff requested that Defendant Qazi stop his harassing conduct, writing "Please stop." at 12:36 P.M.  With no other way to reach him, and hoping that a verbal conversation would diffuse the situation, Plaintiff also asked Defendant Qazi to stop by leaving a message for him to stop at his nominal employer's office on the same day, unaware that Defendant Qazi's "employer" was his father's company and that Qazi did not really work there on a full-time basis.

201.    As early as January 17, 2019, in writing, Defendant Qazi admitted his intent to "fuck with" Plaintiff to an unknown third party.

202.    On February 9, 2021, Twitter found that the @WholeMarsBlog account had violated the Twitter Rules "against promoting or encouraging suicide or self-harm" regarding Plaintiff.  Previously, Twitter had removed content the account posted as it advocated violence.

203.    From 2019 through present day, Defendant Qazi posted credible threats directed at Plaintiff suggesting that he and/or Defendants Musk and Tesla ("we," as written on the @WholeMarsBlog account) had referred Plaintiff to law enforcement and that based on these "criminal referrals," "the FBI and law enforcement" were "very interested."

204.    These threats were credible because law enforcement tends to respond far more quickly to complaints from wealthy individuals and large corporations such as Defendants Musk and Tesla whether or not the underlying substance is true or false.  Furthermore, Defendants Musk and Tesla have a documented history of referring their critics to criminal law enforcement

as a means of squelching criticism.  On or around June 25, 2018, working on behalf of Defendants Musk and Tesla, Hueston Hennigan LLP submitted a "[Redacted] CRIMINAL REFERRAL" labeled "Privileged & Confidential" and "Attorney-Work Product" to the Office of the Nevada Attorney General regarding a former employee who had leaked accurate information to the press critical of Defendants Musk and Tesla.  The same baseless referral was also submitted to the FBI and the United States Attorney's Office for the District of Nevada.  Representatives of Defendants Musk and Tesla further met personally with the Attorney General of Nevada to encourage criminal prosecution of a critic.

205.    Criminal prosecution would pose a significant threat to Plaintiff's health and safety for a variety of reasons, including but not limited to increased COVID-19 risk.

206.    On August 2, 2021, counsel for Defendant Qazi e-mailed Plaintiff, stating in part, "I caution you against keeping Omar as a defendant in this case. I don't want you to claim later that I did not warn you."

207.    On August 5, 2021 at 10:15 A.M., Defendant Qazi posted on the @WholeMarsBlog Twitter account, writing, "Please write to Case Western university [sic] and Neil Greenspan to ask him to stop this harassment…  I worry he's a danger to students at Case." He later repeated this false claim against Dr. Greenspan on August 7, 2021.

208.    On August 5, 2021 at 10:20 A.M., Plaintiff's father received a harassing e-mail from johndoe510150@gmail.com also addressed to the general e-mail account for his employer, the Case Western Reserve University School of Medicine.  The e-mail stated in part, "STOP HARRASSSING [sic] WHOLEMARSBLOG and DOXXING PEOPLE online!!!"

209.    On August 7, 2021 at 12:59 P.M., Defendant Qazi posted on the @WholeMarsBlog Twitter account, "If Greenspan files a fifth revision of his lawsuit on Friday, Chapter 8 will be published continuing the story" in an attempt to intimidate Plaintiff into withholding this document from the Court in violation of 18 U.S.C. § 1512(b).  Defendant Qazi repeated this threat on August 10, 2021 on his personal website.

210.    Defendant Qazi's conduct caused Plaintiff and Plaintiff's family members to

suffer substantial emotional distress due to the real threat of malicious prosecution and/or firing from deliberate smearing of Plaintiff as a supposed likely mass murderer harboring child pornography, and of Plaintiff's father as supposedly posing a "danger to students."

211.    As a result of Defendant Qazi's public conduct and his apparent contact with the restrained party in the Civil Harassment Case, Plaintiff reasonably feared for his and his family's safety after receiving messages, text messages and calls that he and others perceived as threats. As a result, Plaintiff reported Defendant Qazi to the FBI and to SFPD twice.

212.    Defendant Qazi facilitated the violation of Plaintiff's civil harassment restraining order against Diego MasMarques, Jr., which prohibits direct and indirect harassment, of which he was aware as early as January 14, 2019, and further admitted to altering, misconstruing and publicly posting Form CH-100 from the Civil Harassment Case for the express purpose of harassing Plaintiff.

213.    Even after Plaintiff restricted his personal Twitter account in July 2020 due to Defendant Qazi's ceaseless harassment—the digital equivalent of locking a door—Defendant Qazi still used a proxy to follow it and to post screenshots and metadata to his followers, brazenly displaying the padlock icon next to Plaintiff's name in numerous images.

214.    Defendant Qazi posted harassing messages on social media regarding Plaintiff and Plaintiff's family on the order of 1,000 times from different accounts, causing a cascade of harassment that has yet to cease. For example, on October 1, 2019, @HaidarAns wrote, "@AaronGreenspan you sure have a very punchable face [laugh/crying emoji]". With tens of millions of followers, Defendant Musk cemented the effect with only a few posts.

215.    Defendant Qazi has admitted that he thinks harassing Plaintiff is "funny."

216.    Defendants Musk and Tesla are vicariously liable for Defendant Qazi's harassing conduct since at least as early as 2019.

217.    Had Defendants Musk or Tesla instructed Defendant Qazi to stop harassing Plaintiff, Defendant Qazi would have obeyed and stopped. At no time did Defendants Musk or Tesla instruct Defendant Qazi to stop.

218.    Defendants Musk and Tesla have a history of relying upon private investigators, fans with no formal corporate affiliation, and even convicted felons to provide "intelligence" on critics—often fabricated nonsense—to Defendant Musk and the company's legal team.

219.    Upon information and belief, Defendants Musk and/or Tesla have asked that Plaintiff be surveilled and investigated.  Such surveillance is why Defendant Qazi initially replied to Plaintiff's post tagging only @Tesla and @ElonMusk.

220.    Plaintiff seeks equitable relief, including but not limited to damages in the form of general damages, special damages and punitive damages pursuant to Cal. Civil Code § 3294.

221.    Plaintiff respectfully requests an injunction requiring: a) all Defendants to cease and desist making and/or publishing further harassing statements concerning Plaintiff or Plaintiff's family via any published medium, written or oral; b) all Defendants to cease and desist contacting or trying to contact Plaintiff, his family members, his friends, and any person mentioned by name as having known Plaintiff in Plaintiff's public writing; c) all Defendants to cease and desist impersonating others; d) the immediate cessation of the operation of the Smick Sites and/or transfer of the Smick Site domain names to Plaintiff; e) Defendant Qazi to cease and desist using Twitter, directly or indirectly; and f) Defendant Qazi to permanently remove any and all of his content mentioning Plaintiff from any and all websites under his control.

## COUNT V
### Negligent Infliction of Emotional Distress
### Against Defendants Elon Musk and Tesla, Inc.

222.    Plaintiff incorporates by reference the foregoing allegations.

223.    Defendants Musk and Tesla owed Plaintiff a duty of care because Tesla's Anti-Discrimination and Anti-Harassment Policies apply to "visitors who enter onto Tesla's premises" and Defendant Musk is an officer, director and employee of Defendant Tesla.

224.    On December 29, 2018, Plaintiff visited Tesla property, namely, the Tesla showroom in San Francisco, to look into purchasing a Tesla Model 3.

225.    Plaintiff was harassed by Defendants after December 29, 2018 for expressing serious concerns about the Tesla Model 3 and Tesla in general.

226.    Plaintiff informed the Tesla Board of Directors, including Defendant Musk, via e-mail that he was being harassed on August 7, 2019.  Plaintiff received no response.

227.    Plaintiff filed a formal "Tesla Integrity Line" complaint on October 22, 2021. Plaintiff received no response.

228.    Due to the harassment, Plaintiff suffered a degree of emotional distress that no person should reasonably be forced to endure.  Plaintiff is thus entitled to punitive damages.

## COUNT VI
### Abuse of Process
### Against Defendants Elon Musk, Singer Cashman LLP, Adam S. Singer, Allison Huebert, and Adam G. Mehes

229.    Plaintiff incorporates by reference the foregoing allegations.

230.    Defendant Omar Qazi responded to a subpoena issued to him in unrelated criminal proceedings against Nikola Corporation CEO Trevor Milton by making completely irrelevant and libelous statements about Plaintiff, with the purpose of posting his response on social media, simply to libel and harass Plaintiff.

231.    On December 1, 2022, Defendant Qazi posted on his @WholeMarsBlog Twitter account, "So if anyone has any ideas for next legal steps or has a good law firm that they think can really kick Aaron's ass and make him cry let me know. He's having too much fun. He needs to face justice for what he's done, and pay back everyone who has donated to stop him."

232.    Exactly one week later, on December 8, 2022, Defendant Musk attempted to file the Alameda Case in the form of a cross-complaint in another lawsuit then pending in Alameda County, *Hothi v. Musk*—in which Defendant Musk was sued for libel by short-seller Randeep Hothi based on a public e-mail conversation from 2019 between Plaintiff and Musk re-published on Plaintiff's PlainSite website—for the primary purpose of harassing Plaintiff, or in Musk's words, seeking Greenspan's "blood" because he believed Greenspan to be "evil."

233.    When Judge Julia Spain denied Defendant Musk's request for leave to file the proposed cross-compliant, the same claims were filed as the Alameda Complaint in the new, separate Alameda Case on February 24, 2023.

234.    Not until April 10, 2023 was Plaintiff or Plaintiff's company properly served with any subpoenas in the *Hothi v. Musk* matter.

235.    Had Defendant Musk and Hardcore Litigation Department been interested in filing a new, separate complaint based on actual facts, they would have waited until *after* receiving and carefully evaluating the documents provided by Plaintiff or Plaintiff's company in response to the *Hothi* subpoenas before proposing, let alone filing, any type of new pleading.

236.    Given that the Alameda Complaint had already been filed based on Mr. Musk's conspiracy theories and fabrications, the *Hothi* subpoenas served no actual purpose and were merely another instrument of harassment.

237.    The subpoenas, signed by Defendant Cashman, were sweepingly broad, written the apparent goal of learning which journalists Plaintiff had spoken with regarding Tesla since 2018 and learning exactly what they had spoken about, even though the vast majority of such communications had absolutely nothing to do with the *Hothi* litigation.

238.    The Alameda Complaint had no factual basis.

239.    The Alameda Complaint had no legal basis.

240.    Defendants Musk and the members of the Hardcore Litigation Department all knew or should have known that the Alameda Complaint had no factual basis.

241.    The members of the Hardcore Litigation Department all knew or should have known that the Alameda Complaint had no legal basis.

242.    Defendant Musk boasted that he was "out for blood" and stated "There will be blood" in May 2022, before he even knew if there was the possibility of filing any legitimate claim against Greenspan.

243.    Defendant Musk explicitly described his plan in writing on Twitter—of using attorneys at Tesla to target "evil" short-sellers—on April 4, 2023. Defendant Huebert and Defendant Mehes were or are Tesla attorneys.

244.    Defendants Singer Cashman, LLP, Cashman, and Huebert refused to substantiate the legal basis for Mr. Musk's Complaint pursuant to California Code of Civil Procedure

§ 430.41(a)(1) when asked during a recorded meet and confer session on April 28, 2023, citing a litany of excuses, including but not limited to "I'll get back to you," "I don't understand what you mean," and not having citations "handy at the moment." *See*

http://www.aarongreenspan.com/writing/musk/20230428.muskmeetandconfer.mp3.

245.    Defendant Huebert also admitted that her lack of familiarity with California law had caused her to misrepresent Mr. Musk's position and that she had spoken "too soon."

246.    On the same call, Defendant Huebert stated, "If you're right, you're right, and you know, maybe next week we'll be like, yep, sorry, Aaron, you're right, we looked at this and you totally got us." Indeed, on the next business day (the following week), Defendant Musk's Hardcore Litigation Department unilaterally filed its Request For Dismissal with prejudice with regard to Defendants' frivolous Alameda Complaint.

247.    Defendant Huebert stated that "unfortunately, one of the reasons you're in this is, uh, you know, you sent the…Elon's response to Fossi and Hothi before it was publicized." This statement was and is false. Plaintiff did not send Defendant Musk's e-mail responses to Randeep Hothi before they were publicized.

248.    On August 8, 2019 at 10:08 A.M., Bloomberg journalist Dana Hall had asked Plaintiff "Did you share this with ska?" referring to the Musk e-mail conversation up to that point and @skaboosha, Randeep Hothi's Twitter account. Plaintiff responded, "Not yet. I am planning to release it all today to everyone at once when Elon responds again. I'll give him another couple hours." Thus, Defendant Musk's assumption that Randeep Hothi had received special treatment from Plaintiff was false.

249.    While the Hardcore Litigation Department assumed that Plaintiff sent Defendant Musk's e-mail responses to attorney and short-seller Lawrence Fossi because of his representation of Randeep Hothi in the *Tesla, Inc. v. Hothi* case, this assumption was false, and this false assumption, at least according to Defendant Huebert, was Defendant Musk's primary basis for filing the Complaint. In fact, Plaintiff sent Mr. Musk's e-mail responses to Mr. Fossi because having himself been harassed by Defendant Musk previously in 2018, Mr. Fossi was

uniquely positioned to suggest additional questions to ask Mr. Musk.

250. On August 8, 2019 at 6:46 A.M., Plaintiff wrote by e-mail to three journalists and Mr. Fossi, "I've been forwarding to press so you all have a head start and to you Lawrence because you kicked this all off a year ago." By "kicked this all off a year ago," Plaintiff was referring to the 2018 episode in which Defendant Musk revealed Mr. Fossi's pseudonym, "Montana Skeptic," as a form of harassment and revenge for posting informed criticism.

251. Even if Plaintiff had somehow sent Mr. Fossi Defendant Musk's e-mail responses prior to publication because Mr. Fossi represented Randeep Hothi—which was *not* why he sent them—this would not have conferred any particular benefit or advantage on Mr. Hothi at all, as the messages were published hours later anyway and no litigation was pending at the time.

252. Plaintiff was forced to expend a considerable amount of time, energy and money defending himself against Defendants' false claims in court, as well as Defendant Musk's overly broad and unduly burdensome subpoenas.

253. On October 28, 2019, United States Magistrate Judge Jacqueline Scott described Defendant Musk's attempt to subpoena a BuzzFeed journalist as pertaining to "irrelevant and harassing topics" and noted that "the record suggests Mr. Musk feels animus toward non-party Mr. Mac." *See Unsworth v. Musk*, Northern District of California Case No. 3:19-mc-80224-JSC, Document 32.

254. The Hardcore Litigation Department knew in advance that Plaintiff intended to file a demurrer in the Alameda Case on Monday, May 1, 2023, and that doing so would incur filing fees. Defendant Cashman did not definitively answer the question as to whether the Alameda Complaint was being voluntarily dismissed until after Plaintiff's demurrer had already been filed on that day. Even if the demurrer had not been filed, however, conducting legal research, drafting the motion for sanctions and the demurrer, and securing legal representation for Think Computer Corporation took a great deal of time and money.

255. After Plaintiff served all Defendants except Qazi with a Cross-Complaint on May 3, 2023 pursuant to the parties' mutual agreement to electronic service, Ms. Huebert sent an e-

mail dated May 12, 2023 at 6:34 P.M. Pacific Time, stating in part:

> "Any previous agreement regarding electronic service—which, in any event, would have applied only to service on Mr. Musk—was extinguished with the dismissal of the action in question.  To avoid any doubt, however, we are also providing notice to you today that we affirmatively rescind any prior agreement to accept service electronically on behalf of Mr. Musk, or for any purpose with respect to the instant matter and *Hothi v. Musk*.

> With respect to myself and the other named defendants you reference, in the unlikely event the Court issues summonses for your defective suit, we do not agree to accept service electronically."

> Allison Huebert
> Managing Counsel, Litigation
> 1 Tesla Rd., Austin, TX 78725
> E. ahuebert@tesla.com  T. 512.557.8797"

256.    Defendant Huebert's May 12, 2023 attempt to electronically renege on her and Defendant Musk's agreement to accept electronic service of process violated Section 128.5 of the California Code of Civil Procedure, which forbids "bad faith" "tactics" "that are frivolous or solely intended to cause unnecessary delay."  It also plainly violated Rule 3.02 of the Texas Disciplinary Rules of Professional Conduct, entitled "Minimizing the Burdens and Delays of Litigation."  This Rule explicitly states:

> "[A] client may seek to have a lawyer delay a proceeding primarily for the purpose of harassing or maliciously injuring another.  Under this Rule, a lawyer is obliged not to take such an action.  See also Rule 3.01.  It is not a justification that similar conduct is often tolerated by the bench and the bar.  The question is whether a competent lawyer acting in good faith would regard the course of action as having some substantial purpose other than delay undertaken for the purpose of harassing or malicious injuring."

Her conduct also violated Rule 3.27(a) of the Local Rules of the Alameda County Superior Court, which states in part:

> "Represented parties and other represented persons must participate in electronic filing (e-filing) using a court-approved electronic service provider (EFSP) and must serve and accept service electronically, except by court order or if other service is required by law."

257.    There was no legitimate reason to suddenly insist on service of process by mail or in person as of May 12, 2023 at 6:34 P.M.  Defendant Huebert's goal was to delay Plaintiff.

258.    Defendant Huebert's goal of impeding the litigation that she started with her

Hardcore Litigation Department colleagues was affirmed in her 6:58 P.M. follow-up e-mail, which stated:

> "Are you represented by counsel in this dispute? If you are, we are not permitted to communicate with you directly, so please forward us their contact information if that's the case."

259.    Defendant Musk and his agents' and counsel's conduct was malicious and oppressive and done with a willful and conscious disregard for Plaintiff's rights, entitling Plaintiff to an award of punitive damages.

<div align="center">

**COUNT VII**
**Malicious Prosecution**
**Against Defendants Elon Musk, Singer Cashman, LLP, Adam S. Singer, Allison Huebert, and Adam G. Mehes**

</div>

260.    Plaintiff incorporates by reference the foregoing allegations.

261.    With a net worth at times reportedly in excess of $200 billion, Defendant Musk is one of the wealthiest individuals on Earth and did not need to seek funds from Plaintiff or anyone to attempt to offset his potential legal liability in the *Hothi* action.

262.    Defendant Musk caused the Alameda Complaint to be filed for the improper purpose of harassing Plaintiff and harming Plaintiff financially, or in his words, to draw "blood."

263.    Defendant Musk caused the Alameda Complaint to be filed based on the libelous and unsubstantiated statements of Defendant Omar Qazi.

264.    Defendant Qazi obtained much of the false information he repeated against Plaintiff from the convicted murderer against whom Plaintiff obtained a restraining order in 2019, Diego MasMarques, Jr., whose post Mr. Musk cited in the 2019 e-mail conversation that led to the filing of the Alameda Complaint.

265.    Defendant Musk caused the Alameda Complaint to be filed against Plaintiff and Plaintiff's company—even though he either believed that Plaintiff was acting independently or as an employee of his company—in order to waste Plaintiff's resources.

266.    Defendant Musk caused the Complaint to be filed in a venue where neither he nor Plaintiff resided.

267.    Defendant Musk's claims were resolved in Plaintiff's favor as they were unilaterally and voluntarily dismissed by Defendant Musk just two weeks and two days after service was effective on Plaintiff, on the last possible day for Mr. Musk to avoid the filing of a motion for sanctions under Sections 128.7 and 1010.6 of the California Code of Civil Procedure.

268.    The Alameda Complaint had no factual basis.

269.    The Alameda Complaint had no legal basis.

270.    Defendant Musk and the members of the Hardcore Litigation Department all knew or should have known that the Complaint had no factual basis.

271.    The members of the Hardcore Litigation Department all knew or should have known that the Complaint had no legal basis.

272.    The Alameda Complaint was entirely based on two misapprehensions by the Hardcore Litigation Department attorneys.  Having been ordered by Defendant Musk to find evidence for his paranoid conspiracy theory that Plaintiff had orchestrated the *Hothi* litigation— even though Tesla was the first party to take legal action by applying for a restraining order against Randeep Hothi on false pretenses—members of the Hardcore Litigation Department:

    a)  misread an e-mail that Plaintiff sent to Randeep Hothi, presumably obtained from discovery in the *Hothi* matter, warning Mr. Hothi *not to engage* Gill Sperlein instead as a command *to hire* Gill Sperlein, when the e-mail said nothing of the sort;

    b)  falsely assumed that Plaintiff had corresponded with Lawrence Fossi *because* Mr. Fossi had previously represented Randeep Hothi, when Mr. Hothi had nothing to do with Plaintiff's decision to correspond with Mr. Fossi.

273.    Mr. Musk explicitly described his plan in writing on Twitter—of using attorneys at Tesla to target "evil" short-sellers—on April 4, 2023.

274.    Plaintiff was forced to expend a considerable amount of time, energy and money defending himself against Defendants' false claims in court.

275.    Defendant Musk and his agents' and counsel's conduct was malicious and

oppressive and done with a willful and conscious disregard for Plaintiff's rights, entitling Plaintiff to an award of punitive damages.

## COUNT VIII
### Negligence
**Against Defendants Elon Musk, Singer Cashman, LLP, Adam S. Singer, Allison Huebert, and Adam G. Mehes**

276.    Plaintiff incorporates by reference the foregoing allegations.

277.    The members of the Hardcore Litigation Department were grossly negligent in preparing and filing the Alameda Complaint.

278.    In preparing the Alameda Complaint, members of the Hardcore Litigation Department relied on a combination of incorrect data from Google searches; false, unverified statements that originated on a Wikipedia page that redirects from "Aaron Greenspan;" at least one court decision based on a material typographical error sourced from https://wiki.answers.com; and conspiratorial allegations passed through Defendant Qazi that originated with a convicted murderer with a documented history of mental illness.

279.    Defendant Musk is a known associate of eugenicists, child molesters, and sex traffickers Jeffrey E. Epstein (deceased) and Ghislaine Maxwell, both convicted felons—a fact about which he has lied in public repeatedly.  Mr. Musk reportedly invested in a clothing business owned by Emma Coronel Aispuro, the wife of notorious Mexican drug lord Joaquín "El Chapo" Guzman—both of whom have been indicted and/or convicted on numerous criminal charges in the United States.  Defendant Musk also used his wealth manager, Defendant Birchall, as an intermediary doing business under the alias "James Brickhouse" to pay a convicted felon in the United Kingdom $50,000 for false information.  *See* "Elon Musk Hired A Convicted Felon To Investigate The Cave Rescuer Who Is Now Suing Him" by Ryan Mac, *Buzzfeed News*, October 3, 2019, https://www.buzzfeed.com/ryanmac/elon-musk-hired-felon-james-howard-higgins-dirt-pedo-guy.  Given this history, the Hardcore Litigation Department had an obligation to ensure that Defendant Musk was not again relying on or paying for false information from yet another convicted felon.

280.    Defendant Musk himself distrusts Wikipedia.  On July 29, 2022, he posted "Wikipedia is losing its objectivity @jimmy_wales" on his @elonmusk Twitter account.

281.    The Alameda Complaint is replete with indicia of overall gross negligence:

a)  The Complaint falsely states that Plaintiff lives and works in Mountain View—information eight years out of date—even though Plaintiff's court filings in the Northern District of California from 2020 onward, dozens in all, in the public domain, and all in the possession of Elon Musk's counsel, clearly state on the first page of every document that Plaintiff lives and works in San Francisco.

b)  The footer in the Complaint stated that it is the "COMPLAINT OF DEFENDANT ELON MUSK," even though Defendant Musk is the plaintiff in that filing because defendants are not filers of complaints by definition, as should be obvious to any attorney.  The Hardcore Litigation Department was so sloppy when preparing the Complaint that all of its members apparently forgot to change the footer from their rejected proposed cross-complaint, where Elon Musk was the defendant.

c)  Heading I(A)(1) in the Alameda Complaint, "1. Greenspan's Association With $TSLAQ," is orphaned.  There is no subsequent heading I(A)(2).

282.    These errors and the substantive issues with the Alameda Complaint did not phase the Hardcore Litigation Department because they all exhibited reckless disregard for the truth, and because their primary goal was not to achieve any sort of justice involving Plaintiff, but simply to further smear his reputation and harass him.

283.    The errors and substantive issues with the Alameda Complaint have harmed and will continue to harm Plaintiff by providing a permanent record of false information in the form of at least one court filing full of damaging falsehoods that many, if not most, readers will assume to be true.

284.    As an entrepreneur in Silicon Valley, the existence of such false records and the associated false allegations coming from a notable billionaire is likely to preclude Plaintiff from being able to raise the same type of venture capital funding that Plaintiff's peers have been able

to secure, and which at one point years ago was necessary for Defendant Musk to launch his career as an entrepreneur.

285. The existence of such false records has impacted Plaintiff's ability to secure legal representation.

286. Defendant Musk and his agents' and counsel's conduct was malicious and oppressive and done with a willful and conscious disregard for Plaintiff's rights, entitling Plaintiff to an award of punitive damages.

<div align="center">

**COUNT IX**
**California Business and Professions Code § 17200**
**Against Defendant Omar Qazi**

</div>

287. Plaintiff incorporates by reference the foregoing allegations.

288. Plaintiff and Defendant Omar Qazi compete in the field of news distribution.

289. Defendant Qazi harmed Plaintiff by unlawfully impersonating his family members.

290. On the basis of his hundreds of libelous statements about Plaintiff, Defendant Qazi unfairly raised over $150,000 in donations from fans of Defendants Musk and Tesla to mount a bad-faith defense against Plaintiff in the Federal Case, which ultimately failed to dismiss all of Plaintiff's claims with prejudice.

291. On June 4, 2022, on behalf of Defendants Musk and Tesla, Defendant Qazi wrote from his @WholeMarsBlog Twitter account, "Greenspan and the directors of his fraudulent charity @Plainsite must reimburse Qazi $200k in fees + $1 million of damages or they will face a countersuit." In sum, Defendant Qazi demanded $1.2 million from Plaintiff to avoid a frivolous lawsuit.

292. Mr. Qazi had previously posted screenshots of correspondence with Defendant Musk and his attorney, Defendant Alex Spiro, involving at least one planned lawsuit against Plaintiff.

293. An unknown individual purporting to work for Quinn Emanuel Urquhart & Sullivan LLP on behalf of Defendant Musk contacted Plaintiff's father at his home in 2020.

294. Accordingly, Plaintiff interpreted Defendant Qazi's extortionate threat to be serious.

295. Plaintiff refused to pay Defendant Qazi $1.2 million.

296. Defendant Qazi's conduct was unlawful in violation of California Penal Code § 524, "Attempted Extortion."

297. Defendant Musk attempted to file the Alameda Case against Plaintiff approximately six months later, and persisted in filing it even after his initial motion for leave to file was denied.

298. Plaintiff incurred court costs in excess of $450.00 to defend against the frivolous lawsuit threatened by Defendant Qazi and actually filed by Defendant Musk, not including the additional costs of filing related claims.

299. Plaintiff incurred PACER fees to research legal precedent related to the Alameda Complaint's baseless claims and the campaign of defamation and harassment carried out by Defendants.

300. Plaintiff's company incurred legal fees and court costs of over $1,000.00 to defend against the frivolous lawsuit threatened by Mr. Qazi and filed by Mr. Musk.

301. Plaintiff's company's finances pass through to his personal tax return as his company is a Subchapter S corporation.

302. Defendant Musk and his agents' and counsel's conduct was malicious and oppressive and done with a willful and conscious disregard for Plaintiff's rights, entitling Plaintiff to an award of punitive damages.

**COUNT X**
**Conspiracy**
**Against All Defendants**

303. Plaintiff incorporates by reference the foregoing allegations.

304. Defendants Musk and Tesla conspired with the remaining Defendants, as well as stock promoters such as non-parties Vivien Hantusch, Cathie Wood and Ross Gerber, to artificially increase Tesla's stock price based on manipulative trading practices, to facilitate the

suppression of legitimate criticism, and to make false and misleading representations to investors, regulators, and in court, causing harm to short-sellers such as Plaintiff. The conspiracy involved three sub-groups:

       a) Stock Price Manipulation: Defendants Musk, Tesla, Excession, LLC, Birchall, and Morgan Stanley;

       b) Suppression of Legitimate Criticism (eliminating negative publicity): Defendants Musk, Tesla, X Corp., Qazi, Does 1-10, Smick, Singer Cashman, LLP, Cashman, Huebert, Mehes and Spiro;

       c) False and Misleading Representations (creating positive publicity): Defendants Musk, Tesla, Qazi, Smick, and Morgan Stanley and non-parties Vivien Hantusch, Cathie Wood and Ross Gerber.

305. The Stock Price Manipulation conspiracy involved the common goal of increasing Tesla's stock price through the violation of federal securities laws.

306. One tactic employed by the Stock Price Manipulation conspiracy was the use of after-hours trading to deliberately change the price of Tesla's stock when trading volume was predictably thin. By trading before market open, the Stock Price Manipulation conspiracy could increase the starting price for TSLA shares at market open, an unlawful practice the SEC has referred to as "setting the tone."

307. The Suppression of Legitimate Criticism conspiracy involved the smearing of journalists and short-sellers on social media, including but not limited to Plaintiff. By making average people question the credentials, motives and research of anyone criticizing Tesla, Defendants hoped to eliminate any reason why investors—and especially institutional investors—might sell their stock or refrain from buying. Furthermore, by aggressively litigating against critics, lying to regulators and withholding documents during discovery processes, the members of this conspiracy prevented negative messages from breaking through.

308. The False and Misleading Representations conspiracy involved the promulgation of false, hopeful narratives regarding the potential for Tesla's stock price and technology. For

example, Defendant Qazi's hundreds of fake FSD videos and Cathie Wood's pronouncements on CNBC television about her astronomical price targets for Tesla stock were part of this conspiracy. Defendant Morgan Stanley also deliberately published fanciful "analyst" notes concerning Tesla, whose themes could then be repeated on television by Ms. Wood and Mr. Gerber.

### COUNT XI
### California Business and Professions Code § 17200
### Against All Defendants

309.    Plaintiff incorporates by reference the foregoing allegations.

310.    Defendants engaged in unlawful and unfair business practices intended to increase Tesla's stock price.

311.    Defendants Elon Musk, Tesla, Inc., Jared Birchall, Excession, LLC, and Morgan Stanley & Co., LLC engaged in trading activity on Defendant Musk's behalf with the specific intent to illegally manipulate the price of Tesla stock upward, including but not limited to by exploiting thin volume during before-hours and after-hours trading sessions.

312.    Upon information and belief, Defendants Birchall, Excession, LLC and Morgan Stanley & Co., LLC also used one or more Morgan Stanley trading accounts to mask trades actually being executed on Defendant Musk's behalf.

313.    While he held short positions in TSLA directly or indirectly, Plaintiff was harmed by increases in Tesla's stock price.

314.    Defendants Musk and X Corp. deliberately breached Twitter, Inc.'s contract with Plaintiff as a user of the Twitter social networking platform to prevent Plaintiff from being heard on matters concerning Tesla and Musk.

315.    Plaintiff was harmed by the sudden inability to communicate on Twitter.

316.    As a result of Defendant X Corp.'s actions, Plaintiff lost income that would have been derived from PlainSite.

317.    Defendants Musk and Tesla encouraged Tesla employee Vivien Hantusch to post promotional materials on her nominally-independent @flcnhvy Twitter account without any

disclaimers explaining her formal business relationship with Tesla, in violation of the FTC Act.

318. Ms. Hantusch's posts were intended to encourage readers to buy Tesla stock, which, while he held short positions in TSLA directly or indirectly, harmed Plaintiff.

319. Defendant Tesla unlawfully filed false information with the SEC regarding its most important investor metric: "deliveries."

320. While the term "deliveries" was frequently used as a proxy for new car sales, deliveries and sales are different concepts.

321. Defendant Tesla deliberately refused to define "deliveries" for investors to ensure the maximum amount of flexibility for itself.

322. Internally, from quarter to quarter, Tesla's definition of "deliveries" was constantly changing, depending upon a variety of factors including database systems, software errors discussed in JIRA tickets, auditor requirements, and which of the company's many Chief Financial Officers was signing paperwork.

323. Defendant Tesla designed its database systems to allow used car deliveries to be improperly classified as new car deliveries, and did improperly classify used car deliveries as new car deliveries.

324. Defendant Tesla designated its database systems to allow one unique vehicle, as designated by a Vehicle Identification Number ("VIN") to have multiple Tesla Reservation Numbers ("RN") assigned, and in practice, the same car sometimes was "delivered" multiple times.

325. Defendant Tesla often "delivered" vehicles with serious defects in order to achieve metric goals by quarter-end. Often, these vehicles would be returned in a subsequent quarter, at which point they could be "delivered" again.

326. Defendant Tesla's auditors examined a completely different set of paper "delivery" records than the digital records used to calculate "delivery" metrics for investors.

327. Defendant Tesla's artificially high quarterly "delivery" numbers caused its stock price to increase, harming Plaintiff while he held short positions in TSLA directly or indirectly.

328.    Defendant Qazi produced hundreds of YouTube videos for his hundreds of thousands of followers showcasing his Tesla Model 3's purported FSD features, but withheld information about his Comma "cheat device" until he admitted to its persistent use in 2024.

329.    Defendant Qazi also deliberately withheld information about his own Tesla's service problems from his followers, including but not limited to a persistent squeaking noise.

330.    Defendant Qazi's videos were intended to increase Tesla sales and increase Tesla's stock price.  In one video, he exclaimed, "I'll sell them all fuckin' Teslas.  I'll pull in those referrals!"  *See* https://www.youtube.com/watch?v=VSOayMTw5Zw&t=1396s.

331.    An internal Tesla document shows that FSD upgrade refunds were approximately 26.5% of sales in July 2021, 26.75% of sales in August 2021, and 16% of sales in September 2021.  Defendant Tesla deliberately withheld these figures from investors while Defendant Musk continued to tout FSD as a technological breakthrough upon which Tesla's stock price depended.

332.    Defendant Tesla faces ongoing enforcement actions by the California Department of Motor Vehicles due to its false advertising surrounding "Autopilot" and FSD, as well as its willful violations of California Vehicle Code § 24011.5 and Vehicle Code § 11713.

333.    Plaintiff was harmed by Defendants' acts in furtherance of the FSD fraudulent scheme, which increased Tesla's stock price.

334.    Analysts for investment banks, including but not limited to analysts at Defendant Morgan Stanley, frequently cited "deliveries" and FSD promises as primary reasons to buy Tesla stock and to expect the price of Tesla stock to increase.

335.    Defendant Tesla routinely lied to or misled investors in its SEC filings or communications about SEC filings, about other topics including but not limited to its cash balances, abuse of goodwill for warranty repairs, accounts receivable, accounts payable, vehicle safety, solar panel safety, labor conditions, the SolarCity merger, "robo-taxis," and more.

336.    Defendant Tesla abused its Netherlands subsidiary to evade taxes, routinely shipping products to the United States from China and billing them to the Netherlands.

337.    Defendant Spiro unlawfully represented Defendants Musk and Tesla in violation

of California Business and Professions Code § 6125, including in Plaintiff's Federal Case.

338.    Plaintiff suffered a monetary loss in excess of $50,000 due to Defendants' myriad violations of law and unfair business practices.

339.    Plaintiff spent hundreds of dollars on fees for service of process in connection with the Alameda Case that, but for Defendants' violations of law, would have been unnecessary.

340.    Defendants' conduct was malicious and oppressive and done with a willful and conscious disregard for Plaintiff's rights, entitling Plaintiff to an award of punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A. Judgment against Defendants on all counts of the Complaint;

B. A permanent injunction enjoining all Defendants from making further libelous statements, contacting Plaintiff or his family, impersonating others, and requiring the immediate cessation of the operation of and/or transfer of the Smick Sites to Plaintiff;

C. Recovery from all Defendants of damages, including pre-judgment interest Plaintiff sustained and will sustain, and any income, gains, profits, and advantages obtained by Defendants as a result of their unlawful, unfair, fraudulent and deceptive acts alleged hereinabove, in an amount not yet known, to be assessed at the time of trial;

D. Actual and punitive damages, including costs and attorneys' fees (should Plaintiff engage counsel);

E. Compensatory, consequential and punitive damages resulting from Defendant's violation of California Civil Code §§ 1708.7 and 3294;

F. Punitive damages stemming from Defendants' disregard for state and federal laws;

G. Plaintiff's reasonable costs and expenses of this action, including any attorneys' fees and costs (should Plaintiff engage counsel), in accordance with applicable law;

H. Such equitable/injunctive or other relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury for all issues so triable.

Dated: June 12, 2024

Aaron Greenspan
956 Carolina Street
San Francisco, CA  94107-3337
Phone: +1 415 670 9350
Fax: +1 415 373 3959
E-Mail: aaron.greenspan@plainsite.org

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|

Aaron Greenspan
956 Carolina Street, San Francisco, CA 91407-3337

TELEPHONE NO.: +1 415 670 9350    FAX NO.: +1 415 373 3959
EMAIL ADDRESS: aaron.greenspan@plainsite.org
ATTORNEY FOR *(Name):* (Pro Se)

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO**
STREET ADDRESS: 400 McAllister St.
MAILING ADDRESS: 400 McAllister St.
CITY AND ZIP CODE: San Francisco, CA 94102
BRANCH NAME: Civic Center Courthouse

CASE NAME:
AARON GREENSPAN, an individual v. ELON MUSK, an individual, et al

**ELECTRONICALLY**
**F I L E D**
*Superior Court of California,*
*County of San Francisco*
**06/12/2024**
**Clerk of the Court**
BY: JAMES FORONDA
Deputy Clerk

| **CIVIL CASE COVER SHEET** | **Complex Case Designation** | CASE NUMBER: **CGC-24-615352** |
|---|---|---|
| [x] Unlimited (Amount demanded exceeds $35,000) | [ ] Limited (Amount demanded is $35,000 or less) | [ ] Counter [ ] Joinder Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE: |
| | | DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[x] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [ ] is [x] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [x] monetary b. [x] nonmonetary; declaratory or injunctive relief c. [x] punitive
4. Number of causes of action *(specify):*
5. This case [ ] is [x] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: 6/12/2024

Aaron Greenspan
_____
(TYPE OR PRINT NAME)

▶ *Aaron Greenspan*
_____
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET
**CM-010**

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
    Asbestos Property Damage
    Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
    Medical Malpractice– Physicians & Surgeons
    Other Professional Health Care Malpractice
Other PI/PD/WD (23)
    Premises Liability (e.g., slip and fall)
    Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
    Intentional Infliction of Emotional Distress
    Negligent Infliction of Emotional Distress
    Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
    Legal Malpractice
    Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
    Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
    Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
    Negligent Breach of Contract/ Warranty
    Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
    Collection Case–Seller Plaintiff
    Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
    Auto Subrogation
    Other Coverage
Other Contract (37)
    Contractual Fraud
    Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
    Writ of Possession of Real Property
    Mortgage Foreclosure
    Quiet Title
    Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
    Writ–Administrative Mandamus
    Writ–Mandamus on Limited Court Case Matter
    Writ–Other Limited Court Case Review
Other Judicial Review (39)
    Review of Health Officer Order
    Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
    Abstract of Judgment (Out of County)
    Confession of Judgment *(non-domestic relations)*
    Sister State Judgment
    Administrative Agency Award *(not unpaid taxes)*
    Petition/Certification of Entry of Judgment on Unpaid Taxes
    Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
    Declaratory Relief Only
    Injunctive Relief Only *(non-harassment)*
    Mechanics Lien
    Other Commercial Complaint Case *(non-tort/non-complex)*
    Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
    Civil Harassment
    Workplace Violence
    Elder/Dependent Adult Abuse
    Election Contest
    Petition for Name Change
    Petition for Relief From Late Claim
    Other Civil Petition

**CIVIL CASE COVER SHEET**

**For your protection and privacy, please press the Clear**

## NOTICE TO PLAINTIFF

A Case Management Conference is set for:

**DATE:**     **NOV 13, 2024**

**TIME:**     **10:30 am**

**PLACE:**     **Department 610**
                      **400 McAllister Street**
                      **San Francisco, CA  94102-3680**

All parties must appear and comply with Local Rule 3.

CRC 3.725 requires the filing and service of a case management statement form CM-110 no later than 15 days before the case management conference.  However, it would facilitate the issuance of a case management order **without an appearance** at the case management conference if the case management statement is filed and served twenty-five days before the case management conference.

Plaintiff must serve a copy of this notice upon each party to this action with the summons and complaint. Proof of service subsequently filed with this court shall so state. **This case is eligible for electronic filing and service per Local Rule 2.11.  For more information, please visit the Court's website at https://sf.courts.ca.gov under Online Services.**

**[DEFENDANTS: Attending the Case Management Conference does not take the place of filing a written response to the complaint. You must file a written response with the court within the time limit required by law. See Summons.]**

### ALTERNATIVE DISPUTE RESOLUTION REQUIREMENTS

**IT IS THE POLICY OF THE SUPERIOR COURT THAT EVERY CIVIL CASE SHOULD PARTICIPATE IN MEDIATION, ARBITRATION, NEUTRAL EVALUATION,  AN EARLY SETTLEMENT CONFERENCE, OR OTHER APPROPRIATE FORM OF ALTERNATIVE DISPUTE RESOLUTION PRIOR TO A TRIAL.**

**(SEE LOCAL RULE 4)**

Plaintiff **must** serve a copy of the Alternative Dispute Resolution (ADR) Information Package on each defendant along with the complaint.  (CRC 3.221.) The ADR package may be accessed at https://sf.courts.ca.gov/divisions/civil-division/alternative-dispute-resolution or you may request a paper copy from the filing clerk.  All counsel must discuss ADR with clients and opposing counsel and provide clients with a copy of the ADR Information Package prior to filing the Case Management Statement.

**Superior Court Alternative Dispute Resolution Administrator**
**400  McAllister Street, Room 103-A**
**San Francisco, CA  94102**
**adrcoordinator@sftc.org**

**See Local Rules 3.3, 6.0 C and 10 B re stipulation to judge pro tem.**

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

<table>
<tr><td>

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
ELON MUSK, an individual, JARED BIRCHALL, an individual, ADAM S. CASHMAN, an individual,
[Additional Parties Attachment Form is attached.]

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
AARON GREENSPAN, an individual

</td><td>

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*

</td></tr>
</table>

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

<table>
<tr><td>

The name and address of the court is:
*(El nombre y dirección de la corte es):* Superior Court of San Francisco County

Civic Center Courthouse, 400 McAllister St., San Francisco, CA 94102

</td><td>

CASE NUMBER:
*(Número del Caso):*
CGC-24-615352    **CGC-24-615352**

</td></tr>
</table>

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Aaron Greenspan, 956 Carolina Street, San Francisco, CA 94107, Phone: +1 415 670 9350, E-Mail: aaron.greenspan@plainsite.org

DATE:                    Clerk, by                                        , Deputy
*(Fecha)* **06/21/2024**    *(Secretario)*    **JAMES FORONDA**    *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

**Page 1 of 1**

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courts.ca.gov*

**SUM-200(A)**

| SHORT TITLE:<br>Aaron Greenspan v. Elon Musk et al | CASE NUMBER:<br>CGC-24-615352 |
|---|---|

### INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.)*:

☐ Plaintiff    ☒ Defendant    ☐ Cross-Complainant    ☐ Cross-Defendant

EXCESSION, LLC, a Texas Limited Liability Company, ALLISON HUEBERT, an individual, ADAM G. MEHES, an individual, MORGAN STANLEY & COMPANY, LLC, a Delaware Limited Liability Company, OMAR QAZI, an individual, SINGER CASHMAN, LLP, a California partnership, SMICK ENTERPRISES, INC., a Delaware corporation, ALEX SPIRO, an individual, TESLA, INC., a Delaware corporation, X CORP., a Nevada corporation formerly known as Twitter, Inc., DOES 1-10, inclusive

Page ___1___ of ___1___

**Page 1 of 1**

Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**