Aaron Greenspan (*Pro Se*)
956 Carolina Street
San Francisco, CA  94107-3337
Phone: +1 415 670 9350
Fax: +1 415 373 3959
E-Mail: aaron.greenspan@plainsite.org

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

AARON GREENSPAN,

    Plaintiff,

       v.

ELON MUSK, TESLA, INC., X CORP., THE
ELON MUSK REVOCABLE TRUST DATED
JULY 22, 2003, EXCESSION, LLC, JARED
BIRCHALL, MORGAN STANLEY &
COMPANY, LLC, OMAR QAZI, SMICK
ENTERPRISES, INC., SINGER CASHMAN,
LLP, ADAM S. CASHMAN, ALLISON
HUEBERT, ADAM G. MEHES, and ALEX
SPIRO,

    Defendants.

Case No. 3:24-cv-04647-MMC

**FIRST AMENDED COMPLAINT
FOR:**

1. Violation of Racketeer Influenced
   and Corrupt Organizations Act
   (RICO), 18 U.S.C. § 1964
2. Securities Fraud: California Corp.
   Code §§ 25400, *et seq*.
3. Fraud
4. Negligent Misrepresentation
5. Defamation Per Se
6. Defamation
7. Violation of Anti-Stalking Statute,
   Civil Code § 1708.7, *et seq*.
8. Negligent Infliction of Emotional
   Distress
9. Fraud on the Court (Malicious
   Prosecution)
10. Negligence
11. Unjust Enrichment
12. Violation of California Unfair
    Competition Law, Business and
    Professions Code § 17200
13. Violation of California False
    Advertising Law, Business and
    Professions Code § 17500
14. Declaratory Judgment

DEMAND FOR JURY TRIAL

## TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................................... ii

INTRODUCTION .............................................................................................................. 1

A.    The Tesla Matryoshka Doll of Nested, Interdependent Frauds .......................... 1

B.    The Plot Against PlainSite ................................................................................... 6

C.    The "Tesla Files" Confirm The Suspicions of Critics, Including Plaintiff......... 9

D.    Litigation History............................................................................................... 10

PARTIES .......................................................................................................................... 13

JURISDICTION AND VENUE ....................................................................................... 21

AGENCY, JOINT VENTURE, AIDING AND ABETTING, AND CONSPIRACY ...... 21

FACTS COMMON TO ALL CLAIMS FOR RELIEF ................................................... 22

A.    The Tesla "Autopilot" Fraud ............................................................................. 22

B.    The Tesla "Full Self-Driving" Fraud ................................................................ 25

C.    The Tesla Vehicle Quality Fraud ...................................................................... 39

D.    The Tesla Solar Fraud ....................................................................................... 40

E.    The Tesla Stock Inflation Fraud ........................................................................ 47

      a.    Accounting Fraud: Cash Balances ......................................................... 48

          i.    Earned Interest ........................................................................... 48

          ii.    Cash Stuck in China .................................................................. 51

          iii.    Accounts Receivable.................................................................. 52

          iv.    Accounts Payable....................................................................... 53

          v.    Tax Evasion ............................................................................... 54

      b.    Accounting Fraud: "Deliveries" ........................................................... 55

          i.    No Actual Definition................................................................... 55

          ii.    "Delivery Count New" Versus "Delivery Count Used" ............ 56

          iii.    Multiple Undisclosed Dynamic Incorrect Methodologies......... 58

          iv.    Rushed Delivery of Defective Vehicles..................................... 58

          v.    Multiple "Deliveries" Per Vehicle ............................................ 59

          vi.    Conflicted Overseas Auditors In The Dark ............................... 60

          vii.    Contradictions With Known Sales Metrics: New Vehicle Registrations and Google Invoices ................................................................................ 61

      c.    Accounting Fraud: Warranty Reserves and Goodwill Repairs............................ 62

      d.    Accounting Fraud: Material Weaknesses in Internal Controls ............................ 63

      e.    Accounting Fraud: Lying In Public to Justify Revenue Recognition ................. 66

f.      Accounting Fraud: Intentionally Underestimating Performance Metrics To Later Beat Them ................................................................................. 67

g.      Overt Market Manipulation ............................................................... 68

h.      Broadcasting Propaganda on Social Media ...................................... 70

i.      Fraudulent Price Targets .................................................................. 75

j.      Silencing Critics ............................................................................... 77

        i.      Tesla Customer and Shareholder Omar Qazi Responds To A Tesla Model 3 Safety Issue On Elon Musk's Behalf By Amplifying Dangerous Conspiracy Theories About Plaintiff ................................................... 77

        ii.     Qazi Steps Up His Campaign of Criminal Harassment ........................... 80

        iii.    Omar Qazi Leads a Mob That Tries To Frame Plaintiff for Possession of Child Pornography ................................................... 80

        iv.     Elon Musk Personally Participates In The Harassment Campaign .......... 83

        v.      Omar Qazi Targets Plaintiff's Family for Further Harassment ............... 84

        vi.     Even With Omar Qazi Banned From Twitter, His Libel and Harassment Continues ........................................................................ 86

        vii.    The Tesla Cult Fractures, with Omar Qazi Scapegoating Plaintiff .......... 88

F.      The "Hardcore Litigation" Fraud ................................................................. 95

TOLLING OF THE STATUTES OF LIMITATIONS ................................................. 96

CLAIMS FOR RELIEF ................................................................................................ 97

        COUNT I
        Violations of Federal Civil RICO (18 U.S.C. § 1962(c)) ................................. 97

        A.      The Atlanteca Enterprise .......................................................................... 98

        B.      Predicate Offenses ................................................................................... 101

        C.      Pattern of Racketeering Activity .............................................................. 103

        COUNT II
        Violations of Federal Civil RICO (18 U.S.C. § 1962(a)) ............................... 104

        COUNT III
        Conspiracy to Violate Federal Civil RICO (18 U.S.C. § 1962(d)) ................ 105

        COUNT IV
        Securities Fraud (California Corporations Code §§ 25400, 25500) .............. 106

        COUNT V
        Securities Fraud (California Corporations Code §§ 25401, 25501) .............. 106

        COUNT VI
        Assistance Committing Securities Fraud (California Corporations Code §§ 25403, 25504.1, 25504.2) ................................................................................. 107

        COUNT VII
        Fraud ............................................................................................................ 110

COUNT VIII
Negligent Misrepresentation ................................................................. 111

COUNT IX
Defamation Per Se .............................................................................. 112

COUNT X
Defamation Per Se .............................................................................. 124

COUNT XI
Defamation............................................................................................ 127

COUNT XII
Violation of the Civil Anti-Stalking Statute (California Civil Code § 1708.7, *et seq.*).. 128

COUNT XIII
Negligent Infliction of Emotional Distress ...................................... 132

COUNT XIV
Fraud on the Court (Malicious Prosecution)..................................... 136

COUNT XV
Negligence ........................................................................................... 145

COUNT XVI
Unjust Enrichment .............................................................................. 147

COUNT XVII
Violation of Unfair Competition Law (California Business and Professions Code § 17200) ........................................................................................ 148

COUNT XVIII
Violation of Unfair Competition Law (California Business and Professions Code § 17200) ........................................................................................ 150

COUNT XIX
False Advertising (California Business and Professions Code § 17500) ...................... 152

COUNT XX
Declaratory Judgment ....................................................................... 153

PRAYER FOR RELIEF ............................................................................ 154

JURY DEMAND ....................................................................................... 155

1

Plaintiff, Aaron Greenspan, alleges the following causes of action and requests for relief:

2

## INTRODUCTION

3

**A.    The Tesla Matryoshka Doll of Nested, Interdependent Frauds**

4

5    1.    Tesla Motors, Inc., since re-incorporated twice in Delaware and then Texas as

6    Tesla, Inc. ("Tesla"), was founded on July 1, 2003 by engineers Martin Eberhard and Marc

7    Tarpenning to manufacture electric vehicles.  On March 31, 2004, Eberhard and Tarpenning

8    approached dot-com millionaire Defendant Elon Musk to discuss funding Tesla, and Musk

9    ultimately agreed to invest $6.35 million.  He then set about taking control of the company,

10   pushing out the co-founders and churning through staff and hundreds of executives.  In May

11   2009, Eberhard sued Musk in the Superior Court of California for San Mateo County, Case No.

12   CIV484400, and as part of a case settlement, Musk obtained the contractual right to describe

    himself as a Tesla "co-founder."

13   2.    Tesla began trading on public markets on June 29, 2010.  By March 2021, a drug-

14   addled, centi-billionaire Defendant Musk had declared himself "Technoking" of Defendant Tesla

15   as he cultivated a public image of nothing less than humanity's savior: an iconic entrepreneur

16   simultaneously working to reduce greenhouse gas emissions by selling lithium- and cobalt-

17   hungry cars, and also, in case that didn't work, to make life "multi-planetary" by colonizing

18   Mars.  Tesla's market capitalization grew that year to a peak of $1.2 trillion, dwarfing the market

19   capitalization of the rest of the global automotive industry combined and making Defendant

20   Musk the wealthiest person on Earth.  Tesla was hailed as a "green" American success story.

21   3.    Few realized that the way that Defendant Musk achieved these remarkable

22   financial milestones was by orchestrating what was then the largest corporate fraud in American

23   history (succeeded soon after by Facebook, also known as Meta Platforms, Inc., which achieved

24   a $1.4 trillion market capitalization in 2024 based on similarly fraudulent conduct).  Yet the

25   description of Tesla's valuation as being based on "fraud" is, while accurate, far too simple,

26   because despite the company's innovative origins pre-dating Musk's involvement, Tesla is

27   actually a Matryoshka doll of *multiple*, nested, interdependent frauds:

28

---



a) Tesla "Autopilot": a set of driving automation features that Defendant Musk claimed could enable a Tesla vehicle to drive itself from Los Angeles to New York by 2016, which is still not possible in 2024;

b) Tesla "Full Self-Driving" ("FSD"): additional autonomous driving features beyond those offered by "Autopilot," sold for between $5,000 and $15,000 at various times, and advertised to consumers using false and misleading statements, often via videos created by social media influencers;

c) Tesla Solar: fire-prone energy products that Defendant Musk sold as "like having a money printer on your roof," but embraced only to bail out his cousins and his own teetering financial "pyramid;"

d) Tesla Vehicle Quality: severe vehicle quality problems and numerous design defects covered up by non-disclosure agreements and "goodwill" service;

e) Tesla Stock Inflation: shares of TSLA came to be the company's primary product, with its astronomical price based on accounting fraud, countless false

1
2
3

and misleading statements and omissions made over the course of years, and overt market manipulation carried out with the help of Defendant Morgan Stanley & Company, LLC ("Morgan Stanley").

4
5
6
7
8

f)  <u>"Hardcore Litigation"</u>: by filing serial fraudulent lawsuits in courts nationwide financed by securities fraud, Defendant Musk found a way to punish critics and undermine democracy while purportedly shielded by litigation privilege. Notably, these nested, interdependent frauds, which involve consumer fraud, securities fraud, and fraud on the court, resulted in dozens of needless and avoidable deaths.  More will follow.

9
10
11
12
13
14
15
16
17

4.  Defendants Musk and Tesla turned to fraud because without large-scale deception explicitly authorized by Defendant Musk, Tesla would have failed quickly.  Musk effectively admitted this on the witness stand during a trial in the Delaware Court of Chancery in July 2021, when he stated that he tried "very hard not to be the CEO of Tesla, but I have to or frankly Tesla is going to die."  Defendant Musk had long valorized Tesla's many near-"death" experiences and highlighted the dire odds against starting a new American automotive manufacturer to rationalize the need for his purported leadership.  On August 18, 2018, Musk wrote on his Twitter account, "Ford & Tesla are the only 2 American car companies to avoid bankruptcy..."  *See* https://x.com/elonmusk/status/1031111742103814144.

18
19
20
21
22
23
24
25

5.  Defendant Musk has openly admitted that his leadership philosophy is that the ends—here, Tesla's mission of "accelerating the world's transition to sustainable energy"—justify the means, or fraudulent and unlawful business practices, so long as they keep a company afloat.  *See* https://www.youtube.com/watch?v=xrVD3tcVWTY&t=3152s.  According to Defendant Musk's preferred public narrative, he is saving humanity from extinction; laws do not matter to him save for the laws of physics.  Defendant Musk thinks of the world as a video game, where minor characters, such as his employees, are irrelevant, and doubling down on risky bets can be a winning strategy.

26
27
28

6.  To avoid Tesla's "death" and purportedly save mankind, Defendant Musk needed to convince customers, the media, and the investing public that Tesla was not properly viewed as

a car company—historically likely to earn low, if not negative, automotive margins—but rather, as a *technology* company, where margins have historically been limited only by investors' imaginations. On the Q1 2024 Tesla earnings call, Defendant Musk explicitly admitted as much, stating, "I think Cathie Wood said it best. Like really, we should be thought of as an AI or robotics company. If you value Tesla as just like an auto company, you just have to—fundamentally, it's just the wrong framework and if you ask the wrong question, then the right answer is impossible. So, I mean, if somebody doesn't believe Tesla is going to solve autonomy, I think they should not be an investor in the company." In turn, to convince investors, he needed to do two things: 1) simultaneously spread vast quantities of misinformation, or as Tesla Director Kimbal Musk referred to it on July 14, 2021 under oath, "relentless optimism;" and 2) suppress any and all voices calling for a more rational analysis of the company's prospects.

7.    To spread misinformation, Defendants Musk and Tesla attracted and cultivated a literal cult following, both among his customer base and on Twitter, the social network Defendant Musk purchased in 2022 for $44 billion and renamed X (hereinafter "Twitter").

8.    Defendants Musk and Tesla also spread misinformation in Tesla's investor disclosures filed with the United States Securities and Exchange Commission ("SEC"). Tesla relied upon dozens of accounting tricks and grandiose promises, detailed below, many of which are now the subject of multiple investigations by federal and state government agencies, to boost its stock price, cement inclusion in the S&P 500, and achieve crucial market capitalization milestones tied to Defendant Musk's unprecedented—and now rescinded—2018 executive compensation package worth $56 billion.

9.    The combined effect of Defendant Musk's nested and interdependent frauds was that through 2021 or later, Defendant Tesla became the largest Ponzi scheme in history—one that just happened to produce cars. Cash flowing in from new investors replaced outflows from prior investors and cash bleeding from Tesla's staggering losses, while executives, such as Defendant Musk, were consistently rewarded ever more handsomely through stock-based compensation as the company lost more and more money and covered it up.



10.     By 2018, the disconnect between Tesla's stock price and its financial performance made it of particular interest to Defendant Musk's collective arch-nemesis: short-sellers, who had a financial interest in unraveling the frauds propping up the company's valuation.

11.     By 2018, Tesla's stock was also of interest to regulators.  In the fall of that year, the SEC charged Defendant Musk with securities fraud.  Defendants Musk and Tesla signed binding Consent Decrees, stipulated that they would not do anything "creating the impression that [each] [SEC] complaint is without factual basis," and each paid a $20 million fine.

12.     Defendants Musk and Tesla then immediately violated the terms of the Consent Decrees in multiple ways and amplified the magnitude of securities fraud they committed while also committing securities fraud with increasing frequency.  Warned by then-District Judge Alison J. Nathan of the Southern District of New York to put on its "reasonableness pants," the SEC did nothing regarding Musk or Tesla for years, even while its investigations turned up more evidence of fraud, and even while Musk continued to commit fraud and violate the Consent Decrees in broad daylight.  The SEC has since commenced several additional investigations against Defendants Musk and Tesla for violations of securities laws.

13.     To suppress critical voices—the second key ingredient in Defendant Musk's recipe for corporate "death" avoidance—the Defendants collectively scapegoated and targeted short-sellers and journalists, including but not limited to Plaintiff, in a manner closely reminiscent of the eBay cyberstalking affair that resulted in the United States Department of

Justice filing criminal charges against eBay, Inc. and certain of its employees, as well as collecting a $3 million fine from the company. *See* "eBay Inc. to Pay $3 Million in Connection with Corporate Cyberstalking Campaign Targeting Massachusetts Couple," https://www.justice.gov/usao-ma/pr/ebay-inc-pay-3-million-connection-corporate-cyberstalking-campaign-targeting. *See also USA v. eBay, Inc.*, Massachusetts District Court Case No. 1:24-cr-10003-PBS; *USA v. Gilbert et al*, Massachusetts District Court Case No., 1:20-cr-10098-WGY; *USA v. Baugh et al*, Massachusetts District Court Case No. 1:20-cr-10263-PBS.

14.     In recent years, Defendant Musk has come to be known as one of the most prolific cyberbullies on Earth, using his social networking website—on which he now has hundreds of millions of followers—to launch personal attacks based on conspiracy theories, broadcast Russian propaganda, antagonize political leaders worldwide, and even incite riots.

15.     To achieve this ignominious distinction, Defendant Musk needed help. Using the lure of stock market riches, he found enthusiastic assistance from investment banks and bankers (Defendants Morgan Stanley and Birchall), law firms and lawyers (Defendants Singer Cashman LLP, Cashman, Huebert, Mehes, and Spiro), Tesla customers (Defendants Qazi and Smick Enterprises, Inc. ("Smick")), and even star-struck regulators.

16.     Defendants Qazi and Smick assisted Defendants Musk and Tesla with the suppression of legitimate criticism by short-sellers and journalists, including Plaintiff. Simultaneously, Defendants Excession, LLC ("Excession"), Jared Birchall, and Morgan Stanley assisted Defendant Musk with the direct manipulation of Tesla's share price in response to that criticism. Defendant Spiro helped cover it up.

17.     Defendant Musk admitted on the record in late 2020 that short-sellers had been right all along: that in fact, Tesla had been on the verge of bankruptcy from "mid 2017 to mid 2019," rendering its investor disclosures, showing adequate cash and lacking any "going concern" statements, totally fraudulent. In response, regulators did nothing.

**B.     The Plot Against PlainSite**

18.     PlainSite, which Plaintiff co-founded in 2011 with two friends at Stanford

University, is an open legal information service similar to LexisNexis or Westlaw containing tens of millions of court records about millions of legal entities. Starting in 2018, as headlines blared about securities fraud involving Defendants Tesla and Musk, PlainSite users began to express more interest in Tesla and Elon Musk than virtually any other topic.

19.     Plaintiff ensured that records on PlainSite regarding Defendants Tesla and Musk were up to date, and also began writing about related news primarily on the @PlainSite Twitter account, as well as on his personal @AaronGreenspan Twitter account.

20.     Plaintiff also began filing Freedom of Information Act ("FOIA") and state public records requests regarding Defendants Tesla and Musk and posting the resulting documents on PlainSite for public viewing.

21.     The @PlainSite Twitter account ultimately amassed a following of approximately 25,000 followers, including journalists at *The New York Times*, *The Wall Street Journal*, *The Washington Post*, *Bloomberg News*, *The Financial Times*, CNBC, Reuters, and other major media networks. PlainSite and its disclosures were cited in numerous articles and later, in numerous lawsuits.

22.     PlainSite also attracted critics, the most vocal of which were convicted felons upset about their histories of criminal activity being public on court-related websites. One such felon was an especially prolific poster of false and dangerous claims about Plaintiff on-line.

23.     In 2019, Plaintiff started being harassed via Twitter, e-mail, telephone, and fax by an on-line mob of Musk and Tesla cult followers led by Defendants Qazi and Smick, who began amplifying the false and dangerous claims about Plaintiff they had found. In so doing they had the explicit approval of Defendants Musk and Tesla. Among other harassing acts, the mob attempted to frame Plaintiff for the crime of possession of child pornography, which Plaintiff reported to police and the Federal Bureau of Investigation ("FBI").

24.     On January 7, 2020, Plaintiff published a detailed PlainSite Reality Check report (the "Reality Check Report") regarding Defendants Tesla and Musk, similar to previous in-depth reports he had authored and/or co-authored regarding other publicly traded companies. The

Reality Check Report was 101 pages long with 314 footnotes.

25.    After the publication of the Reality Check Report, the harassment campaign against Plaintiff intensified.  For years, Plaintiff lived in fear of attacks from Tesla adherents, and especially Defendants Qazi and Smick working on behalf of Defendants Musk and Tesla—simply for publishing and analyzing public records about the company.

26.    In 2022, Defendant Musk publicly announced that he was "out for blood" and setting up a "hardcore litigation department."  For its debut, he engaged Defendants Singer Cashman, LLP, Adam S. Cashman, Allison Huebert, and Adam G. Mehes (the "Hardcore Litigation Department") to file a frivolous lawsuit against Plaintiff (the "Alameda Case")—the first lawsuit Defendant Musk had ever filed in his individual capacity—in the Superior Court of California for Alameda County in a brazen attempt to silence Plaintiff in retribution for his work to expose Defendants' fraudulent acts.  *See Musk v. Greenspan*, Case No. 23CV028370 (Alameda County *filed* February 24, 2023).  The lawsuit's initial and only complaint (the "Alameda Complaint") was rife with substantive and typographical errors and came to a rapid close in July 2023 after it was voluntarily dismissed with prejudice.

27.    On June 13, 2023, X Corp. suspended Plaintiff's @AaronGreenspan and @PlainSite Twitter accounts, which had become vital resources for journalists covering Defendants Musk and Tesla.  Both accounts were suspended simultaneously at approximately 1:15 P.M. for purported violations of the Twitter Terms of Service, but even after filing several so-called "appeals," Plaintiff was never told precisely what the purported violations were beyond "Violating our rules against posting private information."  Plaintiff was never told how both accounts were found to be in violation at the same time, what the "private information" was, or why Defendant Qazi—accused by Defendant Tesla in writing of "posting its internal information" on Twitter in February 2023—was not similarly suspended.

28.    At first, Defendant Qazi claimed not to have any *paid* relationship with Defendants Musk or Tesla, but evidence of what was at the very least an *unusually close* relationship steadily relationship manifested over time.  Finally, in July 2023, Defendant Qazi

openly admitted that Defendant Musk was, in fact, paying his company, Defendant Smick, via Defendant X Corp. as part of a revenue sharing program that had been crafted by Defendant Musk specifically for a limited number of Tesla and right-wing propagandists like him.

29.    Defendants' collective actions are part of an overt, disturbing, and at this point extremely well-documented pattern in which Defendants have repeatedly incited on-line mobs against anyone who dares question or criticize them. Defendants smeared and throughout this litigation have continued to smear Plaintiff as a mentally ill person making "implausible" and "unintelligible" claims, a "conspiracy theorist," a psychiatric patient, a rapist, a pedophile, a child molester, a likely school shooter, a stalker, and more, all in service of one of the largest and most complex frauds in American history.

**C.    The "Tesla Files" Confirm The Suspicions of Critics, Including Plaintiff**

30.    In late 2021, Plaintiff was contacted by a nameless source who at the time wished to remain anonymous and claimed to be an employee of Defendant Tesla with access to internal documents. Over the course of nearly a year, this source began sending Plaintiff hundreds, and then thousands, of authentic documents from a number of internal Tesla servers.

31.    Plaintiff compiled and organized the information provided to the extent possible and offered it to government agencies and professional journalists.

32.    The information provided to Plaintiff came in part from Tesla's accounting systems and contained evidence of numerous types of fraud, much of which Plaintiff had already alleged was taking place in court. The data also contained records confirming that Defendants Qazi and Smick had committed fraud and worked as agents of Defendants Tesla and Musk, and that Defendant Tesla had taken steps to cover up evidence of their agency relationship. Most importantly, it corroborated that Defendants Tesla and Musk made countless false and misleading statements and caused material omissions, in SEC filings and on Twitter, which Tesla has for years treated as an official communications medium for investors.

33.    Plaintiff's source independently decided to share the internal Tesla data he had obtained with the German newspaper *Handelsblatt* in the hopes that it would publicly reveal

violations of the European General Data Protection Regulation ("GDPR"). Plaintiff's source also independently shared portions of the data with certain other individuals.

34. In preparation for publication of its investigative series, entitled the "Tesla Files," *Handelsblatt* sent Defendant Tesla a list of detailed questions that exposed the source's identity by allowing Tesla to search its log files for key data points.

35. Against Plaintiff's will, *Handelsblatt* also exposed Plaintiff's involvement coordinating the careful, responsible and lawful release of material portions of the Tesla Files.

36. The *Handelsblatt* series focused on consumer complaints regarding Tesla vehicles and Tesla's GDPR violations, but *Handelsblatt*'s staff lacked the background, expertise and professionalism needed to understand the vast amount of data. In this regard, *Hansdelsblatt* was not alone. Many of the most important stories in the "Tesla Files" were never actually published.

**D. Litigation History**

37. Plaintiff first sued Defendants Musk, Tesla, Qazi and Smick in the Northern District of California on May 20, 2020. *See Greenspan v. Qazi et al*, Case No. 3:20-cv-03426-JD (N.D. Cal. *filed* May 20, 2020) ("*Greenspan I*"). A First Amended Complaint, ECF No. 20, was filed pursuant to Federal Rule of Civil Procedure ("Rule") 15(a)(1). A Second Amended Complaint, ECF No. 70, was filed pursuant to Rule 15(a)(2) with the parties' consent. A Third Amended Complaint, ECF No. 103, was filed pursuant to Rule 15(a)(2) with the Court's consent, and was the first version of the complaint reviewed by the Court. District Judge James Donato dismissed the Third Amended Complaint with leave to amend in an order, ECF No. 125, misquoting Plaintiff's pleading while also failing to analyze each issue raised pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Plaintiff's Fourth Amended Complaint, ECF No. 131, was filed on August 13, 2021 subject to a highly unusual order restricting the number of pages allowed for a PSLRA claim.

38. In *Greenspan I*, Defendants Musk and Tesla were initially represented by Cooley, LLP ("Cooley"), which withdrew when Defendant Musk fired the entire firm because it had hired an attorney who previously worked on a Musk investigation at the SEC. Cooley was

replaced by Quinn Emanuel Urquhart and Sullivan, LLP ("Quinn Emanuel"), for which Defendant Spiro works.

39.     Both Cooley and Quinn Emanuel frequently relied on the defense that Plaintiff's allegations were "implausible," even though they and their clients already knew them to be true. In particular, Quinn Emanuel derided Plaintiff's warning about the Tesla Files as "implausible," indicating that at least every allegation so designated in *Greenspan I* is, in fact, true.

40.     Throughout the litigation, Judge Donato and the other parties concealed the fact that Judge Donato's wife had earned and continues to earn income from Solutus Legal Search, whose notable clients include Cooley and Quinn Emanuel, both of which represented Defendants Musk and Tesla.  Judge Donato refused to recuse himself and falsely claimed that his relationship with Cooley, also his former employer, had ended years prior.

41.     On May 19, 2022, Judge Donato dismissed Plaintiff's federal claims in the Fourth Amended Complaint with prejudice and dismissed the state claims without prejudice.  Having received the Tesla Files after the filing of the Fourth Amended Complaint, Plaintiff filed a motion pursuant to Federal Rule of Civil Procedure 60(b), describing some of the new information.

42.     On June 29, 2022, Defendants Musk and Tesla responded to Plaintiff's warning about what amounted to the largest known data breach that Tesla has ever suffered by falsely describing Plaintiff's assertions as a "facial[ly] implausibil[e] [] self-serving tale—which comes from the same person who 'says he created an early version of Facebook.'"  They went on to further cast Plaintiff's true allegations as "self-serving" and "wholly insubstantial."  When Defendant Tesla finally did report the data breach to the Office of the Maine Attorney General as required by law, it falsely represented both the "Date(s) Breach Occurred" and "Date Breach Discovered" as "May 10, 2023," nearly a year after it had belittled Plaintiff's notice.

43.     On June 30, 2022, without allowing Plaintiff to reply and without ever holding a single hearing during the entirety of the case, Judge Donato denied the Rule 60(b) motion.  On July 25, 2022, Plaintiff timely appealed to the United States Court of Appeals for the Ninth

Circuit.  The appellate court scheduled and then later cancelled oral argument.

44.     On February 24, 2023, while the appeal was pending, Defendant Musk filed a frivolous lawsuit against Plaintiff in the Superior Court of California for the County of Alameda, Case No. 23CV028370, based on the false allegation that Plaintiff had masterminded the separate *Hothi* litigation against Musk also proceeding in that court, which was based on a 2019 e-mail conversation between Plaintiff and Defendant Musk subsequently posted on PlainSite.

45.     On April 7, 2023, pursuant to California Code of Civil Procedure § 128.7, Plaintiff served a motion for sanctions on counsel for Defendant Musk highlighting numerous material errors in the frivolous lawsuit.  The California Code of Civil Procedure § 128.7 21-day safe harbor expired on Tuesday, May 2, 2023 inclusive of the two extra days provided by California Code of Civil Procedure § 1010.6.

46.     On Monday, May 1, 2023, realizing that he and his counsel would be sanctioned, Defendant Musk dismissed his frivolous lawsuit against Plaintiff with prejudice.

47.     California Code of Civil Procedure § 1010.6 allowed Plaintiff two extra days to carry out "any right or duty to do any act or make any response within any period or on a date certain after the service of the document" when serving filings electronically.  Accordingly, on May 3, 2023, Plaintiff electronically filed and served a cross-claim in Case No. 23CV028370 for malicious prosecution, which the Superior Court of California for the County of Alameda initially allowed, issuing summonses.  Subsequently, Judge Eumi Lee ruled that the Clerk of Court had acted in error because California precedent artificially stripped the court of its jurisdiction to hear a cross-claim, Section 1010.6 apparently notwithstanding, and thus required a cross-claimant alleging malicious prosecution to file a new, separate civil action and thus to pay a double filing fee.  Plaintiff alleged that this violated due process.  In her July 11, 2023 General Order, Judge Lee did not address Plaintiff's arguments regarding Section 1010.6 or the due process implications of requiring a victim of malicious prosecution to pay double filing fees.

48.     On February 14, 2024, after the Ninth Circuit appeal had been briefed, Judge Donato issued an Order Re Dismissal, ECF No. 49, in *Pauly v. Becker*, Northern District of

California Case No. 3:23-cv-03108-JD, involving the same issue that had formed the crux of Plaintiff's Ninth Circuit appeal: whether or not the PSLRA applied to individual securities actions. Judge Donato ruled that it does not, for the first time agreeing with Plaintiff on that issue years after Plaintiff had first raised it on August 3, 2020 in an Emergency Motion To Clarify Applicability Of The PSLRA And, If Relevant, Lift Discovery Stay.

49.     Judge Donato's outdated decision in *Greenspan v. Qazi* was upheld on appeal without oral argument in an unpublished decision that appears to have been written by a staff attorney, not a judge, with the Ninth Circuit's mandate issued on June 10, 2024.

50.     On June 12, 2024, Plaintiff re-filed the state claims in the Superior Court of California for the County of San Francisco and added additional state claims.

51.     On July 31, 2024, certain of the defendants—but not Defendant Musk, who failed to appear—purported to remove the case to federal court in the Northern District of California in a defective Notice of Removal based on a false declaration by attorney Anthony P. Alden.

52.     Anthony P. Alden's name appears on ECF No. 181 in *Greenspan I* on behalf of Defendants Musk and Tesla, and Attorney Alden also represented Defendants Musk and Tesla in the Ninth Circuit appeal, but he did not file a formal appearance with the District Court in *Greenspan I* in violation of Civil Local Rule 5-1(c)(2)(A). Thus far in this particular action, Attorney Alden does not represent Defendant Musk, nor does any attorney.

## PARTIES

53.     Plaintiff Aaron Greenspan is an individual residing in San Francisco County in the State of California. Plaintiff is not a public figure. Plaintiff graduated from Harvard College with advanced standing in three years and was subsequently a CodeX Fellow at Stanford Law School from 2012-2013. Plaintiff is also a software developer, investor and short-seller who has worked with forensic accountants and journalists to report on accounting and securities fraud at publicly traded companies. Plaintiff purchased Tesla put options in his personal brokerage accounts from September 24, 2018 through March 23, 2020 and lost money through June 2020 as Tesla stock skyrocketed higher due to Defendants' serial unlawful acts. Plaintiff invested in

Tesla put options because he believed that Defendant Tesla's business was fundamentally overvalued by the market. When Plaintiff began purchasing Tesla securities he had no knowledge of any alleged fraud involving Defendant Tesla except for limited knowledge from news reports of Defendant Musk's August 2018 false "funding secured" tweet. Plaintiff is licensed to drive a motor vehicle and frequently drives on roads and interstate highways.

54.    Plaintiff's documented involvement with the origins of Facebook at Harvard College is the source of controversy despite both *The New York Times* in 2007 and his classmate Mark Zuckerberg in 2009, as part of a legal settlement with Plaintiff, publicly verifying that Plaintiff created the original campus-wide website referred to as "The Facebook," which counted Zuckerberg as a member and which was the predecessor to Zuckerberg's unauthorized version. Plaintiff, Plaintiff's company, Zuckerberg, and Facebook, Inc. reached a confidential settlement in May 2009, before the film *The Social Network* was released about Facebook's origins.

55.    Despite being omitted from the film, Plaintiff was deposed as part of the ConnectU litigation that *The Social Network* depicted, where ConnectU was represented by Quinn Emanuel before ConnectU sued Quinn Emanuel for malpractice. The transcript of Plaintiff's November 29, 2007 deposition was marked "Confidential - Attorneys Eyes Only." *See* https://www.plainsite.org/dockets/download.html?id=16332683&a=3&z=785f517e. Yet since the start of this litigation, Defendants, and especially Quinn Emanuel, have sought to abuse the history of the Facebook controversy to portray Plaintiff as unreliable and mentally unstable, furthering the libel and harassment that is the very subject of this lawsuit.

56.    Defendant Elon Musk is a self-described centi-billionaire "far right" public figure who controls numerous companies, who frequently works in California, and who lived in California during much of the relevant timeframe. His superlative wealth is derived almost entirely from fraudulent conduct involving Defendant Tesla, of which he is CEO and "Technoking." Despite also running a defense contractor, in his own words, Defendant Musk regularly "tranq[s] out" and besides tranquilizers abuses LSD, ketamine, cocaine, and various other illegal narcotics according to reporting by *The Wall Street Journal*. Defendant Musk was

charged with securities fraud in 2018 in relation to a marijuana joke, paid $20 million to the SEC to settle those charges, has been found to have acted with scienter in multiple civil securities lawsuits, and has generally admitted to market manipulation, having stated "I might pump but I don't dump" during a conference panel broadcast worldwide on July 21, 2021.  On November 29, 2023, on stage at a *New York Times* DealBook Summit event broadcast live on television, Defendant Musk told X Corp. advertisers, "Don't advertise… Go fuck yourself."  On January 30, 2024, the Delaware Court of Chancery invalidated Defendant Musk's 2018 Tesla executive compensation package worth $56 billion, finding that he controls Defendant Tesla and that he misled shareholders leading up to and during a defective voting process.  Defendant Musk then attempted to supersede that court's decision by having Tesla lie to shareholders about Delaware law in a proxy filing and announcing the purported results of a proxy vote to "ratify" his conflicted plan, which cannot be ratified, before the vote was even complete.

57.     Defendant Musk is 53 years old, four times separated, and preys on young people. He chooses young men and women to serve as his Chiefs of Staff (Sam Teller, Harvard College Class of 2008; Omead Afshar, UC Irvine Class of 2009), his Chief Financial Officers (Zachary Kirkhorn, University of Pennsylvania Class of 2006), his marketing proxies (Omar Qazi, Santa Clara University Class of 2015; Vivien "Viv" Hantusch, Heinrich-Heine-Universität Düsseldorf Class of 2019) and—in the tradition of his friend, former financial advisor, and now-deceased convicted felon Jeffrey E. Epstein—targets of sexual predation.  He preys on young people because they are more likely to be awestruck by fame, and due to their inexperience, they are less likely to ask questions or push back on instructions that are illegal.  When they learn too much, he generally pays them to remain silent, keeps them in his network of close friends where they can be monitored and controlled, and finds replacements.  According to internal company records, Omead Afshar received an equity grant worth $10 million; Afshar is now an investor in Defendant X Corp. via his fund Afshar Partners, LP.  Vivien Hantusch was eventually hired to report to Afshar, and also received stock options.  Immediately after being subpoenaed by the SEC on December 5, 2019 in connection with his work for Defendant Musk, Sam Teller began

working instead at Valor Equity Partners, run by Tesla Director and Musk personal friend Antonio Gracias. And a Space Exploration Technologies Corporation ("SpaceX") flight attendant—one of many such young women specifically hired for their training in massage therapy—received a $250,000 severance payment after turning down a sexual relationship with, and a horse from, Defendant Musk. Musk and Tesla reimburse SpaceX for jet time and fuel.

58. Defendant Musk treats all his companies as though they are one seamless global conglomerate, as evidenced by related-party transactions, shared staff, shared information technology resources, shared source code, cross-marketing agreements, and confidential documents. Defendant Musk is the principal architect and leader of a cult and criminal enterprise as described herein, which spans the various legal entities he controls and influences: Tesla, Inc.; X Corp.; X.AI Corp.; Excession, LLC; SpaceX; TBC-The Boring Company; Neuralink Corp.; the Musk Foundation; the Elon Musk Revocable Trust Dated July 22, 2003 (the "Musk Trust"); and various other limited liability companies. This cult and criminal enterprise, referred to herein as the "Atlanteca Enterprise," is coordinated at least in part through the atlanteca.com domain name, which is not directly associated with any of Defendant Musk's known businesses so as to evade legal process such as discovery obligations and subpoenas.

59. Defendant Tesla, Inc. is a corporation based at all relevant times in California, but now in Texas, with operations in Alameda, Los Angeles, Santa Clara, San Francisco, San Joaquin, and San Mateo Counties in California. Its common stock trades on the NASDAQ Global Select Market under the ticker symbol "TSLA." Despite its peak market capitalization of approximately $1.2 trillion, Defendant Tesla for years had no permanent General Counsel. Three of its prior General Counsels and an Acting General Counsel resigned from 2017 through mid-2021 (Todd Maron, Dane Butswinkas, Jonathan Chang, Al Prescott), as did two prior Chief Financial Officers (Jason Wheeler, Deepak Ahuja) and two Chief Accounting Officers (Eric Branderiz, Dave Morton). Tesla then burnt through two more General Counsels or equivalent officers (Bill Berry, Dinna Eskin) and another Chief Financial Officer (Zach Kirkhorn). Defendant Musk is an officer, director and employee of Defendant Tesla. Under *respondeat*

*superior* doctrine, Defendant Tesla is liable for the actions of Defendant Musk performed in connection with its business. Since Defendant Omar Qazi is a paid agent of Defendant Tesla working at its direction via his company Defendant Smick, Defendant Tesla is also liable for Defendant Qazi's and Defendant Smick's actions.

60.     Defendant X Corp., formerly Twitter, Inc., is a Nevada corporation with offices in San Francisco County. In late 2019, after former Twitter CEO Jack Dorsey refused to reinstate the account of Defendant Musk and Tesla's abusive agent, Defendant Qazi, Defendant Musk began to seriously consider strategies to control Twitter. In 2022, after unlawfully building up a stake in Twitter, Inc. with the help of Defendants Birchall and Morgan Stanley & Company, LLC—an act that is presently the subject of multiple federal investigations by the SEC and United States Department of Justice—and after a lengthy legal battle in the Delaware Court of Chancery, Defendant Musk acquired Twitter, Inc. for the sum of for $44 billion, paid for with his fraudulently inflated Tesla shares. He renamed the company X Corp. and the platform X. Today, Defendant Musk primarily uses the platform to spread pro-Tesla and pro-Russian propaganda, including but not limited to hate speech and messages intended to interfere with the 2024 presidential election. As part of the Atlanteca Enterprise, X Corp. has been used as a weapon against Defendant Musk's many critics. On March 25, 2024, in *X Corp. v. Center for Countering Digital Hate, Inc.*, Judge Breyer of this Court ruled, "The Court notes, too, that X Corp.'s motivation in bringing this case is evident. X Corp. has brought this case in order to punish CCDH for CCDH publications that criticized X Corp." Similarly, X Corp. has also sued to punish Media Matters for America and the World Federation of Advertisers, whom Musk considers enemies.

61.     Defendant Elon Musk Revocable Trust Dated July 22, 2003 (the "Musk Trust") is a trust that owns the majority of Defendant Musk's illicit wealth, including millions of shares of Tesla stock. Defendant Musk is the "sole Trustee" of, and controls, the Musk Trust. Defendant Musk also uses the Musk Trust to reward his collaborators in the Atlanteca Enterprise.

62.     Defendant Excession, LLC is a Texas Limited Liability Company. It is

Defendant Musk's family office, which manages his wealth, including but not limited to the assets of the Musk Trust. Besides Defendant Birchall, Excession has several employees.

63. Defendant Jared Birchall, also known by the alias "James Brickhouse," is Defendant Musk's fixer and right-hand man. He resides in Texas, but lived and worked in California during much of the relevant timeframe. Defendant Birchall has a documented history of hiring and paying at least one convicted felon on Defendant Musk's behalf and was recently deposed by the SEC and the United States Department of Justice in connection with ongoing investigations. Defendant Birchall is the head of Excession, Defendant Musk's family office, which manages Musk's wealth in conjunction with the Musk Trust. Defendant Birchall communicates about sensitive and unlawful matters with Defendant Musk via the encrypted messaging application Signal using messages that automatically disappear after a set interval, or in person, typically during weekly Friday meetings. Defendant Birchall was formerly employed by Defendant Morgan Stanley and Merrill Lynch, from which he was fired in 2010. According to discovery documents originating in the separate civil lawsuit *Rasella v. Musk*, even after being fired, Defendant Birchall conspired with Morgan Stanley employees Jon Neuhaus, Michael Grimes and Kate Claassen as well as former employee Kyle Corcoran to execute deliberately manipulative and/or secret stock trades on Defendant Musk's behalf while evading Morgan Stanley's compliance department and the advice of legal counsel in order to help Defendant Musk acquire Twitter, Inc. at an artificially low price.

64. Defendant Morgan Stanley & Company, LLC is a Delaware Limited Liability Company with offices in California. It provides investment banking and illegal market manipulation services to Defendants Musk and Tesla and the Atlanteca Enterprise. Defendant Morgan Stanley faces ongoing probes from the SEC, the Office of the Comptroller of the Currency, and the United States Department of the Treasury in conjunction with its "wealth management" unit, which services Defendant Musk. Defendant Morgan Stanley and its subsidiaries have paid over $600 million in fines to the SEC over the past decade.

65. Defendant Omar Qazi is a Tesla customer, shareholder and contractor who has

been criminally charged in at least two unrelated cases and who resides at least part-time in San Francisco County.  Defendant Qazi also does business in Los Angeles, Santa Clara and San Francisco Counties in California.  Defendant Qazi, individually and through his corporation, Defendant Smick Enterprises, Inc., is a ferocious paid propagandist for Defendants Musk and Tesla, having authored and/or coordinated over 330,000 tweets praising Tesla and scapegoating its critics—plus essays, podcasts, and promotional videos touting Tesla's purported FSD features.  For the sake of comparison, Yevgeny Prigozhin, known as "Putin's Chef," employed a "troll-factory" that "generated one of the largest known online disinformation campaigns, churning out 71,000 tweets" according to Bellingcat in 2020.  Today, Defendant Qazi has over 500,000 followers on Twitter.  One of those followers is Defendant Musk, who frequently uses Defendant Qazi's posts as springboards for official Tesla communications.  Defendant Qazi was given "VIP" status by Defendants Tesla and X Corp. at Defendant Musk's behest.  Especially after Defendant Musk disbanded Defendant Tesla's formal Public Relations team in late 2019, Defendant Qazi filled in for its role, often working as a tag team with Defendant Musk to hurl accusations and falsehoods concerning Plaintiff, among other topics, in order to discredit Plaintiff's document-based research on Defendants Tesla and Musk.  Before Musk purchased it, Defendant Qazi was banned from Twitter due to his harassing conduct toward Plaintiff, but evaded the ban by appropriating various new accounts until Defendant Musk purchased the platform, reversed his ban, and began paying him to post.

66.     Defendant Smick Enterprises, Inc. is a Delaware corporation that has failed to register with the California Secretary of State or Franchise Tax Board and does not pay required California taxes, but nevertheless operates in Santa Clara and San Francisco Counties.  Defendant Qazi is its Chief Executive Officer.  Under *respondeat superior* doctrine, Defendant Smick is liable for the actions of Defendant Qazi performed in connection with its business.

67.     Defendant Singer Cashman, LLP is a California limited liability partnership that represented Defendant Musk in the Alameda Case and willingly filed a false pleading on his behalf in the Superior Court of California for the County of Alameda that it knew or should have

known was false. On or about June 24, 2024, twelve days after being named in this litigation, the Singer Cashman, LLP website began redirecting to the website of Singer IP, LLP, which no longer featured the profile of prior partner Defendant Adam S. Cashman.

68.    Defendant Adam S. Cashman is an attorney licensed in California, State Bar No. 255063, who represented Elon Musk in the Alameda Case. Mr. Cashman was a named partner at Singer Cashman, LLP and is now a partner at BraunHagey & Borden, LLP. He signed the false Alameda Complaint on behalf of Elon Musk naming Plaintiff as a defendant, which he had a legal obligation to review before filing. He also signed the predecessor document to the Alameda Complaint. Defendant Cashman previously worked for Quinn Emanuel. None of Defendant Cashman's communications with Defendants are protected by attorney-client privilege due to the crime-fraud exception.

69.    Defendant Allison Huebert is an attorney licensed in Texas, Bar Card No. 24124694, working for Tesla, Inc., but who represented Elon Musk in the Alameda Case. Her name appears on the false Alameda Complaint naming Plaintiff as a defendant, which she had a legal obligation to review before filing. Defendant Huebert previously worked for Quinn Emanuel. None of Defendant Huebert's communications with Defendants are protected by attorney-client privilege due to the crime-fraud exception.

70.    Defendant Adam G. Mehes is an attorney licensed in Texas, Bar Card No. 24133603, working for X Corp. and/or Tesla, Inc. but who represented Elon Musk in the Alameda Case. His name appears on the false Alameda Complaint naming Plaintiff as a defendant, which he had a legal obligation to review before filing. His name also appears on the false predecessor document to the Alameda Complaint. Defendant Mehes previously worked for Quinn Emanuel. None of Defendant Mehes's communications with Defendants are protected by attorney-client privilege due to the crime-fraud exception.

71.    Defendant Alex Spiro is a Florida-based attorney licensed in New York who works for Quinn Emanuel and caters to celebrity clients. Defendant Spiro represents Tesla, Inc. and Elon Musk, and works on behalf of the entire Atlanteca Enterprise. Defendant Spiro has

been the subject of a motion for criminal sanctions brought by the State of Florida and routinely practices law in California without a license. Defendant Spiro was also the subject of a sanctions motion in Texas for practicing law in Texas without a license. Defendant Spiro never paid his *pro hac vice* fees in *Greenspan I*—part of a pattern evidenced by roughly a dozen other cases in which Defendant Spiro also failed to file required paperwork or pay required fees. At Defendant Musk's instruction, Defendant Spiro provided legal advice to Defendant Qazi regarding *Greenspan I*. None of Defendant Spiro's communications with Defendants are protected by attorney-client privilege due to the crime-fraud exception.

## JURISDICTION AND VENUE

72.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1337, and 1338(a), as well as 18 U.S.C. § 1964(a) and (c). This is a civil case arising under the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1965 and Declaratory Judgment Act, 28 U.S.C. § 2201.

73.     Supplemental jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1367 over the state law claims that are so related to the federal claims in this action that they form part of the same case or controversy under Article III of the United States Constitution.

74.     Personal jurisdiction and venue are proper because at least one defendant is a corporation headquartered in this district and/or because the improper conduct alleged herein occurred in, was directed from, and/or emanated or exported from California. Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this judicial district.

## AGENCY, JOINT VENTURE, AIDING AND ABETTING, AND CONSPIRACY

75.     Defendants conspired with currently unidentified co-conspirators in carrying out the wrongful conduct alleged herein. All such unidentified co-conspirators were Defendants' agents, employees, and/or joint venturers, and were at all times acting within the course and scope of said agency, employment, and/or joint venture.

76.     Each Defendant and unidentified co-conspirator took actions that aided and abetted, encouraged, and rendered substantial assistance in accomplishing the wrongful conduct,

wrongful goals, and other wrongdoing alleged herein. In taking these actions, each Defendant and unidentified co-conspirator acted with an awareness of his/her primary wrongdoing and realized his/her conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and other wrongdoing. In addition, each act and omission comprising the aforementioned wrongful conduct, wrongful goals, and other wrongdoing was made known to, and ratified by, each of the Defendants.

77.    Each Defendant and unidentified co-conspirator conspired with each other and with others to perpetrate the unlawful scheme on Plaintiff, as alleged herein. In doing so, each Defendant and unidentified co-conspirator have committed acts and omissions, including but not limited to making materially false, misleading, and deceptive statements and omissions, while acting within the scope and in furtherance of the conspiracy alleged herein, and with full knowledge of the goals of that conspiracy.

78.    Plaintiff reserves the right to amend this Complaint when he learns the identities of currently unidentified co-conspirators, and Plaintiff intends to sue each Defendant and co-conspirator as participants, alter egos, agents, and conspirators with one another in the wrongful acts, omissions, plans, schemes, and transactions alleged herein.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

**A.    The Tesla "Autopilot" Fraud**

79.    Tesla "Autopilot" 1.0 was introduced in October 2014 as a set of features that began as a project called "advanced driver assistance" to comply with European safety standards. Its features focused on highway driving: automatic braking and lane-keeping ("Autosteer," automatic lane change and uncommanded lane change). By October 2015, "Autopilot" "7.0" had been released, with Defendant Musk stating as follows at a recorded press event (*see* https://www.youtube.com/watch?v=73_Qjez1MbI&t=4s):

> "What I'm going to take you through is how ***the system learns over time***. I think that what's interesting and unique is that we're deploying a ***fleet learning technology***, essentially ***the network of vehicles is—is gonna be constantly learning*** and um as we release the software and more people enable Autopilot, uh, then the information about how to drive is uploaded to the network. So, so each car—each, ***each driver is really an***

*expert trainer* in how the Autopilot should work.  Um.  And I think you're good about how that works, but it's a combination of a variety of systems, um, um and, um, and it's never really been done as a connected vehicle.  So, and the interesting thing is like, *every car made by Tesla from late September last year will overnight have this ability*…  And the capability will keep improving over time, both from the standpoint of all the expert driving doing approximately a million miles a day of travel and training, but also in terms of the software functionality" (emphasis added).

80.    In fact, no vehicle delivered by Tesla in 2014, 2015, 2016, 2017, 2018, 2019, 2020, 2021, 2022, or 2023 came remotely close to having the ability to "learn[] over time" as described by Defendant Musk.  Instead, Defendant Tesla relied on human beings—independent contractors with sparse training who were often not even Tesla employees—caught up in another fraud described below, to manually tag portions of images and videos that the company's supposed "machine learning" algorithms had no hope of identifying on their own.

81.    The media relied on Defendant Musk's false and misleading statements in its coverage of "Autopilot."  The *MIT Technology Review* captioned its February 23, 2016 article entitled, "Tesla Autopilot" with, "The electric-vehicle maker sent its cars a software update that suddenly made autonomous driving a reality."  This was simply false.

82.    On November 28, 2018, among a flurry of articles reporting that Defendant Tesla claimed that its customers had driven 1 billion miles using "Autopilot," *Bloomberg News* falsely reported, "The resulting trove of real-world miles acts as a feedback loop to the algorithms that are constantly training the fleet of Tesla vehicles..." *See* https://www.bloomberg.com/news/articles/2018-11-28/tesla-customers-rack-up-1-billion-miles-driven-on-autopilot.  To the extent any training "algorithms" existed, they did not work.

83.    On December 16, 2019, a news story began circulating about a boy wearing an orange shirt in Brazil who had been mistaken for a traffic cone by "Autopilot."  While the boy was not hurt, the story continued to raise serious questions about "Autopilot"'s true abilities.

84.    By 2020, confidential internal Tesla presentations still noted hundreds of slides worth of manual tagging errors.  Such errors frequently labeled discrete, solid objects, such as highway barriers, with a system flag for "road debris," with one presentation slide noting, "we annotate standalone curbs that separate lanes as road_debris" next to screenshots of manual

image taggers asking questions like, "Would this be the correct way to annotate this?"

85.     Defendant Tesla evaluated its manual image taggers based on "accuracy" as assessed by their human supervisors, but also on speed, evaluating "Time per frame," abbreviated "T/F," with supervisor dashboards noting that "lower T/F is better."  This metric incentivized Tesla's human image taggers to sacrifice accuracy, especially since Tesla compared taggers to each other on each metric.

86.     The fact that "Autopilot" had never actually involved a "network of vehicles" that was "constantly learning" from "expert trainer" drivers was emphasized in May 2024 by nVIDIA CEO Jensen Huang, who described such features at Tesla as "really revolutionary" because they were purportedly part of Tesla FSD version 12, released approximately *nine years* after the October 2015 "Autopilot" "7.0" press conference falsely claiming that they had already been implemented.  Huang also stated, "We used to train based on images that are labeled." Tesla still does exactly this.  *See* https://www.youtube.com/watch?v=ER7iqeYx9HU&t=508s.

87.     Today, "Autopilot" has been the subject of nearly 100 lawsuits and/or regulatory actions against Defendant Tesla, including but not limited to *Matsko v. Tesla, Inc.*, Case No. 3:22-cv-05240-RFL (N.D. Cal. *filed* September 14, 2022), which features detailed background on pages 17-22 of the Consolidated Third Amended Complaint, ECF No. 102.

88.     As noted in *Matsko*, Defendants "Tesla and Musk often use 'Autopilot' as an umbrella term to refer to all of Tesla's A[dvanced ]D[river ]A[ssistance ]S[ystems] technologies and systems, including Autopilot, Enhanced Autopilot, and FSD, and Tesla's Autopilot team has historically developed all of Tesla's ADAS technologies and systems."

89.     According to the June 30, 2022 videotaped deposition of Tesla Director of Autopilot Software Ashok Elluswamy from *Huang v. Tesla, Inc. et al* in the Superior Court of California for the County of Santa Clara, Case No. 19CV346663, Defendant Musk personally ran the "Autopilot" team, which also included Directors Milan Kovac (who no longer works on "Autopilot"), CJ Moore (who has since left Tesla), and Andrej Karpathy (who has since left Tesla).

90.     While he continued to spread lies to the general public about the software's capabilities, Defendant Musk's "prime directive" to his "Autopilot" team was "do not crash."

91.     Defendant Tesla repeatedly published false and/or misleading statistics embellishing "Autopilot"'s safety record on the Tesla website which failed to take into account various driving conditions such as time of day, street or highway driving, and weather conditions.

92.     Tesla customers and employees believed Defendant Musk's and Tesla's lies, and consequently, many lost their lives.  As of the date of this pleading, according to the tracking website TeslaDeaths.com, "there are 44 'Verified Tesla Autopilot Deaths' across 39 incidents."

**B.     The Tesla "Full Self-Driving" Fraud**

93.     On its own, "Autopilot" was not successful at sufficiently boosting sales of Tesla vehicles—the software's initial goal, as consumers were still generally wary of electric vehicles—and Defendant Tesla continued to lose billions of dollars.  Defendant Musk decided to expand Tesla's automated driving features from highways to "city streets."

94.     In 2016, Defendant Tesla launched "Enhanced Autopilot" and "Full Self-Driving" at Defendant Musk's behest, which it sometimes qualified with the terms "Capability" or "Beta." Tesla published an infamous video entitled "Full Self-Driving Hardware on All Teslas" (*see* https://www.tesla.com/videos/full-self-driving-hardware-all-tesla-cars) that falsely claimed:

> "THE PERSON IN THE DRIVER'S SEAT
> IS ONLY THERE FOR LEGAL REASONS
>
> HE IS NOT DOING ANYTHING
> THE CAR IS DRIVING ITSELF"

95.     The video was intentionally deceptive and had implications that reverberated for years.  On December 6, 2021, *The New York Times* published an article based on "interviews with 19 people who worked on the project over the last decade" which made clear that,

> "The route taken by the car had been charted ahead of time by software that created a three-dimensional digital map, a feature unavailable to drivers using the commercial version of Autopilot, according to two former members of the Autopilot team.  At one point during the filming of the video, the car hit a roadside barrier on Tesla property while using Autopilot and had to be repaired, three people who worked on the video

said."

*See* https://www.nytimes.com/2021/12/06/technology/tesla-autopilot-elon-musk.html.

96.    This strategy of optimizing pre-planned routes would surface again and again with respect to "Autopilot" and FSD.

97.    As competition in electric vehicles ramped up, especially from Chinese automotive manufacturers, Defendant Musk increasingly conveyed that FSD represented the key to Tesla's future.  Defendant Musk began to speak about FSD increasingly in the context of Tesla's stock price, such as on quarterly earnings calls, linking its success or failure to the company's overall likelihood of success or failure.

98.    On November 26, 2018, Defendant Musk made a videotaped admission to *Axios* that Defendant Tesla "faced a severe threat of death" and was "bleeding money like crazy" such that "in a very short period of time, we would die."  *See* https://www.axios.com/2018/11/26/elon-musk-tesla-death-bleeding-cash.

99.    To attempt to remedy the urgent problem of Tesla's cash crunch, starting in late 2018, Defendant Tesla began to cultivate a network of social media influencers from its customer base in an effort to convince the public that its FSD features were safe and effective.

100.    On April 22, 2019, at "Autonomy Investor Day," false promises by Defendant Musk regarding the purported Tesla "robotaxi" network—including Musk's statements that "[T]here will be autonomous robotaxis from Tesla next year...next year for sure, we'll have over a million robotaxis on the road," and that Tesla owners would earn "~$30,000 Total gross profit per car per year" for "11 years" based on "Vehicle longevity"—formed the basis of Defendant Tesla's $2 billion share issuance days later, which was later increased to $2.7 billion.

101.    There were no "forward-looking statement" disclosures or meaningful cautionary statements at "Autonomy Investor Day," only a passing reference to the idea of disclosures in a joke that Defendant Musk used to falsely suggest that his predictions always come true.

102.    Defendant Musk knew that his promises about robotaxis were false when he made them.  In order to launch a network of autonomous taxis, among other steps, Defendant Tesla

would have needed to 1) secure regulatory approval from state and local regulators; 2) set up insurance business relationships; 3) developed a mobile application capable of coordinating complex logistics; 4) tested that mobile application in a variety of settings nationwide; and 5) taken steps to protect any relevant intellectual property, such as by filing for patent and/or trademark protection where appropriate.  By April 22, 2019, Defendant Tesla had done *none* of these, nor had it taken first steps to attempt to accomplish any of them.  In a June 3, 2020 e-mail to Plaintiff, the California Department of Motor Vehicles ("CADMV") confirmed that Defendant Tesla had never actually raised the matter of "robotaxis" with its autonomous driving regulators.

103.    Defendant Morgan Stanley was one of the underwriters of Defendant Tesla's May 2019 "robotaxi" capital raise according to Tesla's SEC Form 424B5 filed May 2, 2019.

104.    The "Tesla First Quarter 2019 Update" filed as part of an SEC Form 8-K on April 24, 2019 promised,

> "A custom-made robotaxi capable of running about a million miles using a single battery pack, with all the sensors and computing power for full autonomy, should cost less than $38,000 to produce.  We believe low vehicle cost, low maintenance cost and an expected powertrain efficiency of 4.5 miles per kWh should make this the lowest cost of ownership, and to be the most profitable autonomous taxi on the market."

105.    FSD also provided Defendant Tesla with a mechanism to generate revenue, which was increasingly important for the cash-strapped company.  On the dubious theory that its value would triple as the software improved, Defendant Musk raised the price of FSD from $5,000 at Autonomy Investor Day in April 2019 to $15,000 in September 2022.

| Date | FSD Cost |
|---|---|
| April 2019 | $5,000 |
| May 2019 | $6,000 |
| August 2019 | $7,000 |
| July 2020 | $8,000 |
| October 2020 | $10,000 |
| January 2022 | $12,000 |
| September 2022 | $15,000 |
| September 2023 | $12,000 |
| April 2024 | $8,000 |

106.    A key problem for Defendant Musk was that no matter the price, not enough

1  customers were interested in purchasing the flawed and dangerous FSD software, leading to

2  frequent remarks on earnings calls about how the public simply did not "understand" the import

3  of Defendant Tesla's supposedly ingenious product.

4      107.    A second key problem for Defendant Musk was that Tesla's lawyers, accountants

5  and auditors knew that his promises often rang hollow, and would not allow the company to

6  recognize all Autopilot or FSD payments as revenue up-front because the products were so

7  speculative.  On August 25, 2020, Tesla Head of SEC Reporting Janice Yeung created general

8  ledger account 411114, "Vehicle Sales - FSD Def Rev," with a note that the account was for

9  "Autopilot deferred revenue."  On September 7, 2020, Ms. Yeung created a general ledger

10  account 471114, "FSD Revenue - Def Rev Release," with a note that the account was for

11  "Autopilot deferred revenue recognized."  Both were assigned to the Microsoft Dynamics 360

12  FSLI-L2 "Revenues" category.  A corresponding liability general ledger account 223230,

13  "Deferred Revenue - Autopilot," had already been on the books since Defendant Tesla started

14  using Microsoft Dynamics 360 in July 2018.

15      108.    Revenue recognition thus became a driving force behind purported FSD

16  development and feature releases.  Defendant Musk repeatedly declared broken and dangerous

17  software to be a technological breakthrough so that the company's lawyers, accountants and

18  auditors would allow the recognition of additional revenue that had been stored in general ledger

19  account 411114 without yet appearing on the company's statement of operations as revenue.

20      109.    Five years after Defendant Musk and Tesla raised nearly $3 billion on the basis of

21  the false promise that 1 million robotaxis would be on the road by 2020, they next promised that

22  the Tesla robotaxi network would be unveiled at an event on August 8, 2024.  That event was

23  cancelled and postponed until November, emphasizing the dishonesty of the 2019 claims.

24      110.    By 2020, Defendant Tesla was so desperate for cash that it simply began stealing

25  customer funds.  Defendant Tesla modified its mobile application to exploit "dark patterns," or

26  user interface designs that made it more likely for customers to make mistakes, such as the

27  inadvertent approval of large expenditures on FSD software packages they did not actually want.

28

For example, Defendant Tesla updated its mobile app to add FSD upgrades to each user's shopping cart by default and re-designed the "purchase" button not to look like a button at all. Defendant Tesla referred to these stolen funds as "customer deposits" or "cash" on its financial statements and recognized the converted funds as revenue.

111.    Once FSD had been "purchased" for thousands of dollars, Tesla typically refused to issue refunds.  This dynamic was described by several Tesla customers on social media:

a)    On January 15, 2020, Nassim Nicholas Taleb wrote in a Twitter post: "The purchase was non-intentional. I unintentionally hit the buy button while the app was in my pocket and do not know of any app that makes you do a purchase of $4,333 with[out] confirmation/password or something of the sort." Although Taleb, who is famous, reportedly received a refund after complaining publicly, many less-famous Tesla customers did not.

b)    Twitter user @CamBirch wrote on January 28, 2020, "I just had this happen. Called Tesla (hard to do) and talked to a support person. It took them a week and the refund is now displayed on my card. Getting the free mud flaps had more confirmations and proof of purchase than a nearly $10k purchase."

c)    Twitter user @mpj510 described the experience on March 9, 2020: "hi Elon! We were having a problem getting a refund for full self drive that we didn't authorize last 1/13/2020 and that costs $7,542.50! Kindly help us."

d)    Twitter user @Maykou1st described her experience on April 10, 2020: "In Jan I noticed an addition in the ph app about upgrades so I looked and noticed I 'bought' a full self driving upgrade in 8/2019 for $3k which I never did and they refused to refund."

e)    At least one other similar public request was deleted as a condition of receiving a refund.

112.    When Tesla customers made FSD upgrade purchases through the Tesla mobile application deliberately or inadvertently, purchases prior to October 2021 were recorded as

revenues in general ledger account 470001 designated for "OTA Upgrade Revenue" and in approximately October 2021 or later in general ledger account 471115 designated for "FSD Revenue – Subscription".

113.    On the June 30, 2021 Q2 2021 Tesla earnings call, Defendant Musk admitted, "***We need to make Full Self-Driving work*** in order for it to be a compelling value proposition" (emphasis added).  The call ended soon thereafter with no further questioners permitted.  Despite the admission that Tesla's FSD features did not yet "work," Defendant Tesla recognized tens of millions of dollars of deferred revenue on the basis of their purported functionality.

114.    An internal Tesla spreadsheet, below, reveals that by Q3 2021, the FSD subscription upgrade refund rate was extremely high: over 26.5% for July 2021 (703 refunds/2,652 upgrades), 26.7% for August 2021 (589 refunds/2,202 upgrades), and 15.9% for September 2021 (520 refunds/3,268 upgrades).



115.    To more widely disseminate false and misleading marketing promoting FSD, in or around September 2021, Defendant Tesla launched the FSD Early Access Program ("EAP") for social media influencers including but not limited to Defendant Qazi, Galileo Russell, and others, who wanted to be able to access early versions of FSD software to create demonstration videos.

116.    E-mails sent to EAP applicants stated that, "The Early Access program is invitation-only and participants are specifically chosen for evaluation.  Therefore it's not open

enrollment.  If one is eligible, we will contact them directly, but we cannot promise that all FSD customers will receive an invitation."

117.    Tesla retained editorial control over all EAP participants and their unbranded Tesla commercials.  On September 19, 2021, EAP contractor Galileo Russell, who regularly collaborates on and appears in Tesla-related videos with Defendant Qazi, posted a video of himself to YouTube in which he admitted that Tesla exercises direct control over EAP contractors.  *See* https://www.youtube.com/watch?v=gvgsoRPiWA8&t=2m14s.  In Russell's words, "Um, but yeah, Tesla doesn't want us sharing all of the clips of the videos, um, ***just like when it looks good***, because they know people take it out of context" (emphasis added).

118.    By the time the EAP came into existence, Defendant Tesla was already in litigation in *Greenspan I*, in which Plaintiff explicitly alleged that Defendants Qazi and Smick acted as Musk and Tesla's agents.  Therefore, to attempt to insulate Tesla from liability and cover up the fact that EAP participants were, in fact, acting as Tesla's agents, the Tesla legal department drafted terms and conditions entitled the "Tesla Early Access Program Agreement" that appeared to explicitly disclaim any agency relationship.

119.    After Defendant Qazi electronically signed Defendant Tesla's EAP Agreement purportedly disclaiming any agency relationship, Defendant Tesla sent Defendant Qazi a contractual rider that re-established the agency relationship.  The rider was entitled "EAP Guidelines" and read as follows:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16

**EAP Guidelines** ⌄

1. Third Party Applications- You may not use third party applications that access data from your vehicle (e.g. TeslaFi, ev-fw.com, etc.), or use your vehicle for Uber, Lyft, Turo, Scoop, or any other ride or vehicle sharing service while running Early Access software.
2. Privacy & Security- While enrolled, we will log and process detailed vehicle data, video clips, and detailed location data tied to your VIN to develop new features and help us diagnose any issues you may experience. For more information on Tesla's EAP-related data practices, please see the attached copy of the Early Access Program Agreement.
3. Do make sure that people that see your media posts understand that this isn't autonomous driving
4. Do explain what is happening in your media posts. For example, many takeovers we see are in situations where you are being extra cautious and attentive even though the vehicle will complete the maneuver safely. That's perfectly fair and a good thing for the audience to understand. We expect there will be some issues with the EAP Beta but you will be able to control them just as with Autopilot. So it's understandable if you publish a video showing interventions and taking over. See #1 above, it's not an autonomous vehicle.
5. Do remember that there are a lot of people that want Tesla to fail; don't let them mischaracterize your feedback and media posts.
6. Do not conduct interviews with media or representatives of other companies. Also, do not invite media/representatives of other companies for ride-alongs or to evaluate this EAP.
7. Do not stream your entire drive and do not try to interact with or hold camera equipment while driving. This could be distracting.
8. Do share on social media responsibly and selectively. There will be many more opportunities to share content, especially as we continue to release new builds to the group. Consider sharing fewer videos, and only the ones that you think are interesting or worthy of being shared.
9. VIN associated Data Sharing is automatically enabled to gather feedback.

17
18
19
20

120.    By stating that "there are a lot of people that want Tesla to fail; don't let them mischaracterize your feedback and media posts," Defendant Tesla explicitly authorized EAP participants including but not limited to Defendant Qazi to act as its agents and attack critics on Tesla's behalf, including but not limited to Plaintiff.

21
22
23
24
25

121.    Further cementing the agency relationship between Defendant Tesla and EAP participants, after Defendant Musk's acquisition of Twitter in 2022, Tesla EAP participants were added to a "VIP" list of only a few dozen Twitter users eligible to earn income from their Twitter posts.  Unlike other revenue share programs, such as those offered by Google and YouTube, the revenue share program offered by Defendant X Corp. was initially not open to the public.

26
27
28

122.    On July 13, 2023, Defendant Qazi posted a screenshot of Defendant Smick's Stripe account reflecting a $6,206.00 payment from Defendant X Corp. for his participation in its

VIP revenue-sharing program—the first of many such payments of varying amounts. *See* https://x.com/WholeMarsBlog/status/1679593569114533888. Each payment amount was nominally based on the impressions and engagement that the @WholeMarsBlog Twitter account received on all of the account's posts since its inception.



123.    Many of the impressions and engagements that Defendant Qazi was paid for were for impressions and engagements of Twitter posts that libeled and/or harassed Plaintiff.

124.    Tesla social media influencer Alexandra Merz, also known as @TeslaBoomerMama on Twitter, posted a spreadsheet of her earnings from the X Corp. VIP revenue-sharing program on Google Sheets. Ms. Merz's spreadsheet reflected the fact that starting on August 7, 2023, Defendant X Corp. made and continues to make payments to participants on a bi-weekly basis. Ms. Merz's smallest bi-weekly payment was reportedly $142.55 ("11/10 - 11/23/2023") and her largest was reportedly $2,859.52 ("6/7 - 6/20/2024").

125.    For a time, Ms. Merz's Google Sheet also contained hidden worksheets for other Tesla social media influencers, including but not limited to Kristen Yamamoto, known on Twitter as @Kristennetten or "K10," and Sawyer Merritt, another Tesla social media influencer.

126.    Defendant Qazi produced hundreds of videos posted on both Twitter and YouTube purporting to depict the flawless operation of Defendant Tesla's FSD software. Yet Defendant Qazi's videos were fraudulent in three different ways:

a) Defendant Qazi deliberately withheld material information about his own Tesla vehicle's service problems, including a persistent "screeching noise," from his followers. He then edited his videos to remove evidence that his Tesla vehicle was not functioning properly. On November 10, 2020, Defendant Tesla's service systems recorded "Jim Qazi" using Defendant Qazi's cell phone number ending in 37 writing via text message, "if you're driving at a low speed and turning the wheel left you should be able to hear the screeching sound. it is so bad and just keeps getting worse and worse. very sad that nobody is able to tell me what it is[.]" On the same day, Defendant Tesla acknowledged that Defendant Qazi "mentioned this concern previously and we were not able to verify it. On March 28, 2021, Defendant Qazi followed up, writing via the Tesla mobile application, "would like someone to look at berkeley even if no repair is ultimately needed, or if they could just burnish the brakes or do whatever to get it go away temporarily that would make me happy too. ***trying to make videos of this new FSD software without the car making loud high pitched screeching noises***" (emphasis added).

b) According to a July 9, 2024 report in *Business Insider*, Defendant Tesla prioritized the review and tagging of camera images for Defendant Musk's and its EAP participants' routes. *See* https://www.businessinsider.com/tesla-prioritizes-musk-vip-data-self-driving-2024-7.

c) Defendant Qazi produced hundreds of YouTube videos for his hundreds of thousands of followers showcasing his Tesla Model 3's purported FSD features, but withheld information about his use of a Comma device that suppressed safety warnings until he admitted to its persistent use on June 7, 2024. *See* https://x.com/WholeMarsBlog/status/1799276775912153403.

127. Defendant Qazi's videos were intended to both increase vehicle sales and increase Tesla's stock price. In one video, he exclaimed, "I'll sell them all fuckin' Teslas. I'll pull in

those referrals!"  *See* https://www.youtube.com/watch?v=VSOayMTw5Zw&t=1396s.  In another post, he wore a T-shirt of Tesla's nearly vertical stock graph.

128.    In order to mass market FSD, Defendant Musk ordered Defendant Tesla's lawyers to devise a strategy to avoid regulatory scrutiny.  Consequently, knowing that U.S. regulators only claimed jurisdiction over "Level 3" and higher systems on the Society of Automotive Engineers ("SAE") Levels of Driving Automation scale (first published in a paper entitled *SAE J3016 Recommended Practice: Taxonomy and Definitions for Terms Related to Driving Automation Systems for On-Road Motor Vehicles* and later revised in 2016, 2018, and 2021), Defendant Tesla exploited justifiable confusion over the various SAE "Levels" and claimed in communications with regulators, obtained by Plaintiff via public records requests, that FSD only constituted a "Level 2" system.

129.    While exploiting confusion over the SAE "Levels," Defendant Tesla also created its own.  In a November 20, 2020 letter from its counsel Eric C. Williams to Miguel Acosta, Chief of the Autonomous Vehicles Branch of the CADMV, Defendant Tesla wrote, "City Streets continues to firmly root the vehicle in SAE Level 2 capability and does not make it autonomous under the DMV's definition."  *See* https://www.plainsite.org/documents/242a2g/california-dmv-tesla-robotaxi--fsd-emails/.  At approximately the same time, the Tesla Insurance Autonomous Vehicle Protection Package in Texas included an "additional definition" stating, "'Autonomous vehicle' means any vehicle equipped with a level two or higher driving automation system as defined by SAE International Standard J3016.'"  *See* https://www.plainsite.org/documents/uhbpli/redpoint-county-mutual-insurance-company-serff-tracking-no-misf132484596-filing-package/.  Thus, Defendant Tesla informed different regulators that its FSD software was both autonomous and not autonomous simultaneously.

130.    Whether or not FSD was actually a "Level 2" system at the outset—which did not necessarily mean it remained so as the software changed—by maintaining that FSD's capabilities had their "root" in a "Level 2" classification, for years Defendant Tesla evaded the jurisdiction of the CADMV and the National Highway Traffic Safety Administration ("NHTSA").

131.    No regulator performed ongoing independent analysis of FSD's capabilities for the purposes of determining the proper SAE Level classification. Each instead relied on technology manufacturers such as Defendant Tesla to self-assess their respective SAE Levels.

132.    On August 12, 2021, NHTSA issued Standing General Order 2021-01, which required manufacturers of Level 2 driver assistance systems to report vehicle crashes.

133.    On August 17, 2021, a member of the public recorded a Tesla sales representative at a Tesla showroom at 4545 La Jolla Village Drive, Unit C17, San Diego, CA 92122 representing that FSD operates at "Level 3 of 5 levels in total of full self-driving." *See* https://www.youtube.com/watch?v=Ii_UvYiO1x0.

134.    Meanwhile, Defendant Musk repeatedly stated that FSD would achieve "Level 5" soon virtually every year starting on April 22, 2019 at Autonomy Investor Day. On December 1, 2020, while accepting the Axel Springer Award in Germany, Defendant Musk claimed that FSD would achieve "Level 5" in 2021.

135.    In response to a public records request by Plaintiff, CADMV produced a March 9, 2021 "Memo to File" that stated, "DMV asked CJ [Moore, Tesla's former Director, Autopilot Software] to address, from an engineering perspective, Elon's messaging about L5 capability by the end of the year. Elon's tweet does not match engineering reality per CJ." CJ Moore was no longer employed by Defendant Tesla soon after this disclosure to Plaintiff.

136.    According to Defendant Tesla's Tesladex database, as of March 22, 2022—two months after Defendant Tesla claimed, "We successfully increased the number of FSD Beta vehicles from a couple of thousand in Q3 to nearly 60,000 vehicles in the US today," in its "Q4 and FY 2021 Update"—there were only actually 42,128 "delivered" Tesla vehicles produced in North America and Europe that were configured for active use of FSD Beta. This was according to a query for all vehicles with the "GUI_fsdControlEnabled" flag set to "true", which means that matching vehicles had an enabled Graphical User Interface panel for FSD Beta on the center console. Tesladex also indicated as of that date that 434,460 "delivered" vehicles were FSD-capable and 218 "delivered" vehicles had had FSD Beta suspended.

1
2
3
4
5
6
7
8
9
10
11



137.    On July 28, 2022, the CADMV initiated two legal proceedings against Defendant Tesla for committing fraud with respect to its FSD software in yet another way: by using the terms "Autopilot" and "Full Self-Driving" at all.  In the First Amended Accusation of Case Nos. 21-02188 and 21-02189 (with minor changes between them to account for the charges relating to Tesla's vehicle dealer, as opposed to manufacturer, license), CADMV alleged,

"Respondent made or disseminated statements that are untrue or misleading, and not based on facts, in advertising vehicles as equipped, or potentially equipped, with advanced driver assistance system (ADAS) features.  On at least five dates between May 28, 2021 and July 12, 2022, specifically May 28, 2021, June 3, 2022, June 14, 2022, June 28, 2022, and July 12, 2022, Tesla advertised ADAS features in written marketing materials primarily on Tesla's internet website using the product label and descriptions:

A.  'Autopilot'

B.  'Full Self-Driving Capability'

C.  The phrase: 'The system is designed to be able to conduct short and long-distance trips with no action required by the person in the driver's seat.'

D.  The claims: 'From Home - All you will need to do is get in and tell your car where to go.  If you don't say anything, your car will look at your calendar and take you there as the assumed destination.  Your Tesla will figure out the optimal route, navigating urban streets, complex intersections and freeways.  To your Destination- When you arrive at your destination, simply step out at the entrance and your car will enter park seek mode, automatically search for a spot and park itself. A tap on your phone summons it back to you.'

Instead of simply identifying product or brand names, these 'Autopilot' and 'Full Self-Driving Capability' labels and descriptions represent that vehicles equipped with the ADAS features will operate as an autonomous vehicle, but vehicles equipped with those ADAS features could not at the time of those advertisements, and cannot now, operate as autonomous vehicles. These advertisements are a deceptive practice under Civil Code § 1770(a)(5). Tesla has published disclaimers including one observed June 28, 2022, stating in part: 'The currently enabled features require active driver supervision and do not make the vehicle autonomous.' However, the disclaimer contradicts the original untrue or misleading labels and claims, which is misleading, and does not cure the violation. Respondent advertised statements not based on facts in violation of Cal. Code Regs. Title 13, § 260.00. Respondent made untrue or misleading statements in advertisements in violation of Vehicle Code § 11713(a). Respondent's acts, omissions, or conduct constitutes cause to discipline a manufacturer license pursuant to Vehicle Code § 11705(a)(10)."

CADMV further alleged,

"Respondent continued to use the product labels 'Autopilot' and 'Full Self-Driving Capability,' from January 1, 2023, to the present, and at least on September 1, 2023, through October 4, 2023, and those labels describe partial driving automation features using language that implies or would otherwise lead a reasonable person to believe that the features allow the vehicle to function as an autonomous vehicle. Respondent thereby violated Vehicle Code § 24011.5(b) and Vehicle Code § 11713(a) as those sections interact. Respondent's acts, omissions, or conduct constitutes cause to discipline a manufacturer license pursuant to Vehicle Code § 11705(a)(10)."

138.    On July 6, 2023, Defendant Musk claimed at the World Artificial Intelligence Conference in Shanghai that FSD would achieve "Level 4 or 5" by the end of 2023. All of these claims were false and Defendant Musk knew them to be false when he made them.

139.    In March 2024, Defendant Tesla dropped the "Beta" suffix after "Full Self-Driving" and replaced it with the term "(Supervised)" in marketing materials.

140.    Tesla's motions to dismiss the CADMV proceedings were denied on June 10, 2024 by California Office of Administrative Hearings Administrative Law Judge Juliet E. Cox. Both CADMV enforcement proceedings remain pending.

141.    On or around August 23, 2024, Defendant Tesla suddenly deleted dozens of posts from its website from 2016-2019, including but not limited to a October 19, 2016 post entitled, "All Tesla Cars Being Produced Now Have Full Self-Driving Hardware."

1

## C.     The Tesla Vehicle Quality Fraud

2

142.     For years, Defendant Tesla has known that, on average, its vehicle quality does

not meet industry standards.  In one internal chat discussing a customer complaint, Tesla Senior

Regional Parts Manager / Senior Supply Chain Field Operations Manager, Material Planning -

Service and Energy Greg Dolgner wrote, "If you want a better quality seat, the customer should

go buy a Mercedes or BMW."

143.     The persistent defects prevalent in Tesla vehicles are a direct result of choices

made by Defendant Musk, such as the decision to build vehicles in an outdoor tent at the

company's Fremont factory, and the decision to use electrical tape from home improvement

stores to fix manufacturing defects.  *See* https://www.cnbc.com/2019/07/15/tesla-workers-in-

ga4-tent-describe-pressure-to-make-model-3-goals.html.  *See also*

https://www.cnbc.com/2018/10/19/tesla-ceo-elon-musk-extreme-micro-manager.html.  While

many of these choices have been widely reported, Defendant Tesla has gone to considerable

lengths to cover up the downstream effects and hide them from customers and investors.

144.     Defendant Tesla forced many customers to sign non-disclosure agreements in

order to have their vehicles repaired.

145.     In 2018, Defendant Musk was referred to the Federal Trade Commission by

NHTSA for making false claims about the Model 3's safety record.  Defendant Tesla's

manufacturing practices arguably made the Model 3's safety considerably worse.

146.     Like all automotive manufacturers, Tesla is routinely sued in "lemon lawsuits"

under the Magnuson-Moss Warranty Act and similar state statutes.  However, per vehicle sold,

records on PlainSite offer a rough estimate that Tesla is sued two to three times as often as its

major competitors such as General Motors, Ford, and Toyota.

147.     Defendant Tesla never disclosed to investors the existence of Case No. 20-

123464TVI-OTIR/04 in Norwegian Oslo District Court, brought by RAC Norway A/S ("RAC

Group"), the local manager of the AVIS car rental brand.  RAC Group sued Defendant Tesla for

the repair costs to its fleet of almost 100 Tesla vehicles, used as Tesla's loaner fleet for car

repairs, after Defendant Tesla stopped paying RAC Group's invoices worth approximately 35 million NOK. The lawsuit ended with a court-ordered settlement of 11.8 million NOK paid by Tesla in March 2021, which was personally approved by Tesla CFO Zachary Kirkhorn.

148.    This omission later had an impact when car rental company Hertz announced a supposed order for 100,000 Tesla vehicles in October 2021, sending Tesla's stock soaring to the tune of about $400 billion in market capitalization, despite the fact that no such order actually existed. Nonetheless, Defendant Musk's personal wealth increased by about $45 billion as a result—enough to purchase Twitter, Inc. the following year. Investors were unaware that Tesla had encountered so much trouble maintaining a fleet of under 100 rental cars in a relatively small country that it ended up being sued and settling the case, with repair costs accruing to Tesla.

149.    Defendant Tesla has been investigated by NHTSA for numerous safety defects, including but not limited to problems with the suspension in Model S and X vehicles, sudden unintended acceleration events, phantom braking, and numerous other recalls the bases for which Defendant Tesla has attempted to deny and cover up for years.

**D.    The Tesla Solar Fraud**

150.    SolarCity was founded in 2006 by Lyndon and Peter Rive, Defendant Musk's cousins. Musk himself was the Chairman of the SolarCity Board of Directors, having reportedly provided the initial impetus to start the company. By that point, Musk had been an investor in Tesla for three years and had been leading SpaceX for four.

151.    Defendant Tesla, SolarCity and SpaceX sometimes engaged in undisclosed related-party transactions, such as SolarCity buying cars from Tesla, or SpaceX purchasing solar panels from SolarCity. In the words of former Tesla Director Brad Buss in Delaware Court of Chancery Case No. 12711-VCS, "We would just—you know, we might buy solar panels for something. They may be buying batteries and stuff from our perspective. You know, I think they bought some cars."

152.    By 2016, SolarCity's CEO, Lyndon Rive, was starting to panic. SolarCity required a bridge loan to avoid defaulting on its revolving debt and no one was willing to provide

it.  Defendant Musk and his cousins had strategized a buyout over a conversation at Lyndon Rive's second home at Lake Tahoe in February 2016.  Rive attempted to tell Defendant Musk how dire the situation was, but Musk seemed distracted by other issues.  When discussing whether SolarCity should raise equity by May 2016, Defendant Musk asked, "Can it wait a month?"  Any buyout would have needed to be approved by shareholders, made challenging by the horrific financials and the conflicts of interest between the Board members.

153.    Because SpaceX owned 77% of SolarCity's bonds, a SolarCity bankruptcy would have had material negative consequences for SpaceX, and in turn, Defendants Musk and the Musk Trust.  The damage to Defendant Musk's reputation alone would have also materially affected cash-strapped Tesla, causing a cascade of events that could have plausibly led to Defendant Musk's personal bankruptcy and long-term alienation from banks and capital markets.  Defendant Musk was therefore motivated to take extreme measures.

154.    Musk schemed with his cousins and both Boards of Directors to make it appear as though his plan for a vertically integrated energy company was widely supported and had made perfect sense all along.  In reality, the Tesla, SolarCity, and even SpaceX Boards were all against a Tesla-SolarCity merger.  Defendant Tesla stood to acquire a large amount of debt from SolarCity, and there was virtually no overlap between manufacturing, selling and financing solar panels and manufacturing and selling electric vehicles.

155.    That the deal made no sense was widely known.  As Linette Lopez wrote in *Business Insider*, "[T]he merger that Musk called a 'no-brainer' appeared to be anything but.  No other company was bidding to buy SolarCity, and according to internal emails, it was also struggling to find financing for a $200 million bridge loan that it needed immediately."  As Lyndon Rive wrote about one of SolarCity's loan facilities, "If we breach [K]ronor, we're dead."

156.    According to Defendant Tesla's own General Counsel at the time, Todd Maron, the deal was worse than nonsensical: it would actually harm Tesla.  As he wrote, "[T. Rowe Price] said what Tesla is trying to accomplish in the automotive space is very complex and to add SolarCity to the mix raises the operational and financial risk profile of the company,

especially given SolarCity's financial challenges as a company."

157.     Advisors Evercore Partners LLC and Lazard also insisted that the deal was problematic, even looking at numbers that painted an overly optimistic picture due to an enormous mathematical error. Both Goldman Sachs and Defendant Morgan Stanley refused to lend money on the basis that SolarCity had failed credit checks. Even the Board of SpaceX "said no" to investing, according to unredacted testimony by SolarCity CEO Rive.

158.     The pliant Tesla Board finally cracked under pressure from Defendant Musk. Virtually all of the Directors were conflicted. Kimbal Musk—who claimed under oath that he didn't perceive any conflict at all—is Defendant Musk's brother and business partner of decades. Steve Jurvetson and his funds owned 1.67 million shares of SolarCity stock. Ira Ehrenpreis was invested in SpaceX through a Special Purpose Vehicle—the only one of his firm's investments that apparently necessitated one. Antonio Gracias vacationed with Musk's family in Mexico.

159.     Defendant Musk devised a solution to save himself and his family: a fake product demonstration. He would announce and launch a "Solar Roof Tile," purportedly proving that the supposed vertical integration between SolarCity and Tesla had always been meant to be. On October 26, 2016, the demonstration took place on the set of the television show Desperate Housewives, carefully orchestrated to keep the press from catching onto the fact that the entire presentation was a hoax. The product did not work, did not really exist, and was not hooked up to the electric grid. It was all for show to induce shareholders to approve the deal.



160.     When Tesla and SolarCity shareholders voted on the merger deal, they were falsely told that Elon Musk had been "recused" from the decision-making process—a lie. Defendant Musk guided the process at every step along the way, even as every other party saw the clear danger in what he proposed.  Investors were not told, however, that SolarCity was at risk of breaching key loan covenants, that it had been rejected by at least two major investment banks for credit, that the Board had been informed about cash concerns for months, that every financial advisor asked had advised against the deal, or that SolarCity solar panels might be using defective components that would need to be recalled to avoid fire risk.  Despite lacking this crucial information and trying to keep it sealed, confidential, and redacted in court, Defendant Tesla's Board maintained that shareholders were fully informed.

161.     Shareholders voted to approve the deal.  Defendant Tesla was saddled with billions of dollars of SolarCity's debt.

162.     Soon after the merger was approved, Tesla was in crisis, with barely enough cash to survive and Defendant Musk pushing to manufacture the new Model 3 *en masse*.  In June 2019 deposition testimony regarding the merger, Elon Musk asserted that while "we certainly believed that the long-term growth of megawatts deployed would be very significant," " if I did not take everyone off of solar and focus them on the Model 3 program to the detriment of solar, then Tesla would have gone bankrupt.  So I took everyone from solar, and said, 'Instead of working on solar, you need to work on the Model 3 program.'"

163.     Defendant Musk's *ex post facto* rationalization—that unless Tesla acquired SolarCity for its labor pool, Tesla would go out of business—contradicts what investors were told in 2016.  At no point did Tesla disclose that it would require thousands of new employees to make the Model 3 program work, let alone that the only way to hire them would be to acquire a company whose staff had no experience whatsoever with vehicle manufacturing or sales.

164.     In mid-2018, a secret project codenamed "Project Titan" was devised to replace faulty Amphenol H4 solar panel connectors that SolarCity had deployed across the United States, as well as SolarEdge optimizers, both of which were starting fires.  Then, in August of 2019,

Walmart sued Defendant Tesla for negligence in maintaining its solar panel installations on the rooves of stores, which had also resulted in multiple fires. *See* https://www.nytimes.com/2019/08/20/business/walmart-tesla-lawsuit-fires.html.

165.    Once the merger was complete, Defendant Tesla faced the challenge of actually manufacturing the fake product that Defendant Musk had demonstrated on the set of Desperate Housewives: the Solar Roof Tile. Defendant Tesla inherited from SolarCity and its Silevo, LLC subsidiary a subsidized solar panel manufacturing arrangement with the State of New York, coordinated by Empire State Development Corporation, Fort Schuyler Management Corporation, and the Research Foundation for the State University of New York that was intended to create New York manufacturing jobs. New York State spent approximately $1 billion to build Defendant Tesla's Buffalo factory (the "Buffalo Factory"), which its auditors later wrote off.

166.    Post-merger, Defendant Musk frequently focused on the topic of solar power to market Defendant Tesla to potential customers and investors and to manufacture purported evidence for litigation surrounding the merger. On August 18, 2019, Defendant Musk posted on Twitter, "Tesla Solar just relaunched. [Let me know] what you think… Tesla.com/solar With the new lower Tesla pricing, it's like having a money printer on your roof if you live a state with high electricity costs. Still better to buy, but the rental option makes the economics obvious." *See* https://x.com/elonmusk/status/1163025594180726784. On October 10, 2019, Defendant Musk wrote on Twitter, "All Tesla Supercharger stations in regions affected by California power outages will have Tesla Powerpacks within next few weeks. Just waiting on permits." He then added, "Also adding Tesla Solar to our Supercharger stations as fast as possible. Goal is 24/7 clean power with no blackouts." *See* https://x.com/elonmusk/status/1182089703039700993.

167.    Defendant Musk has a degree in physics from the University of Pennsylvania, boasted on the May 3, 2018 Q1 2018 earnings call, "I actually studied physics in college," and knew or should have known that adding solar functionality to electric vehicle charging stations in a practical and economical manner, i.e. not requiring multiple football fields worth of solar panels per station, would defy the laws of physics. Tesla Supercharger stations were never

equipped with permanent batteries or solar power.

168.    On or around August 21, 2020, the Office of the New York State Comptroller released Audit Report 2017-S-60.  It states in part, "Since 2017, publicly available Tesla reports have indicated potential setbacks with Tesla's solar roof...  However, in November 2018, Tesla reported it was still refining the product design and installation processes and, as a result, production would not significantly increase until the first half of 2019."

169.    Initially, Defendant Tesla, its Tesla Energy Operations, Inc. subsidiary and Panasonic Solar North America ("Panasonic") planned to manufacture "version 2.0" of the Tesla Solar Roof Tile at the Buffalo Factory using equipment purchased from Von Ardenne GmbH in Germany.  Fort Schuyler Management Corporation paid for a $5,634,000 "Solar Roof Tile" upgrade from Von Ardenne on February 6, 2019, which required heavy machinery to be shipped from Germany to New York.  On July 29, 2019, Defendant Musk posted on Twitter, "Spooling up production line rapidly. Hoping to manufacture ~1000 solar roofs/week by the end of this year."  *See* https://x.com/elonmusk/status/1156005185656782848.  As reported by the *Wall Street Journal* on July 6, 2023, this did not go according to plan:

> "New York state paid to build a quarter-mile-long facility with 1.2 million square feet of industrial space, which it now owns and leases to Tesla for $1 a year.  It bought $240 million worth of solar-panel manufacturing equipment.  Musk had said that by 2020 the Buffalo plant each week would churn out enough solar-panel shingles to cover 1,000 roofs.
>
> The Tesla solar-energy unit behind the plan, however, is averaging just 21 installations a week, according to energy analysts at Wood Mackenzie who reviewed utility data.  The building houses some factory workers, but also hundreds of lower-paid desk-bound data analysts working on other Tesla business.
>
> The suppliers that Cuomo predicted would flock to a modern manufacturing hub never showed up.  The only new nearby business is a Tim Horton's coffee shop.  Most of the solar-panel manufacturing equipment bought by the state has been sold at a discount or scrapped.
>
> A state comptroller's audit found just 54 cents of economic benefit for every subsidy dollar spent on the factory, which rose on the site of an old steel mill.  External auditors have written down nearly all of New York's investment."

*See* https://www.wsj.com/articles/elon-musk-tesla-buffalo-new-york-solar-plant-1b634b9e.

170.    Instead of creating the full-time manufacturing jobs promised at the Buffalo Factory, Defendants Musk and Tesla largely contracted temporary workers from Imagine Staffing Technology, Inc.  These hires were justified in Tesla's WARP Payables system with a note stating, "Having these contractors allows the Workplace team to more effectively and efficiently support site-wide operations across all of our customer buckets.  Paid at competitive market rate for cost efficiencies compared to hiring direct."  In sum, Defendant Tesla went out of its way to avoid hiring full-time employees in New York despite its promise to do the opposite.

171.    The "version 2.0" Solar Roof Tiles never ended up being produced, and the manufacturing equipment was ultimately packed up and stored in a nearby warehouse, paid for by New York State.  So in late 2019, Tesla began purchasing "version 3.0" of its Solar Roof Tiles from a Chinese manufacturer, Changzhou Almaden Co. Ltd. ("Changzhou Almaden").

172.    Nonetheless, on page 9 of its Q4 2019 Investor Update published January 29, 2020, Defendant Tesla falsely stated, "Solarglass tiles are made in our Gigafactory New York."  After the factory's publicly-financed equipment was crated up and warehoused nominally due to the COVID-19 pandemic, Tesla began advertising that it would hire temporary workers to handle manual tagging of images to train "Autopilot" and FSD, meaning that the Buffalo Factory started out as part of one scam, but ended up as part of two more.  In this way, Defendant Tesla could falsely claim to have met New York's job creation milestones.

173.    Defendant Tesla continued to make false claims about the Buffalo Factory.  While Tesla disclosed on page 9 of its Q1 2020 Investor Update (created on April 29, 2020 by Martin Viecha) that, "In Q1, Gigafactory New York reached a significant milestone.  In a single week, Solar Roof production exceeded 4MW…" by the time this disclosure was made, Panasonic manufacturing employees working with Tesla had been laid off for nearly two months and Tesla's publicly-financed solar manufacturing equipment had already been boxed up.  There was no "Solar Roof production" taking place at the Buffalo Factory at all.

174.    A March 6, 2020 United States Department of Labor ("DOL") Petition for Trade Adjustment Assistance (TAA) Form ETA-9042 filed by Defendant Tesla's manufacturing

partner Panasonic states that 403 layoffs were necessary as of that date at the Buffalo Factory due to "Tesla's switch to purchasing solar products from China."

175.    According to the DOL Office of Trade Adjustment Assistance, the federal government spent at least $371,541 in "Training Expenditures" for 84 laid-off Panasonic employees in the United States due to Defendant Tesla's decision to import Chinese solar panels that it falsely told investors were still being manufactured in New York.

176.    Changzhou Almaden shipped its "version 3.0" Solar Roof Tiles direct from the factory in China to Hayward, California, as indicated by labels on the boxes at work sites. Some of these products appeared to have "MADE IN USA" stickers on the back, along with clearly labeled cables from Zhejiang Jiaming Tianheyuan Photovoltaic Technology Co. Ltd.

177.    To sell solar products, Defendant Tesla also committed fraud. Its salespeople targeted elderly non-English speakers and promised that by installing solar panels, they would save on their energy bills. Instead, Tesla was sued repeatedly for elder abuse as energy bills went up. Many of its solar installations also caused major damage to customers' rooves, leading to water damage and mold. Other installations caught on fire. In all, Defendant Tesla was sued more than 150 times over its solar products. *See* https://www.plainsite.org/tags/tesla-solar/.

**E.    The Tesla Stock Inflation Fraud**

178.    The 201-page January 30, 2024 Post-Trial Opinion in *Tornetta v. Musk et al*, Delaware Court of Chancery Case No. 2018-0408-KSJM, begins as follows:

> "Was the richest person in the world overpaid? The stockholder plaintiff in this derivative lawsuit says so. He claims that Tesla, Inc.'s directors breached their fiduciary duties by awarding Elon Musk a performance-based equity-compensation plan. The plan offers Musk the opportunity to secure 12 total tranches of options, each representing 1% of Tesla's total outstanding shares as of January 21, 2018. For a tranche to vest, Tesla's market capitalization must increase by $50 billion and Tesla must achieve either an adjusted EBITDA target or a revenue target in four consecutive fiscal quarters. ***With a $55.8 billion maximum value and $2.6 billion grant date fair value, the plan is the largest potential compensation opportunity ever observed in public markets by multiple orders of magnitude—250 times larger than the contemporaneous median peer compensation plan and over 33 times larger than the plan's closest comparison, which was Musk's prior compensation plan.*** This post-trial decision enters judgment for the plaintiff, finding that the compensation plan is subject to review under the entire fairness standard, the defendants bore the burden of proving that the compensation plan was fair,

and they failed to meet their burden" (emphasis added).

179.    Defendant Musk's unprecedented 2018 executive compensation plan, whose "12 total tranches of options" depended on Defendant Tesla's stock going up precipitously to vest, provided him with an unprecedented incentive to commit securities fraud.

180.    In response to that incentive, Defendant Musk did in fact commit securities fraud many times over, ultimately becoming the wealthiest person alive according to press reports.

181.    In response to Defendant Musk pressuring his executives to commit securities fraud on a routine basis for years, and especially the years 2018-2021, dozens of executives quit their employment with Defendant Tesla.

182.    Zachary Kirkhorn, who later quit, was previously Defendant Tesla's Chief Financial Officer despite having little experience in finance when he assumed the role to replace the prior CFO who had quit.  For years, Mr. Kirkhorn, former Vice President, Investor Relations Martin Viecha, former Musk Chief of Staff Omead Afshar, and current Chief Financial Officer Vaibhav Taneja received daily or weekly "Short Interest Reports" by e-mail from Head of Investor Relations Travis Axelrod concerning short-seller activity.

183.    Defendant Tesla manipulated its balance sheet, statement of operations (otherwise known as a profit and loss statement), and statement of cash flows in a variety of ways including but not limited to complex accounting fraud and overt market manipulation.  Defendant Tesla also manipulated material proprietary metrics relied upon by investors, the media and analysts that did not directly appear on its financial statements.  In this way, Defendant Tesla defrauded the market, artificially inflated the price of its stock, and harmed short-sellers such as Plaintiff, who justifiably expected the stock to go down.

a.    **Accounting Fraud: Cash Balances**

184.    "Cash, cash equivalents and investments" refers to the amount of cash a company has on hand in its bank accounts.

i.    **Earned Interest**

185.    According to a March 5, 2019 *Financial Times* article, the actual cash interest

yield reported by Defendant Tesla indicates that the company began exaggerating cash balances starting in Q4 2016, and continued exaggerating them by $1.5 billion or more through 2018.  *See* https://ftalphaville.ft.com/2019/03/05/1551787633000/How-much-does-Tesla-have-in-the-bank-/.



The article's conclusions are further supported by Defendant Musk's own videotaped admission to *Axios* on November 26, 2018 that Defendant Tesla "faced a severe threat of death" and was "bleeding money like crazy" such that "in a very short period of time, we would die"—disclosures totally absent from the Q3 2018 SEC Form 10-Q filed just 26 days prior, which misleadingly reported an ample "$2,967,504[,000]" of unrestricted cash on hand.

    186.    Defendants Musk and Tesla knew or should have known that they were reporting false and misleading information regarding cash holdings.  Based on earned interest, average cash balances were approximately 90% lower than reported throughout 2019 and part of 2020:

*$ in Millions of Dollars*

| | Q1 2019 | Q2 2019 | Q3 2019 | Q4 2019 | Q1 2020 | Q2 2020 | Q3 2020 | Q4 2020 |
|---|---|---|---|---|---|---|---|---|
| **Cash & Equivalents** | $2,198 | $4,955 | $5,338 | $6,268 | $8,080 | $8,615 | $14,531 | $19,384 |
| **Cash in US Money Market Funds** | $812 | $1,723 | $1,413 | $1,606 | $5,293 | $4,002 | $9,147 | $13,905 |
| **Cash in US Banks** | $1,788 | $4,357 | $4,722 | $5,008 | $6,030 | $5,015 | $10,681 | $12,624 |
| **Cash in Foreign Currencies** | $410 | $598 | $616 | $1,260 | $2,050 | $3,600 | $3,850 | $6,760 |
| | | | | | | | | |
| **SPAXX (Fidelity) 3-Month Avg Yield** | 0.269% | 0.483% | 0.418% | 0.296% | 0.352% | 0.003% | 0.002% | 0.002% |
| **Implied Interest Income (A)** | $2 | $8 | $6 | $5 | $19 | $0 | $0 | $0 |
| | | | | | | | | |
| **Federal Funds Rate Quarterly Avg Yield** | 2.401% | 2.398% | 2.198% | 1.656% | 1.261% | 0.060% | 0.093% | 0.089% |
| **Implied Interest Income (B)** | $43 | $104 | $104 | $83 | $76 | $3 | $10 | $11 |
| | | | | | | | | |
| **Implied Interest Income (A + B)** | $45 | $113 | $110 | $88 | $95 | $3 | $10 | $12 |
| **Reported Interest Income (C)** | $8.8 | $10.4 | $15.0 | $9.9 | $10.0 | $8.0 | $6.0 | $6.0 |
| **% Difference in Reported Vs Implied Interest Income** | -81% | -91% | -86% | -89% | -89% | 158% | -40% | -48% |

187.    Under oath at trial in Case No. 12711-VCS in the Delaware Court of Chancery, Defendant Musk testified on July 12, 2021 that, "We had weekly cash meetings at Tesla too," referring to the weekly cash meetings he had required and attended when SolarCity was in financial distress.  Defendant Musk did not explicitly deny attending Tesla's weekly cash meetings, claiming he could not "recall" attendance.

188.    At many companies, quarter-end and year-end cash balances are manipulated through the use of credit lines to make accounts appear for a brief moment to have more funds in them than they normally do.  When Morgan Stanley analyst Adam Jonas explicitly asked Tesla CFO Kirkhorn about the present-day cash balance—not the quarter-end balance—on the Q1 2020 earnings call, Kirkhorn's statement that, "I don't have any additional color" was false given that as CFO he had full access to Defendant Tesla's financials.  Mr. Kirkhorn's refusal to elaborate was an admission to quarter-end cash balance manipulation.

189.    On November 3, 2020, Defendant Musk further admitted via Twitter that the closest Defendant Tesla had come to bankruptcy "was about a month" from "mid 2017 to mid 2019"—an admission that Defendant Tesla filed and Defendant Musk signed false financial statements in violation of the Sarbanes-Oxley Act of 2002 since the company's disclosures at no point offered any suggestion of bankruptcy or disclosed "going concern" warnings.  *See* https://x.com/elonmusk/status/1323640901248393217.

190.    On December 22, 2020, Defendant Musk further admitted via Twitter that "[d]uring the darkest days of the Model 3 program" he had even e-mailed Apple, Inc. CEO Tim Cook offering to sell Tesla to Apple—a fact also never disclosed to investors—but that he never received a response.  *See* https://x.com/elonmusk/status/1341485211209637889.

191.    Investors were left in the dark with no knowledge of Tesla's cash crisis, while Defendants Musk and Tesla always had knowledge of Tesla's true cash position with weekly resolution at least.  Just as with SolarCity, Defendant Musk was ready to sell Tesla to another company (Apple), but did not inform investors at the time, indicating that he knew exactly how dire the situation was but actively chose to conceal that fact.

1

2

### ii. Cash Stuck in China

192.    Defendant Tesla's general ledger, multiple versions of which Plaintiff obtained

via the Tesla Files, reveals that Tesla has historically had approximately 500 bank accounts

worldwide denominated in various currencies.  Yet some of its Chinese accounts have strict

restrictions on withdrawals that are unacknowledged on the balance sheet.

193.    Exhibit EX-10.85 attached to the 2019 SEC Form 10-K filed February 13, 2020,

the "English Convenience Translation" of the Tesla (Shanghai) Co., Ltd. Fixed Asset

Syndication Loan Agreement dated December 18, 2019 with numerous Chinese banks, includes

clause 11, translated as "Revenue Collection Account Management," which restricts transfers of

revenue collected in China to any other account unless the "transfer is used for the purpose of

repaying any of its working capital loans" from the Chinese banks.  In effect, Defendant Tesla

cannot move cash collected in China to the United States until the loans are repaid unless the

Chinese bank lenders pre-approve such a transfer.

194.    As summarized by Lawrence Fossi, a corporate attorney and writer who has also

been targeted for harassment by Defendants Musk, Tesla, Qazi and Smick,

> "Near the time of the Grant Contract, the Chinese government arranged for a generous
> financing package for Tesla Shanghai from state-controlled banks.  The financing, which
> was re-arranged [in] December[ of 2019], includes a factory loan of up to $1.26 billion
> with a five-year term and a $315 million working capital loan with a one-year term.
>
> Tesla Shanghai sells its production through another Tesla subsidiary, Tesla (Beijing) Co,
> Ltd.…which also imports into China Fremont-made vehicles.  Last year, the Chinese
> government also arranged financing for Tesla Beijing: An RMB 5 billion ($700 million)
> loan facility, secured by the cars in Tesla Shanghai's inventory and by funds on deposit in
> a collection account…
>
> Under the terms of the Tesla Shanghai loan agreements, ***until all loans have been fully
> repaid, no funds can leave the control accounts at Chinese banks except for
> expenditures related to Tesla's Shanghai operations***.  In other words, even if Tesla were
> to be cash flow positive in Shanghai, the cash would be unavailable to Tesla's operations
> throughout the rest of the world for years to come" (emphasis added).

*See* https://seekingalpha.com/article/4369297-tesla-investors-are-flying-blind-in-china.

195.    Since it began doing business in China in or around 2019, Defendant Tesla has

deliberately failed to comply with Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 280, which would require Tesla to enumerate financial metrics for each "economic environment" in which it conducts business.

196.    As Fossi explains in the same article, Tesla meets the ASC 280 criteria necessary to trigger such reporting requirements with regard to China:

> "What constitutes an operating segment?  Per ASC 280 10 50-1, an operating segment has the following characteristics: (1) It engages in activities from which it earns revenues and incurs expenses, (2) it has operating results regularly reviewed by the company's chief operating decision maker, and (3) it has discrete financial information available.

> Tesla's Chinese operations plainly meet the definition of an operating segment, so the next question is: Under what circumstances is the company required to report separately information about that segment?  The answer, found in ASC 280 50-10, is when the assets, profit or loss, or revenue of that segment meet the quantitative threshold set forth in ASC 280 10 50-12, which is 10%.

> Tesla's revenues from its China operations in Q2 totaled $1.4 billion, which is more than 23% of its total revenues of just over $6 billion.  So, the separate reporting requirement is triggered."

197.    Nonetheless, Defendant Tesla has refused to provide investors with detailed disclosures about its cash holdings or sales broken down by geographic region.  Its competitors, such as Toyota and BMW, do provide detailed disclosures broken down by geographic region.

198.    When asked in 2020 why Defendant Tesla's financial disclosures are so limited by one of his cult followers, Defendant Musk responded,

> "People read too much into this level of detail. It's not useful for predicting the future, nor can we ourselves accurately predict what issues we will encounter on a short-term, fine-grained level."

*See* https://x.com/elonmusk/status/1299924292709224448.  In fact, by hiding "this level of detail," Defendants Musk and Tesla ensured that no one can examine what actually happened in the past, covering up the company's massive and multi-faceted accounting fraud.

### iii.  Accounts Receivable

199.    Starting in Q3 2018, Defendant Tesla's Accounts Receivable balance sheet line item jumped from $570 million to $1.155 billion and exceeded $1 billion thereafter.

200.     In December 2019, "Tesla went over why its accounts receivable has been elevated, attributing it to a large gap in timing between vehicle delivery and cash received from banks in Europe" per Deutsche Bank summarizing statements made by Tesla's then-Head of Investor Relations Martin Viecha, in violation of Regulation FD, 17 C.F.R. § 243.100.

201.     On the July 22, 2020 Q2 2020 Tesla earnings call, CFO Kirkhorn then stated:

"While our AR balance is usually about 20 per cent of revenue, it can fluctuate depending upon a number of factors. First, overall, less than 30 per cent of our receivables is associated with new car sales. Second, due to payment terms associated with financing and enterprise customers, settlement times for certain methods of cash payments and geographic mix of our deliveries, our cash balance and associated receivables are impacted significantly by how many cars are delivered in the final weeks and days of the quarter. Third, roughly 40 per cent of the balance is attributed to payment terms on regulatory credit sales and statutory EV incentive programs, both of which have been increasing."

202.     Defendant Tesla has provided at least five different explanations over time (and only four in public) for why it had and has an extremely large accounts receivable balance of over $1 billion, none of which are consistent with each other or with reality.

203.     Given Defendant Tesla's business model, which involves up-front cash payments for physical products, this unusually high and persistent balance attracted notice from prominent investors such as David Einhorn, who publicly questioned Defendant Musk about it twice, and from journalists with accounting degrees and experience, such as Francine McKenna. In Ms. McKenna's words, "They should not have this big of an accounts receivable balance."

204.     Defendant Tesla's accounts receivable balance began to balloon in Q3 2018 (having increased about half a billion dollars from Q2 2018), at the same time that its self-reported "delivery" figures began to diverge from vehicle registration data. This would suggest that Tesla reported to investors that it expected to be paid for cars that it never actually sold.

205.     By Q2 2020, Defendant Tesla reported Accounts Receivable as $1.5 billion.

206.     By Q4 2021, Defendant Tesla reported Accounts Receivable as $1.9 billion.

**iv.  Accounts Payable**

207.     One of Defendant Musk's strategies for dealing with cash shortages at his

businesses is to simply stop paying vendors.  At least 40 lawsuits have been filed against Defendant Tesla for this reason.  *See* https://www.plainsite.org/tags/tesla-vendor-nonpayment/.

208.    Defendant Tesla's persistent failure to pay vendors led to an unusually high reported Accounts Payable balance of over $10 billion in its Q4 2021 Investor Update, or more than half of its reported $17.58 billion cash and cash equivalents on hand.

209.    In Q2 2020, Defendant Tesla reported a still-high Accounts Payable balance of $3.6 billion at a time when it reported cash and cash equivalents on hand of $8.6 billion.

### v.  Tax Evasion

210.    Tesla is a multi-national corporation with numerous international subsidiaries. Various expenses associated with United States-based customers, prospective customers and/or invoices have been attributed to Tesla's subsidiary in The Netherlands.

211.    Defendant Tesla has historically only sold its Solar Roof to consumers in the United States.  According to the Tesla Files, invoices from Changzhou Almaden to Defendant Tesla for glass tiles were billed to "Tesla, Inc." (internal entity ID 3000) with Tesla's Accounts Payable e-mail address, "AccountsPayable@tesla.com".  Yet inside Tesla's WARP Payables accounting system, these expenditures were re-assigned to Tesla Motors Netherlands BV (internal entity ID 4081)—even with "Ship To" addresses in Hayward, California or Sparks, Nevada in the United States for work orders to be carried out in the United States.

212.    There is no legitimate reason why Tesla Motors Netherlands BV would assume financial liability for transactions involving Tesla Solar Roof installations in the United States.

213.    Defendant Tesla re-assigned transactions taking place entirely in the United States to international subsidiaries in order to evade federal income tax and state taxes.

214.    For years, Defendant Tesla engaged in a pattern and practice of delaying the filing of vehicle registration paperwork for its customers in order to avoid the accrual of corresponding tax obligations within the same fiscal quarter as each sale, especially around the end of each quarter when most deliveries took place.  The result was an artificial boost in quarterly profit since liabilities associated with each sale did not accrue until the following quarter or later.

215.     Defendant Musk has abused his purported non-profit organization, the Musk Foundation, to give himself substantial tax breaks.  According to *The New York Times*,

> "Mr. Musk's philanthropy has been haphazard and largely self-serving — making him eligible for enormous tax breaks and helping his businesses.

> Since 2020, he has seeded his charity with tax-deductible donations of stock worth more than $7 billion at the time, making it one of the largest in the country.

> The foundation that houses the money has failed in recent years to give away the bare minimum required by law to justify the tax break, exposing it to the risk of having to pay the government a substantial financial penalty."

*See* https://www.nytimes.com/2024/03/10/us/elon-musk-charity.html.

**b.     Accounting Fraud: "Deliveries"**

216.     While most publicly traded companies report "sales" of products in their financial disclosures, with regard to electric vehicles, Defendant Tesla does not.  Instead, Defendant Tesla reports the number of "deliveries" of its vehicles, but it has intentionally never actually defined what the term "deliveries" means in order to grant itself maximum reporting flexibility.

217.     Its lack of definition notwithstanding, the "deliveries" metric is among the most important metrics used by Wall Street analysts who follow Tesla's stock.  In addition to articles about "deliveries" in financial media, this fact is also reflected in analyst notes, which have for years featured headlines such as, "Tesla 1Q Deliveries Disappoint: How Much Cash in the Bank?" (Morgan Stanley, April 4, 2019), "Tesla, Inc.: 4Q22 deliveries miss, could spark lower mid-term expectations" (RBC Capital Markets, LLC, January 3, 2023), and "Tesla Inc. (TSLA): 1Q23 deliveries increased 36% yoy to about 423k" (Goldman Sachs, April 2, 2023).

**i.     No Actual Definition**

218.     Defendant Tesla has customarily issued a press release at the beginning of each quarter containing its "deliveries" metrics for the prior quarter.  The press release is then attached to a SEC Form 8-K that is filed with the SEC generally the same day.

219.     At all relevant times, Defendant Tesla's quarterly "deliveries" press releases contained substantially the same disclaimer:

"Our net income and cash flow results will be announced along with the rest of our

financial performance when we announce [quarterly] earnings.  Our delivery count should be viewed as slightly conservative, as ***we only count a car as delivered if it is transferred to the customer and all paperwork is correct***.  Final numbers could vary by up to 0.5% or more.  Tesla vehicle deliveries represent only one measure of the company's financial performance and should not be relied on as an indicator of quarterly financial results, which depend on a variety of factors, including the cost of sales, foreign exchange movements and mix of directly leased vehicles" (emphasis added).

(the "Deliveries Disclaimer").

220.    The Deliveries Disclaimer does not actually define what it means for a car to be delivered, allowing Defendant Tesla to claim that the term means whatever it wants it to mean.  While the Deliveries Disclaimer does state, "we only count a car as delivered if it is transferred to the customer and all paperwork is correct," the Deliveries Disclaimer does not explain what "paperwork" it is referring to, what it means to be "correct," and how Tesla defines a "transfer[] to the customer," which may or may not involve actual payment.  The Deliveries Disclaimer further fails to define what a "customer" is, since in many instances, Defendant Tesla transfers vehicles to its own subsidiaries around the world.  In some instances, it even registers vehicles to them, meaning that it "delivers" and registers vehicles to itself.

221.    It is clear that Defendant Tesla believes "deliveries" to have a distinct meaning from "sales."  In its quarterly slide decks, Defendant Tesla's "Forward-Looking Statements" disclaimer has repeatedly referred to "our ability to grow our sales, delivery, installation, servicing and charging capabilities."  The necessary implication is that regardless of what "delivery" means, just because a car has been "delivered" does not mean it has been "sold."

222.    Tesla has historically stated, "A majority of our automotive sales revenue is recognized when control transfers upon delivery to customers" in its SEC filings, such as its SEC Form 10-K for fiscal year 2018 on page 78.  Yet the questions of when and how Tesla recognizes sales revenue are independent from what constitutes a "delivery to customers" in the first place.

### ii.   "Delivery Count New" Versus "Delivery Count Used"

223.    Defendant Tesla's software engineers created database schemas used internally that distinguish between deliveries of used cars and deliveries of new cars.  Through the use of an enumerated data type field that allows a user to toggle between "Delivery Count New" and

"Delivery Count Used," Defendant Tesla designed its information technology systems to allow used car deliveries to be improperly classified as new car deliveries.



224.    The Tesla Files reveal that Defendant Tesla did, in fact, improperly classify used car deliveries as "Delivery Count New" deliveries in certain instances.

225.    Defendant Tesla was constantly handling errors regarding deliveries, as reflected by JIRA tickets with titles such as, "ITBI-10769: Incorrect Delivery Type Count," "BA-604: investigate and correct title status, delivery count type," "ITBI-9222: Delivery Count Type Updates," and "SFDC-12806: Change Delivery Count Type for Reserved Model S/X Used."



### iii.  Multiple Undisclosed Dynamic Incorrect Methodologies

226.    Over time, Defendant Tesla transitioned systems that tracked sales and deliveries from Salesforce to internal systems based on the WARP software architecture that Defendant Tesla adopted from SpaceX.  Even once Defendant Tesla had standardized on WARP, it still maintained multiple information technology systems, some of which ran on Microsoft SQL Server and others of which ran on MySQL—two widely used but incompatible back-end database platforms, requiring additional work to integrate them.

227.    Other JIRA tickets, such as "SFDC-7040: Update to Logic of Delivery Count Type field" and "SFDC-7716: Update to Delivery Count Type Logic" indicate that the definition of what constituted a "delivery" changed frequently within Tesla, even *before* the company switched from Salesforce (the "SF" in "SFDC") to its own proprietary database platform.



228.    From quarter to quarter, Tesla's definition of "deliveries" has constantly changed, depending upon a variety of factors including database systems, software errors discussed in JIRA tickets, auditor requirements, and which of the company's many Chief Financial Officers was signing required paperwork.

### iv.  Rushed Delivery of Defective Vehicles

229.    Historically, not each "delivered" vehicle has necessarily been a finished, working

product.  In 2018, Defendant Tesla began using the term "factory gated" to convince investors that it was meeting "delivery" targets, again, without ever actually defining it.  Many "factory gated" vehicles suffered from severe quality defects.

230.   In December 2020, China-based *PingWest* noted, "Tesla is doing whatever it can to hit the production goal, including lowering its quality standards," by loading "defective parts…onto production vehicles."  "'Let's say, in the past, our vehicles need 80 points in order to leave the factory, now it's only 60.'"

### v.  Multiple "Deliveries" Per Vehicle

231.   After switching from Salesforce, Defendant Tesla designed its own database systems to allow one unique vehicle, as designated by a Vehicle Identification Number ("VIN") to have multiple Tesla Reservation Numbers ("RN") assigned.  In practice, depending upon the database query used, the same car could thus be counted as "delivered" multiple times.

232.   As alleged above, Defendant Tesla routinely defrauded its customers with regard to service, which was often due to poor manufacturing practices and resulting low vehicle quality.  These practices often led to "delivered" vehicles with serious defects in order to achieve "delivery" goals by quarter-end.  Whether such vehicles were returned in the same quarter or a subsequent quarter, they would be repaired and "delivered" again, giving Defendant Tesla a perverse incentive to *lower* vehicle quality.

233.   For example, Defendant Tesla associates the following VINs with multiple RNs:

    a)  VIN 5YJ3E1EA6JF048613: (1) RN113380206, (2) RN113388015, (3) RN113405702, (4) RN113408626;

    b)  VIN 5YJ3E1EA6JF049731: (1) RN110289177, (2) RN111286062;

    c)  VIN 5YJ3E1EA6JF059689: (1) RN109697530, (2) RN110253111;

    d)  VIN 5YJ3E1EA6JF178293: (1) RN113268829, (2) RN113290943, (3) RN113362454, (4) RN113384557, (5) RN113440580, (6) RN113448409, (7) RN113511889;

    e)  VIN 5YJ3E1EA6KF304492: (1) RN110291383, (2) RN112286048;

    f)   VIN 5YJ3E1EA6KF415639: (1) RN109697729, (2) RN112261424;

    g)   VIN 5YJ3E1EA6KF430853: (1) RN113354066, (2) RN113370365,

        (3) RN113381175, (4) RN113397314, (5) RN113434572, (6) RN113496456;

    h)   VIN 5YJ3E1EA6KF447409: (1) RN113379821, (2) RN113386959.

234.    Defendant Tesla's artificially high quarterly "delivery" numbers caused its stock price to increase, harming Plaintiff while he held short positions in TSLA directly or indirectly.

### vi.  Conflicted Overseas Auditors In The Dark

235.    Defendant Tesla's auditor, PricewaterhouseCoopers, LLP ("PwC"), also conducts business with other members of the Atlanteca Enterprise, rendering objective auditing impossible.  For example, SpaceX's 2015 subsidy application to the California Alternative Energy and Advanced Transportation Financing Authority ("CAEATFA"), among other materials, was prepared for SpaceX by Christopher Sharpe of PwC at the same time that PwC was purportedly auditing Tesla's books.  This arrangement was still in place as recently as 2020.  PwC also does CAEATFA (and presumably other tax) work for TBC-The Boring Company.

236.    If PwC proves too troublesome for one Atlanteca Enterprise member, it is possible that Defendant Musk could end its contracts with *all* Atlanteca Enterprise members.

237.    Defendant Musk has not hesitated to fire vendors in the past, such as when he fired law firm Cooley because it hired one former SEC attorney who investigated him.

238.    On March 28, 2024, the United States Public Company Accounting Oversight Board ("PCAOB") fined PwC $2.75 million for "quality control violations related to auditor independence" according to Reuters.

239.    Defendant Tesla has never disclosed that PwC's "audit" work in the United States is at least partially carried out in Argentina, where standards are lower.  In 2023, PwC failed to note a $4 billion discrepancy at client Americanas SA in South America, resulting in a scandal.

240.    On January 18, 2022, German Cuadra Distefano e-mailed Shyama Narayanan, Program Manager, IT Internal Audit at Defendant Tesla with "a few clarifying questions" regarding Tesla's "billing engine configuration."  His e-mail signature stated that he worked for

"Pricewaterhousecoopers Service Delivery Center (Argentina) S.R.L." in Buenos Aires.

241.    PwC has never reviewed the information technology systems that generate Defendant Tesla's "delivery" disclosures for accuracy, as PwC only examines the entirely separate set of paper records that customers sign upon physical delivery of each vehicle.

### vii.   Contradictions With Known Sales Metrics: New Vehicle Registrations and Google Invoices

242.    In theory, Defendant Tesla's "delivery" metrics should have aligned with vehicle registration statistics available from all of the departments and/or bureaus of motor vehicles where the company does business.  They did not.

243.    After conducting a detailed analysis of known vehicle registration data, Plaintiff pressed the Tesla Board of Directors and PwC from 2020 through 2021 for an explanation as to the precise meaning of a "delivery," yet Plaintiff received no response.  As Plaintiff wrote to the Tesla Board of Directors and PwC on April 29, 2020,

> "I believe Tesla's delivery numbers from 2017 to present are fake.  Interpreted as 'sales,' which is how the market interprets 'deliveries'—a misinterpretation Tesla management has actively encouraged—the numbers are impossible to achieve.
>
> Based on DMV vehicle registration data from numerous states, including most of the states where Tesla sells the most vehicles, you are short by about 166,000 sales (the black bars in the graph below minus estimated sales for locations where data is unavailable thus far)."



244.    Prior to 2018, Defendant Tesla entered into a contract with Google, LLC in order

to make use of Google Maps in its on-board navigation systems.  The terms of the agreement required Tesla to pay a license fee for each "existing car" and each "new car," providing a more accurate view of new vehicle sales than Tesla's public reports of "deliveries."  According to Google's monthly invoices to Defendant Tesla, from July 2018 through June 2020, Tesla *sold* 660,600 new vehicles while it "delivered" 734,550, a material difference of 73,950, or 11.2%.

245.    At all relevant times, the market interpreted "deliveries" to mean "sales" and stock analysts and journalists reported on Tesla's "delivery" numbers, impacting the stock.

246.    Defendant Tesla's inflation of its "delivery" numbers by anywhere from 73,950 to 166,000 vehicles was intended to, and did, inflate Tesla's stock price.

### c.    Accounting Fraud: Warranty Reserves and Goodwill Repairs

247.    Tesla service technicians routinely fix vehicles with problems that are common among Tesla vehicles.  In addition to Technical Service Bulletins ("TSB"), Tesla maintains an internal knowledge base, "confidential" and "attorney-client work product" guides (even where no attorney involvement is clearly evident), numerous JIRA tickets, and Microsoft Teams discussion boards where various known defects in vehicles are discussed.

248.    To attempt to placate often-dissatisfied customers who are typically unaware of quality issues until it is too late, Tesla offers "goodwill" service that neither requires customer payment nor affects the vehicle warranty.  For customers, this is a benefit that permits for free repairs even outside of the warranty period on occasion and signifies that the company cares about their experience.  However, because goodwill repairs are not billed to the warranty reserve for vehicles, frequent use has the effect of minimizing the apparent cost of repairs by inflating the remaining warranty reserve for each affected vehicle.  In other words, frequent abuse of "goodwill" repairs allows Tesla to overstate its remaining warranty reserve to investors, and this in turn artificially increases the company's reported profit.

249.    Out of 30 public lawsuits involving Tesla where documentation of service incidents was attached, all 30 involved some sort of "goodwill" repair listed on an invoice.  *See* https://www.plainsite.org/tags/tesla-goodwill-service/.  Internal Tesla documents make clear why

this is.  First, corporate policy prohibits service technicians from assigning any service mandated by government to the warranty reserve.  Therefore, even if the government mandates that a problem covered by the Tesla warranty should be fixed, the warranty reserve is unaffected.  Second, Defendant Tesla has had numerous conflicting goodwill policies over a period of years, some requiring management approval in varying conditions, which have led to service technicians not always knowing when they can and cannot offer goodwill service.

250.    Tesla's policies surrounding "goodwill" service are complex and involve various levels of corporate approval, suggesting that the company is reluctant to offer such concessions on a frequent basis.  Yet the "goodwill" designation is routinely abused due to the frequency with which vehicles encounter quality defects, often straight from the factory.

251.    Tesla was aware that its employees were approving too much "goodwill" service.  Usage of "goodwill" is tracked closely in dozens of the company's Business Intelligence dashboards.  One of Tesla's many confusing sources on "goodwill" procedures, the Goodwill Guide PDF, even includes "APPENDIX: CUSTOMER TALKING POINTS" such as:

> "Why did my friend get a free service when I was charged for mine?
>
> Goodwill is reserved for specific situations and circumstances and applied on a case-by-case basis.
>
> Can Tesla Goodwill be used in place of my warranty?
>
> Tesla Goodwill should not be used in place of a warranty, service plan or any other kind of service that the customer would ordinarily have to pay for" (emphasis in original).

**d.    Accounting Fraud: Material Weaknesses in Internal Controls**

252.    On January 3, 2021, Goldman Sachs published an investor briefing noting Defendant Tesla's "internal control environment" as a risk factor.

253.    The WARP system that tracks vehicle ownership records the chain of successive owners for each vehicle starting from its manufacturing date.  Yet that chain often contains broken or nonsensical links.  Within WARP, it is possible for a vehicle to have no owner at all (a "null" owner in database parlance) for a period of time, or for the end date of row A in the chain

not to match the start date of row B. It is also possible within WARP for a vehicle to have two owners or more at the same time, and not just in situations where, for example, a married couple may want to maintain joint ownership of a vehicle.

254. There is no legitimate reason for Defendant Tesla's software to allow such errors.

255. Within WARP, numerous vehicles worldwide are registered to various fake country-based "Tesla Marketing" "owners" who are assigned GMail e-mail addresses. For example, in Germany, Tesla Marketing uses the GMail address teslademarketing@gmail.com. In Norway, Tesla Marketing uses teslamarketingeu+NO@gmail.com. (The "+NO", referring to Norway's country code, is an SMTP filter for the teslamarketingeu@gmail.com e-mail address.) In China, the owner "marketing TeslaCN" has the GMail address TeslaCNmarketing@gmail.com. Another GMail address of teslamotorsprototype@gmail.com, for "Tesla Motors Pre-Runner," is also the assigned owner for some vehicles.



256. While WARP clearly has a "Customer Type" field to distinguish a typical "Owner" from internal inventory vehicles, these fake owners are not associated with system flags for internal inventory vehicles. At least in Norway, many of these vehicles with fake owner e-mail addresses appear in government records as registered to Tesla Motors Norway A/S.

257. A fake customer associated with yet another GMail address was given a mailing address of Palo Alto, CA in the United Kingdom, which WARP should not have permitted.

258. According to photographs taken by whistleblower Martin Tripp, at Defendant Tesla's Nevada factory, employees were able to modify inventory and scrap material figures by manually editing the MySQL database underlying WARP using the freely available MySQL

1    Workbench software application and/or using an SQL UPDATE query.  Any business logic built

2    into WARP restricting types of entries based on certain rules could therefore be bypassed.  The

3    identity of users updating specific records could also be possibly forged or omitted.  This is

4    perhaps why employees working in Tesla's financial division, such as Scott Smith, wondered, in

5    writing, if the data that they were looking at from company reports was even "real."

**From:**          Scott Smith
**Sent:**          Thursday, July 05, 2018 2:26 PM
**To:**            Michael Bowling
**Cc:**            Shaun Heimlich
**Subject:**       RE: Scrap report 6/25/2018

Hey Michael,

Last week's scrap looked very low. Is this real?

Thanks,

Scott

13    259.    Given the substantial uncertainty internally over the validity of inventory, work-

14    in-progress and Non-Conforming Material (NCM) figures from 2018, Tesla's 2018 financial

15    disclosures should be restated for this reason alone.  Internal e-mails express confusion about

16    inventory timestamps, which may have been overwritten by both batch software programs and

17    manual database editing, as shown above.  In e-mails, Defendant Tesla's database engineers did

18    not seem to be familiar with how MySQL timestamp fields work: the first timestamp column is

19    automatically updated for a given row when the row is changed, but not subsequent fields.

20    260.    As of 2022, Defendant Tesla's WARP Payables system did not track payment

21    methods, causing each corporate credit card to be improperly entered as a separate vendor, e.g.

22    "CitiBank P Card," which was assigned vendor ID 140394.  Even more alarmingly, the line

23    items from such purchasing cards were not entered into WARP individually, but grouped

24    together and totaled in association with a single general ledger account, even when it was a near

25    certainty that not every purchase on the card should have been ascribed to the same general

26    ledger account, let alone the same vendor, as shown below for a mischaracterized, purported

27    "$2,590,484.79" purchase that was actually many separate purchases from many separate

vendors charged to the purchasing card.



261.    In the criminal matter of *USA v. Parulekar*, Northern District of California Case No. 5:18-cr-00550-LHK, a former Tesla Group Manager, Global Supply Management was able to forge signatures on payment documents without any internal controls leading to the payment of $9.3 million to the wrong vendor.

**e.    Accounting Fraud: Lying In Public to Justify Revenue Recognition**

262.    Like many assets, gas and electric motor vehicles depreciate in value over time.

263.    During an April 12, 2019 podcast interview, Defendant Musk stated, "I think the most profound thing is that if you buy a Tesla today, I believe you are buying an appreciating asset—not a depreciating asset."

264.    Upon information and belief, this statement was intended to allow Defendant Tesla to recognize revenue, and therefore boost reported profits, by affecting lease accounting for certain leases whose profitability depended upon whether the final resale value of the vehicle exceeded the buyback price determined in advance.  In sum, if Defendant Tesla insisted that its vehicles were "appreciating" in value, it could potentially record up-front revenue sooner.

265.    In or around April, 2019, Defendant Tesla was still in the period of "mid 2017 to

mid 2019" during which Defendant Musk later admitted the company was at risk of filing for bankruptcy, providing a powerful motivation for recognizing extra revenue.

266.    In August 2018, in a different interview referring to technology products in general, Defendant Musk stated, "[W]ith each successive design iteration...it actually gets better and cheaper.  But, it's like, a natural progression of any new technology," admitting that Defendant Musk knew that technology products depreciate.

### f.    Accounting Fraud: Intentionally Underestimating Performance Metrics To Later Beat Them

267.    By January 5, 2022, Defendant Tesla had held approximately 4,637 private calls with approximately 1,500 institutional investors including but not limited to Springs Capital, SFG Asset Advisors, Samlyn, Ashler Capital, Myriad Asset Management, Atika Capital, Arosa Capital, Alyeska Investment, Balyasny, Palestra Capital, Point72, Holocene Advisors, Graticule Asset Management, and Baron Capital.

268.    Upon information and believe, Defendant Tesla shared material non-public information with institutional investors on these private calls in violation of Regulation FD.

269.    On a regular basis, Vice President, Investor Relations Martin Viecha e-mailed Wall Street analysts with material nonpublic information, such as "consensus" figures regarding future estimates of Tesla's "deliveries" and/or earnings per share, as shown below:

Hi everyone,

Please find attached the latest company-compiled delivery consensus of sell-side analysts.

All the best,

Martin

| | 3Q-2022 | 4Q-2022 | 2022 | 2023 | 2024 | 2025 | 2026 |
|---|---|---|---|---|---|---|---|
| Model S/X deliveries | 18,672 | 19,211 | 68,726 | 73,682 | 76,379 | 78,355 | 76,822 |
| Model 3/Y deliveries | 325,158 | 396,147 | 1,254,935 | 1,723,038 | 2,046,561 | 2,266,989 | 2,622,688 |
| All other models | 0 | 11 | 11 | 39,250 | 189,469 | 400,005 | 534,946 |
| **Total deliveries** | **342,422** | **417,957** | **1,325,161** | **1,847,264** | **2,294,437** | **2,711,699** | **3,181,156** |
| | | | | | | | |
| Median | 343,830 | 417,570 | 1,326,143 | 1,839,854 | 2,263,000 | 2,602,238 | 2,797,000 |
| Standard deviation | 6,896 | 21,549 | 23,327 | 184,131 | 371,465 | 587,761 | 945,932 |
| Count | 24 | 24 | 24 | 24 | 21 | 20 | 13 |

Estimates provided by: Baird, Bernstein, Bank of
America, Canaccord, Citibank, Cowen, Daiwa, Deutsche
Bank, Evercore ISI, Exane BNP, Goldman Sachs,
Guggenheim, JP Morgan, Mizuho, Morgan Stanley, New
Street Research, Oppenheimer, Piper Sandler, RBC,
Truist, Tudor, Wedbush, Wells Fargo, Wolfe

**Martin Viecha  |  VP, Investor Relations**
3500 Deer Creek Rd, Palo Alto, CA 94304



These figures were not shared with the general investing public, also in violation of Regulation FD, 17 C.F.R. § 243.100.

270.    Analyst estimates were derived in part from information provided by Defendant Tesla, which upon information and belief would provide intentionally low estimates in advance, making a "beat" of those estimates more likely when the final number was actually disclosed.

### g.    Overt Market Manipulation

271.    Defendant Morgan Stanley has helped Defendants violate securities laws on a continuous basis for years.  As alleged in the First of Amended Complaint of *Rasella v. Musk*, New York Southern District Court Case No. 1:22-cv-03026-ALC-GWG, ECF No. 99, Morgan Stanley helped Defendant Musk purchase shares of Twitter, Inc. in an unlawful, manipulative manner intended to keep the price of TWTR down and to deliberately evade Morgan Stanley's compliance team, or as Morgan Stanley Managing Director, Private Wealth (likely Jon Neuhaus) put it, "No one knows what is going on and why . . . Not [Morgan Stanley] compliance not anyone."  The allegations in *Rasella*, based on documents obtained during discovery, including but not limited to text messages, are damning:

> "On February 2, 2022, [likely Neuhaus] privately assured Defendant Birchall that 'it will take time but it should if you want to get in under the radar and establish a position.' Birchall agreed and later confirmed that 'we should opportunistically ramp up if given the chance. . . . if there are some interesting premarket blocks [near] or at the close, we should look to take advantage.'  [likely Neuhaus] responded that they would "Buy into weakness and higher volume . . . But not press the price.'  Fearful of letting 'anyone sniff anything out,' warned that they could do 'a slightly larger block trade Provided ***ONLY If we keep it absofuckinglutely Quiet And We execute it well***'" (emphasis in original).

I'm somewhat reticent to do a large block trade outside of how we're doing it because I don't want to let that out or have anyone sniff anything out.

I could ask the trader if we want to do a trade thats a slightly larger block trade

Provided
ONLY

If we keep it absofuckinglutely  Quiet

And
We execute it well.

Like

Oh someone wants to unload 100k shares?
Sure we'll take that... as we buy more shares

272.     On Friday, May 4, 2018 at 6:02 A.M., Defendant Musk posted on Twitter, "Oh and uh short burn of the century comin [sic] soon. Flamethrowers should arrive just in time."

273.     When deposed by the SEC, Defendant Birchall testified under oath that he had weekly meetings with Defendant Musk on Fridays.

274.     On Friday, May 4, 2018 at 5:09 P.M., Defendant Musk posted on Twitter, "Looks like sooner than expected. The sheer magnitude of short carnage will be unreal. If you're short, I suggest tiptoeing quietly to the exit …"

275.     Upon information and belief, at least as early as May 4, 2018, Defendant Musk conspired with Defendant Birchall and/or Defendant Morgan Stanley to devise a strategy to harm short-sellers of Tesla stock.

276.     Upon information and belief, in turn, Defendant Birchall enlisted Defendant Morgan Stanley, which engaged in trading activity on Defendant Musk's behalf with the specific intent to illegally manipulate the price of Tesla stock upward.

277.     According to Defendant Musk's SEC Form 4 disclosures, Defendants Birchall, Excession, Must Trust and/or Morgan Stanley exploited thin trading volume during before-hours and after-hours trading sessions to increase Tesla's stock price.

278.     On Monday, May 7, 2018—the *next business day* after Defendant Musk had

publicly warned of the "short burn of the century comin *[sic]* soon" the previous Friday—Defendant Tesla filed its Q1 2018 SEC Form 10-Q.  The same day, Defendant Musk filed a SEC Form 4 describing eight groups of TSLA share purchases by Defendant Musk Trust, all reportedly on May 7, 2018.

279.    Based on publicly available price data, many of the purchase trades reported on Defendant Musk's SEC Form 4 could not have taken place during regular trading hours when Musk would have been able to take advantage of the most efficient market price.  However, the first group of trades for 5,903 shares worth $1.74 million is completely consistent with trades made hours before market open, when trading was thin and pricing was inefficient.

280.    In all, Defendant Musk's reported May 7, 2018 stock purchases were worth approximately $9.85 million.

281.    Defendant Musk's stock purchases were an effort to "paint the tape," intended to artificially and deliberately increase the price of TSLA by creating the false impression of high trading activity, especially during extended hours—not to secure the best price.

282.    Upon information and belief, Defendants Musk, Birchall, Excession, LLC, Musk Trust and Morgan Stanley repeated this scheme on additional trading days from 2018 to present.

283.    Upon information and belief, Defendants Birchall, Excession, LLC, Musk Trust and Morgan Stanley also used one or more Morgan Stanley trading accounts to mask trades in TSLA actually being executed on Defendant Musk's behalf, as they did with TWTR.

**h.    Broadcasting Propaganda on Social Media**

284.    Beginning in late 2018, Defendant Tesla began to deliberately cultivate social media influencers and small blogs lacking journalistic standards to promote false narratives encouraging viewers to purchase the company's electric vehicles, stock, and later, after the SolarCity merger, solar products.  Each influencer group was especially active on Twitter and YouTube, posting tens of thousands of text messages and videos in aggregate:

a)    "Now You Know" YouTube Channel: Zac Cataldo incorporated Now You Know Productions, LLC in Massachusetts on July 24, 2019.  The channel

located at https://www.youtube.com/@NowYouKnowChannel and run by Mr.
Cataldo recommended purchasing Tesla stock to its "95,000+ subscribers and
17,000,000+ views" for years.  Cataldo's "Creative Director" since May 2015
was Tesla Massachusetts Regional Manager Steven Salowsky.  Per Mr.
Salowsky's LinkedIn profile, the channel "Currently hold[s] the top position
in the world for referring and selling Tesla vehicles." *See*
https://www.linkedin.com/in/ssalowsky/.  Mr. Cataldo never clearly disclosed
the direct involvement of Defendant Tesla with his channel.

b)  <u>"HyperChange" YouTube Channel</u>: A YouTube channel run by social media
influencer Galileo Russell at https://www.youtube.com/@HyperChangeTV.
In a video published on September 20, 2019 entitled "Model 3: The Self-
Driving Electric Smartcar," Russell predicted, "hundreds of millions in annual
revenue, and extremely high profit margins, or even billions" for Defendant
Tesla based on nothing except his own unfounded speculation, while
Defendant Tesla lost money on every car sold.  Russell frequently
recommended purchasing Tesla stock and was permitted to ask questions of
Defendant Musk on at least one Tesla earnings call as though he were a
professional stock analyst.

c)  <u>"Third Row Tesla" YouTube Channel</u>: A channel located at
https://www.youtube.com/@ThirdRowTesla/ promoting Tesla products
starting in late 2019.  Kristen Yamamoto, an Oregon-based coffee shop owner
going by @Kristennetten or "K10" on Twitter, became one of the core
members of "Third Row Tesla" along with Defendant Qazi (@OmarQazi
[banned], @tesla_truth [banned], and @WholeMarsBlog), Vivien Hantusch
(@flcnhvy), Sofiaan Fraval (@Sofiaan), and Vincent Yu
(@vincent13031925).  Yu was affiliated with Tesmanian, LLC, a collection of
companies he runs with George Szeto, who is also connected to Tesmanian,

Inc., Tesmanian Asset Management LLC, VGT Group, Inc. and VGT Investment LLC.  Together, all of these individuals participated in corporate propaganda broadcasts promoting Tesla, some of which took place in one of Defendant Musk's homes where they interviewed Elon and Kimbal Musk.

d) "Electrek" Blog: A blog located at https://electrek.co operated by controversial amateur Canadian securities analyst Fred Lambert that for many years received preferential media treatment from Defendant Tesla.

e) "Teslarati" Blog: A website located at https://www.teslarati.com describing itself as "Tesla news, rumors and reviews" that received preferential media treatment from Defendant Tesla.

f) "CleanTechnica" Blog: A website located at https://cleantechnica.com describing itself as "independent cleantech journalism" that often published false stories and received preferential media treatment from Defendant Tesla.

g) Frunkpuppy, LLC: Dr. Earl Banning and former Morgan Stanley Digital Marketing Assistant Vice President Julissa Bonilla incorporated Frunkpuppy, LLC in Ohio on January 30, 2019 as part of a social media influence campaign.  The "Frunkpuppy" concept of photographing puppies in the front trunks, or "frunks," of Tesla vehicles was heavily promoted by Dr. Banning on his @28delayslater Twitter account.

h) Lex Fridman/MIT: On April 5, 2019, citing a paper by Lex Fridman, Defendant Musk wrote on Twitter, "'...drivers in this dataset use Autopilot for 34.8% of their driven miles, and yet appear to maintain a relatively high degree of functional vigilance.'"  The widely-criticized Fridman paper, entitled "Human Side of Tesla Autopilot: Exploration of Functional Vigilance in Real-World Human- Machine Collaboration," was removed from MIT's websites on an unknown date after May 2020.  All references were removed from Fridman's personal website between May 12, 2020 and August 11, 2020.

1    The Fridman paper's findings were contradicted by subsequent MIT research,

2    which Defendant Musk did not share. *See*

3    https://dl.acm.org/doi/10.1145/3409120.3410644.

4    285.    On April 29, 2019, Mr. Musk wrote, "We don't buy advertising" (*see*

5    https://x.com/elonmusk/status/1122817103373881344) and on July 20, 2020 he wrote, "At some

6    point, we should probably do advertising as art/communication/entertainment & to support high

7    quality media" (*see* https://x.com/elonmusk/status/1285443997654122496).  Emphasizing the

8    point, on April 27, 2021, Mr. Musk wrote, "Other companies spend money on advertising &

9    manipulating public opinion, Tesla focuses on the product." (*see*

10   https://x.com/elonmusk/status/1387172830094233601).

11   286.    On October 25, 2021, Vivien Hantusch, whom Defendant Musk had hired to his

12   "Office of the CEO" within Tesla in secret, posted on Twitter:



27   Page 88 of Tesla's 2018 SEC Form 10-K disclosed "marketing, promotional and advertising

costs of $70.0 million, $66.5 million and $48.0 million in the years ended December 31, 2018, 2017 and 2016, respectively."  Page 80 of Tesla's 2019 SEC Form 10-K disclosed "marketing, promotional and advertising costs of $27 million, $32 million and $37 million in the years ended December 31, 2019, 2018 and 2017, respectively, of which the majority is related to promotional activities."  These figures do not match each other for 2017 and 2018, and they do not match the false claims on Twitter that "Tesla doesn't advertise."  Additionally, a records request response from the Las Vegas Convention and Visitors Authority revealed that Defendant Tesla offered to build free charging stations in Las Vegas for TBC-The Boring Company, another Atlanteca Enterprise member, which amounted to a hidden advertising expense for Tesla, Inc.

287.    Despite representing that "rental car companies" would enjoy "unequivocal" "economic advantages" from owning a "fleet" of Tesla vehicles, Ms. Hantusch, based in Germany, did not mention the RAC Group litigation in Europe proving the opposite.

288.    DEPT is an international public relations firm based in The Netherlands that boasts of its large technology company clients on its home page (https://deptagency.com/en-us/): Apple, Google, Samsung, Sony PlayStation, Spotify, and Defendant Tesla, among others.  The DEPT website features a page clearly stating that it offers Influencer Marketing services, at https://www.deptagency.com/en-us/service/brand-campaigns-content/influencer-marketing/.

289.    Internal Tesla documents demonstrate that Tesla hired DEPT through Tesla's subsidiary in The Netherlands to facilitate a stealth advertising campaign based in Finland targeted at customers in the United States and the rest of North America.  The result was a YouTube video entitled "FIRST DAY IN FINLAND (drifting Teslas)" posted by "Kara and Nate," a couple from Tennessee who have 2.71 million followers on YouTube at present.  *See* https://www.youtube.com/watch?v=r5nCw_zEpTU.  The video's description on YouTube explicitly states, "(BTW Tesla did not pay us to be here, even though it might seem that way with our excitement levels!) Haha."  This was false.  Internally at Tesla, this campaign was referred to as the "2019 Tesla Winter Experience."

290.    Hotel invoices from Finland billed to Tesla demonstrate that in fact, Tesla did pay

for Kara and Nate's stay, in Room 512 of Hotellii Merihovi, from March 12, 2019 through March 14, 2019.  Their Tesla advertisement was posted to YouTube on May 14, 2019.

291.    DEPT is not the only advertising agency Tesla has made use of, despite Defendant Musk's and Tesla's persistent representations that the company does not spend on advertising.  Other marketing vendors in Tesla's WARP Payables system include APCO Worldwide, CP2 Fieldmarketing BV, MWW, Professional Public Relations, and Strategies 360. MWW in particular was hired under the direction of Dave Arnold to secretly spy on Tesla employee Facebook groups for $150.00 per hour or more in order to prevent unionization efforts, a task which possibly violated labor laws.

292.    Prior to DEPT's involvement, Tesla "Director US-East" Jeremy Snyder was responsible for "relationships to create an influencer marketing strategy" according to his LinkedIn profile.  *See* https://www.linkedin.com/in/snyderjeremy.

### i.    Fraudulent Price Targets

293.    Defendant Musk and Tesla's proxies on financial media networks have long been Catherine "Cathie" D. Wood of ARK Investment Management, LLC ("ARK") and Ross Gerber of Gerber Kawasaki, Inc.  Both are investment managers that have shilled for Defendants Tesla and Musk through good times and bad, and both are investors in X Corp., directly (in the case of Ross Gerber) or indirectly (via both funds, but via ARK Venture Private Holdings, LLC in Wood's case).  Wood, who famously touted a $4,000-per-share price target for Tesla's stock on CNBC, sold off a significant portion of ARK's Tesla holdings at around $320 per share in 2019, less than 10% of her target price.



294.    Cathie Wood upped ARK's price target for Tesla to $6,000 per share at the start of August 2019.  Beginning in mid-October, without again changing its price target or its laughably broken "model," ARK began selling large quantities of Tesla shares.

295.    Ms. Wood claimed that her prognostications were based on models, but ARK's supposed models contained stunning errors, such as using Microsoft Excel's formatting functions to remove 0s from cell values instead of using the correct numbers.  In this way, one material figure in an ARK model was off by a factor of one million.

296.    ARK's selling activity was omitted from Cathie Wood's media appearances where she continued to exude optimism about Tesla and technology generally.  In Q4 2019, ARK offloaded about $127.6 million worth of Tesla stock and purchased just over $4 million worth.  In other words, while Cathie Wood insisted that Tesla was a screaming "buy" destined to soar, her funds disposed of around $123 million worth of shares, net.

297.    On December 9, 2019, Ms. Wood appeared on CNBC once again to discuss Tesla.  Although she was more than willing to talk on live television for nearly seven full minutes about the Cybertruck (analyzed from "many different angles"), her perception of Tesla's competitive advantages, her "bear price" of $700, market share, and the supposed fact that "Tesla is not an auto company," what she did not mention was that her firm had just "re-allocated" $100 million away from Tesla stock.  In addition, CNBC displayed a screen about ARK's Tesla holdings falsely claiming that ARK did not have a stake ">1%."

298.    The distribution of material non-public information to select individuals tasked with pumping up a stock price is unlawful.  Yet Wood and Gerber repeatedly met with Defendant Musk privately.  Gerber and Wood enjoyed perks such as exclusive factory tours, access to Musk for interviews, and special event invitations, all while they maintained a uniquely ecstatic outlook in public.  Yet behind the scenes, ARK was selling weekly.



299.    In 2024, the SEC and United States Department of Justice charged and criminally prosecuted short-seller Andrew Left—who publicly flipped from being short Tesla stock to being long on October 23, 2018—for the practice of proclaiming high price targets in public and then quietly selling his stakes, among other allegedly unlawful acts.

300.    Gerber claims to have a degree from Musk's alma mater in "Business Law," but according to the University of Pennsylvania, Gerber never received such a degree.

**j.    Silencing Critics**

301.    Under Defendant Musk's leadership, Defendant Tesla has never hesitated to make false statements.  Former Tesla Senior Director, Global Communications Dave Arnold quit immediately when litigation revealed that he had planted a false story in the Huffington Post accusing former Tesla engineer Cristina Balan of having engaged in "criminal conduct."

**i.    Tesla Customer and Shareholder Omar Qazi Responds To A Tesla Model 3 Safety Issue On Elon Musk's Behalf By Amplifying Dangerous Conspiracy Theories About Plaintiff**

302.    In April 2018, Diego MasMarques, Jr., an individual convicted of murder and attempted murder in Spain and charged with other crimes domestically, made threats directed at Plaintiff over the fact that MasMarques's convictions were public on PlainSite.  On various websites, Mr. MasMarques, who has a documented history of mental illness, posted thousands of libelous fabrications falsely alleging that Plaintiff and his family members had committed a wide variety of crimes ranging from setting up a "fraudulent" non-profit organization, to tax evasion,

to extortion, to the hacking of his e-mail account. Once Mr. MasMarques began making death threats, Plaintiff applied for and was granted a two-year restraining order against him. *See Greenspan v. MasMarques*, Santa Clara County Superior Court Case No. 18CH008067 (the "Civil Harassment Case"). *See also Greenspan v. MasMarques et al*, Massachusetts District Court Case No. 1:23-cv-10134-DJC.

303.    In December 2018, a Tesla critic named Paul Huettner received a thinly-veiled death threat via anonymous fax purporting to be from "Elon Musk." He reported it to the FBI.

304.    On or around January 13, 2019, a Tesla customer recorded a video of a Tesla Model 3 center console that was unresponsive while driving on "Autopilot" on the highway at high speed. Plaintiff posted on Twitter from the @PlainSite account warning Defendants Musk and Tesla, "You have a legal and ethical obligation to fix this before someone else gets killed in an avoidable accident. This mirrors complaints on the $TSLA forum about freezing center consoles." Plaintiff's post embedded the video.

305.    Defendants Musk and Tesla did not respond, but the next day, January 14, 2019, a Twitter account, "@tesla_truth" (posing as "Steve Jobs") did, falsely writing, "Aaron, the center touch screen has nothing to do with driving the car," and ending with, "Good luck in court on Tuesday for violating that restraining order," even though Plaintiff had not violated any order.

306.    Upon information and belief, on January 14, 2019, Mr. MasMarques and/or one of his sympathizers began feeding Defendant Qazi false information concerning Plaintiff on Twitter, and the @tesla_truth account amplified that misinformation without bothering to verify its accuracy. At approximately the same time as @tesla_truth first responded, a since-deleted Twitter account, @Tom34079930, replied to a @tesla_truth post falsely stating in part, "Aaron Greenspan went last year to a judge and lied to get a restraining order on Diego. The judge was pissed when she found out he lied. Now the restraining order is on Aaron and he violated it." The @Tom34079930 account also falsely wrote to @tesla_truth, "Greenspan is a tax cheat."

307.    Plaintiff did not at any point solicit feedback from @tesla_truth. Its owner attacked Plaintiff over a public safety concern, much as it had previously attacked journalists.

308.    The @tesla_truth account then began re-posting and linking to many more of the libelous and deranged posts that were the subject of the unrelated Civil Harassment Case, some of which featured Plaintiff's parents' home address, a photograph of their home, and the name of their synagogue, alongside serious and false accusations about Plaintiff and his family.

309.    The owner of the @tesla_truth account admitted, "I haven't researched many details about all the complaints against Aaron," displaying reckless disregard for the truth.

310.    An attempt via Direct Message ("DM") to discuss the seriousness of the matter and the associated safety concerns with @tesla_truth's owner was not fruitful. The owner of the account refused to stop and continued making public antagonizing statements on Twitter, including, "Jail all shorts," echoing Defendant Musk's notorious scapegoating of short-sellers.

311.    Plaintiff sent a link via DM to the @tesla_truth account owner to a PDF file hosted on his personal website of Twitter posts concerning the Civil Harassment Case. When the account owner clicked on the link, Plaintiff's server logs yielded the account owner's DNS hostname and IP address: c-73-71-59-42.hsd1.ca.comcast.net and 73.71.59.42, respectively. Given the alarming safety concerns associated with the Civil Harassment Case, Plaintiff searched PlainSite's server logs for any associated usage history, and found that a user with the same IP address had searched for "smick enterprises," a company run by Defendant Qazi.

312.    Given the number of people the account owner had already harassed, Plaintiff publicized a redacted form of this information to warn of the danger Defendant Qazi posed.

313.    Defendant Qazi later admitted to using the @tesla_truth Twitter account.

314.    The same day, still concerned about the danger posed to his family and others at synagogues mentioned in some of the posts, Plaintiff attempted to contact Defendant Qazi by phone at his employer's office as determined by his LinkedIn profile, but was unable to reach him. Plaintiff informed an unknown female supervisor that he had asked Defendant Qazi to stop and considered his conduct dangerous, harassing and libelous. At the time, Plaintiff did not know that Defendant Qazi's "employer" was actually Qazi's father's company. Plaintiff did not ask to speak with Defendant Qazi's father or any of his family members when he called.

Plaintiff simply conveyed that Defendant Qazi's dangerous conduct should cease immediately.

### ii.   Qazi Steps Up His Campaign of Criminal Harassment

315.   The next day, on January 15, 2019 at 7:01 P.M. (all times herein are Pacific Time unless otherwise specified) Plaintiff received a harassing phone call from a blocked telephone number.  The anonymous male caller impersonated a service technician who initially only said he was calling from "the phone company," and asked for Plaintiff's home address.  Since the caller refused to identify "the phone company," and since AT&T does not customarily call from blocked numbers for service appointments, Plaintiff refused to divulge any information. Defendant Qazi later admitted to placing this harassing phone call both privately and publicly.

316.   The @tesla_truth Twitter account, posing as "Steve Jobs," was eventually suspended by Twitter for violating its terms of service.  It was permitted to continue operating only by renaming itself to "Steve Jobs *[sic]* Ghost" and by falsely identifying as a so-called "parody" account, even though the account's primary purpose was not to parody Steve Jobs, but to promote Defendants Musk and Tesla by abusing the imprimatur of Apple, Inc.'s co-founder.

317.   In mid-July 2019, the @tesla_truth account once again began posting false and misleading information about Plaintiff and the Civil Harassment Case.  Such posts continued through late October 2019 and inspired harassment from others.

318.   On August 2, 2019 at 11:24 P.M., via the @PlainSite Twitter account, Plaintiff reported on a public video posted by Defendant Qazi on the @tesla_truth account advertising Tesla's so-called "Autopilot" functionality.  The video depicted a black Tesla Model 3 driving through a red stoplight on Autopilot without the driver's hands on the steering wheel as required. Although Defendant Qazi later claimed not to be the driver, he has not denied that the vehicle was his, and he claimed to own the video's copyright.

### iii.   Omar Qazi Leads a Mob That Tries To Frame Plaintiff for Possession of Child Pornography

319.   The next day, on August 3, 2019 starting at 7:49:32 A.M., an internet user with the DNS hostname ip72-203-123-36.oc.oc.cox.net in or around Rancho Palos Verdes, California accessed documents hosted on PlainSite from the Civil Harassment Case.

320.    Less than 20 minutes later, on August 3, 2019 at 8:07 A.M., the @tesla_truth Twitter account posted an altered and false version of Form CH-100 from Plaintiff's Civil Harassment Case, replacing the "Person From Whom Protection Is Sought" with the name "Little Billy Watkins" and an age of "5" (referring to a fictional five-year-old child). The altered document also contained Plaintiff's phone and fax number alongside the text:

> "BREAKING: Aaron Greenspan of Plainsite has been arrested after trying to beat up a group of kids in the playground after a failed child abduction. The kids ended up doing a number on him and now he has filed a restraining order against them. Should've known they would fight back."

321.    Fifteen minutes later, on August 3, 2019 at 8:22 A.M., at the same phone number posted by Defendant Qazi as part of the altered Form CH-100, Plaintiff received several text messages from an unknown telephone number, +1 408 767 6349, shown below:



These text messages falsely alleged that Plaintiff had "child pornography" and "[pornographic] images of underage kids" on his computer and threatened to "call the police" accordingly.

322.    Seven minutes later, on August 3, 2019 at 8:29 A.M., Plaintiff received a fax on the fax number posted by Defendant Qazi as part of the altered Form CH-100 from an unknown fax number, +1 415 969 2047, purporting to be from "Kids R Us" with a cover page message of, "Aaron, let me know if you need more. Full price this time please." The cover page style matched that of the fax cover page that had been sent to Paul Huettner. The next page contained a monochrome pornographic image of a teenage young woman. Plaintiff immediately reported the harassing text messages and pornographic fax to the FBI.

323.    Eight minutes later, on August 3, 2019 at 8:37 A.M., Defendant Qazi used the @tesla_truth Twitter account to post regarding Plaintiff, "he was just posting some stuff about me in his feed so I wanted to mess with him a little bit."

324.    In light of these events, on August 7, 2019 at 3:27 P.M., Plaintiff e-mailed the Tesla Board of Directors, including Defendant Musk, with questions and concerns about Defendant Tesla's relationship with Defendant Qazi.  Plaintiff never received a response.

325.    On August 7, 2019 at 6:38 P.M., Defendant Qazi admitted to further harassment and to the destruction of evidence by posting from his @OmarQazi Twitter account:

"I did make the joke post about Aaron getting beat up by kids or whatever with his contact info I got from PlainSite.  Did it for fun because he posted tweeted *[sic]* about me.  Deleted it later that day.  Nothing personal against Aaron."

326.    In a DM conversation with a third party from September 27, 2019, Defendant Qazi admitted, "[I] take responsibility for what my followers do too and [I] take it seriously."

327.    On August 8, 2019 at 11:13 P.M., Defendant Musk responded to e-mailed, on-the-record questions from Plaintiff with a screenshot of false information stemming from libelous posts by Diego MasMarques, Jr., along with the words, "Your true colors …"

328.    Especially after Plaintiff was able to lawfully obtain previously confidential court documents from Delaware Court of Chancery Case No. 12711-VCS, *In Re Tesla Motors, Inc. Stockholder Litigation* (the "SolarCity Case"), including deposition transcripts of Defendant Musk, on a nearly daily basis, the @tesla_truth account posted dozens of false statements—hundreds in aggregate—regarding Plaintiff, his family, and his non-profit organization.  These harassing statements were read by a wide audience of at least 10,000-35,000 followers.  Virtually all were published to promote Defendant Tesla's stock, its products, and Defendant Musk.

329.    On or around September 28, 2019, an internet user with the same last two cell phone digits as Defendant Qazi (37) created a Twitter account with the username @PlainShite (and a name of "Plain Shit") that made use of the PlainSite name and logo without permission.

330.    On the morning of October 9, 2019, *Bloomberg Businessweek* published an article by Zachary Mider referring to Defendant Musk, profiling Defendant Qazi, and stating:

"The billionaire CEO, who declined to be interviewed for this story, replied to his fan [Defendant Qazi via e-mail] the same day [in August 2019].  'Your Twitter is awesome!' he said, before adding a warning: 'Please be wary of journalists.  They will sweet talk you and then wack *[sic]* you with a baseball bat.'  Musk cc'd me on the message.  Tesla also declined to comment."

The article contained a photograph of Defendant Qazi next to his black Tesla Model 3 and referred to the @tesla_truth account as a "bottomless font of Muskolatry."

331.     On October 9, 2019 at 2:53 P.M., Plaintiff published a copy of a Twitter DM conversation in which Defendant Qazi admitted that he had an "out of control revenge impulse" and that he had made the harassing telephone call to Plaintiff from a blocked number on January 15, 2019 "to fuck with him," though Defendant Qazi misrepresented the call's contents in several respects.  In this same conversation, Defendant Qazi also made reference to an unknown "Jim" who had contributed to or provided input for the @tesla_truth account in January 2019.

332.     To the extent that Defendant Qazi at any point denies having authored statements attributed to him on @tesla_truth or other social media accounts, they were authored by other employees and/or agents of Defendant Tesla with Defendant Qazi's supervision and approval.

333.     On October 9, 2019 at 3:09 P.M., regarding Plaintiff, the @tesla_truth Twitter account posted: "i'm going to drag his name through the mud until the day he does *[sic]*. I want everyone to know the true facts about who he really is..."

**iv.  Elon Musk Personally Participates In The Harassment Campaign**

334.     On October 9, 2019 at 3:34 P.M., Plaintiff e-mailed a Notice of Intent to Sue and Evidence Preservation Notice to Defendant Musk, attorneys at Defendant Tesla and SpaceX, Defendant Qazi, SpaceX Communications Director James Gleeson, and SEC Regional Director Erin Schneider.

335.     Also at 3:48 P.M., Defendant Musk replied by e-mail to all parties, including the SEC, with the message, "Does the psych ward know you have a cell phone? Just curious." (the "Musk Reply").  Defendant Musk then replied to all parties again, in reference to Defendant Qazi's response, with two laugh/crying emojis.  None of the responses had any substantive bearing on the Notice of Intent to Sue and Evidence Preservation Notice whatsoever and were accordingly not pre-litigation communications.  Nor did either of Defendant Musk's responses pertain to an active legal proceeding or a particular legal matter then under review.

336.     Also at 3:48 P.M., Defendant Qazi posted on the @tesla_truth Twitter account a

screenshot of the e-mail containing Plaintiff's Notice of Intent to Sue and Evidence Preservation

Notice to Elon Musk, without redacting any of Plaintiff's contact information.

337.    At 3:51 P.M., Defendant Qazi further posted a screenshot of Elon Musk's

response, falsely suggesting that Plaintiff resided in a "psych ward."

338.    At 3:56 P.M., Defendant Qazi posted an image of the screenshot of the Notice of

Intent to Sue and Evidence Preservation Notice zoomed in on Plaintiff's contact information

alongside the text, "If you would like to contact Aaron for pranks you can email or call him

using the info listed below. Remember that all pranks will be recorded, so give it your best shot."

339.    As a result of Defendants' actions, Plaintiff received unwanted telephone calls, e-

mails and messages, and hundreds of additional libelous messages were posted publicly.

### v.    Omar Qazi Targets Plaintiff's Family for Further Harassment

340.    The following day, on October 10, 2019 at approximately 11:00 A.M., Defendant

Qazi created a fake Twitter account impersonating Plaintiff's father, Dr. Neil S. Greenspan.  The

Twitter account's handle, deliberately intended to confuse others, was @greenspan_neil.  The

account did not identify itself as a parody account and was not a parody account.

341.    Via Twitter, Defendant Qazi admitted that he used and/or uses the "catch all"

feature on Google Apps (since renamed to Google Workspace) to receive all e-mails addressed

to smick.com, including e-mails connected to numerous fake accounts on Twitter.

342.    Defendant Smick uses and/or owns the domain name smick.com.

343.    On Thursday, October 10, 2019, Plaintiff filed a Digital Millennium Copyright

Act ("DMCA") takedown request with Twitter, Inc. regarding the copyrighted photograph Mr.

Qazi used to impersonate Plaintiff's father.  Consequently, Twitter removed the photograph.

Defendant Qazi replaced it with a different copyrighted photograph of Plaintiff's disabled

brother and changed the name on the account to Plaintiff's brother's name, Simon Greenspan.

Plaintiff reported Defendants' harassment to the San Francisco Police Department ("SFPD").

The SFPD desk officer decided of his own volition to focus on the pornographic fax sent to

Plaintiff and accordingly classified his police report as relating to child pornography.

344.    On Friday, October 11, 2019, among other messages, Defendant Qazi wrote, "I hate my brother" from the fake @greenspan_neil account now posing as "Simon Greenspan." In a separate exchange on the same day with Twitter account @enL3X1, who asked, "Are you a parody or actually his brother?" Defendant Qazi wrote, "yeah I'm his little brother haha."

345.    Plaintiff's brother is not active on Twitter and never has been.

346.    On October 11, 2019, Defendant Qazi created websites using servers owned or leased by Defendant Smick Enterprises, Inc. (the "Smick Sites") containing copyrighted photographs of Plaintiff and his family members with the bold headline, "It's plain to see: This fraudulent charity is FULL OF SHIT." The text continued in part:

> "Have you been harassed, intimidated, threatened or targeted for extortion by Aaron Greenspan, his fraudulent 'Think Foundation' 'Charity', or board members Neil Greenspan or Judy Greenspan? You are not alone."

The website's source code contained the hidden HTML, "<!-- fuck you aaron -->".

347.    The Smick Sites mainly echoed Mr. MasMarques's allegations: that Plaintiff's non-profit organization was a "fraudulent charity" and that Plaintiff and his family "harassed, intimidated, or targeted for extortion" individuals. Defendant Qazi claimed to have engaged "Lantham & Watkins" and wrote "56 people" had submitted "verified testimonies" to the site(s).

348.    On October 15, 2019, the Smick Sites were updated to copy the appearance of the PlainSite website and the misspelled reference to Latham & Watkins was removed. Defendant Qazi updated the bold headline to: "Have you been a victim of harassment, intimidation, extortion, sexual assault, identity theft, or cyberstalking by Aaron Greenspan? You are not alone. The victims of Aaron Greenspan Foundation is gathering evidence of Aaron Greenspan's crimes to finally bring this criminal to justice." The supposed "Victims of Aaron Greenspan Foundation" does not exist and never has. Defendant Qazi changed the false number of people who had submitted "testimonies" to "956," corresponding to Plaintiff's home address.

349.    Later iterations of the Smick Sites increased the number of submitted "testimonies" to various numbers in the thousands, added HTML page titles such as "PlainSite :: Fake Charity Comitting *[sic]* Securities Fraud" and included other libelous hidden comments.

350.    On October 15, 2019 at approximately 10:52 P.M., Defendant Qazi contacted Plaintiff's disabled brother via Facebook Messenger.

351.    On October 16, 2019, Defendant Qazi removed the PlainSite source code from the Smick Sites, but left posted the bold headline accusing Plaintiff of several crimes and the copyrighted photographs of Plaintiff's family members, including Plaintiff's brother.

352.    On Friday, October 18, 2019 at 7:06 P.M., one of Defendant Qazi's harassing Twitter accounts, @PlainShite—intended to impersonate and disparage Plaintiff's company's trademarked brand, PlainSite—publicly accused Plaintiff of "attacking and slandering" others.

353.    On October 18, 2019 at 7:34 P.M., Plaintiff wrote to Defendant Qazi via e-mail stating, "If I've said anything objectively false I'd like to know what so that I can correct the record."  At 8:24 P.M., Defendant Qazi responded via e-mail, stating, "Thanks for writing. I will write back to you tomorrow, or Sunday if I don't get time tomorrow."  He never responded further, despite later falsely claiming in public that Plaintiff had failed to engage.

354.    Defendant Qazi solicited information about Plaintiff's supposed "crimes" from thousands of followers, but only two "testimonies" initially appeared on the Smick Sites: "M's TESTIMONY," and "P'S TESTIMONY," a haphazard PDF compilation of Mr. MasMarques's false allegations submitted by Defendant Qazi's friend, a conspiracy theorist and Elon Musk obsessive named Amelia "Mia" Tracey of Sydney and Melbourne, Australia, but posted anonymously.  Neither of these posts described any actual crime committed by Plaintiff or his family members, let alone any actual "victim" of Plaintiff, as none exist.

### vi.  Even With Omar Qazi Banned From Twitter, His Libel and Harassment Continues

355.    Defendant Qazi's harassment of Plaintiff led to the temporary suspension of Defendant Qazi's accounts.  On or around October 22, 2019, Defendant Musk wrote an e-mail to Twitter, Inc. CEO Jack Dorsey in support of Defendant Qazi while disparaging Plaintiff.



356.    On or about October 24, 2019, Twitter permanently banned Defendant Qazi, disabling @OmarQazi, @tesla_truth, @PlainShite, @greenspan_neil, and @SmickTrump.

357.    On October 31, 2019, Defendant Qazi posted an essay on wholemars.org, a domain name and server controlled by Defendant Smick, entitled, "Steve Jobs is dead."  In it, Defendant Qazi admitted that his @tesla_truth account was suspended repeatedly for various legal violations including impersonation, and that it was registered to teslatruth@smick.com.

358.    In response, Defendant Qazi set up open-source software called Mastodon on a server belonging to Defendant Smick.  On November 1, 2019, Defendant Qazi published an essay on wholemars.org thanking his supporters and inviting them to use Mastodon, where he posted false and libelous statements about Plaintiff without fear of Twitter intervening.  (At various points in time, Smick's "wholemars" domain names have redirected to each other.)

359.    On Saturday, November 2, 2019, Sascha Pallenberg, formerly of Daimler AG, wrote from his Twitter account, "Let me just be crystal clear about Omar Qazi. He harassed me, colleagues and dozens of people in the industry over various fake accounts!"  Pallenberg is one of several automotive industry consultants and professional journalists who contacted Plaintiff to

confirm that Defendant Qazi had harassed them as well.

360.    Also on November 2, 2019, an unknown individual created a profile using Plaintiff's name and e-mail address without permission on the pornographic website Pornhub.

361.    On November 6, 2019, an unknown individual using the Wikipedia username "Cihwcihw" made their first edit to Wikipedia since signing up five years prior: the alteration of an article about Plaintiff, in order to supposedly "be more impartial and includ[e] additional details." In fact, this user only changed and added false content about Plaintiff, referencing Defendant Qazi's website while parroting his false claims about Plaintiff.

### vii.   The Tesla Cult Fractures, with Omar Qazi Scapegoating Plaintiff

362.    On April 29, 2020, Defendant Musk erupted into an angry tirade on Defendant Tesla's Q1 2020 earnings call, calling local public health officials "fascist." At one point, Defendant Musk was disconnected from his own earnings call, possibly by his own lawyers.

363.    On May 9, 2020, Defendant Musk ignited further controversy by threatening to sue, and days later suing, Alameda County over its implementation of the multi-county Shelter-In-Place Order concerning COVID-19, which curtailed Tesla's manufacturing in Fremont. Defendant Musk then instructed his employees to violate the Shelter-In-Place Order and return to work and risk death, or in the alternative, risk losing unemployment benefits. Soon after, Musk posted an image on Twitter falsely implying that he had defied the Shelter-In-Place Order.

364.    Many supporters of Defendants Musk and Tesla were, for once, appalled by Musk's erratic behavior and disregard for human life. On May 12, 2020, *Electrek* editor Frederic Lambert wrote an editorial critical of Musk and the "toxic" Twitter account @thirdrowtesla: the channel led by Defendant Musk's most ardent supporters, including Defendant Qazi. *See* https://electrek.co/2020/05/12/tesla-super-fandom-becomes-toxic-negative-electric-revolution-op-ed/.

365.    Signaling the vital importance of his work harassing Tesla's critics, Defendant Musk appeared with Defendant Qazi in a 3.5-hour Third Row Tesla video interview filmed at one of Defendant Musk's Los Angeles homes and published on February 9, 2020. *See* https://www.youtube.com/watch?v=J9oEc0wCQDE. The below photograph depicts Defendant

---

Qazi (far right) with Defendant Musk (far left) and Tesla Director Kimbal Musk (second from right with cowboy hat) at the recording session:



366.    Also pictured is Vivien Hantusch, seated to the right of Defendant Musk, who secretly began working for Tesla full-time in the "Office of the CEO" starting in or around 2020, in a position with salary and lucrative stock options.




367.    Even as she worked for Tesla and Musk, Hantusch steadfastly refused to admit her formal association, posting thousands of messages promoting Tesla and other Musk businesses from her @flcnhvy Twitter account with over 100,000 followers by 2021.

368.    Due in part to the criticism from even friendly bloggers like Lambert, who had now labeled Third Row Tesla "toxic," Hantusch disapproved of Qazi's handling of the Third Row Tesla Twitter account, leading to a rift in the group.

369.    Defendant Qazi ultimately admitted authorship of Third Row Tesla's Twitter posts, thereby also admitting that he had deliberately contravened Twitter's lifetime ban.

370.    The fallout from the rift between *Electrek* and Third Row Tesla, both of which had served as cheerleaders for Defendant Tesla, led Defendant Qazi to author a 17,600-word screed on his website hosted by Defendant Smick, published on May 17, 2020 (the "Qazi Screed"). Entitled "Response to Frederic," it oddly invoked *Plaintiff*'s name at least 47 times.

371.    Virtually every statement concerning Plaintiff in the Qazi Screed was false or misleading. In some cases, Defendant Qazi cropped images to deliberately mislead his readers. Defendant Qazi also linked events that were chronologically impossible and omitted key facts.

372.    On May 20, 2020, Plaintiff filed *Greenspan I* against Defendants Qazi, Smick, Musk, and Tesla.

373.    On or around May 23, 2020, Defendant Qazi returned to Twitter once more via a proxy account, @WholeMarsLog, later renamed @WholeMarsBlog, set up for him by Tesla fan Scott Woods to assist with evasion of his lifetime ban. Defendant Qazi repeatedly made half-baked attempts to deflect blame onto Mr. Woods for his posts in the months that followed.

374.    On May 24, 2020, Third Row Tesla published "Episode 17" recorded on May 15, 2020, depicting Defendant Qazi wearing a shirt imprinted with a graph of TSLA's share price next to the text "Tesla $420.00," referring to Defendant Musk's false "funding secured" claim that led to securities fraud charges by the SEC.



375.    On May 25, 2020, a federal holiday, Plaintiff's father received a phone call at 3:14 P.M. Eastern Daylight Time from a "Private Caller" on caller ID.  The male caller identified himself only as working for the law firm Quinn Emanuel in connection with *Greenspan I* and calling on behalf of Defendants Musk and Tesla.  The caller asked whether Plaintiff's father served on the Board of Directors of Plaintiff's non-profit organization and asked for his address.

376.    At 3:12 P.M. Eastern Daylight Time, two minutes prior to the call, Defendant Qazi's @WholeMarsLog Twitter account had posted, "It's time for the board of Plainsite to face justice for their crimes," among other libelous statements.

377.    On June 8, 2020, Defendant Qazi boasted about his "Nikola shorts," indicating that despite his professed hatred of short-sellers, he had decided to become one himself because Nikola Corporation's purported hydrogen-powered truck competed with Tesla's purported electric truck.

378.    On July 16, 2020, Defendant Qazi referred to the mugshot (below right) associated with his arrest in Brevard County, Florida in connection with Case No. 05-2018-CF-010519-AXXX-XX for felony possession of a controlled substance (LSD) and misdemeanor possession of cannabis—as "my photo" from the @WholeMarsBlog account (below left), which established that Defendant Qazi controlled @WholeMarsBlog, and not Scott Woods.



379.    On or around July 25, 2020, Defendant Qazi posted a third document entitled "F'S TESTIMONY" and a link thereto on his Smick Sites purporting to be "testimony" from a "victim" of Plaintiff.  The document was yet another compilation of Diego MasMarques, Jr.'s posts authored once again by Amelia Tracey, who had also fabricated "P'S TESTIMONY."

380.    In or around August 2020, Defendant Qazi interviewed Nikola Corporation former CEO Trevor Milton and toured Nikola's headquarters in order to report insights back to Defendants Musk and Tesla on one of their potential competitors.

381.    On August 5, 2020, Defendant Qazi falsely and publicly accused Plaintiff of posting Defendant Qazi's phone number and e-mail address on the "Dark Web."

382.    On August 22, 2020, in order to cause Plaintiff worry and anxiety, Defendant Qazi began posting by name on his @WholeMarsBlog account about a female Harvard University dean who Defendant Qazi erroneously believed was a college classmate of Plaintiff's.

383.    On August 25, 2020, Defendant Qazi made a photograph of Plaintiff's parents from a newspaper article the banner image for his @WholeMarsBlog account.

384.    After Plaintiff filed his Second Amended Complaint in *Greenspan I* on August 26, 2020, Defendant Qazi began a full-scale assault on Plaintiff's reputation to "drag his name through the mud" as promised, using at least twelve different websites: among them, Twitter, Hacker News, Mastadon, Quora, Reddit, Wikipedia, Amazon.com, SoundCloud, Anchor.fm, as well as sites owned by Defendants Qazi and/or Smick.

385.    On August 28, 2020, Defendant Qazi appeared on the "Inside Transportation" podcast.  As of July 31, 2021, the podcast had been listened to approximately 1,700 times.  The interview contained a litany of lies about Plaintiff and the admission at 13:30 that Defendant Musk was "very pissed" about Defendant Qazi being banned by Twitter in October 2019.

386.    On September 19, 2020, attempting to cause Plaintiff worry and anxiety, Defendant Qazi posted threats concerning law enforcement on his @WholeMarsBlog account, warning that Plaintiff's house was "completely bugged" due to a "warrant for a wiretap."

387.    On September 22, 2020, Defendant Qazi referred to Plaintiff as "twice as evil as Trevor [Milton]" on the @WholeMarsBlog account, twelve minutes after he had referred to Milton as someone who had "mollested *[sic]* his 15 year old cousin after a funeral."

388.    On September 24, 2020, Defendant Qazi posted links on his @WholeMarsBlog Twitter account to content authored by Diego MasMarques, Jr. and others on various gripe sites.

Plaintiff had previously informed both Defendant Qazi and his counsel of the serious danger associated with the Civil Harassment Case, and again notified Qazi's counsel accordingly.

389.    On September 26, 2020, the @WholeMarsBlog Twitter account wrote "what aaron does to people is worse than murder IMHO", followed by a suggestion that Defendant Qazi was contemplating suicide.  Three days later, another cryptic suggestion appeared on @WholeMarsBlog falsely stating that Plaintiff would be responsible for Defendant Qazi's death.

390.    On October 1, 2020, a photograph of Plaintiff's mother appeared as the background image on the @WholeMarsBlog Twitter account.

391.    On October 2, 2020, Plaintiff reported Defendant Qazi to SFPD a second time for internet harassment as the frequency of his harassing posts increased.

392.    On October 4, 2020, Defendant Qazi wrote that Plaintiff was "10x worse than [alleged child molester] Trevor Milton" and called him a "Truly sick person."  Defendant Qazi's Third Row Tesla colleague and confidant, Kristen Yamamoto, echoed Defendant Qazi's false allegations, writing, "—so you're *[sic]* daughter comes to you saying Trevor molested her & you tell her 'I have a bigger problem, Aaron Greenspan.' 🙁."  Defendant Qazi also posted a photograph of Plaintiff's disabled brother as the banner image of his @WholeMarsBlog account.

393.    On October 6, 2020, it was widely reported that at the direction of Defendant Musk, Defendant Tesla had shut down its entire Public Relations department months prior, leaving Defendant Musk and Qazi's Twitter accounts as the primary sources of information on social media about Defendant Tesla, nominally valued at hundreds of billions of dollars.

394.    On October 9, 2020 at 11:43 P.M., from the @WholeMarsBlog Twitter account, Defendant Qazi wrote, "So it turns out nobody is really suspicious of a Tesla driving around Fremont / someone actually nodded and waved from security" as he photographed Defendant Tesla's factory, which is private property.  In contrast, on April 19, 2019, Randeep Hothi, a researcher of similar age and skin tone to Defendant Qazi, was subject to a Workplace Violence Civil Harassment Order filed by Defendant Tesla for observing the exact same factory by day.

395.    On October 17, 2020, Defendant Qazi retweeted a post by the @OfficialABQ

Twitter account containing the text "Here's a message for Greenspam" above a cartoon image of one stick figure kicking another in the groin, causing it to collapse. Twitter later removed this post for violating its rules prohibiting users from advocating violent conduct.

396.    On October 19, 2020, an unknown party created an unverified Anchor.fm account in Plaintiff's name using Plaintiff's e-mail address, and then used the unverified account to send Defendant Qazi a recorded message *not* from Plaintiff, which Defendant Qazi then falsely and publicly cited as evidence of "harassment" by Plaintiff on his @WholeMarsBlog account.

397.    In late October 2020, Twitter, Inc. published a "Ban evasion policy" now at https://help.x.com/en/rules-and-policies/ban-evasion, clarifying that Defendant Qazi was violating the Twitter Terms of Service by continuing to use the platform, directly or indirectly.

398.    On December 6, 2020, Defendant Qazi attempted to contact a friend of Plaintiff's via LinkedIn for an unknown reason.

399.    Upon information and belief, on December 8, 2020, Defendant Qazi used the Cihcihw Wikipedia account to exclusively edit three pages involving Plaintiff. The edits contained a misspelling that consistently appears in Defendant Qazi's writing.

400.    Also on or about December 8, 2020, Defendant Qazi created a new page on his personal website for "The Story," referring to his involvement with Plaintiff. He promised readers that the saga would be told in installments, starting with an introduction that he published on December 15, 2020. Between December 8th and 15th, Defendant Qazi published nine additional posts he referred to as "Apetizers" *[sic]* containing false and misleading statements about Plaintiff. Each post, whether an "Apetizer" or formally part of "The Story," contained banner advertisements intended to produce financial gain for Defendant Qazi, as well as prominent links encouraging readers to donate to Defendant Qazi's legal defense funds via GoFundMe and PayPal. The "Apetizers" alone were collectively 200 printed pages long.

401.    From December 9-11, 2020, the Cihcihw Wikipedia account continued to smear Plaintiff on various Wikipedia articles by inserting false and misleading changes.

402.    On December 13, 2020, Defendant Qazi began publishing his series, "The Story,"

full of innumerable false and misleading statements and material omissions concerning Plaintiff. By January 11, 2021, the existing portions of "The Story" required 303 pages to print.

403.    Above and beyond those already enumerated, Defendant Qazi wrote over 100 pages of *additional* essays containing countless false statements about Plaintiff, including but not limited to the grotesque falsehood that Plaintiff incited violence against Defendant Qazi.

404.    On January 7, 2021, with the price of TSLA common shares at or near all-time highs, Defendant Qazi celebrated his work, posting, "holy fucking shit we're all rich as fuck!!!"

405.    The SEC recognizes social media as a potential manipulative "device" pursuant to the Securities and Exchange Acts.  Social media was been instrumental to Defendants' unprecedented "pump" of Tesla's stock price, which culminated in a peak market capitalization of over $1.2 trillion in November 2021: about twenty times the peak market capitalization of Enron, and more than the *combined* valuation of the rest of the automotive industry, e.g. Toyota, Volkswagen, Mercedes, General Motors, BMW, Honda, Fiat-Chrysler, Ford, Nissan and Suburu.

406.    Through thousands of false and misleading statements and material omissions broadcast directly to millions, and indirectly to millions more through the media, Defendants successfully and unlawfully "pumped" the stock price of TSLA common shares from an average of $167.66 per share during the period of June 29, 2010 (the date of Defendant Tesla's Initial Public Offering) through September 23, 2018 (the day before Plaintiff first purchased put options) to $6,217.50 per share (split-adjusted) as of November 1, 2021, a 3,608% increase.

407.    After Defendants Musk and Tesla manipulated successive quarterly financial statements to make it appear as though Tesla had turned a profit, which then qualified Tesla for inclusion in the S&P 500 index on December 21, 2020, Tesla's stock peaked in November 2021 and then began to fall.  Today, it trades at approximately 50% of its peak value.

**F.    The "Hardcore Litigation" Fraud**

408.    Since Defendant Musk first announced publicly on May 20, 2022 via Twitter that, "Tesla is building a hardcore litigation department where we directly initiate & execute lawsuits. The team will report directly to me," followed by "Looking for hardcore streetfighters, not

white-shoe lawyers like Perkins or Cooley who thrive on corruption. There will be blood," he has filed at least five frivolous and vexatious lawsuits, which are often Strategic Lawsuits Against Public Participation ("SLAPP"), in state and federal courts.

409.    These lawsuits were financed by the proceeds of securities fraud and involved the use of Defendant Tesla's litigation attorneys, namely, Defendants Huebert and Mehes.

410.    Defendant Musk has attempted to use his frivolous and vexatious litigation strategy to undermine democracy by serially defrauding the courts with the hopes of delegitimizing the regulators who are charged with keeping the various components of the Atlanteca Enterprise in check, including Defendant Tesla, and punishing critics such as Plaintiff.

411.    When he is on the defense, Defendant Musk—whose only argument in court is often a misplaced invocation of the First Amendment—routinely abuses the California Anti-SLAPP Statute, California Code of Civil Procedure § 425.16, to attempt to silence critics by bankrupting them via the statute's mandatory fee-shifting clause. This ironic strategy ran into trouble, however, when the California Court of Appeals ruled unanimously that Defendant Musk was not entitled to anti-SLAPP protection because, there was

 "no 'functional relationship' between the alleged issues of public interest and Musk's statements. For example, Musk's comment that Hothi harassed employees and hit and almost killed employees does not relate to the reliability of Hothi's information. Nor does the statement refute Hothi's comments about Tesla or assert Tesla's past treatment of Hothi was appropriate… Accordingly, the statement does not ``contribute to the public debate`' regarding any of the matters of public interest identified by Musk."

*Hothi v. Musk*, Case No. A162400, Cal. Ct. App (December 20, 2021).

## TOLLING OF THE STATUTES OF LIMITATIONS

412.    To the extent that there are any statutes of limitations applicable to Plaintiff's claims, the running of the limitations periods have been tolled by various doctrines and rules, including but not limited to equitable tolling, the delayed discovery rule, equitable estoppel, and the fraudulent concealment rule. Tolling is supported by the following facts.

413.    Litigation in the frivolous Alameda Case filed by Defendant Musk did not end until July 11, 2023 and Defendants Singer Cashman, LLP, Cashman, Huebert and Mehes

continued to violate various rules and laws through at least June 14, 2023.

414.    Plaintiff has learned the facts herein progressively and on an ongoing basis.

415.    Plaintiff discovered the details of Defendant Birchall's relationship with Defendant Morgan Stanley in approximately June 2024.

416.    Plaintiff discovered that Defendant Qazi had been using his Comma defeat device to deceive viewers of his FSD promotional videos on or after June 8, 2024.

417.    Plaintiff discovered that Defendant Tesla had pre-optimized routes for EAP participants such as Defendant Qazi on July 9, 2024.

418.    Acting on behalf of Defendants Musk and Tesla, Defendants Qazi and Smick have continued to libel and harass Plaintiff on an ongoing basis.  The most recent known instance of libel took place on August 27, 2024.

419.    Defendants have admitted that they believe that this action relates back to the claims alleged in *Greenspan I*.

## CLAIMS FOR RELIEF

### COUNT I
### Violations of Federal Civil RICO (18 U.S.C. § 1962(c))
### Against All Defendants Except Morgan Stanley

420.    Plaintiff incorporates by reference the foregoing allegations.

421.    When driving, especially in California, Plaintiff is forced to share the road with Tesla vehicles equipped with faulty and dangerous "Autopilot" and/or FSD software that threatens not only the safety of each Tesla vehicle's occupants, but everyone on the road in front of, behind, and to the side of them, including but not limited to Plaintiff.

422.    Plaintiff has no ability to prohibit Tesla vehicles from sharing the road with him.

423.    Plaintiff has been forced against his will to drive in a more dangerous manner in order to avoid driving near Tesla vehicles whenever possible.

424.    On May 16, 2022, Tesla employee Hans Von Ohain was driving a 2021 Tesla Model 3 with "Autopilot" activated.  "Autopilot" malfunctioned, the car crashed, and Von Ohain was killed.

425.    Plaintiff is not a Tesla employee.  Plaintiff has not consented and does not consent to being a tester of Defendant Tesla's faulty and dangerous software.

426.    NHTSA has recorded 1,354 crashes involving Tesla vehicles equipped with its "Level 2" "Autopilot" and/or FSD software, more than 10 times as many crashes reported by the next-most-frequent "Level 2" system manufacturer, American Honda Motor Co.  *See* https://www.nhtsa.gov/laws-regulations/standing-general-order-crash-reporting ("Level 2 ADAS-Equipped Vehicles" organized by "Reporting Entity (ADAS)").  Plaintiff has a reasonable fear of Tesla "Autopilot" and/or FSD software causing imminent physical injury.

427.    The federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962, 1964, provides a private right of action for plaintiffs to recover against defendants who harm them by conducting an enterprise through a pattern of racketeering activity, as well as defendants who conspire to do so.

**A.    The Atlanteca Enterprise**

428.    Each of the Defendants is a "person" within the meaning of 18 U.S.C. § 1961(3), because each is "capable of holding a legal or beneficial interest in property," and at all relevant times were employed by and/or associated with Defendant Musk.

429.    At all times relevant hereto, without Plaintiffs' knowledge or consent, the Defendants and others associated together to form an ongoing informal organization for the purposes of carrying out the wrongful activities set forth herein and thus have constituted an association-in-fact "enterprise" within the meaning of 18 U.S.C. § 1961(4).

430.    As used herein, the term "Atlanteca Enterprise" shall refer to the association-in-fact enterprise consisting of the Defendants and others working with them to carry out the wrongful activities set forth herein.

431.    The Atlanteca Enterprise included entities that were controlled by Defendant Musk, including but not limited to Alani Kalea, LLC, Bastooks, LLC, Brick Store, LLC, Bushwhacker, LLC, Callisto 100, LLC, Camellia Ranch, LLC, Domino Solar, Ltd. (Cayman Islands), Duck Duck Goose 100, LLC, Europa 100, LLC, Falcon Landing, LLC, Firehorn Solar

1, LLC (Cayman Islands), Foundation Security, Ganymede November, LLC, Gatsby, LLC, Horse Ranch, LLC, Jadejams Property, LLC, Musk Foundation, Musk Industries, LLC, Musk Ventures, LLC, Muskrat Ventures, LLC, N158X, LLC, Neuralink Corporation, New World Industries, LLC, Otoro Partners, LLC, Pravda Corp., Rose Garden 100, LLC, Sadjam Property, LLC, SpaceX, Starlink, Inc., TBC-The Boring Company, Weisshorn Solar 1, LLC (Cayman Islands), Wyoming Steel, LLC, X Holdings I, Inc., X Holdings II, Inc., and X.ai Corporation, as well as entities that were not, such as Quinn Emanuel, Cooley, and 700 Holdings, LLC. It included individuals who were associated with Defendant Musk as well as those who were not Defendant Musk's employees or agents. The Atlanteca Enterprise engaged in and affected interstate and foreign commerce.

432. The Atlanteca Enterprise made use of the domain name atlanteca.com, which was at all relevant times unknown in association with Defendants, to shield its communications from legal process.

433. The Atlanteca Enterprise also makes use of the term "Muskonomy" to refer to itself, as shown in the confidential xAI Discussion Materials for potential investors promising "Proprietary Access to the Muskonomy" promulgated by X.ai Corporation and described by *Axios*. *See* https://www.axios.com/2024/05/18/elon-musk-xai-fundraising.

434. From at least 2018 through 2023, the Atlanteca Enterprise joined together for a common purpose of defrauding customers and regulators of Defendant Musk's companies regarding "Autopilot" and FSD software; hiding compromising information from litigants; spreading optimistic false narratives about Defendant Musk, his companies, "Autopilot" and FSD; attacking critics of Defendant Musk, his companies, "Autopilot" and FSD; increasing the financial wealth of each Atlanteca Enterprise member beyond what each member might have achieved individually; enriching the Musk family; and promoting the political and financial interests of the Russian Federation, Saudi Arabia, and the People's Republic of China.

435. Each of the Defendants was employed by or associated with the Enterprise.

436. While each of the Defendants were employed by or associated with the

Enterprise, the Enterprise and its purposes were distinct and separate from the Defendants.

437.    Defendant Musk, who is colloquially known as one of the heads of the "PayPal Mafia," leads the Atlanteca Enterprise, assisted at various times by his former and current Chiefs of Staff: Sam Teller, followed by Omead Afshar.  Financial matters were coordinated primarily through Defendant Birchall, Matilda Simon-Ferrigno, Zachary Kirkhorn, Janice Yeung, and Danielle Matsumoto.  While some individuals affiliated with the Atlanteca Enterprise, including but not limited to Jared Birchall, Sam Teller, Emma Gallagher, Elissa Butterfield, Reyna Ortiz, and Jehn Balajadia, were provided with atlanteca.com e-mail addresses, not all were.

438.    Defendant Spiro provided and continues to provide legal advice to the Atlanteca Enterprise, along with his law firm, Quinn Emanuel.  Defendants Cashman, Huebert, and Mehes left Quinn Emanuel to eventually work for the Atlanteca Enterprise as attorneys.  Starting in August 2022, Defendant Mehes technically worked as an attorney for Tesla, and in June 2023 switched to working as an attorney for X Corp., but also represented Defendant Musk in his personal capacity while at both jobs, illustrating that Defendant Mehes actually worked and works for the Atlanteca Enterprise.

439.    Some individuals have worked for multiple Atlanteca Enterprise members at the same time.  For example, Charles Kuehmann has worked for Defendant Tesla and SpaceX simultaneously since 2015.  Vivien Hantusch has also worked for both simultaneously.

440.    Not every person or organization who worked for the Atlanteca Enterprise necessarily knew of its existence.  The atlanteca.com domain name was never publicly disclosed by any of its members and the vast majority of Defendant Musk's tens of thousands of employees across his various businesses were at all times unaware of it.

441.    The atlanteca.com domain name's DNS MX record was and is set up to use Google Workspace to handle e-mail, separate and apart from the Microsoft-based e-mail servers deployed at Defendant Tesla and SpaceX, thereby largely concealing its existence and operation even from information technology administrators at those companies.

442.    Each of the Defendants conducted or participated in, directly or indirectly, the

conduct of the Enterprise's affairs.

443.    Each Defendant's participation was through a pattern of racketeering activity.

444.    Each Defendant benefitted from the infusion of racketeering income and knowingly agreed to facilitate the scheme of the RICO Atlanteca Enterprise.

**B.    Predicate Offenses**

445.    The racketeering activity, as that term is defined in 18 U.S.C. § 1961(1), referred to above includes, but is not limited to, the following predicate offenses:

*Wire Fraud, 18 U.S.C. § 1343*

| Date | From | To | Method / Invoice No. | Amount |
|------|------|-----|---------------------|--------|
| July 2, 2019 | Tesla, Inc. | Quinn Emanuel | 62519-QUINN | $100,000.00 |
| November 20, 2019 | Tesla, Inc. | Quinn Emanuel | 101-0000091385 | $461,214.57 |
| November 20, 2019 | Tesla, Inc. | Quinn Emanuel | 101-0000089828 | $99,164.85 |
| December 3, 2019 | Tesla, Inc. | Quinn Emanuel | 101-0000093949 | $99,807.00 |
| August 17, 2020 | Tesla, Inc. | Quinn Emanuel | 101-0000095402 | $246,032.31 |
| September 16, 2020 | Tesla, Inc. | Quinn Emanuel | 101-0000100178 | $273,742.33 |
| September 16, 2020 | Tesla, Inc. | Quinn Emanuel | 101-0000099186 | $208,992.15 |
| September 16, 2020 | Tesla, Inc. | Quinn Emanuel | 101-0000100968 | $163,355.37 |
| September 16, 2020 | Tesla, Inc. | Quinn Emanuel | 101-0000102206 | $109,813.52 |
| September 16, 2020 | Tesla, Inc. | Quinn Emanuel | 101-0000100179 | $104,426.10 |
| September 16, 2020 | Tesla, Inc. | Quinn Emanuel | 101-0000103855 | $89,833.95 |
| September 16, 2020 | Tesla, Inc. | Quinn Emanuel | 101-0000099185 | $85,248.18 |
| September 16, 2020 | Tesla, Inc. | Quinn Emanuel | 101-0000100967 | $84,284.62 |
| September 16, 2020 | Tesla, Inc. | Quinn Emanuel | 101-0000104510 | $54,545.90 |
| September 16, 2020 | Tesla, Inc. | Quinn Emanuel | 101-0000102208 | $45,854.10 |
| September 16, 2020 | Tesla, Inc. | Quinn Emanuel | 101-0000103613 | $19,617.30 |
| September 16, 2020 | Tesla, Inc. | Quinn Emanuel | 101-0000099187 | $18,053.55 |
| September 16, 2020 | Tesla, Inc. | Quinn Emanuel | 101-0000103856 | $13,881.60 |
| September 16, 2020 | Tesla, Inc. | Quinn Emanuel | 101-0000104512 | $12,096.60 |
| September 18, 2020 | Tesla, Inc. | Quinn Emanuel | 101-0000097912 | $244,475.13 |
| September 18, 2020 | Tesla, Inc. | Quinn Emanuel | 101-0000096323 | $49,967.65 |
| September 18, 2020 | Tesla, Inc. | Quinn Emanuel | 101-0000097911 | $44,406.30 |
| September 18, 2020 | Tesla, Inc. | Quinn Emanuel | 101-0000099893 | $42,636.30 |
| September 18, 2020 | Tesla, Inc. | Quinn Emanuel | 101-0000103386 | $41,903.65 |
| September 18, 2020 | Tesla, Inc. | Quinn Emanuel | 101-0000100180 | $10,807.16 |
| December 1, 2020 | Tesla, Inc. | Quinn Emanuel | 101-0000108184 | $17,496.50 |
| December 11, 2020 | Tesla, Inc. | Quinn Emanuel | 101-0000106729 | $50,578.60 |
| December 29, 2020 | Tesla, Inc. | Quinn Emanuel | 101-0000109087 | $28,129.20 |
| February 13, 2021 | Tesla, Inc. | Quinn Emanuel | 101-0000109086 | $25,000.00 |

| March 3, 2021 | Tesla, Inc. | Quinn Emanuel | 101-000012172020A | $230,861.85 |
|---|---|---|---|---|
| March 30, 2021 | Tesla, Inc. | Quinn Emanuel | 101-0000113213 | $186.00 |
| March 30, 2021 | Tesla, Inc. | Quinn Emanuel | 101-0000099185A | $150,000.00 |
| March 30, 2021 | Tesla, Inc. | Quinn Emanuel | 101-0000109079 | $61,912.47 |
| March 30, 2021 | Tesla, Inc. | Quinn Emanuel | 101-0000110712 | $35,950.50 |
| April 14, 2021 | Tesla, Inc. | Quinn Emanuel | 101-0000102679A | $3,466.00 |
| April 14, 2021 | Tesla, Inc. | Quinn Emanuel | 101-000012172020C | $230,861.85 |
| May 6, 2021 | Tesla, Inc. | Quinn Emanuel | 101-0000114218 | $3,637.36 |
| May 11, 2021 | Tesla, Inc. | Quinn Emanuel | 101-0000108229 | $60,866.55 |
| May 11, 2021 | Tesla, Inc. | Quinn Emanuel | 101-0000108229 | $60,866.55 |
| June 10, 2021 | Tesla, Inc. | Quinn Emanuel | 101-0000109079A | $3,127.50 |
| June 10, 2021 | Tesla, Inc. | Quinn Emanuel | 101-0000115619 | $1,999.25 |
| June 10, 2021 | Tesla, Inc. | Quinn Emanuel | 101-0000115618 | $401.00 |
| June 10, 2021 | Tesla, Inc. | Quinn Emanuel | 101-0000114224 | $21,668.14 |
| June 10, 2021 | Tesla, Inc. | Quinn Emanuel | 101-0000113114 | $63,072.85 |
| June 10, 2021 | Tesla, Inc. | Quinn Emanuel | 101-0000114224 | $21,668.14 |
| June 23, 2021 | Tesla, Inc. | Quinn Emanuel | 101-0000105111A | $314.18 |
| June 23, 2021 | Tesla, Inc. | Quinn Emanuel | 101-0000110251 | $4,428.00 |
| June 29, 2021 | Tesla, Inc. | Quinn Emanuel | 101-0000117116 | $124.00 |
| July 9, 2021 | Tesla, Inc. | Quinn Emanuel | 101-000012172020B | $231,130.01 |
| August 2, 2021 | Tesla, Inc. | Quinn Emanuel | 101-0000118501 | $1,562.64 |
| August 2, 2021 | Tesla, Inc. | Quinn Emanuel | 101-0000114225 | $1,827.60 |
| August 16, 2021 | Tesla, Inc. | Quinn Emanuel | 101-0000116922 | $666.40 |
| August 16, 2021 | Tesla, Inc. | Quinn Emanuel | 101-0000116917 | $1,725.93 |
| August 16, 2021 | Tesla, Inc. | Quinn Emanuel | 101-0000110722A | $977.50 |
| September 13, 2021 | Tesla, Inc. | Quinn Emanuel | 101-0000120268 | $48,399.31 |
| November 8, 2021 | Tesla, Inc. | Quinn Emanuel | 101-0000121949 | $477.00 |
| November 8, 2021 | Tesla, Inc. | Quinn Emanuel | 101-0000121263 | $3,334.05 |
| July 13, 2023 | X Corp. | Smick Enterprises, Inc. | ACH via Stripe | $6,206.00 |
| July 13, 2023 | X Corp. | Sawyer Merritt | ACH via Stripe | $6,454.00 |
| August 7, 2023 | X Corp. | Farzad Mesbahi | ACH via Stripe | $1,881.00 |
| August 8, 2023 | X Corp. | Sawyer Merritt | ACH via Stripe | $4,249.60 |
| August 18, 2023 | X Corp. | Alexandra Merz | ACH via Stripe | $204.82 |
| September 1, 2023 | X Corp. | Alexandra Merz | ACH via Stripe | $651.59 |
| September 15, 2023 | X Corp. | Alexandra Merz | ACH via Stripe | $249.55 |
| September 29, 2023 | X Corp. | Alexandra Merz | ACH via Stripe | $166.42 |
| October 13, 2023 | X Corp. | Alexandra Merz | ACH via Stripe | $204.48 |
| October 27, 2023 | X Corp. | Alexandra Merz | ACH via Stripe | $191.31 |
| November 10, 2023 | X Corp. | Alexandra Merz | ACH via Stripe | $143.21 |
| November 24, 2023 | X Corp. | Alexandra Merz | ACH via Stripe | $142.55 |
| December 8, 2023 | X Corp. | Alexandra Merz | ACH via Stripe | $541.62 |

| December 22, 2023 | X Corp. | Alexandra Merz | ACH via Stripe | $600.75 |
|---|---|---|---|---|
| January 5, 2024 | X Corp. | Alexandra Merz | ACH via Stripe | $430.09 |
| January 19, 2024 | X Corp. | Alexandra Merz | ACH via Stripe | $356.61 |
| February 2, 2024 | X Corp. | Alexandra Merz | ACH via Stripe | $458.82 |
| February 16, 2024 | X Corp. | Alexandra Merz | ACH via Stripe | $394.13 |
| March 1, 2024 | X Corp. | Alexandra Merz | ACH via Stripe | $171.20 |
| March 15, 2024 | X Corp. | Alexandra Merz | ACH via Stripe | $285.37 |
| March 29, 2024 | X Corp. | Alexandra Merz | ACH via Stripe | $186.31 |
| April 12, 2024 | X Corp. | Alexandra Merz | ACH via Stripe | $806.85 |
| April 26, 2024 | X Corp. | Alexandra Merz | ACH via Stripe | $1,551.94 |
| May 10, 2024 | X Corp. | Alexandra Merz | ACH via Stripe | $1,051.09 |
| May 24, 2024 | X Corp. | Alexandra Merz | ACH via Stripe | $1,275.13 |
| June 7, 2024 | X Corp. | Alexandra Merz | ACH via Stripe | $1,211.70 |
| June 21, 2024 | X Corp. | Alexandra Merz | ACH via Stripe | $2,859.52 |
| July 5, 2024 | X Corp. | Alexandra Merz | ACH via Stripe | $926.38 |
| July 19, 2024 | X Corp. | Alexandra Merz | ACH via Stripe | $1,047.67 |
| August 2, 2024 | X Corp. | Alexandra Merz | ACH via Stripe | $862.46 |
| August 16, 2024 | X Corp. | Alexandra Merz | ACH via Stripe | $997.09 |

## C.    Pattern of Racketeering Activity

446.    Defendants committed multiple predicate acts of wire fraud which are indictable under the provisions of the U.S. code enumerated in 18 U.S.C. § 1961(1)(B).  Defendants did knowingly, willfully, and unlawfully conduct or participate, directly or indirectly, in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

447.    Defendants conspired with or aided and abetted other Defendants in committing at least two predicate acts of wire fraud constituting a continuous course of conduct spanning a period from at least 2018 to the present.  The temporal duration and the number of predicate acts are so extensive as to constitute a pattern of racketeering activity with, at minimum, closed-ended continuity, though on information and belief, such conduct is continuing—e.g., Defendants are continuously forming new for-profit entities and continuing to promote their fraudulent products, namely, Tesla "Autopilot" and FSD software—and there exists a specific threat it will persist indefinitely, constituting a pattern of racketeering activity that is open-ended.

448.    In order to implement their scheme, Defendants used the interstate wires to reward their co-conspirators for defrauding customers, defrauding courts, defrauding regulators, and attacking anyone who could expose their scheme, as alleged herein.  Such acts not only

shared a common or related result, participants, and victims, but also shared a common method of commission. Defendants' acts of racketeering were all committed for the purpose of defrauding as many people as necessary to sell electric vehicles containing faulty and dangerous "Autopilot" and FSD software.

449. The Atlanteca Enterprise harmed Plaintiff's business by enlisting Defendant X Corp. to take action against Plaintiff due to Plaintiff's criticism of Defendants Musk, Tesla, Qazi and Smick and Plaintiff's refusal to be intimidated by Defendants Musk, Tesla, Qazi, Smick, Spiro, Singer Cashman, LLP, Cashman, Huebert, and Mehes.

450. As a direct and proximate cause of the Defendants' actions, Plaintiff has been injured, and continues to be injured, in his business by reason of the violations of 18 U.S.C. § 1962 in an amount to be proven at trial.

451. By reason of these RICO violations, Plaintiffs are entitled to damages in an amount to be proven at trial and all civil remedies afforded by 18 U.S.C. § 1964(c), including treble damages, reasonable attorneys' fees, and the costs of this litigation.

## COUNT II
### Violations of Federal Civil RICO (18 U.S.C. § 1962(a))
### Against All Defendants Except Morgan Stanley

452. Plaintiff incorporates by reference the foregoing allegations.

453. Each of the Defendants participated in the pattern of racketeering set forth above.

454. Defendants are persons who received income from the pattern of racketeering set forth above.

455. Defendants each invested or used all or part of that income in the establishment, operation, and maintenance of the Atlanteca Enterprise.

456. The Atlanteca Enterprise was engaged in and affected interstate and foreign commerce.

457. Plaintiffs' business and property was injured by reason of each Defendant's use or investment of their income in the Atlanteca Enterprise in an amount to be proven at trial.

**COUNT III**
**Conspiracy to Violate Federal Civil RICO (18 U.S.C. § 1962(d))**
**Against All Defendants Except Morgan Stanley**

458.    Plaintiff incorporates by reference the foregoing allegations.

459.    Defendants have undertaken the fraudulent acts described above as part of a common scheme.  Defendants willfully, knowingly, and unlawfully conspired, confederated, and agreed together and with others to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).  Defendants intentionally concealed their fraudulent conduct, which prevented Plaintiff from discovering their scheme, notwithstanding his exercise of due diligence.

460.    Defendants were aware of the illegal activity.  Defendants knew that they had made false and/or misleading representations to Tesla customers, regulators, courts, and the general public regarding "Autopilot" and FSD, and that doing so would cause customers and the public to lose money, property, and in some cases, people's lives.  Defendants knew of and agreed to facilitate the operation of the Atlanteca Enterprise their scheme.

461.    Defendant Musk directed and caused the Atlanteca Enterprise to engage in the racketeering activity alleged hereinabove.

462.    Each Defendant understood that he or it was committing numerous RICO predicate acts and participating in a racketeering scheme, evidenced among other things, by his or its overt acts and involvement in repeatedly promulgating false and/or misleading representations via wire transmissions, including email correspondence, online transmittal, and social media posts, and receiving financial and other contributions, including wired funds, based on those fraudulent communications.  In addition, the Defendants understood they were facilitating and/or aiding and abetting Defendant Musk's self-dealing and furthering the scheme by helping to conceal their fraudulent conduct.

463.    The participation and agreement of each Defendant was necessary to the scheme.  Defendants knew their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the scheme, and agreed and conspired to conduct and participate in the affairs of the Atlanteca Enterprise through a consistent and continual pattern of

racketeering activity. Further evidence of the agreement among Defendants is peculiarly within their knowledge and control.

464. As a direct and proximate result of Defendants' conspiracy and violations of 18 U.S.C. § 1962(d), Plaintiff has been injured in his business and property, as alleged herein, and is entitled to treble damages, attorneys' fees, and costs of suit.

<div align="center">

**COUNT IV**
**Securities Fraud (California Corporations Code §§ 25400, 25500)**
**Against Defendants Musk, Tesla, Excession, Musk Trust, Birchall, Qazi, Smick and Morgan Stanley**

</div>

465. Plaintiff incorporates by reference the foregoing allegations.

466. Defendants made false statements in order to artificially raise the price of Tesla stock.

467. Defendants engaged in fraudulent transactions in order to artificially raise the price of Tesla stock.

468. Defendants took steps to conceal their unlawful actions.

469. As described in Exhibit A, Plaintiff lost at least $59,310.22 on his investment in Tesla put options due to Defendants' unlawful acts.

470. Pursuant to California Corporations Code §§ 25400 and 25500, Defendants are obligated to restore to Plaintiff all consideration paid for TSLA securities, plus interest at the legal rate.

<div align="center">

**COUNT V**
**Securities Fraud (California Corporations Code §§ 25401, 25501)**
**Against Defendants Musk, Tesla, Excession, Musk Trust, Birchall, Qazi, Smick and Morgan Stanley**

</div>

471. Plaintiff incorporates by reference the foregoing allegations.

472. Plaintiff does not know the identity of the legal entity or entities that sold him the TSLA put options that resulted in Plaintiff's losses.

473. Pursuant to California Corporations Code §§ 25401 and 25501, Defendants are obligated to restore to Plaintiff all consideration paid for TSLA securities, plus interest at the legal rate.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**COUNT VI**

**Assistance Committing Securities Fraud (California Corporations Code §§ 25403, 25504.1, 25504.2)**

**Against Defendants Excession, Musk Trust, Birchall, Qazi, Smick, Morgan Stanley and Spiro**

474.    Plaintiff incorporates by reference the foregoing allegations.

475.    Defendant Birchall served as a vital conduit for Defendant Musk's and Defendant Tesla's interactions with Defendant Morgan Stanley, so that unlawful proceeds of securities transactions could flow to Defendants Excession and Musk Trust on Defendant Musk's behalf.

476.    Defendants Qazi and Smick willingly assisted Defendants Musk and Tesla with the artificial inflation of Tesla stock.

477.    Plaintiff does not contest Defendant Morgan Stanley's First Amendment right to publish its views, grounded in fact, on any particular stock.  Nonetheless, Defendant Morgan Stanley selectively disclosed its views to different groups of investors, depending on whether those views were positive or negative, in a manner intended to aid and abet the securities fraud carried out by the other Defendants.

478.    When Morgan Stanley analyst Adam Jonas had positive news to share about Tesla, he published frequent, extremely optimistic written research notes that were widely disseminated to financial media and, in turn, the public.  When Jonas had negative news to share, he held private client calls where his views were intended to stay private.

479.    One such call was recorded on May 22, 2019 by Paul Huetter, who published a transcript on-line.  *See* https://www.dropbox.com/scl/fi/1iglhsa6tgso11arqemnu/Morgan_Stanley_Tesla_Call_2019_05_22.pdf?rlkey=8q0c0lr0ypw8k5tks02pfag5q&e=1&dl=0.  On the call, Defendant Morgan Stanley, through Adam Jonas, described Defendant Tesla—whose stock offering Morgan Stanley had just underwritten days before—as a "distressed credit story and a restructuring story."

480.    Defendant Tesla's SEC Form 424B5 filed May 2, 2019 with Morgan Stanley's name on it did not disclose that the stock being issued was for a "distressed" issuer.  Instead, it stated, "We intend to use the net proceeds from this common stock offering and our concurrent

convertible notes offering to further strengthen our balance sheet, as well as for general corporate purposes," falsely suggesting that Defendant Tesla's balance sheet was already strong.

481.    Defendant Morgan Stanley approved the language of the May 2, 2019 SEC Form 424B5.

482.    Defendant Morgan Stanley knew that Defendant Tesla was in distress prior to May 2, 2019.  On March 12, 2019, Jonas cut Morgan Stanley's price target on TSLA to $260 per share due to what it called a possible "air pocket in demand that is coming earlier than we expected" in a published note, but did not use the same dire language he used in private in May.

483.    Defendant Morgan Stanley agreed to publish "buy" recommendations, publish artificially high earnings per share projections, suppress the negative information it knew about Defendant Tesla's business, and/or add Tesla stock to its model portfolio in order to earn fee revenue from underwriting Defendant Tesla's stock offerings, keep the continued business of Defendant Musk himself, and/or to ensure its loans to Defendant Musk would not sour.

484.    Morgan Stanley admits that it had a possible "conflict of interest" in a disclaimer on its research reports.

485.    Defendant Morgan Stanley has also fraudulently published nonsensical gibberish in the guise of "research" to justify high price targets on Defendant Tesla's stock.  While Morgan Stanley has the right to sell gibberish to its clients if they are willing to pay for it, no investment bank has the right to do so with fraudulent intent.

486.    Defendant Morgan Stanley had fraudulent intent due to its conflicts of interest.  For example, on December 2, 2018, Adam Jonas was the lead contributor on a "bluepaper" called "Flying Cars: Investment Implications of Autonomous Urban Air Mobility" that began, "Autonomous flying cars aren't $\pi$ in the sky" while noting, "Tesla CEO Elon Musk is regularly asked about flying cars."  On December 15, 2023, Adam Jonas wrote regarding Tesla,

> "Tesla sits at the epicenter of a potential Cambrian Explosion of technology ushering in a new morphological era…"

and

> "The other night I was observing my son (somewhat past his bedtime) drawing a picture

of dragon with a crayon.  He showed me how by pressing hard against the paper he could make the color a darker, richer shade of green.  As he pressed with all his might, the crayon disintegrated onto the page…"

Nominally, these passages were intended to describe the potential of Defendant Tesla's as-yet-unreleased "Optimus" robot, which was introduced to the public as a person in a skintight suit dancing The Robot since the product as described did not and does not actually exist.  When these passages were written, TSLA traded at $239.29 per share but Morgan Stanley's price target was $380.00 per share, 59% higher.

487.    Even Defendant Musk's cheerleaders recognize that the "Optimus" project at Tesla is utter nonsense.  On August 23, 2024, Ross Gerber, who formerly appeared on financial networks to support Defendants Tesla and Musk, was quoted as saying, "Nobody wants a robot from Elon Musk.  Why?  Who would trust it?... The last thing I need is some robot built by Elon Musk in my house, so I don't know if they thought about the marketing of this at all yet." *See* https://www.youtube.com/watch?v=HMF0GWfSRNQ&t=480s.

488.    Also on August 23, 2024, Defendant Morgan Stanley announced that it was reducing its holdings of Tesla stock in its model portfolio.

489.    Defendant Spiro made at least one false statement to the SEC on behalf of Defendants Musk, Tesla, Excession and/or Musk Trust.  Specifically, on December 19, 2019, in response to SEC subpoenas as part of Investigation No. SF-04322, Defendant Spiro informed the SEC that "until recently, Tesla's systems may not have automatically summarized cash balance information on a daily basis" according to an SEC Division of Enforcement summary.  This statement was false.

490.    Defendant Spiro was the point person for Defendant Musk, Tesla, Excession and/or Musk Trust in response to the SEC for Investigation No. SF-04322.  In that role, Defendant Spiro deliberately withheld discoverable materials from the SEC that would have implicated his clients in criminal activity.  One SEC document production round, 20200320_H52749_VOL001.zip, was merely 830KB compressed—seven pages of data in all ("This production contains documents bearing Bates labels [redacted] 4322_00000001-

[redacted]_SEC_SF_4322_00000007."). A prior SEC document production round, 20200228_H52448_VOL005.zip, was only 34.7MB compressed. Before that, on January 24, 2020, Defendant Tesla produced only 78 pages in response to the SEC's subpoena, which Defendant Spiro requested confidential treatment for the same day.

491. In contrast, PwC sent the SEC an entire laptop with years worth of data for Investigation No. SF-04322.

492. Defendants Excession, Must Trust, Birchall, Qazi, Smick, Morgan Stanley and Spiro acted with knowledge and provided substantial assistance to Defendants Musk and Tesla in committing the violations of the California Corporate Securities Laws set forth above. Defendants Excession, Musk Trust, Birchall, Qazi, Smick, Morgan Stanley and Spiro are therefore liable as aiders and abettors of Defendant Musk within the meaning of California Corporations Code §§ 25403, 25504.1, and/or 25504.2.

<div align="center">

**COUNT VII**
**Fraud**
**Against Defendants Musk, Tesla, Qazi and Smick**

</div>

493. Plaintiff incorporates by reference the foregoing allegations.

494. Defendants Musk, Tesla, Qazi, and Smick carried out fraudulent acts with regard to Tesla "Autopilot" and FSD intended to deceive consumers into purchasing faulty and dangerous software, thereby putting Plaintiff's physical safety while driving at risk.

495. Defendants Musk and Tesla carried out fraudulent acts with regard to Tesla vehicle quality, thereby putting Plaintiff's physical safety while driving at risk.

496. On an ongoing basis, Plaintiff is unable to drive in a normal manner due to the presence of defective Tesla vehicles with dangerous "Autopilot" and FSD software on the road.

497. Defendants Musk, Tesla, Qazi, and Smick filed false and misleading documents in *Greenspan I* in order to defraud the court, which had the material effect of leading to the improper dismissal of *Greenspan I*. Specifically:

    a)  Defendants Musk and Tesla falsely alleged that Plaintiff had invented an "implausible" self-serving story about the Tesla Files data breach, when in

fact, Plaintiff's allegations were true and altered Defendants Musk and Tesla to the largest data breach in the company's history;

b) Defendants Musk and Tesla falsely alleged that aspects of their securities fraud as alleged by Plaintiff were "implausible," when in fact they knew that Plaintiff's allegations were true;

c) Defendant Qazi signed a declaration under penalty of perjury in which he claimed the risk of "significant financial hardship," while omitting that he had actually signed the declaration while on vacation in Hawaii. ECF No. 136-1.

<div align="center">

**COUNT VIII**
**Negligent Misrepresentation**
**Against Defendants Musk, Tesla, Qazi, Smick and Morgan Stanley**

</div>

498.    Plaintiff incorporates by reference the foregoing allegations.

499.    For years, Defendants Musk, Tesla, Qazi, Smick and Morgan Stanley misrepresented a) the capabilities of Tesla "Autopilot" and FSD software and the financial condition of Defendant Tesla to investors, regulators, courts, and the general public by claiming that the software was both less capable—to evade regulation—and more capable—to boost sales and Tesla's stock price—than it really was, depending on the context; and b) that Defendant Tesla was more financially stable than it really was.

500.    Defendants had no reasonable grounds for believing their representations were true and not misleading or deceptive when they made them.

501.    Investors, regulators, courts and the general public reasonably relied on Defendants' misrepresentations, nondisclosure, and/or concealment, and were actually misled and deceived thereby, and were induced by Defendants' wrongful conduct to purchase or lease vehicles containing "Autopilot" and FSD software and/or shares of Tesla stock that they would not otherwise have purchased or leased in the absence of Defendants' wrongful conduct.

502.    Plaintiff was damaged by Defendants' misrepresentations and the reliance of investors, regulators, courts and the general public was a substantial factor in causing that harm.

503.    As a result of Defendants' negligent misrepresentation and the harm caused

thereby, Plaintiff seeks and is entitled to (a) damages in an amount to be determined at trial and (b) all other available relief prayed for below.

<div align="center">

**COUNT IX**
**Defamation Per Se**
**Against Defendants Qazi and Smick**

</div>

504.    Plaintiff incorporates by reference the foregoing allegations.

505.    Starting on January 14, 2019 and even after the date of his ban by and from Twitter, Defendants Qazi and Smick made use of several Twitter accounts to publish constant, deliberate misinformation about Plaintiff and Plaintiff's family.

506.    From October 11, 2019 through present day, Defendants Qazi and Smick have employed a variety of domain names and websites, including but not limited to wholemars.com, wholemars.net, and wholemars.org to publish deliberate misinformation about Plaintiff and Plaintiff's family.

507.    Defendant Qazi made these false statements thousands of times with the hope that tarnishing Plaintiff's reputation and discrediting both Plaintiff's work and unrelated third-party court filings located by Plaintiff would increase or prevent any decrease in the value of TSLA shares.  Qazi was successful: TSLA shares increased in value, he was profiled in a major financial publication in connection with Defendant Musk, many of his followers began repeating his false claims about Plaintiff, and many refused to believe anything published by Plaintiff.

508.    Via Twitter and the Smick Sites, Defendants Qazi and Smick Enterprises, Inc. explicitly encouraged others to spread false statements and disinformation about Plaintiff.

509.    Defendant Qazi explicitly encouraged others to "harass" and "prank" Plaintiff.

510.    Defendant Qazi threatened, "any attempts to silence us will only make us louder."

511.    Defendants Qazi and Smick placed banner advertisements alongside their libelous statements about Plaintiff in order to derive further profits from their lies.

512.    Although Defendant Qazi published falsehoods, misleading barbs and reputation-damaging accusations over a period of more than two years such that it is impossible to enumerate each and every one, select representative examples include:

| Example No. / Date | Public Statement by Defendant Qazi | False / Misleading Aspects |
|---|---|---|
| 1.<br><br>January 14, 2019 | "Strange how Aaron mentions that he think *[sic]* Diego wants to 'get in his pants'. Sounds like may be revealing some deeper desires there" | Plaintiff never said any such thing in any context or via any medium. This statement falsely suggested a sexual attraction to Plaintiff's stalker. That "Aaron mention[ed]" this statement on the particular website discussed in the post is provably false. |
| 2.<br><br>September 28, 2019 | "Aaron Greenspan has child pornography at his house. I do not." | This statement explicitly and falsely accused Plaintiff of possessing child pornography, which would be a crime. The statement is provably false. |
| 3.<br><br>September 30, 2019 | "To conclude, is anyone surprised Aaron Greenspan is a complete fraud? Every $tslaq I have looked into has committed serious crimes.<br><br>Aaron, know you have anger issues and like to 'do something' when you're mad but retaliating against me for reporting your fraud will make it worse" | This statement again explicitly mentioned Plaintiff and falsely accused him of fraud, and by referring to short-sellers including Plaintiff, "serious crimes." This statement also falsely stated that Plaintiff suffers from a medical condition. Plaintiff has never been diagnosed with "anger issues" or any similar medical condition. Defendant Qazi twisted a lone remark Plaintiff made at a memorial service for his deceased friend, Aaron Swartz. |
| 4.<br><br>October 9, 2019 | "How will Aaron Greenspan, a criminal guilty of felony tax fraud with no lawyer, do in court against two guys with a lot more money than him?" | This post explicitly mentioned Plaintiff and stated that he is a "criminal guilty of felony tax fraud," which is false. Plaintiff has hired lawyers in various contexts over many years. |
| 5.<br><br>October 15, 2019 | "Have you been a victim of harassment, intimidation, extortion, sexual assault, identity theft, or cyberstalking by Aaron Greenspan? You are not alone. The victims of Aaron Greenspan Foundation is gathering evidence of Aaron Greenspan's crimes to finally bring this criminal to justice" | This headline appeared on at least four of the known Smick Sites, directly and falsely implicating Plaintiff in numerous crimes. The Smick Sites have *zero* actual accounts of Plaintiff committing any of the listed crimes because Plaintiff never committed them. |
| 6.<br><br>November 1, | "he extorted $250,000 from Mark Zuckerburg *[sic]*" | This statement is part of an essay on Defendant Qazi's website that explicitly names Plaintiff. Plaintiff |

| 2019 | | did not extort Mark Zuckerberg or anyone else, making this statement provably false. |
|---|---|---|
| 7.<br><br>May 25, 2020 | "Yes, Aaron Greenspan, Neil Greenspan, and Judith Greenspan.<br><br>As board members they presided over Plainsite's tax fraud, harassment of Tesla customers, and short and distort fraud." | Also posted on the @WholeMarsLog Twitter account, this statement falsely accused Plaintiff and his parents of various crimes. |
| 8.<br><br>June 23, 2020 | "Aaron Greenspan abuses his charity to inure private benefit to himself.<br><br>His tax exempt status should and will be revoked, and he must pay back the taxes he illegally avoided." | From the @WholeMarsBlog Twitter account, where Defendant Qazi again falsely alleged that Plaintiff has committed tax crimes. The IRS did not identify any taxes that were "illegally avoided" in its recent audit of Think Computer Foundation, making the statement provably false. |
| 9.<br><br>June 23, 2020 | "Aaron Greenspan is a cyberstalker who has been threatening and harassing Omar & others for years.<br><br>A common tactic used by cyber stalkers is false accusations and false victimization.<br><br>The harasser will try and make it look like they are the victim and use that to incite hate." | From the @WholeMarsBlog Twitter account, Defendant Qazi again falsely alleged that Plaintiff committed the crime of stalking while projecting his own actions onto Plaintiff. That Plaintiff has ever threatened Defendant Qazi with anything other than the instant litigation is provably false. |
| 10.<br><br>July 10, 2020 | "I'm sad. Greenspan has stalked me and tried to hurt me so much, it can't even fit in a tweet. He rapes his victims, entering their mind and shattering their peace when they least expect it. You can't imagine it unless you've seen it first hand." | From the @WholeMarsBlog Twitter account, where Defendant Qazi falsely claimed that Plaintiff is a rapist. |
| 11.<br><br>July 11, 2020 | "Aaron Greenspan had servers in New Jersey.<br><br>The same place the death threat @JohnnaCrider0 got this week came from." | Here, Defendant Qazi falsely implied that Plaintiff had sent a Tesla super-fan a death threat across state lines, a criminal act, because Plaintiff's company once maintained a co-located server in New Jersey *in 2003*, which was provably decommissioned and disconnected in March 2007. |
| 12. | "Even though Greenspan himself | From Defendant Qazi's personal |

| | | |
|---|---|---|
| July 12, 2020 | published the book, he didn't like people reading what he has to say because it establishes that he's been angry at the world and suffering from paranoid delusions since high school (or perhaps earlier)." | website in his "Aaron Greenspan Tries To Remove Book Review: How Evil People Abuse The DMCA To Silence Critics" post, in which he falsely describes Plaintiff as mentally ill. |
| 13.<br><br>July 17, 2020 | "Aaron Greenspan is a serial rapist.<br><br>He enters his victims *[sic]* lives unannounced and unexpected, and rapes them while they're going about their lives, with their friends<br><br>You can't understand it unless you've been targeted by him. I will fight for all his victims — past and future." | From the @WholeMarsBlog Twitter account, where Defendant Qazi falsely claimed that Plaintiff is a serial rapist. |
| 14.<br><br>July 17, 2020 | "saying that he harasses and threatens people just doesn't communicate the kind of person he is<br><br>he's a rapist<br><br>and the world will know the truth, no matter how hard he fights to keep it quiet" | From the @WholeMarsBlog Twitter account, Defendant Qazi again falsely claimed that Plaintiff is a rapist and insisted that it was the "truth." |
| 15.<br><br>July 18, 2020 | "Aaron Greenspan stalks and harasses colleged *[sic]* aged girls! Creepy! Leave her alone!<br><br>@jack @Twitter Safety" | In this post, Defendant Qazi accused Plaintiff of harassment and stalking and flagged Twitter's safety team because Plaintiff wrote a single comment on the absurdity of a Third Row Tesla member publicly defending billionaire Jack Dorsey against outrage over Twitter (and @ElonMusk) being hacked. |
| 16.<br><br>August 3, 2020 | "Scary. someone tried to hack into Omar's iCloud account, so it got locked and he had to reset the password.<br><br>Added to the Greenspan criminal activity file…" | Defendant Qazi falsely accused Plaintiff of breaking into his iCloud account and of being a "criminal" as a result. Plaintiff has never made any attempt of any kind to break into Defendant Qazi's accounts on any platform. This statement is provably false based upon server log evidence. |
| 17. | "Motives and profile of a Cyberstalker like Aaron | In this post, Defendant Qazi again falsely accused Plaintiff of the crime |

| August 21, 2020 | Greenspan" [image of excerpt from "Motives and profile" section of Wikipedia article at https://en.wikipedia.org/wiki/Cyberstalking] | of "stalking" for a variety of completely inapplicable reasons. This is yet another example of Defendant Qazi projecting his own pathological obsession with and stalking of Plaintiff. |
| 18. August 21, 2020 | "Based on his cyberstalking and false police reports we have a good case to put him away for 5 and a half years" | In this post, Defendant Qazi again falsely accused Plaintiff of the crimes of "stalking" and filing a false police report, suggesting that Plaintiff would be incarcerated as a result. No criminal case against Plaintiff even exists. |
| 19. October 26, 2020 | "His rants are starting to sound like that of a Mass Shooter [sic]." | Defendant Qazi retweeted a post referring to Plaintiff by Twitter user @tesla_grl. |
| 20. November 30, 2020 | "Recently Martin Tripp has been working with Aaron Jacob Greenspan to threaten, harass and doxx Tesla customers." | This statement is baseless and false in several ways: Plaintiff has not ever "worked" with Martin Tripp, nor has Plaintiff ever taken any action against "Tesla customers." |
| 21. December 7, 2020 | "While researching the Aaron Greenspan story we've uncovered shocking evidence of massive fraud."<br><br>"we're talking about major organized criminal activity… this is some messed up stuff" | In two separate posts, both of which readers understood to refer to Plaintiff, Defendant Qazi falsely accused Plaintiff of unspecified "major organized criminal activity" and "massive fraud." |
| 22. December 8, 2020 | "Harvard Shut Down Aaron Greenspan's Website For Stealing Student Passwords" | Defendant Qazi falsely claimed that Plaintiff was stealing passwords, a possible violation of 18 U.S.C. § 1030, and that Harvard shut down Plaintiff's product. In reality, the product was secure and the university did not shut it down. Harvard administrators were misinformed by an overzealous student. |
| 23. December 8, 2020 | "I am trying to diagnose his various mental conditions, and believe he may have narcissistic personality disorder…"<br><br>"What a psychopath." | From Defendant Qazi's personal website in his "Harvard Shut Down Aaron Greenspan's Website For Stealing Student Passwords" post, in which Defendant Qazi, who is neither a doctor nor qualified to offer a diagnosis in any way, again falsely |

| | "Aaron Greenspan clearly has serious mental health and anger issues that continue to this day." | portrays Plaintiff as mentally ill. |
|---|---|---|
| 24.<br><br>December 8, 2020 | "Given what we know about Aaron obsessively logging and storing all activity on his servers to try and use as blackmail, you can bet students were compromised the minute they signed up." | In this post, Defendant Qazi falsely accuses Plaintiff of having committed the crime of blackmail. |
| 25.<br><br>December 9, 2020 | "Greenspan has also admitted to anger issues that are completely out of control, driving him to seek revenge for even small or imagined slights." | In this post, Defendant Qazi again falsely portrays Plaintiff as mentally ill.  This is textbook projection based on Defendant Qazi's self-described "out of control revenge impulse."  There was no such admission by Plaintiff. |
| 26.<br><br>December 9, 2020 | "Well Aaron…FaceCash was shut down for violating financial regulations." | Here, Defendant Qazi falsely suggests that Plaintiff violated 18 U.S.C. § 1960.  In fact, Plaintiff's company voluntarily shut down FaceCash *before* any violation could occur to ensure compliance with the law. |
| 27.<br><br>January 13, 2021 | "Aaron Greenspan has admitted that he is willing to resort to violence to silence us if his attempts at non-violent retaliation fail." | This assertion is completely false as no such admission or anything resembling such an admission was ever made. |
| 28.<br><br>March 13, 2021 | "Breaking — Aaron Greenspan spotted angrily crying outside Zuckerberg hospital in San Francisco with piss streaming down one of his pant legs as he hurls feces at the building from a plastic bag." | This was a total fabrication intended to cast Plaintiff as mentally ill. |
| 29.<br><br>April 6, 2021 | "Aaron Greenspan…  He's like, you know, this very mentally ill guy…" | Defendant Qazi made this false verbal statement on a YouTube video podcast viewed approximately 1,700 times and hosted by a 13-year-old child. |
| 30.<br><br>June 13, 2021 | "Aaron Greenspan: 'Adolph *[sic]* Hitler was a great founder'" | Plaintiff is Jewish and does not believe that Adolf Hitler was "great" in any way.  This quotation fabricated by Defendant Qazi falsely summarized a satirical post by Plaintiff highlighting the "just |

| | | following orders" mentality pervasive in technology companies. |
|---|---|---|
| 31.<br><br>June 14, 2021 | "that's what a lot of people are concerned about" | This statement from the @WholeMarsBlog Twitter account affirming "He sounds like a future mass murderer" in response to the above post about Hitler falsely suggests Plaintiff's intent to commit murder. |
| 32.<br><br>July 18, 2021 | "Aaron Greenspan has gone to insane lengths to make sure nobody learns the truth about the Greenspan crime family and their fraudulent charity. They're ready to harass Omar for years if they have to. Telling people what's happening is the only thing keeping them from killing him" | This statement from the @WholeMarsBlog Twitter account falsely suggests Plaintiff's involvement in a conspiracy to commit murder. |
| 33.<br><br>May 19, 2022 | "After more than two years, Tesla short-seller and cyber stalker Aaron Greenspan's illegal SLAPP-suit against @elonmusk and Omar Qazi has been dismissed with prejudice. Greenspan filed more than 4,000 pages of nonsense with the court to try and extort Omar. It was all BS & lies." | Greenspan is not a "cyber stalker." The lawsuit in question was not found by any judge in any court to be a Strategic Lawsuit Against Public Participation, or "SLAPP." The filing of the lawsuit in question was not "illegal" and Greenspan violated no laws by filing it. The lawsuit was not dismissed with prejudice; the state law claims, including claims against Mr. Qazi, were explicitly dismissed without prejudice. Plaintiff did not at any point attempt to "extort Omar." Extortion is a crime. |
| 34.<br><br>May 21, 2022 | "Aaron Greenspan has got to be sweating that they might find grounds to charge him criminally / Rumor has it Block was acting as the balance sheet (funding) for his short activism and harassment campaign." | There were and are no grounds for the United States Department of Justice, which Mr. Qazi was referring to, to charge Greenspan criminally. Complainant never has had any financial relationship directly or indirectly with short-seller Carson Block whatsoever, and Complainant has never run a "harassment campaign," let alone sought funding for one. |
| 35. | "After more than two years of Greenspan filing thousands of | This is false. No judge ever issued any such ruling. |

| June 4, 2022 | pages of documents in an attempt to extort Qazi, the judge ruled that there was absolutely no truth or merit to any of Greenspan's absurd allegations." | |
|---|---|---|
| 36.<br><br>June 4, 2022 | "Aaron, you've filed 67 lawsuits against hundreds of victims." | This is false. |
| 37.<br><br>July 3, 2022 | "Greenspan is probably going to appeal … Started stalking us a year or two before that. He's told us he's going to stalk us until the day he died or gets locked up." | Beginning with the word "started," Mr. Qazi's statement is a total fabrication. |
| 38.<br><br>July 6, 2022 | "For the past two years since then Greenspan has been attempting to extort me into silence…"<br><br>"I could not in good conscience pay off such a deranged and evil criminal…" | These statements falsely accuse Plaintiff of the crime of extortion. |
| 39.<br><br>August 24, 2022 | "this nut job aaron greenspan litigated the case for years and filed thousands of documents with the court and the judge ruled he was completely full of shit and that he did not invent Facebook." | This is a total fabrication.  Many of the documents filed in court were hundreds of pages of falsehoods and/or doctored photographs authored and created by Defendant Qazi regarding Plaintiff. |
| 40.<br><br>August 24, 2022 | "I make money writing software. Something Greenspan doesn't understand never working a day in his life. Harassment & extortion isn't a job!" | This is false.  Plaintiff has worked in various roles since approximately 1994 and has never harassed or extorted anyone. |
| 41.<br><br>August 24, 2022 | "more than a [] few screws loose…completely nuts…harassed and threatened the guy and his wife for not putting him in the movie…a real nut job…very offended by the story of Facebook because he was left out of it but the reality is that he had nothing to do with Facebook." | These characterizations from the "Dr. Know-it-all" podcast at https://www.youtube.com/watch?v=crMHh7yPyzE are false, the assertion that Plaintiff harassed Ben Mezrich is false, and the assertion that Plaintiff had "nothing to do with Facebook" is false. |
| 42.<br><br>August 25, 2022 | "Is @RealDanODowd committing tax fraud by using a non-profit to inure private benefit to himself? I can't believe it… he set up a fake charity to benefit himself financially just like Aaron | This is false.  Plaintiff did not set up a "fake charity," for any reason. |

| | | |
|---|---|---|
| | Greenspan!" | |
| 43.<br><br>December 1, 2022 | "this is a criminal harassment issue, with Greenspan abusing the courts to extort me for a large cash payment & insane demands that I stay silent about his harassment" | This statement again falsely accuses Plaintiff of "abusing the courts," the crime of extortion, and the crime of harassment. |
| 44.<br><br>December 3, 2022 | "I never would have picked up this 40 year old online stalker i've never met who has been following and threatening me for 4+ years now / he sued me and elon to hide the fact that he was committing fraud and harassing people / We won the case, and then won again and had it dismissed with prejudice but now he's appealing. He will never stop obsessing over me as long as he's alive until he faces justice." | Each part of this statement is false except for Plaintiff's age, having turned 40 after the time of publication. The state law claims against Defendant Qazi were dismissed without prejudice. |
| 45.<br><br>December 3, 2022 | "he sued me and elon to hide the fact that he was committing fraud and harassing people" | This statement falsely alleges that Plaintiff committed the crime of fraud. |
| 46.<br><br>December 4, 2022 | "He's let Greenspan drag this bullshit case through courts for years while failing to explain to the judge that this is a criminal harassment issue, with Greenspan abusing the courts to extort me for a large cash payment & insane demands that I stay silent about his harassment." | Each part of this statement is false. |
| 47.<br><br>January 13, 2023 | "Woah, this is crazy. My stalker Aaron Greenspan & his goons submitted thousands of fraudulent 50 cent donations on stolen credit cards to my donation page for legal defense against his SLAPP-suit against me and @elonmusk." | This is false. The acts described, wire fraud, conversion, and identity theft—none of which Greenspan committed—are crimes. |
| 48.<br><br>February 6, 2024 | "I was doxxed by Tesla short sellers on Twitter before Elon bought it. First Greenspan called my employer, but we own the company so I didn't get fired.<br><br>He harassed, stalked and tormented | These statements falsely allege that Plaintiff committed the crimes of harassment and stalking. |

| | | |
|---|---|---|
| | me for years, and still to this day. It's no joke." | |
| 49.<br><br>May 4, 2024 | "Baby reindeer reminded me a lot of my experience with my TSLAQ stalker Aaron Greenspan" | Stalking is a crime. "Baby Reindeer" is a Netflix production concerning a female convict who physically harassed a male comedian and was sentenced to prison for it. |
| 50.<br><br>July 26, 2024 | "If we are investigating short sellers, I suggest @SECGov look into my stalker Aaron Jacob Greenspan. I want to know who has been funding his years long short and distort and harassment campaign against myself and many others. Charging Greenspan criminally will not take back the harm he caused but it will begin to make things right. This is perhaps the most egregious and over the top short & distort example I have ever seen. Greenspan has vowed to torment me until the day he dies. Until he is put away his victims will never be able to find peace." | Shorting stocks with an intent to distort price is a crime that Plaintiff has never engaged in, yet Defendant Qazi suggested that the SEC and USDOJ should investigate and charge Plaintiff civilly and criminally. Plaintiff has never made any such "vow" and has no "victims." |
| 51.<br><br>August 27, 2024 | "When I made an anonymous account and started calling out their BS for what it was, they attacked. My stalker Aaron Greenspan (who was furious I laughed at him for thinking he invented Facebook) doxxed me and called my employer to try and get me fired for my tweets. He started blackmailing me to try and keep me silent." | Defendant Qazi unilaterally violated a confidentiality agreement during settlement negotiations in *Greenspan I* for which his former attorney, Karl Kronenberger, apologized. Then Defendant Qazi falsely mischaracterized those negotiations on Twitter as "extortion" and "blackmail," which he reiterates here. |
| 52.<br><br>August 27, 2024 | "yeah my stalker Aaron Greenspan is a truly insane person. As long as he's alive he will always be trying to hurt me. I'm not his first victim either." | Every part of this statement is entirely false. |

513.    On or around July 6, 2022, Defendant Qazi posted on his @WholeMarsBlog Twitter account a copy of his purported response to a subpoena issued to him in the criminal case of *United States of America v. Milton*, New York Southern District Court Case No. 1:21-cr-00478-ER. Trevor Milton is the former CEO of purported electric truck manufacturer Nikola

Corporation.  Mr. Qazi once visited the headquarters of Nikola Corporation to interview Mr. Milton with other Tesla enthusiasts and was thus subpoenaed in that case.  In his subpoena response, rather than directly addressing any requests posed to him, Defendant Qazi instead launched into a lengthy diatribe against Plaintiff, writing:

a) "Greenspan filed false DMCA notices with Twitter;"

b) "…filed multiple false police reports with the San Francisco police department claiming I was in possession of child pornography;"

c) "For the past two years since then Greenspan has been attempting to extort me into silence;"

d) "I could not in good conscience pay off such a deranged and evil criminal…;"

e) "…knowing that he had filed 64 similar lawsuits against numerous victims…"

f) "the case has now been dismissed with prejudice;"

g) "Greenspan was abusing the pro se designation to extort me into silence;"

h) "Greenspan is extremely deceptive, thinks he's smarter than the authorities, and will do everything he can to escape justice."

All of these statements are false and/or contain falsehoods.  None of these statements in any way whatsoever pertain to Trevor Milton or the *United States of America v. Milton* criminal proceedings and are thus not covered by litigation privilege.

514.    Defendant Qazi's website appears prominently in search engine results for queries based on Plaintiff's name.

515.    From Twitter and his Smick Sites, Defendant Qazi published links to libelous and/or pornographic material with the intent of poisoning search results concerning Plaintiff.

516.    Defendant Qazi's @WholeMarsBlog Twitter account has over 500,000 followers, including Tesla executives who frequently "like" its content, and is on a short-list of VIP Twitter accounts that receive special treatment from Twitter's owner, Defendant Musk.

517.    Defendant Qazi's @WholeMarsBlog Twitter account is a collaboration with several other anonymous individuals who contribute content, over which Defendant Qazi has

immediate control.

518.     Defendant Qazi's statements via the @tesla_truth Twitter account, that he would "drag [Plaintiff's] name through the mud until the day he [dies]" and that "[a]fter he dies I'll keep telling people he sucked," as well as his repeated posting of Plaintiff's contact information, as well as his explicit encouragement that several thousand individuals "contact Aaron for pranks," all demonstrate considerable malice and reckless disregard for the truth.

519.     Defendant Qazi's persistent lies kicked off a chain of libel by his followers, whom Qazi assumed responsibility for, and who publicly referred to Plaintiff as a "psychopathic incel" and a likely "mass shooter."

520.     Defendant Qazi's written and verbal false statements were made with actual malice because Qazi knew the statements were false and made the statements with reckless disregard for whether the statements were false or not, *even after* the filing of *Greenspan I*.

521.     On October 19, 2019, Defendant Qazi stated, "I want everyone to know the true facts about who he really is," and on August 24, 2020, Defendant Qazi admitted that he frequently posts material on his Twitter accounts intended to be interpreted as fact, writing, "I trust you guys to be smart enough to figure out what's fact and speculation."

522.     Defendant Qazi's thousands of aspersions demonizing Plaintiff—none of which addressed a single one of Plaintiff's substantive concerns regarding Defendant Tesla's business practices—were interpreted by readers statements of fact.  On October 9, 2020, one reader even replied to a @WholeMarsBlog post with a video clip of man holding up a sign that simply reads "#FACTS."  *See* https://x.com/SjvTesla/status/1314685422497411074.

523.     In addition to using a Twitter account containing the word "truth" to make statements concerning Plaintiff, Defendant Qazi also repeatedly exhorted his followers on Twitter and via the Smick Sites to complete IRS Form 13909 in order to file false reports echoing the conspiracy theories already submitted by Diego MasMarques, Jr.

524.     Communications with the IRS are regulated by federal law and are required to be factual.  Defendant Qazi also frequently tagged law enforcement Twitter accounts in posts.

525.    On January 29, 2021, Defendant Qazi posted a heavily altered photograph of Plaintiff with a modified nose, mouth, eyes, and eyebrows that elicited replies from readers such as "ugly as shit" and "Stay safe out there!"  Defendant Qazi posted it again on February 25, 2021, April 29, 2021, and June 8, 2021, each time labeling the photograph with Plaintiff's name.

526.    Defendant Qazi's false and misleading statements concerning Plaintiff, whether written or verbal, were not in service of and failed to further any public debate.

527.    Defendant Qazi's false and misleading statements, written and verbal, have irreparably harmed Plaintiff's reputation by providing disinformation for others to re-post in an endless loop of defamation.

### COUNT X
### Defamation Per Se
### Against Defendants Musk and Tesla

528.    Plaintiff incorporates by reference the foregoing allegations.

529.    Since 2019, Defendants Musk, Tesla and X Corp. have treated Defendants Qazi and Smick in such a manner as to cause any reasonable observer to believe that Qazi and Smick are actual or ostensible agent of Defendants Musk and/or Tesla, and that Qazi is more than just a casual friend—as falsely alleged by counsel in *Greenspan I*—as exhibited by:

    a)  paying, through Defendant X Corp. on or about July 14, 2023 in the amount of $6,206.00, Defendant Qazi via Defendant Smick's Stripe account, as part of a select group of eligible users, for his Twitter posts (the first of several payments);

    b)  Defendant Qazi's reasonable expectation of future employment with Defendant Tesla given its hiring of his Third Row Tesla colleague Vivien Hantusch;

    c)  Defendant Musk authorizing and endorsing Qazi's harassing conduct toward his critics, including but not limited to Plaintiff, by e-mailing Qazi, "Your Twitter is awesome!" alongside advice for handling journalists (as a Tesla Public Relations employee would) in an August 2019 e-mail to Qazi after the Tesla Board of Directors, including Defendant Musk, had been warned about Qazi's harassment;

    d)  having reportedly shut down Tesla's Public Relations department, and out of his

then-over 59 million followers, Defendant Musk consistently using Defendant Qazi's Twitter accounts as springboards to make material disclosures to investors;

e) Defendant Qazi admitting from the @WholeMarsBlog Twitter account, "Many people don't know that Tesla actually reads everything we post on Twitter. Even if Elon doesn't respond to you, they will get the feedback to the appropriate team. It's someone's job I think," prompting a former Tesla employee to write "Can confirm" and another observer to write, "They have this instead of a pr team.";

f) permitting Defendant Qazi to attend exclusive, invite-only Tesla events where Defendant Musk presented new products;

g) prior to the EAP, granting Defendant Qazi early access to Tesla FSD beta software—an honor bestowed upon only "25…non-employees" globally "based on…their safe driving record" according to Tesla attorney Eric C. Williams's December 14, 2020 letter to the CADMV—despite Qazi's history of criminal charges for violating the California Vehicle Code, including an alleged but later dismissed violation of § 23222(B): Possession of Marijuana While Driving, as well as Defendant Qazi publicly posting to Twitter images of substantial amounts of alcohol reportedly consumed before driving his Tesla vehicle;

h) entering into a contract, the EAP Agreement, with Defendant Qazi that restricted his discussions with the media about Tesla beta software and gave Tesla editorial control over content;

i) allowing Defendant Qazi access to Tesla's private property in the same fashion that has resulted in Tesla filing for restraining orders against others;

j) permitting Defendant Qazi to use the TESLA registered trademark in his @tesla_truth Twitter handle with no legal consequence;

k) granting Defendant Qazi over three hours of Defendant Musk's time to conduct an in-person interview promoting Defendant Tesla's products and narratives;

l) providing Defendant Qazi with access to material non-public information and

other leaked news tips from inside Tesla;

m) Defendant Musk autographing the interior of Defendant Qazi's Model 3;

n) encouraging and/or allowing Tesla management, such as former Senior Global Director, Public Policy and Business Development Rohan Patel, to follow and "like" Defendant Qazi's Twitter posts regardless of the substantial controversy surrounding Qazi's misconduct;

o) Defendant Musk petitioning Twitter, Inc. CEO and fellow billionaire Jack Dorsey for special treatment for Defendant Qazi after Qazi was suspended from Twitter so that he could continue to promote Defendant Tesla's stock and products;

p) promoting Defendant Qazi's legal defense fund for *Greenspan I*;

q) allowing Defendant Qazi to correspond with Defendant Musk's preferred attorney, Defendant Spiro, about *Greenspan I*;

r) relying on Defendant Qazi for intelligence regarding competitors obtained at meetings and tours where official Tesla employees would not be permitted;

s) regularly corresponding with Defendant Qazi about business matters via e-mail and Twitter DM;

t) actively ignoring written concerns expressed to the Board of Directors about Defendant Qazi's conduct;

u) Defendant Qazi admitting on video that he performs work, compensated through stock ownership and referral bonuses, for Defendant Tesla, by exclaiming, "I'll sell them all fuckin' Teslas.  I'll pull in those referrals!"

v) Defendant Qazi appearing to work nearly 24 hours per day, every day, to exclusively promote the interests of Defendants Musk and Tesla on social media;

w) Defendant Qazi admitting that he is a Tesla shareholder;

x) Ensuring that Defendant Qazi's Twitter account would not be suspended even after he posted internal Tesla information.

530. Defendants Musk and Tesla are vicariously liable for all defamatory statements

published by Defendant Qazi concerning Plaintiff from at least as early as 2019.

531.    Had Defendants Musk or Tesla instructed Defendant Qazi to stop defaming Plaintiff, Defendant Qazi would have obeyed and stopped because his defamatory statements were made in service of Defendants Musk and Tesla.  At no time did Defendants Musk or Tesla instruct Defendant Qazi to stop.

532.    Defendant Musk and his agents' conduct was malicious, oppressive and done with a willful disregard for Plaintiff's rights, entitling Plaintiff to an award of punitive damages.

<div align="center">

**COUNT XI**
**Defamation**
**Against Defendant X Corp.**

</div>

533.    Plaintiff incorporates by reference the foregoing allegations.

534.    Plaintiff does not dispute that Defendant X Corp. has the right to make editorial decisions about content published on its website by third parties and that pursuant to 47 U.S.C. § 230 it is immune from suit for allegations pertaining specifically to those editorial decisions.

535.    Plaintiff does not dispute Defendant X Corp.'s right to suspend Twitter accounts. Plaintiff alleges only that *after* his accounts were suspended, Defendant X Corp. defamed Plaintiff by making false statements broadcast to thousands of users about the purported reason(s) why the accounts were suspended.  47 U.S.C. § 230 does not immunize Defendant X Corp. in this regard.

536.    When Defendant X Corp. suspended Plaintiff's Twitter accounts on June 13, 2023, thousands of visitors to those accounts' former pages were informed that "Twitter suspends accounts that violate the Twitter Rules," falsely indicating that Plaintiff had, in some way, violated the Twitter Rules.

537.    In fact, Plaintiff did not violate the Twitter Rules.  Prior to Twitter, Inc. being owned by Defendant Musk, Plaintiff's accounts had been reported numerous times by various users who followed Defendants Qazi and/or Musk, but Twitter, Inc. examined those reports and found no violation.  In one instance, when Twitter, Inc. did purportedly find a violation reported in bad faith by Diego MasMarques, Jr., it quickly admitted an error and corrected that error.

538.    Today, X Corp. states, "X suspends accounts that violate the X Rules" when third parties attempt to visit Plaintiff's former profile pages.  However, Plaintiff never agreed to the X Rules and was never bound by them.  The implication that Plaintiff violated the X Rules, meriting suspension, is false.

539.    Plaintiff's accounts were not suspended because they "violated the X Rules." Plaintiff's accounts were suspended in retribution for criticizing Defendant Musk, in order to silence Plaintiff.

540.    On and after June 13, 2023, due the account suspensions, Plaintiff suffered harm. The on-line mob that Defendant Qazi had led for years expressed scorn and ridicule directed at Plaintiff, interpreting the suspensions as validation of the hundreds, if not thousands, of lies that Defendants Musk, Tesla, Qazi and Smick had spread about Plaintiff.

541.    On or around February 28, 2023, Defendant Tesla informed Defendant Qazi by e-mail that he had posted "its internal information on public platforms," referring to Twitter.  Yet Defendant X Corp. did not suspend the @WholeMarsBlog account operated by Defendant Qazi and Smick, and in fact, began paying Defendant Smick to post starting in July 2023.

542.    At least as early as July 17, 2024, Defendant Musk stated via Twitter that X Corp. only suspends accounts that violate laws, falsely suggesting that Plaintiff's accounts had been suspended because it violated a law.

### COUNT XII
### Violation of the Civil Anti-Stalking Statute
### (California Civil Code § 1708.7, *et seq.*)
### Against Defendant Qazi

543.    Plaintiff incorporates by reference the foregoing allegations.

544.    Per California Civil Code § 1708.7(a)(1), starting on January 14, 2019, Defendant Qazi began following, alarming, and harassing Plaintiff through a pattern of conduct involving his use of multiple Twitter accounts, prank telephone calls, false accusations regarding rape and possession of child pornography, and republication of deliberately altered court documents. These actions also led to the transmission of additional false allegations regarding child

pornography via text message and fax to Plaintiff.

545.    Per California Civil Code § 1708.7(a)(2)(A) and (B), Defendant Qazi's amplification of posts by Diego MasMarques, Jr. made it more likely that his mob of followers would locate posts that identified Plaintiff's parents home by its address and photograph as well as posts that identified Plaintiff's parents' synagogue.

546.    Per California Civil Code § 1708.7(a)(3)(A), as early as January 14, 2019, Plaintiff requested that Defendant Qazi stop his harassing conduct, writing "Please stop." at 12:36 P.M.  With no other way to reach him, and hoping that a verbal conversation would diffuse the situation, Plaintiff also asked Defendant Qazi to stop by leaving a message for him to stop at his nominal employer's office on the same day, unaware that Defendant Qazi's "employer" was his father's company and that Qazi did not really work there on a full-time basis.

547.    Per California Civil Code § 1708.7(a)(3)(A), as early as January 17, 2019, in writing, Defendant Qazi admitted his intent to "fuck with" Plaintiff to an unknown third party.

548.    On February 9, 2021, Twitter found that the @WholeMarsBlog account had violated the Twitter Rules "against promoting or encouraging suicide or self-harm" regarding Plaintiff.  Previously, Twitter had removed content the account posted as it advocated violence.

549.    Per California Civil Code § 1708.7(a)(3)(A), from 2019 onward, Defendant Qazi posted credible threats directed at Plaintiff suggesting that he and/or Defendants Musk and Tesla ("we," as written on the @WholeMarsBlog account) had referred Plaintiff to law enforcement and that based on these "criminal referrals," "the FBI and law enforcement" were "very interested."

550.    These threats were credible because law enforcement tends to respond far more quickly to complaints from wealthy individuals and large corporations such as Defendants Musk and Tesla whether or not the underlying substance is true or false.  Furthermore, Defendants Musk and Tesla have a documented history of referring their critics to criminal law enforcement as a means of squelching criticism.  On or around June 25, 2018, working on behalf of Defendants Musk and Tesla, Hueston Hennigan LLP submitted a "[Redacted] CRIMINAL

REFERRAL" labeled "Privileged & Confidential" and "Attorney-Work Product" to the Office of the Nevada Attorney General regarding a former employee, Martin Tripp, who had leaked accurate information critical of Defendants Musk and Tesla to the press.  The same baseless referral was also submitted to the FBI and the United States Attorney's Office for the District of Nevada.  Representatives of Defendants Musk and Tesla further met personally with the Attorney General of Nevada to encourage criminal prosecution of a critic.

551.     Criminal prosecution would pose a significant threat to Plaintiff's health and safety for a variety of reasons, including but not limited to increased COVID-19 risk.

552.     On August 5, 2021 at 10:15 A.M., Defendant Qazi posted on the @WholeMarsBlog Twitter account, writing, "Please write to Case Western university *[sic]* and Neil Greenspan to ask him to stop this harassment…  I worry he's a danger to students at Case." He later repeated this false claim against Dr. Greenspan on August 7, 2021.

553.     On August 5, 2021 at 10:20 A.M., Plaintiff's father received a harassing e-mail from johndoe510150@gmail.com also addressed to the general e-mail account for his employer, the Case Western Reserve University School of Medicine.  The e-mail stated in part, "STOP HARRASSSING *[sic]* WHOLEMARSBLOG and DOXXING PEOPLE online!!!"

554.     On August 7, 2021 at 12:59 P.M., Defendant Qazi posted on the @WholeMarsBlog Twitter account, "If Greenspan files a fifth revision of his lawsuit on Friday, Chapter 8 will be published continuing the story" in an attempt to intimidate Plaintiff into withholding this document from the Court in violation of 18 U.S.C. § 1512(b).  Defendant Qazi repeated this threat on August 10, 2021 on his personal website.

555.     Defendant Qazi's conduct caused Plaintiff and Plaintiff's family members to suffer substantial emotional distress due to the real threat of malicious prosecution and/or firing from deliberate smearing of Plaintiff as a supposed likely mass murderer harboring child pornography, and of Plaintiff's father as supposedly posing a "danger to students."

556.     As a result of Defendant Qazi's public conduct and his apparent contact with the restrained party in the Civil Harassment Case, Plaintiff reasonably feared for his and his family's

safety after receiving messages, text messages and calls that he and others perceived as threats. As a result, Plaintiff reported Defendant Qazi to the FBI and to SFPD twice.

557.    Defendant Qazi facilitated the violation of Plaintiff's civil harassment restraining order against Diego MasMarques, Jr., which prohibits direct and indirect harassment, of which he was aware as early as January 14, 2019, and further admitted to altering, misconstruing and publicly posting Form CH-100 from the Civil Harassment Case for the express purpose of harassing Plaintiff.

558.    Even after Plaintiff restricted his personal Twitter account in July 2020 due to Defendant Qazi's ceaseless harassment—the digital equivalent of locking a door—Defendant Qazi still used a proxy to follow it and to post screenshots and metadata to his followers, brazenly displaying the padlock icon next to Plaintiff's name in numerous images.

559.    Defendant Qazi posted harassing messages on social media regarding Plaintiff and Plaintiff's family on the order of 1,000 times from different accounts, causing a cascade of harassment that has yet to cease.  For example, on October 1, 2019, @HaidarAns wrote, "@AaronGreenspan you sure have a very punchable face [laugh/crying emoji]".  With tens of millions of followers, Defendant Musk cemented the effect with only a few posts.

560.    Defendant Qazi has admitted that he thinks harassing Plaintiff is "funny."

561.    Had Defendants Musk or Tesla instructed Defendant Qazi to stop harassing Plaintiff, Defendant Qazi would have obeyed and stopped.  At no time did Defendants Musk or Tesla instruct Defendant Qazi to stop.

562.    Plaintiff seeks equitable relief, including but not limited to damages in the form of general damages, special damages and punitive damages pursuant to Cal. Civil Code § 3294.

563.    Plaintiff respectfully requests an injunction requiring: a) all Defendants to cease and desist making and/or publishing further harassing statements concerning Plaintiff or Plaintiff's family via any published medium, written or oral; b) all Defendants to cease and desist contacting or trying to contact Plaintiff, his family members, his friends, and any person mentioned by name as having known Plaintiff in Plaintiff's public writing; c) all Defendants to

cease and desist impersonating others; d) the immediate cessation of the operation of the Smick Sites and/or transfer of the Smick Site domain names to Plaintiff; e) Defendant Qazi to cease and desist using Twitter, directly or indirectly; and f) Defendant Qazi to permanently remove any and all of his content mentioning Plaintiff from any and all websites under his control.

## COUNT XIII
### Negligent Infliction of Emotional Distress
### Against Defendants Musk and Tesla

564.    Plaintiff incorporates by reference the foregoing allegations.

565.    Over time, Defendant Tesla has had a number of workplace policies that have been periodically revised and have at times pertained to overlapping subject matter.

566.    As an officer, director and employee of Defendant Tesla, Defendant Musk is bound by Defendant Tesla's workplace policies.

567.    Defendants Musk and Tesla have frequently used the existence of Defendant Tesla's workplace policies to justify the shielding of Defendant Musk's purportedly private information and to excuse Defendant Musk's failure to respond to inquiries involving service of process, thus admitting that Defendant Tesla's policies are binding upon Defendant Musk.

568.    Defendants Musk and Tesla owed Plaintiff a duty of care because starting in 2016, Tesla's Anti-Harassment/Discrimination policy explicitly states that it applies to "visitors who enter onto Tesla's premises" unconditionally and without regard to whether harassment, such as "[v]erbal abuse," physically takes place on Tesla's premises.

569.    That policy was updated several times. Tesla's July 2018 Policy Against Discrimination & Harassment in the Workplace (U.S. Locations) states:

"At Tesla, we believe it's essential to provide all employees with a respectful and safe working environment. As a result, we don't tolerate discrimination, harassment or any mistreatment of employees in the workplace or work-related situations, whether based on a protected class under applicable law or otherwise.

Because the intent of this Policy Against Discrimination & Harassment in the Workplace (the 'Policy') is to deter conduct that is unwanted, unreasonable, and demeaning, Tesla may consider an employee's conduct to be in violation of this Policy even if it falls short of unlawful conduct under applicable law. When determining whether conduct violates this Policy, we consider whether a reasonable person could conclude that the conduct

contributed to or created an intimidating, hostile, degrading or demeaning work environment.

Tesla does not consider conduct in violation of this Policy to be within the course and scope of employment and does not sanction such conduct on the part of any individual or employee, including people leaders.

This Policy applies to everyone who works for Tesla and any of its subsidiaries. Everyone – including individual contributors and people leaders – is responsible for following and upholding this Policy. Additionally, we don't tolerate conduct in violation of this Policy by employees towards non-employees (e.g., contingent workers or contractors, guests, vendors, customers, etc.), nor do we tolerate such conduct by non-employees towards employees."

570.    Tesla's November 28, 2018 Policy Against Discrimination & Harassment in the Workplace (U.S. Locations) reiterates the above paragraphs and further states:

"Other types of prohibited harassment may include behavior similar to the examples above pertaining to sexual harassment.  It can also include, but is not limited to:

- Verbal conduct including taunting, jokes, threats, epithets, derogatory comments or slurs based on an individual's status in a Protected Class;

- Visual and/or written conduct including derogatory posters, photographs, calendars, cartoons, drawings, websites, emails, text messages or gestures based on an individual's status in a Protected Class; or

- Physical conduct including assault, unwanted touching or blocking normal movement because of an individual's status in a Protected Class.

The list of examples in this Policy is not exhaustive, and there may be other behaviors that are unacceptable under this Policy.

'I was joking' or 'I didn't mean it that way' are not defenses to allegations of harassment or violations of this Policy.  Nor is being under the influence of alcohol or other substances.  This Policy applies to conduct at work, in work areas (even when off duty) including in the Company parking lot, and at work-related social events, office parties, off-sites, and customer entertainment events.

Employees are expected to be particularly careful about what they say and do in these circumstances.  You do not need to be the subject of the conduct to be negatively impacted; rather, it is sufficient for you to have personally witnessed such offensive conduct.  Harassment does not include a reasonable action taken by Tesla relating to the supervision and direction of an employee or the workplace."

571.    Pursuant to Defendant Tesla's November 28, 2018 Policy Against Discrimination

& Harassment in the Workplace (U.S. Locations), Defendant Musk is a "people leader" "who works for Tesla."

572.   Pursuant to Defendant Tesla's November 28, 2018 Policy Against Discrimination & Harassment in the Workplace (U.S. Locations), Plaintiff is a "non-employee" "guest."

573.   On December 29, 2018, Plaintiff visited Tesla property, namely, the Tesla Showroom and Service Center at 999 Van Ness Avenue in San Francisco to look into purchasing a Tesla Model 3, at which point a duty of care attached in regard to Plaintiff in perpetuity.

574.   Plaintiff was harassed by Defendants Musk and Tesla and their agents from 2019 through present day for expressing serious concerns about the Tesla Model 3 and Tesla in general, in a way that was "unwanted, unreasonable, and demeaning."

575.   In violation of Defendant Tesla's policies, Defendant Musk himself published the following statements about Plaintiff on his Twitter account, read by millions worldwide:

| Date / Medium | Written Statement by Defendant Musk |
|---|---|
| October 9, 2019 E-Mail and Twitter via Qazi | "Does the psych ward know you have a cell phone? Just curious." |
| October 12, 2019 Twitter | "@DrPatSoonShiong, are you aware that one of your senior journalists (Russ Mitchell) is openly funding a fake charity run by an online bully?" |
| July 3, 2020 Twitter | "Greenspan is crackers, bananas, barky & ten cards short of a full deck" |

576.   Plaintiff informed the Tesla Board of Directors, including Defendant Musk, via e-mail that he was being harassed on August 7, 2019.  Plaintiff received no response.  The harassment continued.

577.   Plaintiff filed a formal "Tesla Integrity Line" complaint on October 22, 2021.  Plaintiff received no response.  The harassment continued.

578.   On December 1, 2022, Defendant Qazi posted on his @WholeMarsBlog Twitter account, "So if anyone has any ideas for next legal steps or has a good law firm that they think can really kick Aaron's ass and make him cry let me know. He's having too much fun. He needs to face justice for what he's done, and pay back everyone who has donated to stop him."

579.   One week later, on December 8, 2022, Defendant Musk attempted to drag

Plaintiff into the *Hothi v. Musk* litigation via a frivolous and vexatious proposed cross-compliant.

580.    Defendant Musk's request to file the proposed cross-compliant was denied. Instead, on February 24, 2023, he filed the Alameda Case, a frivolous and vexatious lawsuit with no factual or legal basis against Plaintiff, and spent two months attempting to serve Plaintiff.

581.    On April 4, 2023, Defendant Cashman issued a wildly overbroad, vexatious subpoena to Plaintiff on Defendant Musk's behalf.

582.    On April 7, 2023, Defendant Cashman issued a wildly overbroad, vexatious subpoena to Plaintiff's company on Defendant Musk's behalf.

583.    Defendant Musk has a history of harassing critics with subpoenas. On October 28, 2019, Magistrate Judge Jacqueline Scott Corley described Defendant Musk's attempt to subpoena then-BuzzFeed journalist Ryan Mac as pertaining to "irrelevant and harassing topics," noting "the record suggests Mr. Musk feels animus toward non-party Mr. Mac." *See Unsworth v. Musk*, Northern District of California Case No. 3:19-mc-80224-JSC, ECF No. 32.

584.    Once he had purchased Twitter, Inc., on or around June 13, 2023, Defendant Musk ordered Defendant X Corp. to terminate not only Plaintiff's business account, @PlainSite, but his personal account, @AaronGreenspan, as well.

585.    All of these actions violated Defendant Tesla's anti-harassment policies.

586.    On or around July 26, 2024, Defendant Qazi had the approval of Defendants Musk and Tesla when he wrote on his @WholeMarsBlog Twitter account to approximately 500,000 followers that "@SECGov look into my stalker Aaron Jacob Greenspan" for "short and distort and harassment" crimes.

587.    Due to the harassment, Plaintiff suffered a degree of emotional distress that no person should reasonably be forced to endure. Plaintiff reported being harassed to local and federal law enforcement repeatedly. For years, Plaintiff described the harassment to a journalist as it was happening in real-time so that if he were to be physically harmed, there would be a witness who understood the situation. Plaintiff also enhanced his home security. Plaintiff is thus entitled to punitive damages.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**COUNT XIV**
**Fraud on the Court (Malicious Prosecution)**
**Against Defendants Musk, Singer Cashman, LLP, Cashman, Huebert and Mehes**

588.    Plaintiff incorporates by reference the foregoing allegations.

589.    Establishing his pattern of vexatious litigation that has now become familiar to this Court, Defendant Musk set out in 2022 to file a frivolous "case in order to punish [Plaintiff] for [Plaintiff's] publications that criticized [Defendant Musk and his businesses]." *X Corp. v. Center for Countering Digital Hate, Inc.*, Case No. 3:23-cv-03836-CRB (N.D. Cal. March 25, 2024).  This constituted an ulterior motive that was not a proper impetus for litigation.

590.    On December 8, 2022, Defendant Musk attempted to file the Alameda Case in the form of a cross-complaint in another lawsuit then pending in Alameda County, *Hothi v. Musk*— in which Defendant Musk was sued for libel by short-seller Randeep Hothi based on a public e-mail conversation from 2019 between Plaintiff and Musk re-published on PlainSite.  Musk did so for the primary purpose of harassing Plaintiff, or in Musk's words, seeking Greenspan's "blood" because he believed Greenspan to be "evil."

591.    When Judge Julia Spain denied Defendant Musk's request for leave to file the proposed cross-compliant, the same claims were filed as a complaint in the new, separate Alameda Case on February 24, 2023 (the "Alameda Complaint").

592.    The Alameda Complaint and the proposed cross-compliant preceding it constituted a willful fraud on the Superior Court of California for the County of Alameda, in violation of numerous State Bar Rules of Professional Conduct in California and in Texas.

593.    The Alameda Complaint contained numerous falsehoods:

    a)  The Alameda Complaint stated that "Mr. Greenspan has made a career out of threatening and harassing individuals and businesses."  This is false.

    b)  The Alameda Complaint stated that Plaintiff's "first major target was Facebook."  This is false.  Plaintiff has never had any "targets."  Mark Zuckerberg openly admits that Plaintiff developed the initial version of "The Facebook" at Harvard College in 2003, of which Zuckerberg was a member.

Had Plaintiff "threaten[ed] and harass[ed]" Zuckerberg and/or Facebook as claimed by Mr. Musk, they would not have settled with Plaintiff and Plaintiff's company in 2009.  *See* https://about.fb.com/news/2009/05/facebook-and-think-computer-corporation-resolve-trademark-dispute/.

c) The Alameda Complaint stated that "Mr. Greenspan's own website had been shut down for privacy violations because it improperly collected Harvard university account passwords from students."  This is false.  In 2003, Harvard University administrators lacking technological savvy were *concerned* about the way that Greenspan's houseSYSTEM student portal stored passwords, which they did not understand, but at no point was any password ever compromised as Greenspan used appropriate technologies to safeguard passwords for the time.  Nor was houseSYSTEM ever "shut down" due to any issues involving passwords.  The possibility was merely discussed.

d) The Alameda Complaint stated that Greenspan filed a frivolous lawsuit "because he was not included as a character in *The Accidental Billionaires*."  This is false.  The lawsuit in question was not frivolous; the same defendants settled a similar defamation claim from another party for $1 million before it was filed in court.  Greenspan was included in both the 2009 and 2010 editions of *The Accidental Billionaires*, which is to say, all editions.  This fact is easily verifiable using, for example, Google Books, which allows any person to instantly search text within numerous books free of charge.

e) The Alameda Complaint stated that Greenspan's company "was forced to shut down" because of "consumer protection law violations."  This is false. Greenspan's company 1) did not shut down; 2) did not violate any consumer protection laws; and 3) was never even accused of violating any consumer protection laws.  The facts surrounding Greenspan's company's dispute with the then-California Department of Financial Institutions over the

1    constitutionality of the 2010 California Money Transmission Act—including

2    the fact that Greenspan shut down the company's payment system *voluntarily*

3    to *prevent* any legal violations—are a matter of public record. Moreover,

4    Greenspan's company was *named as a defendant in the Complaint in the*

5    *Alameda Case*, so any reasonable attorney would have questioned the basis

6    for the allegation given that the "shut down" company was still operating.

7    f) The Alameda Complaint stated that Plaintiff "acted with actual malice

8    because, among other reasons, he caused Mr. Musk's statement to be

9    publicized precisely in order to help support Mr. Hothi's claim for

10    reputational damages in response to Mr. Musk's initial private, and true,

11    statement." This is false. Plaintiff did not believe that Mr. Hothi had any

12    claim for reputational damage at the time, and the response from Defendant

13    Musk was in no way private, nor was it completely true.

14    g) The Alameda Complaint stated that Plaintiff "did not publicize Defendant

15    Musk's private email via PlainSite.org or Twitter until after having first

16    communicated with Mr. Hothi's counsel." This is false. Musk's e-mail was

17    not private, as he knew or should have known that Plaintiff intended to

18    publish it. Plaintiff waited to publish because Defendant Musk failed to

19    respond as promised, causing Plaintiff to decide to allow him additional time.

20    h) The Alameda Complaint stated that Plaintiff "reached out to Mr. Hothi and

21    recommended that he retain plaintiff lawyer Gill Sperlein and his fellow

22    $TSLAQ member, Mr. Fossi, to defend Mr. Hothi in the restraining order

23    proceedings." This is false as Plaintiff did not know who Gill Sperlein was.

24    i) The Alameda Complaint stated that Plaintiff filed "vexatious lawsuits." This

25    is false. Plaintiff is not now and never has been a vexatious litigant in

26    California or any other state. No lawsuit he has ever filed has been

27    "vexatious." A motion filed by Diego MasMarques, Jr. to have Plaintiff

28

FIRST AMENDED COMPLAINT                    138                    3:24-cv-04647-MMC

deemed a vexatious litigant was flatly denied by a Superior Court of Santa Clara County judge in 2019.  A second attempt by Mr. MasMarques in the District of Massachusetts to have Plaintiff deemed a vexatious litigant was denied by District Judge Denise J. Casper in March 2024.

j)   The Alameda Complaint stated that Plaintiff had filed "more than 60 lawsuits" in his career.  This is false.  Plaintiff has not filed anywhere close to 60 lawsuits in his career, directly or indirectly.

k)   The Alameda Complaint stated that Plaintiff had "over 100 victims."  This is false.  Plaintiff has never been charged with a crime let alone convicted of one, naming a defendant in a civil lawsuit is not a criminal act, and dozens of the defendants named in Plaintiff's lawsuits were merely alter egos or subsidiaries of other defendants.

l)   The Alameda Complaint stated that "Mr. Greenspan did not engage in any due diligence."  This is false.  Plaintiff was known to Defendant Musk precisely because of his ability to conduct due diligence, which he did prior to contacting Mr. Musk in August 2019.

594.   The Alameda Complaint was authored and/or reviewed by Mr. Musk's three attorneys: Defendant Cashman, Defendant Huebert, and Defendant Mehes.

595.   The Alameda Complaint was reviewed or should have been reviewed by Defendant Musk, on whose behalf it was filed.

596.   The inclusion of the false and libelous statements concerning Plaintiff was deliberate and done with actual malice and reckless disregard for the truth.

597.   The false and libelous statements in the Alameda Complaint were not included in the December 8, 2022 proposed cross-complaint filed in *Hothi v. Musk*.  They were specifically added for the filing of the document as a separate, independent complaint.

598.   The false and libelous statements in the Alameda Complaint were not covered by litigation privilege as Plaintiff's time at Harvard, history with Facebook and Mark Zuckerberg,

litigation over state money transmission laws, and litigation history in general all have absolutely nothing to do with, are not connected with, and have no logical relation to, Elon Musk libeling Randeep Hothi. The false and libelous statements were completely extraneous to the lawsuit.

599. The Alameda Case was filed as part of a much longer and broader campaign of defamation and harassment by Defendants.

600. Not until April 10, 2023 was Plaintiff or Plaintiff's company properly served with any subpoenas in the *Hothi v. Musk* matter.

601. Had Defendant Musk and his Hardcore Litigation Department been interested in filing a new, separate complaint based on actual facts, they would have waited until *after* receiving and carefully evaluating the documents provided by Plaintiff or Plaintiff's company in response to the *Hothi* subpoenas before proposing, let alone filing, any type of new pleading.

602. Given that the Alameda Complaint had already been filed based on Mr. Musk's conspiracy theories and fabrications, the *Hothi* subpoenas served no actual purpose and were merely another instrument of harassment.

603. The subpoenas, signed by Defendant Cashman, were sweepingly broad, written with the apparent goal of learning which journalists Plaintiff had spoken with regarding Tesla since 2018 and learning exactly what they had spoken about, even though the vast majority of such communications had absolutely nothing to do with the *Hothi* litigation.

604. The Alameda Complaint had no factual basis. Defendants fabricated purported facts to justify the filing of the Alameda Complaint.

605. Defendant Musk and the members of the Hardcore Litigation Department all knew or should have known that the Alameda Complaint had no factual basis.

606. The Alameda Complaint was conceptually based on two misapprehensions by the Hardcore Litigation Department. Having been ordered by Defendant Musk to find evidence for his paranoid conspiracy theory that Plaintiff had orchestrated the *Hothi* litigation—even though Tesla was the first party to take action by applying for a restraining order against Randeep Hothi on false pretenses—the Hardcore Litigation Department attorneys:

a) misread an e-mail that Plaintiff sent to Randeep Hothi, presumably obtained from discovery in the *Hothi* matter, warning Mr. Hothi *not to engage* Gill Sperlein instead as a purported command *to hire* Gill Sperlein, when the e-mail said nothing of the sort;

b) falsely assumed that Plaintiff had corresponded with Lawrence Fossi *because* Mr. Fossi had previously represented Randeep Hothi, when Mr. Hothi had nothing to do with Plaintiff's decision to correspond with Mr. Fossi.

607.    The Alameda Complaint had no legal basis as it amounted to a Strategic Lawsuit Against Public Participation.

608.    The members of the Hardcore Litigation Department all knew or should have known that the Alameda Complaint had no legal basis.

609.    Defendant Musk acted with malice.  Defendant Musk boasted that he was "out for blood" and stated "There will be blood" in May 2022.

610.    Defendant Musk explicitly described his plan in writing on Twitter—of using attorneys at Tesla to target "evil" short-sellers—on April 4, 2023.  *See* https://x.com/elonmusk/status/1643335710840070148.  Defendant Huebert and Defendant Mehes are or were Tesla attorneys.

611.    Defendants Singer Cashman, LLP, Cashman, and Huebert refused to substantiate the legal basis for Mr. Musk's Complaint pursuant to California Code of Civil Procedure § 430.41(a)(1) when asked during a recorded meet and confer session on April 28, 2023, citing a litany of excuses, including but not limited to "I'll get back to you," "I don't understand what you mean," and not having citations "handy at the moment."  *See* http://www.aarongreenspan.com/writing/musk/20230428.muskmeetandconfer.mp3.

612.    Defendant Huebert also admitted that her lack of familiarity with California law had caused her to misrepresent Mr. Musk's position and that she had spoken "too soon."

613.    On the same call, Defendant Huebert stated, "If you're right, you're right, and you know, maybe next week we'll be like, yep, sorry, Aaron, you're right, we looked at this and you

totally got us."  Indeed, on the next business day (the following week), Defendant Musk's Hardcore Litigation Department unilaterally filed its Request For Dismissal with prejudice with regard to Defendants' frivolous and vexatious Alameda Complaint.

614.    Defendant Huebert stated that "unfortunately, one of the reasons you're in this is, uh, you know, you sent the…Elon's response to Fossi and Hothi before it was publicized."  This allegation was and is false.  Plaintiff did not send Defendant Musk's e-mail responses to Randeep Hothi before they were publicized.  On August 8, 2019 at 10:08 A.M., *Bloomberg News* journalist Dana Hall had asked Plaintiff "Did you share this with ska?" referring to the Musk e-mail conversation up to that point and @skaboosha, Randeep Hothi's Twitter account.  Plaintiff responded, "Not yet.  I am planning to release it all today to everyone at once when Elon responds again.  I'll give him another couple hours."  Thus, Defendants' assumption that Randeep Hothi had received special treatment from Plaintiff was false.

615.    While Defendants assumed that Plaintiff sent Defendant Musk's e-mail responses to attorney and short-seller Lawrence Fossi because of his representation of Randeep Hothi in the *Tesla, Inc. v. Hothi* case, this assumption was false, and this false assumption, at least according to Defendant Huebert, was Defendant Musk's primary basis for filing the Alameda Complaint. In fact, Plaintiff sent Mr. Musk's e-mail responses to Mr. Fossi because having himself been harassed by Defendant Musk in 2018, Mr. Fossi was uniquely positioned to suggest additional questions to ask Mr. Musk.

616.    On August 8, 2019 at 6:46 A.M., Plaintiff wrote by e-mail to three journalists and Mr. Fossi, "I've been forwarding to press so you all have a head start and to you Lawrence because you kicked this all off a year ago."  By "kicked this all off a year ago," Plaintiff was referring to the 2018 episode in which Defendant Musk revealed Mr. Fossi's pseudonym, "Montana Skeptic," as a form of harassment and revenge for posting informed criticism.

617.    Even if Plaintiff had somehow sent Mr. Fossi Defendant Musk's e-mail responses prior to publication because Mr. Fossi represented Randeep Hothi—which was *not* why he sent them—this would not have conferred any particular benefit or advantage on Mr. Hothi at all, as

the messages were published hours later anyway and no litigation was pending at the time.

618.    Plaintiff was forced to expend a considerable amount of time, energy and money defending himself against Defendants' false claims in court, as well as Defendant Musk's overly broad and unduly burdensome subpoenas.

619.    The Hardcore Litigation Department knew in advance that Plaintiff intended to file a demurrer in the Alameda Case on Monday, May 1, 2023, and that doing so would incur filing fees.  Defendant Cashman did not definitively answer the question as to whether the Alameda Complaint was being voluntarily dismissed until after Plaintiff's demurrer had already been filed on that day.  Even if the demurrer had not been filed, however, conducting legal research, drafting the motion for sanctions and the demurrer, and securing legal representation for Plaintiff's company took a great deal of time and money.

620.    After Plaintiff served all Defendants except Qazi with a Cross-Complaint on May 3, 2023 pursuant to the parties' mutual agreement to electronic service, Ms. Huebert sent an e-mail dated May 12, 2023 at 6:34 P.M. Pacific Time, stating in part:

> "Any previous agreement regarding electronic service—which, in any event, would have applied only to service on Mr. Musk—was extinguished with the dismissal of the action in question.  To avoid any doubt, however, we are also providing notice to you today that we affirmatively rescind any prior agreement to accept service electronically on behalf of Mr. Musk, or for any purpose with respect to the instant matter and *Hothi v. Musk*.
>
> With respect to myself and the other named defendants you reference, in the unlikely event the Court issues summonses for your defective suit, we do not agree to accept service electronically."

621.    Defendant Huebert's May 12, 2023 attempt to electronically renege on her and Defendant Musk's agreement to accept electronic service of process violated Section 128.5 of the California Code of Civil Procedure, which forbids "bad faith" "tactics" "that are frivolous or solely intended to cause unnecessary delay."  It also plainly violated Rule 3.02 of the Texas Disciplinary Rules of Professional Conduct, entitled "Minimizing the Burdens and Delays of Litigation."  This Rule explicitly states:

> "[A] client may seek to have a lawyer delay a proceeding primarily for the purpose of harassing or maliciously injuring another.  Under this Rule, a lawyer is obliged not to

> take such an action.  See also Rule 3.01.  It is not a justification that similar conduct is often tolerated by the bench and the bar.  The question is whether a competent lawyer acting in good faith would regard the course of action as having some substantial purpose other than delay undertaken for the purpose of harassing or malicious injuring."

Her conduct also violated Rule 3.27(a) of the Local Rules of the Alameda County Superior Court, which states in part:

> "Represented parties and other represented persons must participate in electronic filing (e-filing) using a court-approved electronic service provider (EFSP) and must serve and accept service electronically, except by court order or if other service is required by law."

622.    There was no legitimate reason to suddenly insist on service of process by mail or in person as of May 12, 2023 at 6:34 P.M.  Defendant Huebert's goal was to delay Plaintiff.

623.    Defendant Huebert's goal of impeding the litigation that she started with her colleagues was affirmed in her 6:58 P.M. follow-up e-mail, which stated:

> "Are you represented by counsel in this dispute?  If you are, we are not permitted to communicate with you directly, so please forward us their contact information if that's the case."

624.    Defendants continued to make false representations via e-mail in connection with the Alameda Case through at least June 14, 2023, with Defendant Huebert claiming, "there is no pending case in which you may serve discovery" and "I just received your other email, which was filtered in my spam again due to an unverified DNS associated with your email address," both of which were false statements.  In fact, the Alameda Case remained open until July 11, 2023, and as Plaintiff indicated to Defendant Huebert at the time, "I double-checked and as I thought, the plainsite.org domain does in fact have a valid DNS SPF record in place—and has the entire time that we have corresponded."

625.    Defendant Musk and his agents' and counsel's conduct was malicious and oppressive and done with a willful and conscious disregard for Plaintiff's rights, entitling Plaintiff to an award of punitive damages.

626.    With a net worth at times reportedly in excess of $200 billion, Defendant Musk is one of the wealthiest individuals on Earth and did not need to seek funds from Plaintiff or anyone to attempt to offset his potential legal liability in the *Hothi* action.

627.    Defendant Musk caused the Alameda Complaint to be filed for the improper purpose of harassing Plaintiff and harming Plaintiff financially, or in his words, to draw "blood."

628.    Defendant Musk caused the Alameda Complaint to be filed based on the libelous and unsubstantiated statements of Defendant Qazi.

629.    Defendant Qazi's language, "67 lawsuits against hundreds of victims," was echoed almost verbatim by Defendant Musk in ¶ 4 of the Alameda Complaint.

630.    Defendant Qazi obtained much of the false information he repeated against Plaintiff from Diego MasMarques, Jr., whose ComplaintsBoard post Defendant Musk cited in the 2019 e-mail conversation that was the purported basis for the Alameda Complaint.

631.    Defendant Musk caused the Alameda Complaint to be filed against Plaintiff and Plaintiff's company—even though he either believed that Plaintiff was acting independently or as an employee of his company—in order to waste Plaintiff's resources.

632.    Defendant Musk caused the Alameda Complaint to be filed in a venue where neither he nor Plaintiff resided.

633.    Defendant Musk's claims were substantively resolved in Plaintiff's favor as they were unilaterally and voluntarily dismissed by Defendant Musk just two weeks and two days after service was effective on Plaintiff, on the last possible day for Mr. Musk to avoid the filing of Plaintiff's motion for sanctions under Sections 128.7 and 1010.6 of the California Code of Civil Procedure, indicating that the reason for dismissal was substantive.

634.    Defendant Musk did not at any point reach a settlement agreement with Plaintiff.

635.    Defendant Musk and his agents' and counsel's conduct was malicious and oppressive and done with a willful disregard for Plaintiff's rights, entitling Plaintiff to an award of punitive damages.

### COUNT XV
### Professional Negligence
### Against Defendants Musk, Singer Cashman, LLP, Cashman, Huebert and Mehes

636.    Plaintiff incorporates by reference the foregoing allegations.

637.    The Hardcore Litigation Department and its client, Defendant Musk, owe a duty

of the care to any court they file in and/or to any tribunal before which they appear.

638.    Defendant Musk and the Hardcore Litigation Department were grossly negligent and acted with reckless disregard in preparing and filing the Alameda Complaint.

639.    In preparing the Alameda Complaint, Defendant Musk and the Hardcore Litigation Department relied on a combination of incorrect data from Google searches; false, unverified statements that originated on a Wikipedia page that redirects from "Aaron Greenspan;" at least one court decision based on a material typographical error sourced from https://wiki.answers.com; and conspiratorial allegations passed through Defendant Qazi that originated with a convicted murderer with a documented history of mental illness.

640.    Defendant Musk is a known associate of eugenicists, child molesters, and sex traffickers Jeffrey E. Epstein (deceased) and Ghislaine Maxwell, both convicted felons—a fact about which he has lied in public repeatedly.  Defendant Musk also used Defendant Birchall as an intermediary to pay a British convicted felon $50,000 for false information.  *See* https://www.buzzfeed.com/ryanmac/elon-musk-hired-felon-james-howard-higgins-dirt-pedo-guy.  Given this history, the Hardcore Litigation Department had an obligation to ensure that Musk was not again relying on or paying for false information from yet another convicted felon.

641.    Defendant Musk himself distrusts Wikipedia.  On July 29, 2022, he posted "Wikipedia is losing its objectivity @jimmy_wales" on his @elonmusk Twitter account.

642.    The Alameda Complaint is replete with indicia of overall gross negligence:

a)  The Alameda Complaint falsely states that Plaintiff lives and works in Mountain View—information that was eight years out of date—even though Plaintiff's filings in the Northern District of California from 2020 onward, dozens in all, and all in the possession of Musk's counsel, state on the first page of every document that Plaintiff lives and works in San Francisco.

b)  The footer in the Alameda Complaint stated that it is the "COMPLAINT OF DEFENDANT ELON MUSK," even though Defendant Musk is the plaintiff in that filing because defendants are not filers of complaints by definition, as

should be obvious to any attorney. The Hardcore Litigation Department was so sloppy when preparing the Alameda Complaint that all of its members apparently forgot to change the footer from their rejected proposed cross-complaint, where Elon Musk was the defendant.

    c)   Heading I(A)(1) in the Alameda Complaint, "1. Greenspan's Association With $TSLAQ," is orphaned. There is no subsequent heading I(A)(2).

643.    These errors and the substantive issues with the Alameda Complaint did not phase the Hardcore Litigation Department because they all exhibited reckless disregard for the truth, and because their primary goal was not to achieve any sort of justice involving Plaintiff, but simply to further smear his reputation and harass him.

644.    The errors and substantive issues with the Alameda Complaint have harmed and will continue to harm Plaintiff by providing a permanent record of damaging, false information that many, if not most, readers—including attorneys—will assume to be true.

645.    As an entrepreneur in Silicon Valley, the existence of such false records and the associated false allegations coming from a notable billionaire is likely to preclude Plaintiff from being able to raise the same type of venture capital funding that Plaintiff's peers have been able to secure, and which at one point was necessary for Defendant Musk to launch his own career.

646.    The existence of such false records impacted Plaintiff's ability to secure legal representation.

647.    Defendant Musk and his agents' and counsel's conduct was malicious and oppressive and done with a willful and conscious disregard for Plaintiff's rights, entitling Plaintiff to an award of punitive damages.

**COUNT XVI**
**Unjust Enrichment**
**Against Defendants Qazi and Smick**

648.    Plaintiff incorporates by reference the foregoing allegations.

649.    Defendants Qazi and Smick earned an unjust benefit from the Atlanteca Enterprise in an amount of at least $6,206.00 due to their unlawful conduct regarding Plaintiff.

650.    Defendants Qazi and/or Smick earned an unjust benefit from Google AdSense banner advertising placed on web pages containing libelous statements about Plaintiff.

651.    Defendants Qazi and/or Smick earned an unjust benefit from the Tesla referral program.

652.    On the basis of his hundreds of libelous statements about Plaintiff and false statements about *Greenspan I*, Defendants Qazi and/or Smick unfairly raised over $150,000 in donations from fans of Defendants Musk and Tesla to mount a bad-faith defense against Plaintiff in *Greenspan I*, which ultimately failed to dismiss all of Plaintiff's claims with prejudice.

653.    On December 12, 2023, Defendant Qazi posted on Twitter,

"Today, the majority of my income actually comes from social media, with only a minority coming from software development.

Huge thanks to the X team for making this possible. My income comes from advertising revenue share on X and YouTube, $3 a month X subscriptions from people who like my content, tips from my X profile, and sponsorships from companies who want me to help get the word out about their product or service…

Some people have said recently that I have too much money, so people shouldn't support Whole Mars…

You might not think social media is a serious job and laugh at me and call me pathetic but this is the primary way I feed myself and take care of basic needs. My parents didn't take it seriously either until they saw that there was real interest from sponsors and meaningful ad revenue share."

*See* https://x.com/WholeMarsBlog/status/1734429337682940309.  All of Defendant Qazi's stated "income" is derived from libeling Plaintiff and fraud harming Plaintiff.

654.    Plaintiff is entitled to restitution plus interest.

### COUNT XVII
**Violation of Unfair Competition Law (California Business and Professions Code § 17200) Against Defendants Qazi and Smick**

655.    Plaintiff incorporates by reference the foregoing allegations.

656.    Plaintiff and Defendants Qazi and Smick compete in the field of news distribution and software development.

657.    Defendant Qazi harmed Plaintiff by unlawfully impersonating his family

members.

658.     On June 4, 2022, on behalf of Defendants Musk and Tesla, Defendant Qazi wrote from his @WholeMarsBlog Twitter account, "Greenspan and the directors of his fraudulent charity @Plainsite must reimburse Qazi $200k in fees + $1 million of damages or they will face a countersuit." In sum, Defendant Qazi demanded $1.2 million from Plaintiff to avoid a frivolous lawsuit.

659.     Defendant Qazi posted screenshots of correspondence with Defendant Musk and his attorney, Defendant Alex Spiro, involving at least one planned lawsuit against Plaintiff.

660.     An unknown individual purporting to work for Quinn Emanuel on behalf of Defendant Musk contacted Plaintiff's father at his home in 2020.

661.     Plaintiff interpreted Defendant Qazi's extortionate threat to be serious.

662.     Plaintiff refused to pay Defendant Qazi $1.2 million.

663.     Defendant Qazi's conduct was unlawful in violation of California Penal Code § 524, "Attempted Extortion."

664.     Defendant Musk attempted to file the Alameda Case against Plaintiff approximately six months later, and persisted in filing it even after his initial motion for leave to file was denied.

665.     Plaintiff incurred court costs in excess of $450.00 to defend against the frivolous lawsuit threatened by Defendant Qazi and actually filed by Defendant Musk, not including the additional costs of filing related claims.

666.     Plaintiff incurred PACER and state court fees for legal research related to the Alameda Complaint's baseless claims and Defendants' campaign of defamation and harassment.

667.     Plaintiff's company incurred legal fees and court costs of over $1,000.00 to defend against the frivolous lawsuit threatened by Mr. Qazi and filed by Mr. Musk.

668.     Plaintiff's company's finances pass through to his personal tax return as his company is a Subchapter S corporation.

669.     Defendant Musk and his agents' and counsel's conduct was malicious and

oppressive and done with a willful and conscious disregard for Plaintiff's rights, entitling Plaintiff to an award of punitive damages.

<div align="center">

**COUNT XVIII**

**Violation of Unfair Competition Law (California Business and Professions Code § 17200) Against Defendants Musk, Tesla, Singer Cashman, LLP, Cashman, Huebert, Mehes and Spiro**

</div>

670.    Plaintiff incorporates by reference the foregoing allegations.

671.    Defendants engaged in unlawful and unfair business practices intended to artificially inflate Tesla's reported profits.

672.    Plaintiff has lost money due to Defendant Tesla's persistent perjury, which was intended to artificially inflate Tesla's reported profits.  Defendant Musk and/or Representatives of Defendant Tesla perjured themselves in violation of California Penal Code § 118 when:

a) Defendant Musk falsely stated under oath during his June 1, 2019 deposition in Delaware Court of Chancery Case No. 12711-VCS that he was "sure [he] thought it was correct" that "SolarCity [was] headed to cash flow positive situation for the next three to six months at the outside" even as it was drowning in losses and debt.  When warned about "penalty of perjury," Musk responded by saying, "This is unreasonable" and "you just keep trying to ask all of these tricky questions."  *See* https://www.plainsite.org/dockets/download.html?id=289302298&a=3&z=f7555350 at 161-165.  Musk used the phrase "I don't recall" at least 65 times.  Musk also falsely claimed that he believed Tesla's "growth of megawatts deployed would be very significant" even as he intended to and then did assign virtually all of SolarCity's employees to work on the Model 3.  *Id*. at 37.

b) Mark Olson, former Tesla Senior Director, U.S. Tax, submitted false and incomplete application materials to CAEATFA under penalty of perjury when he responded "None" to a question that required him to "Disclose any legal or regulatory action or investigation that may have a material impact on the

financial viability of the project or the Applicant."

    c)  When Tesla applied to start a regulated insurance company with the California Department of Insurance, under penalty of perjury an unknown employee answered the question "Has the business entity or any of its partners, members, controlling persons, officers, directors, managers or any shareholders owning 10% or more interest in the business entity, ever been notified by any jurisdiction to which you are applying of any delinquent tax obligation that is not the subject of a repayment agreement?" by checking "No." Tesla was sued for failing to pay taxes on March 10, 2017. See *County of Orange, Treasurer-Tax Collector v. Tesla Inc*, Superior Court of California for the County of Orange, Case No. 30-2017-00909290-SC-SC-CJC.

    d)  On the same California Department of Insurance application, under penalty of perjury an unknown employee answered, "Has the business entity or any of its partners, members, controlling persons, officers, directors, managers or any share- holders owning 10% or more interest in the business entity, a party to, or ever been found liable in any lawsuit or arbitration proceeding involving allegations of fraud, misappropriation or conversion of funds, misrepresentation or breach of fiduciary duty?" by checking "No." Elon Musk and Tesla, Inc. were sued for securities fraud by the SEC and settled the case, after which Musk was charged with contempt of court for violating the agreement. Separately, Musk admitted that he concocted a "bait and switch" scheme involving Roadster deposits, and Kimbal Musk admitted that Elon had misappropriated Roadster deposit funds.

673.    Defendants Musk and Tesla encouraged Tesla employee Vivien Hantusch to post promotional materials on her nominally-independent @flcnhvy Twitter account without any disclaimers explaining her formal business relationship with Tesla, in violation of the FTC Act.

674.    Defendants Tesla has willfully violated 16 C.F.R. § 465 on an ongoing basis

through its FSD EAP.

675.    Defendant Tesla has willfully violated of California Vehicle Code §§ 24011.5 and 11713 on an ongoing basis through its marketing of "Autopilot" and FSD.

676.    Defendant Spiro unlawfully represented Defendants Musk and Tesla in California, where he is unlicensed, in violation of California Business and Professions Code § 6125, including in *Greenspan I*.

677.    Defendants Singer Cashman, LLP, Cashman, Huebert and Mehes willfully violated Section 128.5 of the California Code of Civil Procedure, Rule 3.2 of the California Rules of Professional Conduct, Rule 3.02 of the Texas Disciplinary Rules of Professional Conduct, and Rule 3.27(a) of the Local Rules of the Alameda County Superior Court.

678.    Defendants Singer Cashman, LLP, Cashman, Huebert, Mehes, and Spiro have willfully violated Rule 3.3 of the California Rules of Professional Conduct and Rule 3.03 of the Texas Disciplinary Rules of Professional Conduct on an ongoing basis.

679.    Plaintiff spent money on PACER fees for legal research as a consequence of Defendant Spiro's unlicensed practice of law.

680.    Plaintiff spent hundreds of dollars on fees for service of process that, but for Defendants' violations of law, would have been unnecessary.

681.    Plaintiff suffered a monetary loss of at least $60,000.00 due to Defendants' myriad violations of law and unfair business practices.

682.    Defendants' conduct was malicious and oppressive and done with a willful and conscious disregard for Plaintiff's rights, entitling Plaintiff to an award of punitive damages.

**COUNT XIX**
**False Advertising (California Business and Professions Code § 17500)**
**Against Defendants Musk, Tesla and X Corp.**

683.    Plaintiff incorporates by reference the foregoing allegations.

684.    Defendants engaged in false advertising with regard to Tesla "Autopilot," FSD, "robotaxis," and numerous other products and topics.

685.    On July 17, 2024, Defendant Musk wrote on Twitter,

"X is a free speech platform that aspires to give equal voice to all, within the bounds of the law."

and

"You can do anything on this platform that doesn't violate or probably violate the law." These statements were and are false. At all times, Plaintiff's use of Twitter fell well "within the bounds of the law," and did not "violate the law," yet Plaintiff's @PlainSite and @AaronGreenspan accounts were suspended.

686.    On August 27, 2024, Defendant Musk wrote on Twitter,

"Just want to reiterate that this platform really is meant to support all viewpoints within the bounds of the laws of countries, even those of people with whom I vehemently disagree and personally dislike.

If that doesn't seem to be happening, please yell at me (ideally on X)."

This statement was and is false. At all times, Plaintiff's use of Twitter fell well "within the bounds of the laws of countries," yet Plaintiff's @PlainSite and @AaronGreenspan accounts were suspended because Plaintiff is a person that Defendant Musk "personally dislike[s]."

## COUNT XX
### Declaratory Judgment
### Against Defendants Singer Cashman, LLP, Cashman, Huebert and Mehes

687.    Plaintiff incorporates by reference the foregoing allegations.

688.    The Declaratory Judgment Act provides that in "a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

689.    After May 1, 2023, even after the Alameda Case had been voluntarily dismissed, Defendants Singer Cashman, LLP, Cashman, Huebert and Mehes asserted that a cross-claim could not be filed against them for malicious prosecution.

690.    Pursuant to California precedent, victims of malicious prosecution must presently file a separate civil suit after the conclusion of the underlying suit in the victim's favor.

691.    Under California law, a filing fee is due both for the plaintiff at the time of filing,

and for each defendant at the time that a first responsive pleading is filed.

692.    Thus, California's fee schedule and prohibition on filing a cross-claim for malicious prosecution in the same malicious action violates the victim's due process rights by requiring the victim to pay a filing fee twice: first to first *respond* to the malicious lawsuit, and then *again* to file the claim for malicious prosecution.

693.    Plaintiff seeks a Declaratory Judgment clarifying that the Fifth Amendment forbids such an arrangement and that California courts must retain limited jurisdiction after a malicious lawsuit has been dismissed in the victim's favor to hear any potential cross-claim for malicious prosecution, just as California courts retain jurisdiction to hear any motion for attorney's fees and/or costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.  Judgment against Defendants on all counts of the First Amended Complaint;

B.  A permanent injunction enjoining all Defendants from making further libelous statements, contacting Plaintiff or his family, impersonating others, and requiring the immediate cessation of the operation of Defendant Qazi's and/or Smick's websites regarding Plaintiff;

C.  Recovery from all Defendants of damages, including pre-judgment interest Plaintiff sustained and will sustain, and any income, gains, profits, and advantages obtained by Defendants as a result of their unlawful, unfair, fraudulent and deceptive acts alleged hereinabove, in an amount not yet known, to be assessed at the time of trial;

D.  Treble damages pursuant to 18 U.S.C. § 1964(c);

E.  Actual and punitive damages, including costs and attorneys' fees (should Plaintiff engage counsel);

F.  Compensatory, consequential and punitive damages resulting from Defendant's violation of California Civil Code §§ 1708.7 and 3294;

G.  Plaintiff's reasonable costs and expenses of this action, including any attorneys' fees

and costs (should Plaintiff engage counsel), in accordance with applicable law;

H.  Such equitable/injunctive or other relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury for all issues so triable.

Dated: August 28, 2024

Aaron Greenspan
956 Carolina Street
San Francisco, CA  94107-3337
Phone: +1 415 670 9350
Fax: +1 415 373 3959
E-Mail: aaron.greenspan@plainsite.org