1  Kenneth M. Trujillo-Jamison (Bar No. 280212)
   ktrujillo-jamison@willenken.com
2  Kirby Hsu (Bar No. 312535)
   khsu@willenken.com
3  WILLENKEN LLP
   707 Wilshire Blvd., Suite 3850
4  Los Angeles, California 90017
   Telephone:  (213) 955-9240
5  Facsimile:  (213) 955-9250
6
7  Attorneys for Defendant X Corp.

8                    UNITED STATES DISTRICT COURT
9                   NORTHERN DISTRICT OF CALIFORNIA
10
11
   AARON GREENSPAN,                    | Case No.: 3:24-cv-04647-MMC
12
                                       | The Hon. Maxine M. Chesney
13        Plaintiff,
                                       | **DEFENDANT X CORP.'S NOTICE OF**
14                                     | **MOTION AND MOTION TO STRIKE**
   v.                                  | **OR, ALTERNATIVELY, DISMISS**
15                                     | **PLAINTIFF'S CLAIMS AGAINST X**
                                       | **CORP. ASSERTED IN THE AMENDED**
16 ELON MUSK, TESLA, INC., X CORP., THE | **COMPLAINT; MEMORANDUM OF**
   ELON MUSK REVOCABLE TRUST DATED     | **POINTS AND AUTHORITIES**
17 JULY 22, 2003, EXCESSION, LLC, JARED |
   BIRCHALL, MORGAN STANLEY &          |
18 COMPANY, LLC, OMAR QAZI, SMICK      | Date:       January 17, 2025
   ENTERPRISES, INC., SINGER CASHMAN,  | Time:       9:00 a.m.
19 LLP, ADAM S. CASHMAN, ALLISON       | Ctrm:       7
   HUEBERT, ADAM G. MEHES, and ALEX    |
20 SPIRO,                              | State Action Filed:  June 12, 2024
21        Defendants.                  | Removed to Fed. Court: July 31, 2024
22
23
24
25
26
27
28

1

# <u>TABLE OF CONTENTS</u>

2
<u>Page</u>

3   I.      INTRODUCTION ........................................................................................... 1

4   II.     FACTUAL BACKGROUND.......................................................................... 3

5           A.      Plaintiff Is Bound by X's Terms of Service.................................... 3

            B.      X's Terms of Service Disclaim Liability for Third-Party Content ...... 3

6           C.      X's Terms of Service Allow X To Suspend Users for Any or No Reason,
                    Without Liability to the User .......................................................... 4
7
    III.    LEGAL STANDARD .................................................................................... 5
8
    IV.     ARGUMENT ................................................................................................. 6
9
            A.      Plaintiff's Claims Against X Are Subject to California's Anti-SLAPP Law ..... 6

            B.      Plaintiff Fails to State a Claim Upon Which Relief Can Be Granted ................... 7
10
                    1.      Section 230 Bars Plaintiff's Claims Against X ........................ 7
11
                    2.      The First Amendment Independently Bars Plaintiff's Claims ................. 12
12
                    3.      Plaintiff's Claims Are Independently Barred by X's Terms of
                            Service.......................................................................... 13
13
                    4.      Plaintiff Fails to Plausibly Allege Any Cause of Action ....................... 14
14
                            a.      RICO: 8 USC § 1962(c) ............................................. 15
15
                            b.      RICO: 18 USC §§ 1962(a) and (d)............................. 19
16
                            c.      Defamation.................................................................. 20

                            d.      California Business & Professions Code § 17500 ...................... 22
17
    V.      CONCLUSION............................................................................................. 25

18

19

20

21

22

23

24

25

26

27

28

DEF. X CORP.'S MOTION TO STRIKE OR, ALTERNATIVELY, DISMISS CLAIMS AGAINST X CORP.

1

## <u>TABLE OF AUTHORITIES</u>

2

Page(s)

3

**Cases**

4    *Abhari v. Victory Park Capital Advisors*,
     No. CV 20-05734 PA, 2020 WL 7346676 (C.D. Cal. Nov. 16, 2020) ................................... 19

5    *Aniel v. PHH Mortg. Corp.*,
     No. 4:21-cv-6071-YGR, 2022 WL 2164702 (N.D. Cal. June 1, 2022) ........................... 15, 16
6

7    *Ashcroft v. Iqbal*,
     556 U.S. 662 (2009) ........................................................................................................... 5

8    *Bartholomew v. YouTube, LLC*,
     17 Cal. App. 5th 1217 (6th Dist. 2017) ......................................................................... 21, 22
9

10   *Bass v. Facebook, Inc.*,
     394 F. Supp. 3d 1024 (N.D. Cal. 2019) ............................................................................... 14

11   *BMA LLC v. HDR Global Trading Ltd.*,
     No. 20-cv-03345-WHO, 2021 WL 949371 (N.D. Cal. March 12, 2021) .............................. 15
12

13   *Brittain v. Twitter, Inc.*,
     No. 19-cv-00114-YGR, 2019 WL 2423375 (N.D. Cal. June 10, 2019) ........................... 8, 11

14   *Brown v. Madison Reed, Inc.*,
     No. 21-cv-01233-WHO, 2021 WL 3861457 (N.D. Cal. Aug. 30, 2021) .............................. 24
15

16   *Bryant v. Lowe's Home Centers, LLC*,
     No. 22-16586, 2023 WL 8797886 (9th Cir. Dec. 20, 2023) ................................................. 20

17   *Castillo v. Prime Hydration LLC*,
     No. 23-cv-03885-AMO, 2024 WL 4133815 (N.D. Cal. Sep. 9, 2024) ........................... 24, 25
18

19   *Club Members for an Honest Election v. Sierra Club*,
     45 Cal. 4th 309 (2008) ......................................................................................................... 6

20   *CoreCivic, Inc. v. Candide Grp., LLC*,
     No. C 20-03792 WHA, 2022 WL 16823696 (N.D. Cal. Nov. 8, 2022) .................................. 5
21

22   *Coronavirus Reporter v. Apple, Inc.*,
     85 F.4th 948 (9th Cir. 2023) ............................................................................................... 15

23   *Cross v. Facebook, Inc.*,
     14 Cal. App. 5th 190 (1st Dist. 2017) .................................................................................... 7
24

25   *Darnaa, LLC v. Google Inc.*,
     236 F. Supp. 3d 1116 (N.D. Cal. 2017) ............................................................................... 13

26   *Darnaa, LLC v. Google LLC*,
     756 F. App'x 674 (9th Cir. 2018) ........................................................................................ 13
27

28   *Elansari v. Meta, Inc.*,
     2022 WL 4635860 (E.D. Pa. Sept. 30, 2022) ...................................................................... 11

*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC.*,
    521 F.3d 1157 (9th Cir. 2008).............................................................................................. 11

*FilmOn.com Inc. v. DoubleVerify Inc.*,
    7 Cal. 5th 133 (2019)............................................................................................................ 7

*Glair v. Nat'l Evaluation Servs.*,
    No. CV-08-2685, 2009 WL 10672610 (C.D. Cal. Apr. 27, 2009) ...................................... 14

*Greenspan v. MasMarques*,
    No. 23-cv-10134-DJC, 2024 WL 1258062 (D. Mass. Mar. 25, 2024) ................................ 22

*Hassell v. Bird*,
    5 Cal. 5th 522 (Cal. 2018)................................................................................................ 8, 12

*In re Bang Energy Drink Mktg. Litig.*,
    No. 18-cv-05758-JST, 2020 WL 4458916 (N.D. Cal. Feb. 6, 2020).................................. 24

*Jones v. Twitter, Inc.*,
    2020 WL 6263412 (D. Md. Oct. 23, 2020) ...................................................................... 12

*Kesiraju v. Makker*,
    No. CV 23-9298-CBM-RAOx,
    2024 U.S. Dist. LEXIS 44714 (C.D. Cal. Mar. 12, 2024)........................................... 19, 20

*King v. Facebook, Inc.*,
    No. 19-CV-01987-WHO, 2019 WL 4221768 (N.D. Cal. Sept. 5, 2019)............. 5, 6, 8, 9, 11

*La'Tiejira v. Facebook, Inc.*,
    272 F. Supp. 3d 981 (S.D. Tex. 2017)................................................................................ 6

*LegalForce RAPC Worldwide, P.C. v. Trademark Info. Int'l LLC*,
    No. 17-cv-07354-MMC (N.D. Cal. May 25, 2018) ............................................................ 25

*Lewis v. YouTube, LLC*,
    244 Cal. App. 4th 118 (6th Dist. 2015) ....................................................................... 13, 14

*Low v. LinkedIn Corp.*,
    900 F. Supp. 2d 1010 (N.D. Cal. 2012)........................................................................ 23, 24

*Manriquez v. J.B. Hunt Transp., Inc.*,
    No. 22-CV-03060-SK, 2022 WL 20509212 (N.D. Cal. Apr. 13, 2022) ............................. 18

*Martinez v. Extra Space Storage, Inc.*,
    No. C 13-00319 WHA, 2013 WL 1390412 (N.D. Cal. Apr. 4, 2013) ................................. 19

*Masin v. Vistakon Pharms.*,
    No. 3:08-cv-00550-RCJ-VPC, 2010 WL 11594971 (D. Nev. June 14, 2010)...................... 18

*Moody v. NetChoice, LLC*,
    No. 22-277, 2024 WL 3237685 (U.S. July 1, 2024) ...................................................... 7, 13

*Morton v. Twitter, Inc.*,
    CV 20-10434-GW-JEMx, 2021 WL 1181753 (C.D. Cal. Feb. 19, 2021) ........................... 8, 9

*Murphy v. Twitter, Inc.*,
  60 Cal. App. 5th 12 (1st Div. 2021) .............................................................. 8, 9, 11, 12, 13, 14

*New Show Studios, LLC v. Needle*,
  No. 2:14-cv-01250, 2016 WL 5213903 (C.D. Cal. Sep. 20, 2016) ...................................... 22

*O'Handley v. Padilla*,
  579 F. Supp. 3d 1163 (N.D. Cal. 2022) ....................................................................... 6, 7, 13

*O'Handley v. Weber*,
  62 F.4th 11454 (9th Cir. 2023) ............................................................................................ 6

*Riegman v. San Mateo Cnty.*,
  No. 20-CV-09303-JST, 2021 WL 11636100 (N.D. Cal. Aug. 23, 2021) .............................. 20

*Scoggins v. HSBC Bank United States*,
  No. CV 15-01328 SJO (SSx), 2015 WL 12670410 (C.D. Cal. Oct. 8, 2015) ....................... 19

*Sikhs for Just., Inc. v. Facebook, Inc.*,
  697 F. App'x 526 (9th Cir. 2017) ......................................................................................... 11

*Sikhs for Just."SFJ", Inc. v. Facebook, Inc*,
  144 F. Supp. 3d 1088 (N.D. Cal. 2015) ................................................................................ 11

*Simon v. Seaworld Parks & Entm't, Inc.*,
  No. 3:21-cv-1488-LL-MSB, 2022 WL 1594338 (S.D. Cal. May 19, 2022) .................... 23, 24

*Sterling Park, LLC v. Axos Fin., Inc.*,
  No. 21-CV-01347 W (BLM), 2022 WL 935194 (S.D. Cal. Mar. 29, 2022) .................... 17, 18

*Unknown Parties v. Google LLC*,
  No. 23-CV-05523-VC, 2024 WL 1892291 (N.D. Cal. Apr. 29, 2024) .............................. 9, 10

*Vaughan v. Wardhaugh*,
  No. 23-cv-02879-RFL, 2024 WL 2853972 (N.D. Cal. May 10, 2024)................................. 16

*Young v. Facebook, Inc.*,
  No. 5:10-CV-03579-JF/PVT, 2010 WL 4269304 (N.D. Cal. Oct. 25, 2010) ...................... 14

*Yuksel v. Twitter, Inc.*,
  No. 22-CV-05415-TSH,
  2022 WL 16748612 (N.D. Cal. Nov. 7, 2022) ...................................... 8, 9, 10, 11, 12, 14, 15

*Zhang v. Twitter Inc.*,
  No. 23-CV-00980-JSC, 2023 WL 5493823 (N.D. Cal. Aug. 23, 2023) ......................5, 20, 22

**Statutes**

18 USC § 1962(a) ...................................................................................................................... 19

18 USC § 1962(c) ................................................................................................................ 15, 19

18 USC § 1962(d) ................................................................................................................ 19, 20

47 U.S.C. § 230 ........................................................................... 2, 7, 8, 10, 11, 12, 14

47 U.S.C. § 230(c)(1) ........................................................................................... 7, 8, 9

47 U.S.C. § 230(f)(2) ..................................................................................................... 8

47 U.S.C. § 230(f)(3) ..................................................................................................... 9

Cal. Code Civ. P. § 45a(4)(b) ...................................................................................... 22

Cal. Code Civ. P. § 48a .............................................................................................. 22

Cal. Code Civ. P. § 425.16 ............................................................................................ 1

Cal. Code Civ. P. § 425.16(b) ....................................................................................... 5

Cal. Code Civ. P. § 425.16(e)(4) ................................................................................... 6

Cal. Bus. & Profs. Code § 17500 ........................................................................... 22, 23

**Rules**

Fed. R. Civ. P. 8 ............................................................................................................ 1

Fed. R. Civ. P. 9(b) ........................................................................................... 1, 15, 23

Fed. R. Civ. P. 12(b)(6) ............................................................................................ 1, 5

1

**NOTICE OF MOTION AND MOTION TO STRIKE OR, ALTERNATIVELY,
DISMISS PLAINTIFF'S CLAIMS AGAINST X CORP.
ASSERTED IN THE AMENDED COMPLAINT**

2

3     PLEASE TAKE NOTICE that, on January 17, 2025, at 9:00 a.m., or as soon thereafter as

4   the matter may be heard, this Motion to Strike or, Alternatively, Dismiss Plaintiff's Claims

5   Against X Corp. Asserted in the Amended Complaint[1] under Federal Rules of Civil Procedure

6   12(b)(6), 8, and 9(b), and California Code of Civil Procedure § 425.16 (the "Motion"), brought

7   by Defendant X Corp. ("X"), will be heard. This Motion is based on this Notice of Motion and

8   the Memorandum of Points and Authorities below, as well as X's Request for Judicial Notice,

9   and the Declaration of Kenneth M. Trujillo-Jamison, filed concurrently. X also joins the

10   arguments submitted in connection with Tesla's Motion to Strike and Morgan Stanley's Motion

11   to Dismiss and incorporates them by reference herein.

12                          **STATEMENT OF REQUESTED RELIEF**

13     X requests that the Court strike Plaintiff's claims against X Corp. asserted in the

14   Amended Complaint or, alternatively, dismiss those claims with prejudice.

15                          **MEMORANDUM OF POINTS AND AUTHORITIES**

16   **I.    INTRODUCTION**

17     Plaintiff's Amended Complaint makes one thing clear: Plaintiff's claims have nothing to

18   do with X (formerly Twitter). Like his initial Complaint, the 160-page Amended Complaint is

19   notably light on allegations against X. That is not surprising: the Amended Complaint largely

20   repeats the same allegations Plaintiff asserted in a previous action in this Court brought against

21   only Tesla, Elon Musk, Omar Qazi, and Smick Enterprises, Inc., which was dismissed by this

22   Court and affirmed by the Ninth Circuit.

23     The Amended Complaint alleges five causes of action against X (Counts I-III (RICO), XI

24   (Defamation), and XIX (False Advertising)). Like in the initial Complaint, those claims, reduced

25

26   _____

[1] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in
Defendants Tesla, Excession, Huebert, Musk, Singer Cashman LLP, Cashman, and Mehes's
27   Memorandum of Law in Support of Their Motion to Strike or Dismiss the Amended Complaint
("Tesla's Motion to Strike"). Morgan Stanley & Company, LLC's Motion to Strike or Dismiss is
28   referred to herein as "Morgan Stanley's Motion to Strike."

DEF. X CORP.'S MOTION TO STRIKE OR, IN THE ALTERNATIVE, DISMISS CLAIMS AGAINST X CORP.

1    to their core, attempt to hold X liable for (a) content posted on X's platform by third parties

2    supportive of Tesla or critical of Plaintiff; or (b) X's suspension of Plaintiff from the platform on

3    June 13, 2023. Although the Amended Complaint is lengthy, Plaintiff's allegations against X are

4    sparse. Plaintiff alleges that: X runs a social media platform used by millions of users; Plaintiff

5    and certain third parties (not X) discussed Tesla and each other on the X platform for years; X

6    paid thousands of users for their posts based on neutral criteria through X's Creator Ad Revenue

7    Sharing Program; and X suspended Plaintiff from its social media platform on June 13, 2023.

8    Those limited, generalized allegations target X's editorial decisions concerning the content and

9    users on the X platform and are insufficient to state any of Plaintiff's far-fetched claims against

10   X, much less allege that X was part of a sprawling conspiracy. As explained in greater detail

11   below, Plaintiff's claims against X fail for several, independent reasons and should be stricken

12   under California's anti-SLAPP law or, alternatively, dismissed with prejudice.

13       *First*, Section 230 of the Communications Decency Act, 47 U.S.C. § 230 ("Section

14   230"), bars Plaintiff's claims. Section 230 immunizes X from claims, including those alleged

15   here, that seek to hold it liable for information shared by third-party users of its platform and for

16   content moderation decisions, including decisions to suspend users.

17       *Second*, Plaintiff's claims are barred by the First Amendment, which likewise protects

18   X's editorial decisions, including the speech it allows to be disseminated on its platform, who it

19   allows to engage in that speech on its platform, and how X enforces its terms of service (the

20   "Terms of Service" or "TOS") and other policies.

21       *Third*, Plaintiff's claims are barred by X's Terms of Service, to which Plaintiff repeatedly

22   agreed, which provide that: (a) X "disclaims all responsibility and liability" for third-party

23   content on its platform, and (b) X may "suspend or terminate" accounts on its platform "at any

24   time for any reason or no reason" and "without liability to" the user.

25       *Finally*, Plaintiff fails to plausibly allege *any* of his causes of action against X. Plaintiff

26   fails to allege his few claims against X based on minimal and conclusory allegations.

27       Accordingly, Plaintiff's claims against X should be stricken under California's anti-

28   SLAPP law or, alternatively, dismissed with prejudice.

## II.  **FACTUAL BACKGROUND**

X incorporates the facts set forth in Tesla's Motion to Strike and Morgan Stanley's Motion to Dismiss. It includes the following additional factual background specific to X.

### A.    **Plaintiff Is Bound by X's Terms of Service**

Plaintiff created @PlainSite and @AaronGreenspan, the Twitter accounts at issue in the Amended Complaint, in October 2011 and January 2012, respectively. (*See* X Ex. A at 2;[2] X Ex. B at 2; AC ¶ 19.) When he created the accounts, Plaintiff necessarily agreed to be bound by Twitter's Terms of Service to use the platform. (X Ex. C at 2 (October 2011 sign-up page); X Ex. D at 2 (January 2012 sign-up page).)

Twitter's Terms of Service effective in October 2011 and January 2012 provided that "[b]y accessing or using the [platform] [the user] agree[s] to be bound by these Terms" of service. (X Ex. E at 1 (TOS effective June 1, 2011).) The Terms of Service further provided that Twitter "may revise these Terms [of service] from time to time" and that a user is "bound by the revised Terms." (X Ex. E at 5-6.)

Plaintiff alleges that X suspended his accounts on June 13, 2023. (AC ¶¶ 27, 536.) As of that date, the Terms of Service provided that by continuing to use the platform, each user was bound by the platform's Terms of Service. (X Ex. F at 2 (TOS effective May 18, 2023) ("By using the Services you agree to be bound by these Terms.").) Plaintiff also concedes that by using the platform, he was subject to the applicable Terms of Service. (Complaint ¶ 314 ("Twitter, Inc.'s contract with Plaintiff as a user of the Twitter social networking platform").)[3]

### B.    **X's Terms of Service Disclaim Liability for Third-Party Content**

The Terms of Service in effect at all times relevant to the allegations in the Amended

---

[2] Citations to an X Exhibit ("X Ex. _") refer to the exhibits submitted in connection with this motion, X's Request for Judicial Notice, and attached to the Declaration of Kenneth M. Trujillo-Jamison in Support of Defendant X Corp.'s Request for Judicial Motion to Strike or, Alternatively, Dismiss Plaintiff's Claims Against X Corp. Asserted in the Amended Complaint, filed concurrently.

[3] The Terms of Service also incorporate relevant platform rules and policies—first, the "Twitter Rules" and later, the "X Rules"—and explain that X may suspend users for "violat[ing]" those rules.  (X Ex. F at 1, 9; X Ex. G at 4, 11 (Current TOS effective September 29, 2023).)

Complaint provide that X cannot be held liable for third-party content on the platform. The Terms of Service in effect on June 13, 2023 (the date of Plaintiff's suspension) provide that third-party content on X was the "sole responsibility of the person who originated such Content," that X "cannot take responsibility for such Content," and that X "disclaims all responsibility and liability" based on "the completeness, accuracy . . . or reliability of . . . any Content":

> Any use or reliance on any Content or materials posted via the Services or obtained by you through the Services <u>is at your own risk</u>. <u>We do not endorse, support, represent or guarantee the completeness, truthfulness, accuracy, or reliability of any Content</u> or communications posted via the Services or endorse any opinions expressed via the Services. You understand that by using the Services, you may be exposed to Content that might be offensive, harmful, inaccurate or otherwise inappropriate, or in some cases, postings that have been mislabeled or are otherwise deceptive. <u>All Content is the sole responsibility of the person who originated such Content</u>. We may not monitor or control the Content posted via the Services and, <u>we cannot take responsibility for such Content</u>. . . . <u>Your access to and use of the Services or any Content are at your own risk</u>. You understand and agree that the Services are provided to you on an "AS IS" and "AS AVAILABLE" basis. . . . The Twitter Entities make no warranty or representation and <u>disclaim all responsibility and liability for: (i) the completeness, accuracy, availability, timeliness, security or reliability of the Services or any Content</u> . . . .

(X Ex. F at 3, 9-10 (emphasis added); *see also* X Ex. G at 5, 11-12 (current TOS effective September 29, 2023); X Ex. H at 2-3, 8-9 (TOS effective May 25, 2018); X Ex. I at 2-3, 9 (TOS effective January 1, 2020); X Ex. J at 2-3, 9-10 (TOS effective June 18, 2020); X Ex. K at 2-3, 9-10 (TOS effective August 19, 2021); X Ex. L at 3, 9-10 (TOS effective June 10, 2022).)

## C. X's Terms of Service Allow X To Suspend Users for Any or No Reason, Without Liability to the User

The X Terms of Service also provided X at all times with broad rights to "suspend or terminate" accounts on its platform "at any time for any reason or no reason" and "without liability to" the user:

> Our Services evolve constantly. As such, the Services may change from time to time, at our discretion. <u>We may stop (permanently or temporarily) providing the Services or any features within the Services to you</u> or to users generally. We also retain the right to create limits on use and storage at our sole discretion at any time. We may also remove or refuse to distribute any Content on the Services, limit distribution or visibility of any Content on the service, <u>suspend or terminate users</u>, and reclaim usernames <u>without liability to you</u>. . . . <u>We may suspend or terminate your account or cease providing you with all or part of the Services at any time for any or no reason</u>, including, but not limited to, if we reasonably believe: (i) you

1    have violated these Terms or our Rules and Policies or Periscope Community
2    Guidelines. . . .

3    (X Ex. F at 8-9 (emphases added); *see also* X Ex. G at 7-8, 11; X Ex. H at 4-5, 7-8; X Ex. I at 5-
4    6, 8; X Ex. J at 5-6, 8-9; X Ex. K at 5-6, 8-9; X Ex. L at 5-6, 8-9.)

5    **III.  LEGAL STANDARD**

6    *Special Motion to Strike*: Under California's anti-SLAPP statute, where a claim "aris[es]
7    from any act of [the defendant] in furtherance of [the defendant]'s right of . . . free speech . . . in
8    connection with a public issue," the cause of action "shall be subject to a special motion to
9    strike . . . ." Cal. Civ. Proc. Code § 425.16(b). To prevail on a motion to strike, "defendants must
10   make a prima facie showing that the claims arise from a" protected act of free speech, and
11   "[t]hereafter, the burden shifts to plaintiff to establish a reasonable probability of prevailing on
12   the claims to survive dismissal." *CoreCivic, Inc. v. Candide Grp., LLC*, No. C 20-03792 WHA,
13   2022 WL 16823696, at *2 (N.D. Cal. Nov. 8, 2022) (citation omitted). Where, as here, the "anti-
14   SLAPP motion to strike challenges only the legal sufficiency of a claim, a district court should
15   apply the [Fed. R. Civ. P.] 12(b)(6) standard and consider whether a claim is properly stated. If
16   the special motion succeeds, the defendant is entitled to attorney's fees and costs." *Id.* (citation
17   and internal quotation marks omitted).

18   *Motion to Dismiss*: To survive a motion to dismiss under Rule 12(b)(6), a complaint must
19   contain factual allegations that "state a claim to relief that is plausible on its face." *Ashcroft v.*
20   *Iqbal*, 556 U.S. 662, 678 (2009). "There must be more than a sheer possibility that a defendant
21   has acted unlawfully. While courts do not require heightened fact pleading of specifics, a
22   plaintiff must allege facts sufficient to raise a right to relief above the speculative level." *King v.*
23   *Facebook, Inc.*, No. 19-CV-01987-WHO, 2019 WL 4221768, at *3 (N.D. Cal. Sept. 5, 2019)
24   (citations and internal quotation marks omitted), *aff'd,* 845 F. App'x 691 (9th Cir. 2021). This
25   Court may consider the Amended Complaint, documents incorporated by reference, and matters
26   of public record subject to judicial notice. *Zhang v. Twitter Inc.*, No. 23-CV-00980-JSC, 2023
27   WL 5493823, at *2 (N.D. Cal. Aug. 23, 2023) (appeal pending). The Court need not accept as
28   true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable

1    inferences." *King*, 2019 WL 4221768, at *3 (citations omitted).

2    **IV.    ARGUMENT**

3        **A.    Plaintiff's Claims Against X Are Subject to California's Anti-SLAPP Law**

4        To be subject to California's anti-SLAPP statute, "the defendant must make a prima facie

5    showing that the 'causes of action [] arise from' the defendant's actions 'in furtherance of that

6    defendant's right of [] free speech [] in connection with a public issue." *Club Members for an*

7    *Honest Election v. Sierra Club*, 45 Cal. 4th 309, 315 (2008); *see* Cal. Code Civ. Proc.

8    § 425.16(e)(4). Plaintiff's claims against X meet both elements: they arise from protected First

9    Amendment activities and involve a matter of public interest.

10        *First*, Plaintiff's claims against X arise from X's protected free speech activities. The

11    Amended Complaint challenges X's decisions about what "content to include, exclude,

12    moderate, filter, label, restrict, or promote" on its platform, "and those decisions are protected by

13    the First Amendment." *O'Handley v. Padilla*, 579 F. Supp. 3d 1163, 1186-88 (N.D. Cal. 2022)

14    (citations omitted), *aff'd on other grounds sub nom. O'Handley v. Weber*, 62 F.4th 1145 (9th Cir.

15    2023), *cert denied*, 2024 WL 3259696 (U.S. July 2, 2024). At bottom, Plaintiff's claims against

16    X are premised on either (a) the statements of third parties, including other Defendants, allegedly

17    promoting Tesla or criticizing Plaintiff on the X platform,[4] or (b) the suspension of Plaintiff's X

18    accounts.[5] X's publication of third-party content on its platform and its decisions to suspend user

19    accounts are paradigmatic First Amendment activities. *See, e.g.*, *La'Tiejira v. Facebook, Inc.*,

20    272 F. Supp. 3d 981, 991 (S.D. Tex. 2017) (Plaintiffs "claims concern the publication of

21    statements by [a] third-party . . . [and] arise directly and exclusively from Facebook's First

22

23    _____

24    [4] (AC ¶¶ 126 ("Qazi produced hundreds of videos posted on both Twitter and YouTube"), 284
     ("Beginning in late 2018, Defendant Tesla began to deliberately cultivate social media
25    influencers and small blogs . . . especially active on Twitter and YouTube") (Counts I-III).)
     [5] (AC ¶¶ 536-39 ("When Defendant X Corp. suspended Plaintiff's Twitter accounts. . . .
26    Plaintiff's accounts were not suspended because they 'violated the X Rules.' Plaintiff's accounts
     were suspended in retribution for criticizing Defendant Musk, in order to silence Plaintiff.")
27    (Count XI), 685 ("At all times, Plaintiff's use of Twitter fell well 'within the bounds of the law,'
     and did not 'violate the law,' yet Plaintiff's @PlainSite and @AaronGreenspan accounts were
28    suspended.") (Count XIX).)

1   Amendment right to decide what to publish and what not to publish on its platform."); *Padilla*,

2   579 F. Supp. 3d at 1186-88 (suspension is exercise of First Amendment rights); *Moody v.*

3   *NetChoice, LLC*, No. 22-277, 2024 WL 3237685, at *15 (U.S. July 1, 2024) (social media

4   platforms making "expressive choices . . . receive First Amendment protection").

5        *Second*, the allegations concern a matter of public interest. "[W]hether something is an

6   issue of public interest must be construed broadly." *Cross v. Facebook, Inc.*, 14 Cal. App. 5th

7   190, 198-99 (1st Dist. 2017) (internal quotation marks and citations omitted). Plaintiff alleges

8   (insufficiently) a far-reaching RICO enterprise involving high-profile companies like X and

9   Tesla and individuals like Musk. *FilmOn.com Inc. v. DoubleVerify Inc.*, 7 Cal. 5th 133, 145

10  (2019) (requirement met when "the subject of the speech or activity 'was a person or entity in the

11  public eye' or 'could affect [a] large number[] of people beyond the direct participants'"

12  (citations omitted)); (*see, e.g.*, AC ¶ 56 (Musk is a "public figure"). Plaintiff's claims therefore

13  concern matters of public interest, and because those claims also implicate X's protected free-

14  speech activities, X has made its prima facie showing that Plaintiff's claims are subject to

15  California's anti-SLAPP law.

16      **B.    Plaintiff Fails to State a Claim Upon Which Relief Can Be Granted**

17       The second prong of California's anti-SLAPP law is also met because, for several

18  independent reasons, Plaintiff has failed to state a claim against X.

19           *1.    Section 230 Bars Plaintiff's Claims Against X*

20       Section 230 immunizes X from all of Plaintiff's claims, which seek to impose liability

21  based on X's publishing functions, including X's decisions about what content may be posted on

22  X and by whom. As this Court recently explained in dismissing claims against X brought by

23  another *pro se* plaintiff seeking to "hold Twitter liable for its decision to suspend his account"

24  allegedly based on improper reasons, "Section 230(c)(1) of the CDA provides: 'No provider . . .

25  of an interactive computer service shall be treated as the publisher or speaker of any information

26  provided by another information content provider.' 47 U.S.C. § 230(c)(1). This provision [also]

27  protects from liability an interactive computer service provider when it exercises traditional

28  editorial or publishing functions, including whether to post content or to withdraw content."

1    *Yuksel v. Twitter, Inc.*, No. 22-CV-05415-TSH, 2022 WL 16748612, at \*3 (N.D. Cal. Nov. 7,

2    2022). Indeed, "[c]ourts have routinely rejected a wide variety of civil claims . . . that seek to

3    hold interactive computer services liable for . . . suspending or deleting accounts (or failing to do

4    so) on the grounds they are barred by the CDA." *Murphy v. Twitter, Inc.*, 60 Cal. App. 5th 12, 27

5    (1st Div. 2021); *King*, 2019 WL 4221768, at \*1. "[L]awsuits seeking to hold a service provider

6    liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to

7    publish, withdraw, postpone or alter content—are barred [under Section 230]." *Hassell v. Bird*, 5

8    Cal. 5th 522, 532 (Cal. 2018).

9           All requisite elements of Section 230 are met here. *First*, X is a "provider . . . of an

10   interactive computer service." 47 U.S.C. § 230(f)(2). *Second*, Plaintiff seeks to hold X liable for

11   decisions regarding "information provided by another content provider." 47 U.S.C. § 230(c)(1).

12   *Third*, Plaintiff seeks to treat X as a publisher because Plaintiff's claims derive entirely from

13   third-party content on X's platform and X's decision to suspend Plaintiff's accounts.

14   Accordingly, Section 230 provides X with immunity from Plaintiff's claims.

15          *1. X Is an "Interactive Computer Service."* Section 230 defines an "interactive computer

16   service" as "any information service, system, or access software provider that provides or

17   enables computer access by multiple users to a computer server." Countless courts, including this

18   Court, have held that X is an "interactive computer service" under Section 230. *Yuksel*, 2022 WL

19   16748612, at \*3 (Twitter is an "interactive computer service" under Section 230); *Brittain v.*

20   *Twitter, Inc.*, No. 19-cv-00114-YGR, 2019 WL 2423375, at \*2 (N.D. Cal. June 10, 2019);

21   *Morton v. Twitter, Inc.*, CV 20-10434-GW-JEMx, 2021 WL 1181753, at \*3 (C.D. Cal. Feb. 19,

22   2021) (same).

23          *2. The Statements at Issue Are Third-Party "Information Provided by Another Content*

24   *Provider."* Plaintiff's and the other Defendants' posts and accounts on X/Twitter constitute

25   "information provided by another information content provider" under Section 230. 47 U.S.C.

26   § 230(c)(1). Section 230 defines an "information content provider" as "any person or entity that

27   is responsible, in whole or in part, for the creation or development of information provided

28   through the Internet or any other interactive computer service." *Id.* § 230(f)(3).

The Amended Complaint concedes that Plaintiff's claims against X are premised on either (a) the statements of third parties, including other Defendants, on the platform or (b) the suspension of Plaintiff's Twitter accounts. *See supra* at IV.A. Accordingly, Plaintiff's claims are based on "information that [others], rather than Twitter, provided"—*i.e.*, "information provided by another content provider." *Yuksel*, 2022 WL 16748612, at *1, *3 (addressing claim that Twitter improperly suspended plaintiff's account based on political speech and holding "[plaintiff] seeks to hold Twitter liable for decisions regarding 'information provided by another information content provider'—that is, information that he, rather than Twitter, provided." (citation omitted)); *Murphy*, 60 Cal. App. 5th at 25-26 (similar); *see also King*, 2019 WL 2019 WL 4221768, at *4 (this "prong of the CDA immunity test" is met where "allegations rest on treatment of speakers (who make posts or otherwise provide content) and differential treatment of specific posts made either by [plaintiff] or by other . . . users" (citations omitted)).

*3. Each of Plaintiff's Claims Seek to Treat X as a "Publisher."* Section 230's third and final prong is satisfied because Plaintiff seeks to impose liability on X for "publishing" activities—namely, by (a) publishing content created by third parties, including other Defendants, on its platform, and (b) by suspending Plaintiff's accounts from the platform. 47 U.S.C. § 230(c)(1).

<u>RICO Claims (Counts I-III)</u>. Plaintiff's RICO claims (AC ¶¶ 420-64) all seek to hold X liable for content posted by third parties, including purported "social media influencers" like Defendants Qazi and Smick, on the X platform. (AC ¶¶ 99, 115, 284-92.) The act of publication, however, is the prototypical protected publishing activity. *See Unknown Parties v. Google LLC*, No. 23-CV-05523-VC, 2024 WL 1892291, at *1 (N.D. Cal. Apr. 29, 2024) ("Section 230 . . . shields websites from liability for content created and posted by third parties"); *Morton*, 2021 WL 1181753, at *4 ("website" is "immune from claims predicated on that content." (citation omitted)).

Here, the Amended Complaint alleges a RICO enterprise "spreading optimistic false narratives about Defendant Musk, his companies, 'Autopilot' and FSD; [and] attacking critics of Defendant Musk, his companies, 'Autopilot' and FSD." (AC ¶ 434.) But the only purported

1   "spreading [of] optimistic false narratives" and "attack[s]" described in the Amended Complaint

2   are statements attributable to third parties, *not X*. (*See, e.g.*, AC ¶¶ 7 ("To spread misinformation,

3   Defendants Musk and Tesla attracted and cultivated a literal cult following, both among his

4   customer base and on Twitter"), 126 ("Qazi produced hundreds of videos posted on . . .

5   Twitter . . . purporting to depict the flawless operation of Tesla's FSD software"), 284 ("social

6   media influencers and small blogs . . . promote false narratives encouraging viewers to purchase

7   the company's electric vehicles, stock"), 301-354.) Tellingly, Counts I-III cite no statements by

8   X.[6] Because Plaintiff seeks to hold X liable for third-party content published on its platform,

9   Plaintiff's RICO claims against X are barred by Section 230. *Yuksel*, 2022 WL 16748612, at *5

10  ("Section 230 [provides] immunity" from "civil RICO claims." (collecting cases)).

11        <u>Defamation (Count XI) and False Advertising (Count XIX)</u>. Plaintiff's other two claims

12  against X arise from X's suspension of Plaintiff's accounts. In so doing, they attempt to hold X

13  liable for another protected publishing function—content moderation through account

14  suspension—which is foreclosed as a matter of law by Section 230. "[P]laintiff seeks to treat

15  Twitter as the publisher because his claims derive entirely from Twitter's decision to exclude his

16  content and suspend his account–that is, traditional publishing functions." *Yuksel*, 2022 WL

---

18  [6] While Plaintiff alleges (implausibly) that third parties who posted on the platform are agents of
19  "*Musk and/or Tesla*" (AC ¶ 529 (emphasis added); *see also id.* ¶¶ 32 ("Defendants Qazi and
    Smick had committed fraud and worked as agents of Defendants Tesla and Musk"), 121
20  ("agency relationship between Defendant Tesla and EAP participants")), he makes no similar
    allegations that any third party was an agent of *X*.

22  For good reason. Even if the Amended Complaint had included such an agency theory, the
    allegations are insufficiently pled as a matter of law because the Amended Complaint contains
23  no allegations that X "exercised any control over what [] content [third parties] posted" or "that
    [third parties] acted on behalf of" X "in posting [their content]." *Unknown Parties v. Google*
24  *LLC*, 2024 WL 1892291, at *1. As in *Unknown Parties v. Google*, the Creator Ads Revenue
    Sharing Program is "simply a revenue-sharing agreement where [X] pays content creators a
25  percentage of advertising revenue generated by their videos," which is insufficient to allege
    agency. (AC ¶ 121 ("users eligible [] earn income from their Twitter posts")); *Unknown Parties*
26  *v. Google LLC*, 2024 WL 1892291, at *1; *see also infra* at Section IV.B.4.a (further discussing
    Plaintiff's allegations concerning X's Creator Ads Revenue Sharing Program). Moreover, the X
27  Subscriptions Creator Terms expressly disclaim any agency or other legal relationship between
    X and content creators on the platform. (X Ex. Q at 16-17 ("your relationship with us is solely
28  that of a user . . . [n]o agency, partnership or joint venture is intended or created").)

16748612, at *4; *see also Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC.*, 521 F.3d 1157, 1170-71 (9th Cir. 2008) (en banc) ("[A]ny activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230."); *Brittain*, 2019 WL 2423375, at *3 (claims that "ultimately arise from Twitter's alleged decision to suspend" plaintiff's Twitter accounts "seek to treat Twitter as a publisher under the CDA"); *Murphy*, 60 Cal. App. 5th at 29 (similar).

Counts XI and XIX similarly seek to hold X accountable for its protected publishing functions. Count XI alleges defamation because X "suspended Plaintiff's Twitter accounts on June 13, 2023 . . . falsely indicating that Plaintiff had, in some way, violated the Twitter Rules." (AC ¶ 536.) Count XIX alleges false advertising because Defendant Musk publicly lauded X's approach to "free speech" on the platform and yet X suspended Plaintiff's accounts. (AC ¶¶ 683-86.) These claims arise from the suspension of Plaintiff's X accounts, which is a protected publisher activity, and thus are barred as a matter of law by Section 230. *See Yuksel*, 2022 WL 16748612, at *4; *Roommates.*, 521 F.3d at 1170-71; *Brittain*, 2019 WL 2423375, at *3; *Murphy*, 60 Cal. App. 5th at 29.

It is no matter that Plaintiff suggests (in conclusory fashion and insufficiently) that X suspended his account only because Plaintiff was critical of Tesla or Musk. Deciding who can post content and what content they can post is a protected publisher's activity, regardless of the motive. *See King*, 2019 WL 4221768, at *1 (Section 230 barred claims, including Section 1981 claim, where plaintiff alleged Facebook "violated its [terms of service] in removing his posts and suspending his account, and . . . treats black activists and their posts differently than it does other groups, particularly white supremacists"); *Elansari v. Meta, Inc.*, 2022 WL 4635860, at *2, *6 (E.D. Pa. Sept. 30, 2022) (Section 230 barred claims, including Section 1981 claim, where plaintiff alleged defendant "removed news published by Palestinian and Muslim news sources" but not news by "Pro-Israel and Pro-Jewish organizations"); *Sikhs for Just. "SFJ", Inc. v. Facebook, Inc*, 144 F. Supp. 3d 1088, 1090, 1095-96 (N.D. Cal. 2015), *aff'd sub nom. Sikhs for Just., Inc. v. Facebook, Inc.*, 697 F. App'x 526 (9th Cir. 2017) (Section 230 barred claim alleging Facebook's content removal motivated by "discrimination . . . on the grounds of race, religion,

1    ancestry, and national origin"); *Yuksel*, 2022 WL 16748612, at \*3 (Section 230 barred claims

2    alleging "Twitter suspended" plaintiff's account "to appease" the President of Turkey); *Murphy*,

3    60 Cal. App. 5th at 29 (Section 230 barred claims that "Twitter 'enforced its Hateful Conduct

4    Policy in a discriminatory and targeted manner").

5         In fact, Plaintiff *concedes* "that Defendant X Corp. has the right to make editorial

6    decisions about content published on its website by third parties and that pursuant to 47 U.S.C.

7    § 230 it is immune from suit for allegations pertaining specifically to those editorial decisions."

8    (AC ¶ 534.) And Plaintiff "does not dispute Defendant X Corp.'s right to suspend Twitter

9    accounts." (*Id.* ¶ 535.) Nevertheless, Plaintiff contends, with respect to his defamation claim

10   alone, that Section 230 does not immunize X because the alleged false and defamatory statement

11   that "Twitter suspends accounts that violate the Twitter Rules" appeared on Plaintiff's accounts

12   only "*after* his accounts were suspended." (*Id.* ¶ 535.) But that timing does not change the

13   substance of Plaintiff's defamation claim. The predicate for Plaintiff's claim is that X's

14   determination that Plaintiff violated the X/Twitter Rules for "posting private information" was

15   wrong (*id.* ¶ 27)—*i.e.*, the conclusion that Plaintiff violated the X/Twitter Rules is false. These

16   claims thus seek to hold X liable for its content moderation decisions, which are protected by

17   Section 230. *See Hassell*, 5 Cal. 5th at 541 (Section 230 barred defamation and false light claims

18   where "plaintiffs seek to overrule [defendant's] decision" regarding content moderation); *Jones*

19   *v. Twitter, Inc.*, 2020 WL 6263412, at \*3 (D. Md. Oct. 23, 2020) (Section 230 barred defamation

20   claim premised on plaintiff's account suspension for "violating . . . Twitter Rules against hateful

21   conduct" because such claims "clearly seek to hold Twitter liable as a publisher of third-party

22   content, as [it] relates to Twitter's decision not to publish Plaintiff's content").

23        In sum, all of Plaintiff's claims seek to impose liability on X for its protected publishing

24   activities. X meets all three requirements for Section 230 immunity, and its motion to strike

25   should be granted for this reason alone.

26           *2.    The First Amendment Independently Bars Plaintiff's Claims*

27        It is well settled that X has a First Amendment right to exercise editorial judgment over

28   what content to publish, prioritize, and exclude on its platform. The Supreme Court recently

1    confirmed that "[w]hen [social media] platforms [such as X] use their Standards and Guidelines

2    to decide which third-party content those feeds will display . . . they are making expressive

3    choices. And because that is true, they receive First Amendment protection." *Moody*, 2024 WL

4    3237685, at *15. Consistent with this conclusion, "like a newspaper or a news network, [X]

5    makes decisions about what content to include, exclude, moderate, filter, label, restrict, or

6    promote, and those decisions are protected by the First Amendment." *Padilla*, 579 F. Supp. 3d at

7    1186-88 (dismissing on First Amendment grounds claims based in part on Twitter account

8    suspension). Acts such as "appending labels to [] tweets," "imposi[ng] strikes on [an] account,"

9    or "remov[ing] [an] account from the platform. . . . constitute the exercise of editorial control and

10   judgment and are protected by the First Amendment." *Padilla*, 579 F. Supp. 3d at 1186 (citations

11   and internal quotation marks omitted).

12        As set forth above (*supra* Section IV.B.1), Plaintiff's claims against X seek to hold it

13   liable for editorial decisions about what third-party content can be posted on X and by whom,

14   which are constitutionally protected decisions. The First Amendment bars such claims.

15            3.    *Plaintiff's Claims Are Independently Barred by X's Terms of Service*

16        X's Terms of Service disclaim any liability on X's part for third-party content posted on

17   X and provide X with the express right to suspend accounts on its platform without liability to

18   the user. As a user of X, Plaintiff necessarily and repeatedly agreed to be bound by X's Terms of

19   Service. *See supra* Section II. Accordingly, Plaintiff's claims are barred as a matter of law by

20   X's Terms of Service.

21        "Limitation of liability clauses 'have long been recognized as valid in California'" and

22   may be used at the pleading stage to reject a party's claims. *Lewis v. YouTube, LLC*, 244 Cal.

23   App. 4th 118, 125 (6th Dist. 2015) (enforcing limitation of liability clause and affirming

24   dismissal). Courts routinely enforce online platforms' limitation of liability clauses in suits—like

25   Plaintiff's here—that arise out of conduct protected by terms of service. *See, e.g.*, *Murphy*, 60

26   Cal. App. at 36; *Darnaa, LLC v. Google Inc.*, 236 F. Supp. 3d 1116, 1123 & n.3 (N.D. Cal.

27   2017) (enforcing YouTube's limitation of liability clause and dismissing complaint), *aff'd sub*

28   *nom. Darnaa, LLC v. Google LLC*, 756 F. App'x 674 (9th Cir. 2018); *Bass v. Facebook, Inc.*,

1   394 F. Supp. 3d 1024, 1037 (N.D. Cal. 2019) (enforcing Facebook's limitation-of-liability

2   clause). These clauses are particularly "appropriate when one party is offering a service for free

3   to the public," as X does here. *Lewis*, 244 Cal. App. 4th at 125; *see also Murphy*, 60 Cal. App. at

4   36 (enforcing the limitation of liability clause in the Twitter Terms of Service). Courts have

5   enforced waiver of liability clauses to dismiss non-breach of contract claims, like Plaintiff's

6   claims here. *See, e.g.*, *Glair v. Nat'l Evaluation Servs.*, No. CV-08-2685, 2009 WL 10672610, at

7   *5 (C.D. Cal. Apr. 27, 2009) (enforcing waiver of liability and dismissing constitutional and

8   breach of contract claims), *aff'd*, 424 F. App'x 653 (9th Cir. 2011).

9         X's Terms of Service bar Plaintiff's claims for at least two reasons. *First*, X's Terms of

10  Service provide that third-party content on X is the "sole responsibility of the person who

11  originated such Content," X "cannot take responsibility for such Content," and X "disclaims all

12  responsibility and liability" based on "the completeness, accuracy . . . or reliability of . . . any

13  Content." (*See, e.g.*, X Ex. F at 3, 9-10.) *Second*, X's Terms of Service provide X with the broad

14  right to "suspend or terminate" accounts on its platform "at any time for any or no reason" and

15  disclaims any "liability to" the user arising from that suspension or termination. (*See, e.g.*, X Ex.

16  F at 8-9.) Those terms plainly apply here and foreclose Plaintiff's claims, which arise from third-

17  party content and the suspension of his accounts. *See, e.g.*, *Young v. Facebook, Inc.*, No. 5:10-

18  CV-03579-JF/PVT, 2010 WL 4269304, at *4 (N.D. Cal. Oct. 25, 2010) (dismissing claim that

19  Facebook "fail[ed] to provide the safety services it advertised" where "Facebook expressly

20  disclaimed any duty to protect users' online safety"); *Murphy*, 60 Cal. App. at 36 (dismissing

21  claim "because Twitter's Terms of Service expressly state that they reserve the right to 'suspend

22  or terminate [users'] accounts . . . for any or no reason' without liability"); *Yuksel*, 2022 WL

23  16748612, at *5 (similar).

24                  **4.**    *Plaintiff Fails to Plausibly Allege Any Cause of Action*

25        In addition to the multiple fatal defects identified above, Plaintiff has not plausibly

26  alleged the substantive elements of his claims against X. Thus, even if Plaintiff's claims were not

27  barred by Section 230, the First Amendment, and X's Terms of Service (and they are), his claims

28  still would fail as a matter of law.

1

<u>a.</u>    <u>RICO: 8 USC § 1962(c)</u>

2    "The elements of a civil RICO claim [under § 1962(c)] are as follows: (1) conduct (2) of

3    an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5)

4    causing injury to plaintiff's business or property." *Yuksel*, 2022 WL 16748612, at *6 (citation

5    omitted). Where, as here, Plaintiff's RICO claims sound in fraud (*see, e.g.*, AC ¶¶ 420-70), the

6    Amended Complaint's allegations are subject to the heightened pleading standards of Rule 9(b),

7    which requires Plaintiff to plead the "who, what, when, where, and how of the [alleged]

8    misconduct." *See, e.g.*, *Coronavirus Reporter v. Apple, Inc.*, 85 F.4th 948, 958 (9th Cir. 2023)

9    (applying Rule 9(b)'s heightened pleading standard to RICO claims sounding in fraud (citation

10   omitted)). Plaintiff fails to plead *every* element of his RICO claim.

11   *First*, Plaintiff fails to plead a RICO enterprise. "To establish the existence of such an

12   enterprise, a plaintiff must provide both evidence of an ongoing organization, formal or informal,

13   and evidence that the various associates function as a continuing unit" in service of a "common

14   purpose." *Aniel v. PHH Mortg. Corp.*, No. 4:21-cv-6071-YGR, 2022 WL 2164702, at *6 (N.D.

15   Cal. June 1, 2022) (cleaned up). Plaintiff alleges the "Atlanteca Enterprise joined together for a

16   common purpose of defrauding customers and regulators," "spreading optimistic false

17   narratives" and "attacking critics" of Tesla's business.[7] (AC ¶ 434.) But Plaintiff's

18   "conclusory . . . allegations do not sufficiently allege the existence of an enterprise." *Aniel*, 2022

19   WL 2164702, at *6; *BMA LLC v. HDR Global Trading Ltd.*, No. 20-cv-03345-WHO, 2021 WL

20   949371, at *11-12 (N.D. Cal. March 12, 2021) (dismissing fraud-based RICO claims where

21   plaintiff claimed a string of corporations were "used by the Enterprise to conceal or disguise the

22   true sources of funds used for acquiring the real estate properties" but "[p]laintiffs plead no facts

23   in support of those assertions"). Plaintiff's entire factual allegations concerning X's purported

24   membership in any illicit enterprise are that X was "acquired" by Defendant Musk in 2022 (AC

25

26

_____

27   [7] Plaintiff also claims that the Atlanteca Enterprise "promot[ed] the political and financial
interests of the Russian Federation, Saudi Arabia, and the People's Republic of China," but the

28   Amended Complaint is devoid of any allegations supporting that claim. (AC ¶ 434.)

¶ 60) and that Musk also has an ownership interest in several other companies (*id.* ¶ 58).[8] Such generalized allegations reflect nothing more than routine commercial dealings, and "[c]ourts routinely hold that the common purpose requirement is not met where, as here, the allegations in the complaint are consistent only with the execution of a routine contract or commercial dealing." *Aniel*, 2022 WL 2164702, at *6 (cleaned up). Plaintiff likewise fails to allege even the most basic facts to suggest X ever agreed to target Tesla critics or engage in securities fraud— much less explain how *X* would benefit from a scheme to inflate *Tesla* stock. (AC ¶¶ 58-60, 428-44); *Vaughan v. Wardhaugh*, No. 23-cv-02879-RFL, 2024 WL 2853972, at *1 (N.D. Cal. May 10, 2024) (dismissing RICO claim where Plaintiff failed to allege facts sufficient to show "Defendants acted with the same purpose in mind.").

*Second*, Plaintiff fails to plead conduct sufficient to plausibly allege a RICO claim. "[I]t is well established that to satisfy the conduct element of a RICO claim, plaintiff[] must allege facts that the defendant had some part in directing [the enterprise's] affairs." *Aniel*, 2022 WL 2164702, at *6 (cleaned up). "Simply being a part of the enterprise or performing services for the enterprise does not rise to the level of direction required." *Id.* (cleaned up). Here, the only allegations concerning X are of ordinary business dealings—the use of X's platform by other Defendants (along with hundreds of millions of other users), the payment of thousands of content creators through X's Creator Ads Revenue Sharing Program, and content moderation decisions, like the suspension of Plaintiff's account. Plaintiff pleads no facts that X "directed anything at all aside from [its] independent business activities," and so this element has also not been met. *Id.*

---

[8] Although Plaintiff generally and in a conclusory manner asserts that "Defendant Musk treats all his companies as though they are one seamless global conglomerate" (AC ¶ 58), Plaintiff fails to plead a single fact supporting his general allegations *with respect to X*; Plaintiff does not cite a *single* "related-party transaction[]" involving X, any "shared information technology resources, shared source code, cross-marketing agreements, or confidential documents." (AC ¶ 58); *Aniel*, 2022 WL 2164702, at *6 ("plaintiff's conclusory and inconsistent allegations do not sufficiently allege the existence of an enterprise."). While Plaintiff alleges that "[s]tarting in August 2022, Defendant Mehes" worked at Tesla and "in June 2023[,] switched to working as an attorney for X" (*id.* ¶ 438), there is nothing illicit or unusual about changing jobs. In any event, these allegations reflect only "routine contract or commercial dealing." *Aniel*, 2022 WL 2164702, at *6.

1   *Third*, Plaintiff has not pleaded a pattern of racketeering activity. Plaintiff claims

2   payments through the X Creator Ads Revenue Sharing Program to Defendant Smick, and non-

3   parties Sawyer Merritt, Farzad Mesbahi, and Alexandra Merz from July 13, 2023 to August 16,

4   2024 constitute "wire fraud."[9] (AC ¶¶ 445-48.) But Plaintiff fails to plead facts sufficient to

5   show that these payments were improper, much less wire fraud. Rather, Plaintiff concedes that:

6   X regularly processes payments to a wide variety of "eligible users" (AC ¶¶ 121, 529(a));

7   eligibility for the Creator Ad Revenue Sharing Program is based on neutral criteria such as the

8   number of impressions (X Ex. P, Creator Ads Revenue Sharing, at 1 (July 13, 2023) ("at least

9   5M impressions on your posts in each of the last 3 months"); X Ex. M at 3-4 (July 31, 2024)

10  (similar)); and payments through the program are not tied in any way to statements toward

11  Plaintiff or Tesla, but are tied to "impressions and engagements" on posts, generally (AC ¶¶ 121-

12  23, 529(a)). These allegations fail to allege any pattern of racketeering activity.

13          In an apparent acknowledgment of that deficiency in his first Complaint, Plaintiff now

14  alleges that Qazi and certain "Tesla EAP participants" were "added to a 'VIP' list of only a few

15  dozen Twitter users eligible to earn income from their Twitter posts" and that the "revenue share

16  program . . . was initially not open to the public." (AC ¶ 121.) Even taking these allegations to be

17  true for purposes of this motion, Plaintiff fails to allege anything improper here, too. (*Id.* ¶¶ 121-

18  25.) First, like the general program, Plaintiff concedes that payments in connection with the VIP

19  program were not tied in any way to statements toward Plaintiff or Tesla and were instead tied to

20  "impressions and engagements" on posts, generally. (*Id.* ¶¶ 122-23.) Second, Plaintiff does not

21  allege the basis for "eligibil[ity]" in the alleged "'VIP' list" had anything to do with a RICO

22  enterprise, rather than neutral criteria. (*Id.*) For example, Plaintiff does not allege eligibility for

23  the program was tied to anything other than usage of the X platform or the size of a user's initial

24  payment under the X Creator Ads Revenue Sharing Program. As alleged, the so-called VIP

25

26  _____

27  [9] To allege wire fraud Plaintiff must plead "(A) the formation of a scheme to defraud, (B) the use of the mails or wires in furtherance of that scheme, and (C) the specific intent to defraud." *Sterling Park, LLC v. Axos Fin., Inc.*, No. 21-CV-01347 W (BLM), 2022 WL 935194, at *4

28  (S.D. Cal. Mar. 29, 2022).

1   program was "was open to a "*few dozen* Twitter users" (*Id.* ¶ 121 (emphasis added)), but Plaintiff

2   alleges, at *most*, just four users (only one of whom is a Defendant) whose payments he suggests

3   were improper—confirming that eligibility for the program was not connected to any illicit

4   conduct. (*Id.* ¶¶ 121-25; 445-48.) Finally, Plaintiff provides no details about the program itself

5   other than the simple allegation that some users received payments earlier. (*Id.* ¶¶ 121-25.) For

6   instance, Plaintiff says nothing about when the alleged program started or ended, or whether

7   users who were not part of the VIP program nevertheless accrued earnings on their impressions

8   and engagements during the same time period but were paid at a later date. Indeed, the X Creator

9   Ad Revenue Sharing Program was always available to all users who were eligible—though an

10  "initial group" (the alleged VIP program) were simply "invited to accept payment" first. (X Ex.

11  P at 2); *Manriquez v. J.B. Hunt Transp., Inc.*, No. 22-CV-03060-SK, 2022 WL 20509212, at *2

12  (N.D. Cal. Apr. 13, 2022) ("The court need not . . . accept as true allegations that contradict

13  matters properly subject to judicial notice." (citation omitted)). Simply put, the payments from

14  the X Creator Ad Revenue Sharing Program were not improper, much less wire fraud. *Sterling*

15  *Park*, 2022 WL 935194, at *5-6 (dismissing RICO claim where "[t]here [was] nothing

16  suggesting either Defendant had an intent to defraud.").

17      *Finally*, Plaintiff fails to allege causation. "[T]o establish proximate cause, Plaintiffs must

18  demonstrate that there exists a 'direct relation between the injury asserted and the injurious

19  conduct alleged.'" *Masin v. Vistakon Pharms.*, No. 3:08-cv-00550-RCJ-VPC, 2010 WL

20  11594971, at *3 (D. Nev. June 14, 2010) (citation omitted). Plaintiff's only X-specific damages

21  theory is that "[t]he Atlanteca Enterprise harmed Plaintiff's business by enlisting Defendant X

22  Corp. to take action against Plaintiff"—presumably by suspending Plaintiff's accounts from the

23  X platform on June 13, 2023. (AC ¶¶ 27, 449.) As explained below, the Amended Complaint

24  itself provides other, more reasonable inferences for Plaintiff's suspension. (*See infra* at Section

25  IV.4.c.) Moreover, X had an unqualified right to "suspend or terminate" accounts on its platform

26  "at any time for any reason or no reason" and "without liability" to a user, rendering Plaintiff

27  unable to establish proximate cause. (*See, e.g.*, X Ex. F at 8-9); *see also supra* at Section IV.B.3;

28  *Scoggins v. HSBC Bank United States*, No. CV 15-01328 SJO (SSx), 2015 WL 12670410, at *2

1   (C.D. Cal. Oct. 8, 2015) ("In the instant case, Plaintiffs' allegations show, at most, a remote

2   connection between [Defendant] and Plaintiffs' purported injuries.").

3                        b.      RICO: 18 USC §§ 1962(a) and (d)

4          The Amended Complaint technically includes three RICO causes of action, but all are

5   based on the same insufficient allegations set forth above. (*See* AC ¶¶ 420-64.) Plaintiff's claims

6   under 18 USC §§ 1962(a) and (d) fail for the very same reasons its claim under 18 USC

7   § 1962(c) fails, and thus they should be dismissed. *See Abhari v. Victory Park Capital Advisors*,

8   No. CV 20-05734 PA, 2020 WL 7346676, at *3-7 (C.D. Cal. Nov. 16, 2020) (dismissing claims

9   under 18 USC §§ 1962(a)-(d) for failure to meet the elements of § 1962(c)).

10         *First*, to state a claim under 18 USC § 1962(a), a plaintiff must plausibly allege that

11  "[f]irst, a person [] derive income from a pattern of racketeering activity[;] [s]econd, that income

12  must be invested in an enterprise[;] [a]nd third, the enterprise must be engaged in interstate

13  commerce." *Kesiraju v. Makker*, No. CV 23-9298-CBM-RAOx, 2024 U.S. Dist. LEXIS 44714,

14  at *16 (C.D. Cal. Mar. 12, 2024). As set forth above, Plaintiff fails to plead an enterprise, pattern

15  of racketeering activity or causation, and Plaintiff's claim should be dismissed for that reason

16  alone. *Id.*; *see also Scoggins*, 2015 WL 12670410, at *2.

17         Plaintiff's 18 USC § 1962(a) claim fails for the independent reason that he fails to allege

18  harm. To state a claim under 18 USC § 1962(a), "the complaint must show that the investment

19  [of the alleged illegally gained funds] harmed plaintiff differently than the racketeering activity."

20  *Martinez v. Extra Space Storage, Inc.*, No. C 13-00319 WHA, 2013 WL 1390412, at *6 (N.D.

21  Cal. Apr. 4, 2013). The Amended Complaint alleges only that "Defendants each invested or used

22  all or part of that income in the establishment, operation, and maintenance of" the alleged

23  enterprise. (AC ¶ 455.) Such conclusory allegations are insufficient to state a claim. (AC ¶¶ 452-

24  57); *Kesiraju*, 2024 U.S. Dist. LEXIS 44714, at *16 ("[T]he Complaint fails to allege facts

25  demonstrating Plaintiff was injured by the use or investment of racketeering income as required

26  to state a" claim.).

27         *Second*, and with respect to 18 USC § 1962(d), it is well settled that where "Plaintiff fails

28  to adequately plead facts to state a substantive RICO violation [under §§ 1962(a)-(c)], Plaintiff

1    fails to state a RICO conspiracy claim." *Kesiraju*, 2024 U.S. Dist. LEXIS 44714, at *16.

2        In sum, Plaintiff fails to plausibly allege a civil RICO claim under 18 USC § 1962(d),

3    which should be dismissed.

4                        c.    Defamation

5        Plaintiff likewise fails to plausibly allege his defamation claim. "Under California law,

6    the elements of a defamation claim are: (1) a publication that is (2) false, (3) defamatory,

7    (4) unprivileged, and (5) has a natural tendency to injure or causes special damage." *Bryant v.

8    Lowe's Home Centers, LLC*, No. 22-16586, 2023 WL 8797886, at *1 (9th Cir. Dec. 20, 2023).

9    Plaintiff alleges that after his accounts were suspended, X displayed the message that X/Twitter

10   "suspends accounts that violate the" X/Twitter rules—the same automatically generated

11   statement of corporate policy that X displays on every other suspended account—and that this

12   message created "[t]he implication that Plaintiff violated the X Rules, meriting suspension,

13   [which] is false." (AC ¶¶ 536-39.) Those allegations fail to plausibly state a defamation claim for

14   several reasons.

15       *First*, the alleged defamatory statement is not false because it is a true statement of

16   corporate policy. "[T]he truth of the offensive statements . . . is a complete defense against civil

17   liability." *Riegman v. San Mateo Cnty.*, No. 20-CV-09303-JST, 2021 WL 11636100, at *14

18   (N.D. Cal. Aug. 23, 2021) (citation omitted). The statements at issue (AC ¶¶ 536-39) merely

19   reflect X's Terms of Service, which provide that X can suspend or terminate a user for violating

20   X's rules and policies concerning the use of its platform (the Twitter Rules (X Ex. N) and later,

21   the X Rules (X Ex. O)). (X Ex. F at 9 (may "suspend or terminate" account "if we reasonably

22   believe you have violated these Terms or the Twitter Rules and Policies . . ."); X Ex. G at 11

23   ("violated these Terms or our Rules and Policies . . .").) Because there was no "false statement,"

24   Plaintiff's defamation claim fails. *Riegman*, 2021 WL 11636100, at *14; *Zhang*, 2023 WL

25   5493823, at *7 (defamation claim based on similar "Account suspended Twitter suspends

26   accounts that violate the Twitter Rules" language "fail[s] to satisfy any . . . elements").

27       *Second*, Plaintiff does not plausibly allege he did not breach the Twitter/X Rules. Instead,

28   Plaintiff asserts that "[i]n fact, Plaintiff did not violate the Twitter Rules" and speculates that his

1   accounts "were suspended . . . for criticizing Defendant Musk." (AC ¶¶ 537-39.) But those

2   assertions are both conclusory and contradicted by the Amended Complaint's other allegations,

3   including Plaintiff's admission that he was informed that he was suspended for violating rules

4   against "posting private information" (AC ¶ 27), which the Twitter/X Rules prohibit (X Ex. N at

5   4; X Ex. O at 4). Indeed, the Amended Complaint is replete with concessions that he posted such

6   information. (AC ¶¶ 593(f)-(g) (posting a private email from Defendant Musk), 312 ("Plaintiff

7   publicized a redacted form of" information about who accessed his website), 304 (posting video

8   of Tesla driver), 331 ("Plaintiff published a copy of a Twitter DM conversation" with Qazi).)[10]

9   Plaintiff fails to plausibly allege he was not suspended because he violated the Twitter/X Rules.

10          *Third*, the statement at issue is not defamatory because the generalized statement of

11  corporate policy—that a Plaintiff's account violated rules concerning usage of the X platform—

12  does not subject the Plaintiff to "hatred, contempt, ridicule, or obloquy. . . ." *Bartholomew v.

13  YouTube, LLC*, 17 Cal. App. 5th 1217, 1233 (6th Dist. 2017) (citation omitted). *Bartholomew* is

14  on all fours with this case: there, the court held that the general statement that a "video has been

15  removed because its content violated YouTube's Terms of Service" was not defamatory because

16  the statement did not indicate precisely why the video was removed and the terms at issue

17  included non-defamatory bases like "using YouTube for commercial purposes without prior

18

19

_____

20  [10] The Amended Complaint includes the additional assertion that "Defendant Tesla informed
    Defendant Qazi by e-mail that he had posted 'its internal information on public platforms,'" but
21  X did not suspend one of Defendant Qazi's accounts. (AC ¶ 541.) But whether Defendant Qazi
    posted Tesla's private information has no bearing on whether Plaintiff has plausibly pleaded that
22  *he* did not post private information. And, in any event, Plaintiff alleges no facts concerning this
    exchange sufficient to allege that Qazi actually violated the X Rules, including what "internal
23  information" was posted, whether that internal information was actually not public, whether
    Defendant Qazi actually posted such information (all that is alleged is an accusation from Tesla
24  that he did), and whether X (rather than Tesla) was aware such information was posted.
    (*Id.*)  Likewise, Plaintiff—in a conclusory manner and in connection with a cause of action not
25  against X—now alleges without support that "Defendant Musk ordered" Plaintiff's accounts to
    be suspended. (AC ¶ 584.)  Plaintiff does not allege *why* Musk purportedly ordered Plaintiff's
26  accounts to be suspended, much less that it was in service of a RICO enterprise. Moreover, as
    explained above, Plaintiff alleges he was informed that he was suspended for posting private
27  information (AC ¶¶ 27, 593(f)-(g)), and Twitter/X has a policy prohibiting doxxing on the
    platform. (X Ex. N at 4; X Ex. O at 4.)
28

1    written consent." *Id.* at 1222, 1233. Similarly here, the alleged defamatory statements do not

2    identify any specific violation of the Twitter/X Rules. (AC ¶¶ 536-38.) The Twitter/X Rules

3    themselves include non-defamatory bases like posting "video content on or through our services

4    that includes third-party advertising . . . without our prior consent." (X Ex. N at 5; X Ex. O at 5);

5    *Zhang*, 2023 WL 5493823, at *7 (similar "Account suspended" language not defamatory).

6    Moreover, the statements at issue do not purport to describe the exclusive means by which X can

7    suspend accounts. Instead, an account can be suspended for "any or no reason" at all under the

8    Terms of Service, and the statement at issue does not foreclose the conclusion that Plaintiff's

9    accounts could have been suspended for some other non-defamatory reason. (X Ex. F at 9.)

10       *Fourth*, Plaintiff has not plausibly alleged any damages caused by the alleged defamatory

11   statement. Unlike defamation per se (which Plaintiff does not allege against X), a plaintiff

12   alleging defamation must allege "he has suffered special damage as a proximate result" of the

13   statement, and special damages are damages to a plaintiff's "property, business, trade,

14   profession, or occupation, including" the amounts. *Bartholomew*, 17 Cal. App. 5th at 1226 &

15   n.6; Cal. Civ. Code §§ 45a(4)(b); 48a. Here, the only damages Plaintiff even attempts to

16   articulate is that "due [to] the account suspensions, Plaintiff suffered harm. The on-line mob that

17   Defendant Qazi had led for years expressed scorn and ridicule directed at Plaintiff . . . ." (AC

18   ¶ 540.) All Plaintiff alleges is an unspecified amount of uncertain, non-business damages based

19   on general allegations of "scorn and ridicule," which does not suffice. *New Show Studios, LLC v.

20   Needle*, No. 2:14-cv-01250, 2016 WL 5213903, at *6 (C.D. Cal. Sep. 20, 2016); (AC ¶ 540). A

21   court in the District of Massachusetts recently rejected similar allegations that Plaintiff suffered

22   economic loss arising from the suspension of his X accounts. *Greenspan v. MasMarques*, No.

23   23-cv-10134-DJC, 2024 WL 1258062, at *13 (D. Mass. Mar. 25, 2024) ("[Greenspan] does not

24   allege with specificity any economic losses arising directly from his inability to access his

25   Twitter account."). This Court should do the same.

26                      d.    California Business & Professions Code § 17500

27       Plaintiff's final claim for false advertising rests on the allegation that Musk publicly

28   lauded X's approach to "free speech" on the platform in several posts and yet X suspended

1    Plaintiff's accounts. (AC ¶¶ 683-86.)[11] California's False Advertising Law requires a plaintiff to

2    plead that a defendant made an untrue and misleading statement which it knew, or by the

3    exercise of reasonable care should [have] known, was untrue or misleading. California Business

4    & Professions Code § 17500. Where, as here, a plaintiff alleges certain statements "were and are

5    false" (AC ¶ 685), his False Advertising Law claim is subject to the heightened pleading

6    requirements of FRCP 9(b). Plaintiff alleges Musk posted the following on X:

7
- "On July 17, 2024," that "X is a free speech platform that aspires to give equal voice to
8      all, within the bounds of the law";

9
- "On July 17, 2024," that "You can do anything on this platform that doesn't violate or
10      probably violate the law"; and

11
- "On August 27, 2024," that "Just want to reiterate that this platform really is meant to
      support all viewpoints within the bounds of the laws of countries, even those of people
12      with whom I vehemently disagree and personally dislike. If that doesn't seem to be
      happening, please yell at me (ideally on X)."
13

14   (AC ¶¶ 685-86.) Plaintiff's False Advertising Law claim based on those statements fails for

15   several reasons.

16        *First*, and as a threshold matter, Plaintiff fails to allege statutory standing. In order to

17   allege statutory standing for a False Advertising Law claim, Plaintiff must allege "[a]ctual

18   reliance" on the "specific marketing materials claimed to [be] misleading," including that

19   Plaintiff "incurred economic injury as a result . . . *e.g.*, by purchasing a product for more money

20   [than] the plaintiff would have (or not purchasing a product at all) but for the misrepresentation."

21   *Simon*, 2022 WL 1594338, at *3 (cleaned up); *Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010,

22   1027 (N.D. Cal. 2012) ("[A]ctual reliance is required  . . . ."). Simply put, Plaintiff lacks standing

23

24   _____

25   [11] Although Plaintiff generally alleges that "Defendants engaged in false advertising with regard
     to Tesla, 'Autopilot,' FSD, 'robotaxis,' and numerous other products and topics" (AC ¶ 684), he
26   does not identify a single statement by X concerning about any of those topics, and thus he has
     failed to allege false advertising claim against X on those bases. *Simon v. Seaworld Parks &*
27   *Entm't, Inc.*, No. 3:21-cv-1488-LL-MSB, 2022 WL 1594338, at *6 (S.D. Cal. May 19, 2022)
     (dismissing California false advertising claim where "Plaintiff fails to identify the exact
28   statement" at issue).

1    because all of Plaintiff's alleged usage of the X platform occurred *long before* the statements at

2    issue. Plaintiff signed up for his Twitter accounts in 2011 and 2012 (X Ex. A at 2; X Ex. B at 2)

3    and was suspended on "June 13, 2023" (AC ¶ 536), but the alleged false advertising did not

4    occur until "July 17, 2024" and "August 27, 2024" (*id.* ¶¶ 685-86). That timing is dispositive,

5    and confirms Plaintiff's failure to plead actual reliance. *Cf. Simon*, 2022 WL 1594338, at *4

6    ("Plaintiff's argument that he relied on the language on his issued ticket(s) for the terms of the

7    ADDD, also fails because based on the allegations in the SAC, it appears that he received the

8    tickets . . . *after* he decided to upgrade to the ADDD"); *Low*, 900 F. Supp. 2d at 1027; *Brown v.*

9    *Madison Reed, Inc.*, No. 21-cv-01233-WHO, 2021 WL 3861457, at *10 (N.D. Cal. Aug. 30,

10    2021) (dismissing False Advertising Law claim and noting "timing problem" where challenged

11    statements were "in 2020" but plaintiff "alleges that she only bought products from 'early 2016

12    through 2018'"). Moreover, Plaintiff does not even purport to plead *any* damage—much less the

13    required *economic* damages—arising from the allegedly false representations, which is an

14    independent basis to find lack of statutory standing. (*See* AC ¶¶ 683-86 (failing to articulate

15    damages)); *Low*, 900 F. Supp. 2d at 1026 (dismissing claim where "threshold requirement of lost

16    money or property has not been met." (cleaned up)).

17        *Second*, Plaintiff fails to plead that any of Musk's statements are false. Plaintiff claims

18    that the statements are false because Plaintiff was suspended but "[a]t all times, Plaintiff's use of

19    Twitter fell well 'within the bounds of the laws.'" (AC ¶¶ 685-86.) However, as explained above,

20    Plaintiff does not plead that he did not "violate or ***probably violate*** the law," including by posting

21    private information. (*Id.* (emphasis added)); *see supra* at Section IV.B.4.c. The Amended

22    Complaint thus "falls short [] in articulating the 'how'" Plaintiff is required to plead "because

23    [he] offer[s] nothing more than conclusory assertions" that the alleged statements are false. *In re*

24    *Bang Energy Drink Mktg. Litig.*, No. 18-cv-05758-JST, 2020 WL 4458916, at *14 (N.D. Cal.

25    Feb. 6, 2020) (cleaned up).

26        *Third*, no reasonable consumer would rely on the cited statements. "Under the consumer

27    protection laws of California, . . . claims based on deceptive or misleading marketing must

28    demonstrate that a 'reasonable consumer' is likely to be misled by the representation." *Castillo v.*

1  *Prime Hydration LLC*, No. 23-cv-03885-AMO, 2024 WL 4133815, at *6 (N.D. Cal. Sep. 9,

2  2024). "The reasonable consumer test requires more than a mere possibility . . . the test requires

3  a probability that a significant portion of the general consuming public or of targeted consumers,

4  acting reasonably in the circumstances, could be misled." *Id.* (cleaned up). Each of the

5  statements at issue represent qualified aspirational goals for the platform and its content

6  moderation: that "X . . . ***aspires*** to give equal voice to all"; that "[y]ou can do anything on this

7  platform that doesn't violate or ***probably*** violate the law"; and "[j]ust want to reiterate that this

8  platform ***really is meant to support all viewpoints*** . . . ." (AC ¶¶ 685-86 (emphasis added).) It is

9  settled law that "[g]eneral, vague statements about product superiority are insufficient to mislead

10  consumers." *Castillo*, 2024 WL 4133815, at *6 (cleaned up). That is all Plaintiff has alleged

11  here, and so his claim necessarily fails. *Id.*

12       The actual terms of X's content moderation policy make clear that no reasonable

13  consumer would be misled by Musk's statements. The Twitter/X Rules—which reflect and

14  elaborate upon Musk's aspirational goals—were publicly available at all times and specifically

15  prohibit posting private information. (X Ex. N at 4; X Ex. O at 4.) Relatedly, the publicly

16  available Terms of Service allows X to suspend accounts for any reason or no reason. *See supra*

17  at Section IV.B.3. No reasonable consumer would have relied on Musk's statements as a specific

18  representation of their rights to access the platform in light of the X/Twitter Rules and the Terms

19  of Service, to which Plaintiff agreed. *See LegalForce RAPC Worldwide, P.C. v. Trademark Info.*

20  *Int'l LLC*, No. 17-cv-07354-MMC, at *5 (N.D. Cal. May 25, 2018) ("[P]laintiffs fail to allege

21  sufficient facts to support a finding that" the inference that defendant "provides its customers

22  with legal advice" would "reasonably would be drawn by consumers, particularly given

23  plaintiffs' acknowledgement that [defendant] 'represents on its website that it does not practice

24  law'").

25  **V.    CONCLUSION**

26       For the foregoing reasons, Plaintiff's claims against X should be stricken under

27  California's anti-SLAPP statute or, alternatively, dismissed with prejudice.

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

Dated:  September 30, 2024

WILLENKEN LLP

By:  _/s/ Kenneth M. Trujillo-Jamison_
Kenneth M. Trujillo-Jamison
Attorneys for Defendant X Corp.

DEF. X CORP.'S MOTION TO STRIKE OR, ALTERNATIVELY, DISMISS CLAIMS AGAINST X CORP.